**N.W. ENTERPRISES, INC., et al., Plaintiffs,**

v.

**The CITY OF HOUSTON, Defendant.**

**Civil Action No. H–97–0196.**

United States District Court,
S.D. Texas,
Houston Division.

Feb. 18, 1998.

As Amended June 9, 1998.

Opinion Supplementing Decision
on Reconsideration, June
11, 1998.

Additional Supplemental Opinion
Aug. 7, 1998.

Beatrice Mladenka–Fowler, Mladenka–Fowler & Associates, Houston, TX, Michael Acuna, Asst. City Atty., Donna Edmunson, Sr. Asst. City Atty., Gilbert Douglas, Sr. Asst. City Atty., Gene L. Locke, City Atty., Anthony W. Hall Jr., City Atty., for City of Houston, Texas.

Gerald Hopkins, Houston, TX, for N.W. Enterprises, Inc., et al.

Joe W. Meyer, Louis J. Gurwitch, Meyer, Knight & Williams, Houston, TX, John H. Weston, G. Randall Garrou, Weston, Garrou & DeWitt, Los Angeles, CA, David A. Furlow, Morris & Campbell, Houston, TX, for FTU, Inc., Dajo, Inc. Ice Embassy, Inc., Texas Richmond Corp., et al.

Nelson T. Hensley, Houston, TX, H. Louis Sirkin, Sirkin, Pinales, Mezibov & Schwartz, Cincinnati, OH, David A. Wasserman, Winter Park, FL, for Chil Soung, et al. and Trumps, Inc., et al.

Mike DeGeurin, Foreman, DeGeurin, Gerger & Nugent, Houston, TX and Joseph M. Grant, Nicholas, Grant & Hubbard, Houston, TX, for A.H.D., Inc., et al.

Peter Heckler, Houston, TX, for Southeastern Management, Inc.

John E. Hill, Houston, TX, for Elgin Investment, Ltd dba French Quarter (Filed motion to intervene on May 14, 1997; Intervention motion granted on May 15, 1997).

Becki Fahle, San Antonio, TX, John Fahle, San Antonio, TX, for Dee & Dee Enterprises, Inc., et al.

Phillip W. Boyko, Houston, TX, for Mark Thai Do, et al.

Rokki Ford Roberts, Houston, TX, for Marketing Organization of America, Inc., et al.

Paul Decuir, Jr., Houston, TX, for D.S.S.S. Aria Merica, Inc.

Jimmy L. DeFoyd, DeFoyd & Associates, Houston, TX, for Kim Mihulka dba ACME Studio, et al.

### AMENDED MEMORANDUM OPINION AND ORDER

ATLAS, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................... 767
 A. Procedural History .................................... 767
 B. History of the Ordinance .............................. 770
II. SUMMARY JUDGMENT STANDARD ..................... 772
III. LEGAL STANDARD FOR FIRST AMENDMENT CHALLENGE ............ 773
 A. Businesses Entitled to Heightened First Amendment Scrutiny ........... 774
 1. *Content–Based Regulations Receive Strict Scrutiny* ................... 774
 2. *Content–Neutral Regulations Receive Intermediate Scrutiny* ......... 774
 3. *Distinguishing Content–Based from Content–Neutral Regulations* ...... 776
 4. The Relevance of Turner Broadcasting System v. F.C.C. ............... 779
 B. Businesses Not Entitled to Heightened First Amendment Scrutiny Receive Rational Basis Review for All Provisions of the Ordinance .............. 780
 C. Can the Ordinance's Validity Be Determined Through Summary Judgment? ..... 782
 1. In General ....................................... 782
 2. Chil Soung's § 1983 and § 1985 Claims................... 784
 3. Other Issues Plaintiffs Claim Have Not Been Addressed by the City's Summary Judgment Motion ......... 785
IV. GENERAL OBJECTIONS TO THE CITY'S EVIDENCE ................. 785
V. OBJECTIONS TO SPECIFIC PROVISIONS OF THE ORDINANCE ......... 787
 A. Coverage of the Ordinance .............................. 787
 1. Vagueness....................................... 787
 2. Overbreadth ..................................... 789

3. Enterprises Containing Coin–Operated Machines ..................... 790
4. Extension of Ordinance's Coverage to Adult Mini–Theatres ........... 791
B. *Locational Restrictions* .............................................. 792
 1. Abstention Question ............................................. 793
 2. Local and State Statutory Arguments................................ 795
 a. Zoning and the Houston City Charter ......................... 795
 b. Locational Restrictions on Enterprises Containing Coin–Operated Machines .................................................... 798
 3. First Amendment Challenge ....................................... 800
 a. Increased Distance Requirements: ............................. 800
 The New 1,500 Foot Rules
 i. Content–Based or Content–Neutral? ........................ 800
 ii. Conclusion as to Validity of Increased Distance Requirements for Protected Businesses ....................................... 813
 b. Public Parks ................................................ 814
 i. Content–Based or Content–Neutral? ........................ 814
 ii. Narrowly Tailored to Serve Substantial Governmental Interests? 815
 iii. Alternative Avenues of Communication ...................... 815
 iv. Conclusion as to Validity of New Provision Regarding Public Parks ..................................................... 815
 c. Multifamily Dwellings ....................................... 815
 i. Content-Based or Content–Neutral? ........................ 815
 ii. Narrowly Tailored to Serve Substantial Governmental Interests? 816
 iii. Alternative Avenues of Communication ...................... 816
 iv. Conclusion as to Validity of New Formula Regarding Multifamily Dwellings ................................................. 817
C. *Amortization* ....................................................... 817
 1. Guidelines for Providing Amortization Extensions.................... 818
 2. Time Limits on Amortization Decisionmaker........................ 820
 3. Adequacy of Amortization ........................................ 821
 4. Amortization for Adult Arcades and Mini–Theatres ................. 821
 5. Amortization for Plaintiffs in *4330 Richmond* ..................... 822
 6. Measure of Compensation ........................................ 822
 7. Length of Amortization Period..................................... 823
D. *Notice Provision* .................................................... 823
E. *Structural, Visibility, and Lighting Requirements* ...................... 824
 1. Permissibility of Non–Locational Regulation of Sexually Oriented Businesses Under Texas State Law ................................. 824
 2. What These New Requirements Prohibit ............................ 824
 3. Legislative Justification for These Requirements .................... 826
 4. Patrons' Right to Privacy......................................... 827
 5. Economic Harm to Plaintiffs ...................................... 828
F. *Signage and Exterior Portions Restrictions* ........................... 829
 1. The Restrictions ................................................ 829
 2. The Continued Applicability of *SDJ* .............................. 832
 3. Extension of Signage Restrictions to Enterprises in Multi–Unit Centers 834
 4. State Law Requirements for Revising Signage Restrictions............ 835
G. *Entertainer and Manager Permit Requirement*......................... 836
 1. Permissibility of Individual Permit Requirement .................... 838
 2. Content–Based or Content–Neutral?................................ 839
 3. Narrowly Tailored to Serve Substantial Governmental Interests?....... 840
 4. Public Disclosure of Permit Application Information Under Texas Public Information Act............................................ 841
 5. Prior Restraint ................................................. 843
 a. Procedural Safeguards........................................ 843
 i. Application Processing Period................................ 844
 ii. Prompt Judicial Review .................................... 846
 iii. Burden on City to Justify Permit Denials in Court .............. 846
 b. Criminal Background Check ................................... 847
 c. Texas Constitution ........................................... 847
 6. "As Applied" Challenge ........................................... 848

7. Conspicuous Display Requirement ............................... 848
H. *No–Touch and Three–Foot Rules* ...................................... 850
 1. Content–Based or Content–Neutral? ............................. 850
 a. Legislative Justification for these Requirements .................. 851
 b. Economic Impact .......................................... 851
 2. Narrowly Tailored to Serve Substantial Governmental Interests? ....... 853
 3. Interference With Expressive Content ............................ 855
 4. Vagueness and Arbitrary Enforcement............................ 856
 5. Texas Constitution ........................................... 857
VI. *CONCLUSION* ................................................. 857

## I. *INTRODUCTION*

One hundred five individuals and eighty-eight Houston-area adult entertainment establishments—cabarets, movie theatres, arcades, mini-theatres, video stores, bookstores, modeling studios, and tanning salons—have brought this action challenging the City of Houston's most recent amendments to its sexually oriented business regulatory ordinance. Plaintiffs attack Ordinance 97–75 (hereinafter "Ordinance"), enacted on January 15, 1997, primarily on the ground that it violates the First Amendment to the United States Constitution, but also on other federal and state constitutional, as well as federal, state, and local statutory grounds. Pending before the Court are numerous motions for summary judgment filed by Defendant City of Houston and all Plaintiffs. These motions, which are described in more detail below, are granted in part and denied in part.

### A. *Procedural History*

During a pretrial conference held on June 12, 1997, the parties agreed that this case would proceed most efficiently if the Court would first consider all legal issues not requiring extensive factual development through discovery. At that conference, the City of Houston agreed not to enforce the Ordinance during a designated period in which the Court would consider whether all or part of this challenge could be resolved through legal briefs and documentary evidence without a trial.[1] At the Court's direction, the parties have submitted extensive briefing on the legality of various provisions of the Ordinance. Limited discovery was permitted on various issues.

The City of Houston has filed a "comprehensive" Motion for Summary Judgment,[2] in which it argues that the entire Ordinance is valid as a matter of law and that no genuine issues of material fact exist which require a trial in this case. In accordance with the previously entered scheduling orders, Plaintiffs have filed two sets of responses, the first set addressing all issues other than the Ordinance's new locational restrictions on sexually oriented businesses and the second set addressing the locational restrictions.[3] Plaintiffs, who include the original plaintiffs in this action as well as numerous intervenors who joined later in the litigation, are divided into the following nine groups, each of which is represented by a different set of attorneys and has filed separate briefs: N.W. Enterprises [4]; FTU [5]; Dee & Dee En-

---

1. At a later conference held on October 17, 1997, the City agreed to extend the standstill while the Court considered the City's pending summary judgment motion and Plaintiffs' cross-motions for summary judgment, which were filed shortly after the conference.

2. Throughout this Opinion, unless otherwise specified, the City's "Motion" refers to the City's Amended Motion for Summary Judgment [Doc. # 120], which was filed on June 30, 1997.

3. Throughout this Opinion, Plaintiffs' first set of responses will be referred to simply as "responses," and Plaintiffs' second set of responses will

be referred to as "locational responses." The Dee & Dee Plaintiffs' attorneys claim to have experienced computer problems which delayed their filing of their Locational Response [Doc. # 214]. The City did not object to this late filing and does not appear to have suffered any prejudice as a result. Dee & Dee's Motion to File Two Hours Late [Doc. # 213] is therefore **GRANTED**.

4. The "N.W. Enterprises" Plaintiffs, who were the original plaintiffs in this action, include N.W. Enterprises, Inc.; Amethyst Enterprises, Inc.; Campus Investments, Inc.; 1431 West 18th, Inc.; Vista Video Corporation; Douglas Skyock; and John Doe.

terprises [6]; A.H.D.[7]; Marketing Organization [8]; Mark Thai Do [9]; Elgin Investment [10]; Chil Soung [11]; and KQ Investments.[12]

**5.** The "FTU" Plaintiffs include FTU, Inc.; Dajo, Inc.; Ice Embassy, Inc.; Texas Richmond Corp.; Andrea Stafford; Andrea Allbright Marco; Naomi L. Parrish; Ann Marie Hasselbach; Jeanne L. Grigsby; Susan Boyle; Dana Lynn Thomas; Kimberly Ann Dushman; Michelle Hadley; Colleen Cloer; Leah Marie Wilson; Carla K. Eaton; Andrea Hill; Gina Oliver; Heather Weldin; Charisma Barry; Donna Soto; Cheryl Thompson; Robert G. Furey; Eric Rubenstein; and Frank I. Kent. It also appears that Jeana Wiley and Southeastern Management, Inc. d/b/a Northshore Video and News later joined the FTU Plaintiffs.

**6.** The "Dee & Dee" Plaintiffs include Dee & Dee Enterprises, Inc.; 9924 I–45 North, Inc.; Hi–Houston, Inc.; and Charles Wesley, Inc.

**7.** The "A.H.D." Plaintiffs include A.H.D. Houston, Inc. d/b/a Centerfolds; D.N.W. Houston, Inc. d/b/a Gold Cup; Parabar Co. d/b/a Paradise; Jane Doe One; and Jane Doe Two.

The City has filed a Motion to Strike Jane Doe Plaintiffs [Doc. # 229], arguing that these Plaintiffs should not be allowed to proceed without revealing their identities to the City and to the Court. The A.H.D. Plaintiffs contend that Fifth Circuit authority allows parties to challenge governmental action anonymously in cases in which the plaintiffs have a compelling need to protect their privacy. *See Doe v. Stegall,* 653 F.2d 180, 185 (5th Cir.1981); *Southern Methodist University Ass'n of Women Law Students v. Wynne & Jaffe,* 599 F.2d 707, 712–13 (5th Cir.1979). The City argues, however, that even in these two cases, the plaintiffs revealed their identities to the opposing parties for the purposes of discovery and so that the opposing parties could challenge their standing. While the Court generally agrees with the City that the "Jane Doe" Plaintiffs' identities should be disclosed if open-ended discovery occurs, their identities are not material at this time. Thus, the Court does not find these reasons for disclosure applicable. In the case at bar, discovery has been stayed, the Court is primarily addressing facial constitutional challenges, and there are many other entertainers who are named plaintiffs in this action and thus clearly have standing to challenge the Ordinance's provisions that affect individual entertainers. There is therefore no reason for the City to challenge the standing of these two unnamed plaintiffs. The Court **DENIES** the City's Motion to Strike Jane Doe Plaintiffs [Doc. # 229].

**8.** The "Marketing Organization" Plaintiffs include Marketing Organization of America, Inc.; Budget Distributors, Inc. d/b/a Franc's of Beverly Hills; Michael D's Restaurant, Inc. d/b/a Houston Salon and Fitness Center d/b/a Texas Health Salon; Le Crazyhorse Cabaret Astrodome, Inc. d/b/a Malibu Resorts d/b/a Sensational Impressions; EPZ Trading Company d/b/a Texas Health Salon; Deux Soeur Enterprises, Inc. d/b/a Native T.A.N.; Limerick, Inc. d/b/a Video Specials; and Your A to X Video Outlet, Inc.

**9.** The "Mark Thai Do" Plaintiffs include Mark Thai Do d/b/a Dong Kyong Modeling Studio and Norman S. Harrison.

**10.** The "Elgin Investment" Plaintiff includes Elgin Investment Company, Ltd. d/b/a French Quarter Theater.

**11.** The "Chil Soung" Plaintiffs include Chil Soung, Inc. d/b/a BJ's 24 Hour Newstand; Daris, Inc. d/b/a Riveria Cabaret; GNCD, Inc. d/b/a Fantasy South; Rude Dog II, Inc. d/b/a Scores Cabaret; Lone Start Multi Theatres, Inc. d/b/a Cinema West; AVW, Inc. d/b/a Adult Video Megaplexxx; C.L.M.S., Inc. d/b/a 24 Hour Video & News; C–SNAP, Inc. d/b/a Interludes; East Bay, Inc. d/b/a East Tex 24 Hour News & Video d/b/a Hempstead Adult Bookstore d/b/a World News Stand d/b/a X.T.C. Cabaret Center; TNT Services, Inc. d/b/a Xcalibur; 9834 Jensen, Inc. d/b/a Harlem Knights; 8503 North Freeway, Inc. d/b/a Fantasy Cabaret; Corporate Clubs of Texas, Inc. d/b/a Fantasia I XTC; US Clubs, Inc. d/b/a Fantasia III XTC; Cabaret, Inc. d/b/a XTC; DHL, Inc. d/b/a Executive XTC; Cherie Feldman d/b/a Executive Playmates; Eve Enterprises, Inc. d/b/a Club Royale; Long Tran d/b/a Ellington Newstand; Nien X. Nguyen d/b/a DT Video; W.M.F. Investments, Inc. d/b/a Chesapeake Bay; A.K.M., Inc. d/b/a Gigi's Cabaret; DHR, Inc. d/b/a Hi–10 Cabaret; Panah, Inc. d/b/a Mirage Cabaret; R & R Entertainment, Inc. d/b/a Moments Cabaret; S.S.D. Enterprises, Inc. d/b/a Ritz Cabaret; H.H.E., Inc. d/b/a Passion Cabaret; F & R Club, Inc. d/b/a Silk Bar & Grill Cabaret; Atcomm Services, Inc. d/b/a Broadstreets; Houman Shaghai d/b/a Foxxy's Cabaret; Southeast Texas Ventures, a Texas Joint Venture d/b/a The Tropy Club; KMRC, Inc. d/b/a LaChatte; Aris Mylonas d/b/a Baby Dolls Saloon; M.K. Club & Restaurants, Inc. d/b/a Moulin Rouge; 10128 TDC 1, Inc. d/b/a Texas Dolls Cabaret; Southwest Clubco, Inc. d/b/a Playmates; Duncan Burch, Inc. d/b/a Michael's International; Obession Cabaret, Inc. d/b/a Obsession Cabaret; Norman R. Glenn d/b/a West Mt. Houston Newsstand d/b/a Far West News d/b/a Highway 6 Newsstand; James Drew d/b/a Gold Touch Stress Clinic and Velvet Touch Stress Clinic; Pete Caserly d/b/a Northwest News; A to X Video d/b/a Pacific Management Enterprises; Hughes & St. Clair, Inc. d/b/a Pacific Management Enterprises; Quasar International, Inc. d/b/a Pacific Management Enterprises; Video News, Inc. d/b/a Pacific Management Enterprises; Chuck Wesley d/b/a Pacific Management Enterprises; Chuck Wesley, Inc. d/b/a Northwest News; Jacob Borenstein d/b/a Northwest News; 12851–59 Westheimer, Inc.; 608 West Mt. Houston, Inc.; Gino A. Barone d/b/a Ban Management Co. a/k/a Consolidated

In their original responses, most Plaintiffs primarily argued that numerous factual issues preclude resolution of this case through summary judgment on the current record. However, two sets of Plaintiffs, the A.H.D. and the FTU Plaintiffs, also filed cross-motions for summary judgment with their original responses, contending that the Court could *invalidate* the Ordinance in whole or in part as a matter of law.[13] In order to expedite its consideration of the legal issues presented in this case, the Court ordered at the pretrial conference held on October 17, 1997, that any other Plaintiffs who believe summary judgment in their favor is appropriate in whole or in part should promptly submit cross-motions for summary judgment. All the remaining Plaintiffs submitted such cross-motions.[14]

Video d/b/a Hillcroft News & Video d/b/a Telephone Road News & Video; Heaven Video & News; Airline Video and Thai Company; City Wide Group, Inc. d/b/a Studz News; A.N.S., Inc. d/b/a Lone Star News; Northstar, Inc. d/b/a North Freeway News; Northeast, Inc. d/b/a Gulf Freeway News; Eastex 24–Hour Newsstand; G.W. Rodgers; R. Glass; G. Humphrey; D.L. Stoneham; L.J. Putterman; M. Roberts; V.L. Auzston; J.J. Langan; H. Perez; A. Lucke; Y. Hinojosa; A.N. McMillen; B. Webb; R. Sternes; S. Mongonia; K. Martin; N. Roberts; V. Gobea; D. Quick; K. Warren; R. Sanchez; S. Jurek; N. Espinosa; C. Emery; K. Martin; C. Combs; J. Dampier; W. Kalinowski; J. Crenshaw; L.M. Bates; H. MacTavish; T. Dove; E. Castillo; K.K. Hannan; C.J. Sharpe; A. Cook; N. Bailey; T.R. King; L.B. Meagher; N. Henry; A. Bailey; D. Dodson; J. Suarez; A.N. McMillan; K. Rosenberry; C. Garcia; M. Fisher; D.M. Muenzler; T.J. Oakley; D. Carswell; A. Kelly; T. Western; K.A. Rader; L. Phillips; T. Jones; A. Gibson; G. Pierce; N. Neuenfeldt; T. Allen; S.L. Whittenburg; P.A. Buffin; C. Vaughn; T.L. Aldape; S.Y. Noreno; L. Tauarez; T. Dardas; N. Barry; T. Standride; J.D. Burden; S.S. Salazar; H.L. Lococo; S. Brady; S. Nnoli; E.I. Street; D. Jorgenson; D.G. Lewis; P.Z. German; J.M. Rogers, Jr.; B. Templemire, Jr.; R. Duncan; J. Easterwood; J.C. Acres; N. Templemire; Trumps, Inc. d/b/a Rick's Cabaret; and Andrew Sefia d/b/a Rumors.

In addition, the "Chil Soung" Plaintiffs originally indicated in the caption of their case style heading that they include "others similarly situated." The City of Houston filed a Motion to Strike this language [Doc. # 233], since Plaintiffs have not sought to certify this case as a class action. In response, the Chil Soung Plaintiffs consented to strike the language "and others similarly situated" from their case style heading. The City's Motion to Strike [Doc. # 233] is therefore **GRANTED.**

12. The "KQ Investments" Plaintiff, which includes KQ Investments, Inc. d/b/a Amenity Cabaret, filed a Motion to Intervene [Doc. # 280] on October 24, 1997. The City has objected to this intervention [Doc. # 320] on the ground that it is untimely and will delay the resolution of this case. Although the parties agreed at the conference held on May 12, 1997, that the deadline for intervention would be May 30, 1997, the Court finds that the intervention of this one additional party will not delay the proceedings or impose an undue burden on the City. Therefore, KQ Investments' Motion to Intervene [Doc. # 280] is **GRANTED.** However, this Plaintiff is subject to the same scheduling deadlines as the other parties and is bound by this Opinion. The City has informed the Court, and KQ Investments has not denied, that KQ Investments has been aware of this federal suit since before the deadline for intervention, specifically decided at an earlier time not to join this suit, but apparently changed its mind on this issue. Thus, since KQ Investments is voluntarily joining this litigation late, it cannot claim that it will suffer any prejudice by the existing deadlines and briefing. The Court notes further that most of the Plaintiffs in this suit have not submitted independent briefing; they instead have relied on the briefing filed by other Plaintiffs.

Finally, it is unclear from the pleadings to which group of plaintiffs D.S.S.S. Aria Merica, Inc. d/b/a Solid Platinum belongs. This Plaintiff's claims are addressed through the rulings stated herein.

13. In their original response and cross-motion [Doc. # 173], the A.H.D. Plaintiffs sought summary judgment invalidating the entire Ordinance, whereas the FTU Plaintiffs sought summary judgment on only discrete, specified issues [Doc. # 170]. The FTU Plaintiffs, as well as the N.W. Enterprises Plaintiffs, strenuously argued that many of the issues presented here are factual and urged that, pursuant to Fed.R.Civ.P. 56(f), they be given the opportunity for further discovery in order to present evidence demonstrating the existence of material questions of genuine fact. *See, e.g.,* FTU's Response [Doc. # 170], at 53–56; FTU's Locational Response [Doc. # 221], at 14–18; N.W. Enterprises' Response [Doc. # 151], at 26.

14. In addition, the FTU Plaintiffs submitted a Supplemental Cross–Motion [Doc. # 270], in which they revised their earlier indication that they were seeking summary judgment only on several discrete issues. The FTU Plaintiffs now seek summary judgment on all issues which they have briefed. They continue to contend, however, that neither they nor the City has moved for

The City has filed a reply to each response as well as responses to the cross-motions. Plaintiffs have filed replies to the City's responses. Except as noted where relevant, Plaintiffs have generally incorporated all of one another's responses and arguments challenging the Ordinance.[15]

In addition to these motions and cross-motions for summary judgment, the parties have raised numerous objections to each other's proffered evidence and have filed motions to strike various briefs and exhibits. The Court will address these motions below where relevant.

After detailed consideration of the parties' briefs, exhibits, all other matters of record in this case, and the relevant authorities, the Court concludes that Ordinance 97–75 is valid and enforceable except in several respects discussed below and that no parties have yet raised any material issues of genuine fact necessitating resolution through a trial. Thus, the City's Motion for Summary Judgment [Doc. # 120] is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiffs' Cross–Motions for Summary Judgment [Docs. # 170, 173, 218, 221, 258, 268, 270, 289, and 290] are **GRANTED IN PART** and **DENIED IN PART** in accordance with this Opinion.

## B. *History of the Ordinance*

An understanding of Plaintiffs' challenge to Ordinance 97–75 requires a brief recounting of the history of Houston's regulation of sexually oriented businesses, which are also referred to by the parties and the Court as "adult businesses."

The first attempt, brought to this Court's attention, by the City of Houston to regulate sexually oriented businesses was in 1977, before the development of most of the current First Amendment law on the subject of adult entertainment. Ordinances 77–1259 and 77–1260 prohibited the operation of adult commercial establishments within two thousand feet of any church, school, or other educational or charitable institution. A federal district court declared these ordinances unconstitutional on the grounds that they were vague and overbroad, violated the First and Fourteenth Amendments, and denied the adult businesses due process and equal protection. *See Universal Amusement Co., Inc. v. Hofheinz*, 616 F.2d 202, 204 (5th Cir. 1980).[16]

In 1983, the City again attempted to regulate sexually oriented businesses by enacting the first version of its current ordinance. Ordinance 83–1812, Exhibit A to the City's Motion [Doc. # 120], prohibited such businesses as adult cabarets, adult modeling studios, and adult encounter parlors from operating within 750 feet of any "school or church or place of worship," within 1,000 feet of any other sexually oriented business, or on any tract of land for which 75% or more of the tracts within a 1,000 foot radius were residential. The ordinance also placed severe restrictions on the businesses' exterior decor and signage. Due to then existing state law restrictions on municipal regulatory power, that ordinance did not apply to adult bookstores, movie theatres, or cabarets that were licensed by the state to sell alcoholic beverages.

In 1985, the City enacted Ordinance 85–1337, Exhibit B to the City's Motion [Doc. # 120], which imposed restrictions on adult arcades, including requirements that adult arcades maintain visible interiors, managers' stations, and minimal levels of lighting.[17]

---

summary judgment on six of their causes of action.

**15.** Throughout this Opinion, the Court will occasionally specify which groups of Plaintiffs have raised various arguments and will cite portions of specific briefs. These designations are for the convenience of the parties only in locating generally where particular arguments are addressed. Because many Plaintiffs have raised overlapping or similar arguments, these designations do not purport to indicate that *only* the specified Plain-

tiffs mentioned a particular argument in their briefing or that the argument is only addressed on the pages cited.

**16.** The district court's opinion was not published, and the Fifth Circuit did not review the merits of the district court's constitutional ruling.

**17.** "Adult arcades" are establishments containing "coin- or slug-operated or electronically or mechanically controlled machine[s] or device[s]" that dispense adult entertainment intended for

This ordinance was upheld against constitutional attack in *Rahmani v. State*, 748 S.W.2d 618 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd), *cert. denied*, 490 U.S. 1081, 109 S.Ct. 2102, 104 L.Ed.2d 663 (1989).

In response to a 1985 change in state law permitting cities to regulate adult businesses licensed by the state to serve alcoholic beverages,[18] the City enacted another ordinance in 1986 to extend the locational and other restrictions of the 1983 ordinance to adult lounges, ("topless clubs").[19] *See* Ordinance 86–323, Exhibit C to the City's Motion [Doc. 9 120]. The 1986 Ordinance also added licensed daycare centers to the list of protected land uses from which the businesses could not operate within 750 feet. At least twenty-three topless clubs that were forced to close or relocate as a result of this ordinance brought a federal lawsuit seeking to enjoin its enforcement. In *SDJ, Inc. v. City of Houston*, 636 F.Supp. 1359 (S.D.Tex.1986) (McDonald, J.), the district court upheld this ordinance against various constitutional and other legal challenges, with the exception of several minor provisions.[20] On appeal, the Fifth Circuit affirmed the district court. *See SDJ, Inc. v. City of Houston*, 837 F.2d 1268 (5th Cir.1988), *cert. denied sub nom. M.E.F. Enterprises, Inc. v. City of Houston*, 489 U.S. 1052, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989).

In response to a 1989 change in state law permitting cities to regulate adult bookstores and movie theatres,[21] the City enacted Ordinance 91–187, Exhibit D to the City's Motion [Doc. # 120], which expanded the scope of the previous ordinances to cover adult bookstores and adult movie theatres. A number of affected businesses brought a constitutional challenge against this ordinance in federal court. In *4330 Richmond Ave. et al. v. City of Houston*, No. 91–0665 (S.D.Tex. July 11, 1997) (Rainey, J.), the district court upheld Ordinance 91–187 except in two minor respects.[22] That case is currently on appeal to the Fifth Circuit.

On January 15, 1997, the City enacted Ordinance 97–75, the subject of the current lawsuit. This Ordinance increases the locational restrictions on all sexually oriented businesses, expands the scope of regulation to cover "adult mini-theatres," [23] imposes new structural requirements on sexually oriented businesses, expands the reach of signage restrictions, and adds new regulations affecting individuals working in sexually oriented businesses. The new locational restrictions imposed by Ordinance 97–75 include an increase in the minimum distance between sexually oriented businesses and protected land uses from 750 feet to 1,500 feet[24]; the addition of "public parks" to the

viewing by five or fewer persons. Houston, Tex., Code of Ordinances § 28–81. Unless otherwise indicated, all further references to section numbers beginning with 28 refer to Chapter 28 of the Houston, Tex., Code of Ordinances, which is the chapter pertaining to sexually oriented businesses.

18. *See* Tex. Loc. Gov't Code § 243.005 (previously codified at Tex.Rev.Civ.Stat art. 2372w).

19. "Adult lounges" are adult cabarets that are licensed by the state to serve alcoholic beverages. *See* § 28–121.

20. The district court struck down a provision that required operators of sexually oriented businesses to furnish lists for the City of all employees or contractors who provided services for the businesses; a provision that required disclosure of the operators' aliases; and a provision requiring operators to have "fully complied with all state, federal and local laws or regulations affecting the conduct of [their] business[es]" before receiving a permit. *See SDJ*, 636 F.Supp. at

1371–72. The City later amended the ordinance to delete these provisions.

21. *See* Tex.Loc. Gov't Code § 243.002 (previously codified at Tex.Rev.Civ.Stat. art. 2372w).

22. The court found unconstitutional a provision that did not provide for judicial review of the City's decision to suspend a sexually oriented business permit and the City's requirement that sexually oriented business operators deliver their permit applications in person to the Vice Squad.

23. "Adult mini-theatres" are similar to "adult arcades," except that "adult mini-theatres" contain machines that dispense adult entertainment intended for viewing by more than five and fewer than one hundred persons. *See* § 28–81.

24. *See* § 28–125(b)(1). The prior minimum distance, 750 feet, is roughly equivalent to the length of two football fields (including the end zones) placed end-to-end. Thus, the City has attempted to double the minimum distance between sexually oriented businesses and protected land uses from two football field lengths to four football field lengths.

list of protected land uses [25]; an increase from 1,000 to 1,500 feet in the radius for calculating whether 75% or more of surrounding tracts are residential in character [26]; and a revision in the method for calculating the percentage of residential tracts.[27] The Ordinance requires that applicants for licenses to open sexually oriented businesses publish newspaper notices warning the public of their applications.[28] Also, the Ordinance requires adult mini-theatres and other sexually oriented businesses to conform to new structural, visibility, and lighting requirements. These provisions will require many businesses to remodel their interior spaces and eliminate doors and private rooms.[29] In addition, the adult arcades and mini-theatres must seal their interior walls to eliminate so-called "glory holes" through which patrons purportedly engage in anonymous sex.[30] The Ordinance extends the application of previous signage limitations to sexually oriented businesses located in multi-tenant complexes.[31] Ordinance 97–75 also requires managers and entertainers who work in sexually oriented businesses to obtain individual permits, for which they must divulge personal information and undergo criminal background checks,[32] and to wear personal identification cards at all times while they are working.[33] Finally, the Ordinance prohibits touching between entertainers and patrons [34] and requires that entertainers, while working, stay at least three feet away from patrons.[35]

In this action, Plaintiffs challenge the validity of numerous provisions of Ordinance 97–75 on various federal, state, and local law grounds discussed below.

## II. *SUMMARY JUDGMENT STANDARD*

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

**25.** *See id.*

**26.** *See* § 28–125(b)(3).

**27.** Under the previous versions of the Ordinance, a tract of land occupied by a "multifamily" structure was counted as a single residential tract. However, under Ordinance 97–75, "multifamily" tracts are counted as multiple residential tracts, for which each one-eighth acre of land is equivalent to one residential tract. *See id.*

**28.** *See* § 28–123(f).

**29.** Section 28–101, which previously applied only to adult arcades and now applies to adult mini-theatres as well, requires that all interior areas of a business be visible from managers' stations. Section 28–103, which also previously applied only to adult arcades and now applies to adult mini-theatres as well, establishes minimum lighting requirements. Section 28–136, a new provision, establishes access, visibility, and lighting requirements for all other sexually oriented businesses.

**30.** *See* § 28–102.

**31.** *See* § 28–130(g).

**32.** *See* §§ 28–253 and 28–254.

**33.** *See* § 28–256.

**34.** *See* § 28–258(a).

**35.** *See* § 28–258(b). Ordinance 97–75 consists of a preamble and twelve Sections. Section 1 adopts the preamble and legislative record for the Ordinance. Section 2 amends Article II of the Houston, Tex., Code of Ordinances; this article includes §§ 28–81 to 28–116 of the Code of Ordinances and applies only to adult arcades and adult mini-theatres. Section 3 amends Article III of the Code of Ordinances; this article includes §§ 28–121 to 28–136 of the Code of Ordinances and applies to *all* sexually oriented business enterprises, including adult arcades and mini-theatres. Section 4 creates a new article for the Code of Ordinances, Article VIII; this article includes §§ 28–251 to 28–259 of the Code of Ordinances and establishes conduct and permit requirements for individuals working in sexually oriented businesses. Section 5 amends the Code of Ordinances with a list of criminal offenses which may prevent individuals from obtaining permits under Article VIII. Section 6 provides for the posting of a pertinent section of the Code of Ordinances in state courthouses. Sections 7, 8, and 9 contain effective dates for various provisions of Ordinance 97–75, and Section 8 provides for certain extensions that may be obtained from these effective dates. Section 10 is a housekeeping provision describing the format used in Ordinance 97–75 to show which provisions are new and which provisions from the previous Ordinance are stricken. Section 11 contains a severability clause, indicating that if any portions of Ordinance 97–75 are held to be invalid, the City Council intends for the remaining valid sections to be severed. Finally, Section 12 provides that the Ordinance shall take effect immediately upon its passage.

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Boze v. Branstetter*, 912 F.2d 801, 804 (5th Cir.1990). The facts are to be reviewed with all inferences drawn in favor of the party opposing the motion. *See Bozé*, 912 F.2d at 804 (citing *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986)). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Laughlin v. Olszewski*, 102 F.3d 190, 193 (5th Cir. 1996).[36]

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. If the movant meets this initial burden, the burden shifts to the nonmovant to demonstrate with "significant probative evidence" that there is an issue of material fact so as to warrant a trial. *See Texas Manufactured Hous. Ass'n v. Nederland*, 101 F.3d 1095, 1099 (5th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997); *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 161 (5th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996); *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir.1995); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.1994).

The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *See Grimes v. Texas Dept. of Mental Health*, 102 F.3d 137, 139–40 (5th Cir.1996); *Little*, 37 F.3d at 1075. Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *See Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

### III. *LEGAL STANDARD FOR FIRST AMENDMENT CHALLENGE*

Plaintiffs primarily attack Ordinance 97–75 as an infringement upon their First Amendment right to free speech. In a series of cases, the Supreme Court has held that some types of adult entertainment qualify as constitutionally protected speech and have accordingly applied heightened scrutiny under the First Amendment to government restrictions on: nude dancing, *see Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); adult bookstores and adult video stores, *see FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); and adult movie theatres, *see City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 69–70, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Under these cases, most, but not all, of the Plaintiffs in this action are entitled to receive the Court's heightened First Amendment scrutiny of various provisions of Ordinance 97–75.[37]

 In sum, regulations that affect First Amendment interests and are content-based are evaluated under "strict scrutiny"; regulations that affect First Amendment interests but are content-neutral are evaluated under "intermediate scrutiny." *See City of Renton*, 475 U.S. at 46–47, 106 S.Ct. 925. To

---

**36.** Under Fed.R.Civ.P. 56(f), nonmovants may instead seek continuance on the motion by submitting affidavits describing why they have not yet been able to obtain the requisite evidence. "A party seeking a continuance to conduct discovery must demonstrate 'both why it is currently unable to present evidence creating a genuine issue of fact and how a continuance would enable the party to present such evidence.' " *Haynsworth v.*

*The Corporation*, 121 F.3d 956, 970 (5th Cir. 1997) (quoting *Liquid Drill, Inc. v. U.S. Turnkey Exploration, Inc.*, 48 F.3d 927, 930 (5th Cir. 1995)).

**37.** *See infra* Section III.B. for a discussion of the Plaintiffs who are not entitled to this heightened scrutiny.

the extent that a regulation does not affect First Amendment or other constitutional interests and does not make distinctions on the basis of any protected classes, it is reviewed under the lowest level of constitutional scrutiny, the rational basis test. *See City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 441–42, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 7–8, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *SDJ,* 837 F.2d at 1273.

## A. Businesses Entitled to Heightened First Amendment Scrutiny

In *City of Renton,* the Supreme Court upheld a local ordinance that restricted the permissible locations for constitutionally protected adult movie theatres [38] and described the contours of the applicable First Amendment test as follows:

> [R]egulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment. On the other hand, so-called "content-neutral" time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication.

475 U.S. at 46–47, 106 S.Ct. 925 (citations omitted). Under this test, a court must first consider whether a challenged time, place, and manner regulation [39] is content-based or content-neutral.

### 1. Content–Based Regulations Receive Strict Scrutiny

■ A regulation is "content-based" if it was intended to "suppress the expression of unpopular views," *id.* at 48, 106 S.Ct. 925, or if it "distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed," *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (*Turner I* ). If a court determines that a regulation is content-based, then that regulation must be subjected to strict scrutiny, is presumptively impermissible, and may only be upheld if the government entity demonstrates a compelling reason for the regulation. *See Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.,* 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (in order to justify differential treatment of speech on the basis of content, "the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end") (quoting *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 231, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987)); *City of Renton,* 475 U.S. at 46–47, 106 S.Ct. 925.

### 2. Content–Neutral Regulations Receive Intermediate Scrutiny

■ On the other hand, regulation of adult entertainment is "content-neutral" if it is " '*justified* without reference to the content of the regulated speech,' " *City of Renton,* 475 U.S. at 48, 106 S.Ct. 925 (quoting *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)), and if the legislative body's "predominate concerns" in enacting it were to address the undesirable secondary effects of adult businesses, for example, concerns such as preventing crime, "protect[ing] the city's retail trade, maintain[ing] property values, and generally 'protec[ting] and preserv[ing] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life,' " *id.*[40] Even if the legislative body's motivation in enacting various restrictions on

---

**38.** Renton's ordinance prohibited adult movie theatres "from locating within 1,000 feet of any residential zone, single- or multiple-family dwelling, church or park, and within one mile of any school." *City of Renton,* 475 U.S. at 43, 106 S.Ct. 925.

**39.** A regulation that establishes restrictions on adult businesses, such as minimum distances between adult businesses and protected land uses, but does not ban the businesses altogether, is a time, place, and manner regulation. *See City of*

*Renton,* 475 U.S. at 46, 106 S.Ct. 925. Thus, because Ordinance 97–75 does not expressly ban any businesses altogether, its provisions may be characterized as time, place, and manner regulations. However, "[d]escribing the ordinance as a time, place, and manner regulation is, of course, only the first step in our inquiry." *Id.*

**40.** The Fifth Circuit has held that a city may show the requisite secondary effects by documenting that adult businesses "adversely affect property values, cause an increase in crime, en-

adult businesses was based *in part* by a desire to suppress expressive activity, that fact alone would not render those provisions content-based, and thus invalid, so long as the legislative body's *predominate* motivation was to regulate secondary effects. In *City of Renton*, the Supreme Court specifically held that the relevant inquiry is to determine the City Council's "predominate" intent and that an ordinance is not invalid if restricting the adult businesses' First Amendment rights was merely *"a motivating factor"* in the City's decision to enact the ordinance. 475 U.S. at 47–48, 106 S.Ct. 925 (emphasis in original).

■ If a court determines that a regulation that affects protected speech is content-neutral, then the court must apply intermediate scrutiny. Under intermediate scrutiny, a court may uphold the regulation only if it is:

(1) narrowly tailored [41]

(2) to serve a substantial governmental interest [42] *and*

(3) does not unreasonably limit alternative avenues of communication. [43]

■ A regulation is "sufficiently well tailored" to meet the narrow tailoring requirement if it "effectively promotes the government's stated interest," *SDJ*, 837 F.2d at 1276, and does not "burden substantially more speech than necessary to further those interests," *Turner Broadcasting System, Inc. v. F.C.C.*, 520 U.S. 180, 117 S.Ct. 1174, 1186, 137 L.Ed.2d 369 (1997) (*Turner II*); *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). [44]

■ As for the second element of the *City of Renton* intermediate scrutiny test, municipal regulation of sexually oriented businesses serves a "substantial governmental interest" when it is designed to combat negative secondary effects associated with those businesses. *See SDJ*, 837 F.2d at 1274. [45] *See also TK's Video v. Denton County, Texas*, 24 F.3d 705, 709–10 (5th Cir.1994).

courage businesses to move elsewhere, and contribute to neighborhood blight." *Lakeland Lounge of Jackson, Inc. v. City of Jackson*, 973 F.2d 1255, 1259 (5th Cir.1992).

**41.** *See Woodall v. City of El Paso*, 49 F.3d 1120, 1122 (5th Cir.1995) (citing *City of Renton*, 475 U.S. at 46–48, 106 S.Ct. 925).

**42.** *City of Renton*, 475 U.S. at 47, 106 S.Ct. 925.

**43.** *Id.*

**44.** Plaintiffs strenuously argue that the Supreme Court's recent declarations in *Turner II* and *Ward* that a regulation is narrowly tailored if it does not "burden substantially more speech than necessary to further those interests," overrules the Fifth Circuit's holding in *SDJ* that "an ordinance is sufficiently well tailored if it effectively promotes the government's stated interest," *SDJ*, 837 F.2d at 1276. Although the Fifth Circuit's description of the narrow tailoring test was taken directly from the Supreme Court's opinion in *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) ("an incidental burden on speech is no greater than is essential, and therefore is permissible under [*United States v.*] *O'Brien*, [391 U.S. 367, 383–84, 88 S.Ct. 1673 (1968),] so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation"), Plaintiffs argue that this description of the test is logically unsound and directly conflicts with the Supreme Court's decision in *Schad*, 452 U.S. 61, 101 S.Ct. 2176, that a ban on all forms of live entertainment was impermissi-

ble, even though the ban would have effectively achieved the county's goal of restricting the negative effects of adult entertainment. *See* FTU's Response [Doc. # 170], at 7–9.

This Court is not persuaded that the narrow tailoring requirement described in *SDJ* was altered in any material way by *Turner* and *Ward* because, in both of those cases, the Supreme Court *also* quoted the *Albertini* language, which the Fifth Circuit relied on in *SDJ*, that "an ordinance is sufficiently well tailored if it effectively promotes the government's stated interest." *Turner I*, 512 U.S. at 662, 114 S.Ct. 2445; *Ward*, 491 U.S. at 799, 109 S.Ct. 2746 (both quoting *Albertini*, 472 U.S. at 689, 105 S.Ct. 2897). Thus, it appears that the current Supreme Court narrow tailoring standard is an amalgam of, or requires, *both* prongs of the standard quoted above. *See also Simon & Schuster*, 502 U.S. at 122, 112 S.Ct. 501 ("[a] regulation is not 'narrowly tailored' ... where, as here, 'a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals'") (quoting *Ward*, 491 U.S. at 799, 109 S.Ct. 2746).

In any event, the Court finds the exact wording of this standard immaterial to the resolution of this case because the Fifth Circuit has held that "narrow tailoring is less important when the potential for overbreadth burdens a category of speech subject to less than full first amendment protection; sexually-oriented expression falls into such a category." *SDJ*, 837 F.2d at 1276.

**45.** The "substantial governmental interest" test appears to overlap significantly with the thresh-

As for the third *City of Renton* element, an ordinance does not unreasonably limit "alternative avenues of communication" if it provides adult businesses with "a reasonable opportunity to own and operate their businesses." *Woodall*, 49 F.3d at 1126.

Plaintiffs' primary line of attack is to argue that Ordinance 97–75 is invalid in full and should be struck down in its entirety under the First Amendment because it is a content-based restraint on speech, enacted by the Houston City Council for the primary purpose of significantly reducing, if not shutting down entirely, the city's sexually oriented business industry. With respect to each challenged provision of the Ordinance, Plaintiffs argue that the provision should be invalidated under strict scrutiny as a content-based restriction. In the alternative, with respect to each challenged provision, Plaintiffs argue that, even if the provision is content-neutral, it is nevertheless invalid because (i) it is not narrowly tailored, (ii) the City Council did not base its enactment on reasonably reliable evidence that the provision would serve a substantial governmental interest, and, (iii) with respect to the Ordinance's new locational restrictions, there is not a sufficient number of adequate alternative sites to which the businesses may relocate under the Ordinance.

### 3. Distinguishing Content–Based from Content–Neutral Regulations

 In assessing whether various provisions of Ordinance 97–75 were designed to address undesirable secondary effects, and thus are content-neutral, or were instead intended to suppress speech, and thus are content-based, the Court must give great deference to the stated goals of the City Council. "It is the legislature, and not the courts, which determines how much testimony is enough to require city action in redressing a perceived problem." *SDJ*, 636 F.Supp. at 1367.[46]

In the preamble to Ordinance 97–75, the City Council included the following language

through which it intended to show that the new restrictions on adult businesses and individuals working in adult businesses were enacted to address negative secondary effects created by the businesses:

> WHEREAS, the City Council finds that sexually oriented businesses can exert dehumanizing influences on churches, schools, and day care centers, can have negative effects on property values, [and] can contribute to increased criminal activities in the surrounding areas ... and ...
>
> WHEREAS, the City Council finds that sexually oriented businesses provide enhanced opportunities for employee participation in various forms of criminal activities, including prostitution, lewd conduct, indecent exposure, obscenity law violations and related crimes that are associated with sexual conduct or sexually-oriented materials; and
>
> WHEREAS, the City has a substantial public concern that its residents be protected from criminal activity and be protected from casual sexual activity that facilitates the spread of sexually transmitted diseases ...

Preamble to Ordinance 97–75, at 2, 4.

 Although these statements of purpose in the Ordinance's preamble are clearly relevant to the Court's determination of whether various provisions are content-neutral, the Court may not rely exclusively on the City Council's conclusory statements regarding its intent. Instead, the Court must also consider whether the City Council relied on evidence in the legislative record from which it could have reasonably determined that negative secondary effects associated with adult businesses actually exist and that the proposed regulations would in some way address these effects. *See Lakeland Lounge*, 973 F.2d at 1259; *SDJ*, 837 F.2d at 1274.

In *Lakeland Lounge*, the Fifth Circuit set forth several factors by which courts could judge the trustworthiness of language in an

---

old analysis of whether a regulation is content-based or content-neutral.

**46.** *See also City of Renton*, 475 U.S. at 50, 106 S.Ct. 925 ("a city's 'interest in attempting to

preserve the quality of urban life is one that must be accorded high respect' ") (quoting *American Mini Theatres*, 427 U.S. at 71, 96 S.Ct. 2440 (plurality opinion)).

ordinance's preamble that purports to establish that a City's legislative motivation was to combat undesirable secondary effects of sexually oriented businesses. The court explained that:

> [Preamble] language might not save a statute that was formulated without specific attention to secondary effects. Nevertheless, in context here, where (1) the drafters of the ordinance did rely upon studies of secondary effects, (2) a majority of the council members did receive some information about the secondary effects during an open hearing of the planning board, and (3) nothing in the record otherwise suggests impermissible motives on the part of the council members, the language of the preamble shows the city council's awareness of the studies upon which the planning staff relied when framing the ordinance and reflects that a reasonable legislature with constitutional motives could have enacted the ordinance.

*Lakeland Lounge,* 973 F.2d at 1259 (citing *SDJ,* 837 F.2d at 1274).

In *SDJ,* the Fifth Circuit set forth the following standard for evaluating whether restrictions on sexually oriented businesses are content-based or content-neutral:

> [U]nlike our review under a standard of rationality, we will not hypothesize [a permissible] objective or accept a naked assertion. Rather, we intrude into the regulatory decision process to the extent that we insist upon *objective evidence of purpose —* a study or findings. Insisting upon findings reduces the risk that a purported effort to regulate effect is a mask for regulation of content. That is, *evidence of legitimate purpose is supported by proof that secondary effects actually exist and are the result of the business subject to the regulation.* At the same time, it is apparent that as we increase the required preci-

sion in findings, we increasingly encounter the difficulties we found unacceptable in [*Shelton v.*] *City of College Station,* [780 F.2d 475 (5th Cir.1986) (en banc) ]. Our task in setting the level of review is to strike for that point of equilibrium that vindicates first amendment values at the least cost to a state's decisional arrangements.

> Thus, as the Court explained in *City of Renton,* a city may establish its "substantial interest" in the regulation by compiling a record with *evidence that it may be* "*reasonably believed to be relevant to the problem that the city addresses."* [475 U.S. at 51–52, 106 S.Ct. 925] We do not ask whether the regulator subjectively believed or was motivated by other concerns, but rather whether an objective lawmaker could have so concluded, supported by an actual basis for the conclusion. Legitimate purpose may be shown by reasonable inferences from specific testimony of individuals, local studies, or the experiences of other cities. This level of scrutiny best accommodates the need to ensure proper purposes with the limited competence of courts to discern ephemeral legislative motivations.

*SDJ,* 837 F.2d at 1274 (emphasis added).

In *City of Renton,* 475 U.S. at 51, 106 S.Ct. 925, the Supreme Court established that a city may enact restrictions on adult businesses without "conduct[ing] new studies or produc[ing] evidence independent of that already generated by other cities." However, if a City Council relies on studies from other cities, it must have had a basis for believing that such studies are applicable to that city's own problems. *See id.* at 51–52, 106 S.Ct. 925 (evidence from other cities must be "reasonably believed to be relevant to the problem that the city addresses").[47]

---

**47.** In this respect, a city's regulation of adult businesses requires justification loosely analogous to that required for a city's adoption of an affirmative action program for local government contracting. In *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 498–99, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), the Supreme Court held that, in order to justify a local affirmative action program, a city must rely on specific proof of discrimination and cannot base its efforts on

mere "generalized" or "amorphous" assertions that discrimination exists. Likewise, in order to demonstrate that a regulation imposed on adult businesses protected by the First Amendment is content-neutral, a city may not rely merely on conclusory assertions that sexually oriented businesses create negative secondary effects, but must instead show that it considered some evidence, or had some other basis for believing, that the regulation would address specific negative

Thus, in the case at bar, the City of Houston must demonstrate that, in adopting the various provisions of Ordinance 97–75, City Council members had a reasonable basis for believing that these provisions would address negative secondary effects actually and currently attributable to sexually oriented businesses in Houston.[48] The Court cannot merely surmise this fact from vague references to evidence in other cities or surmise the current validity of the City Council's purported beliefs regarding specific secondary effects from previous evidence used to support earlier versions of the Ordinance.

The City claims that the existence of negative secondary effects justifying Ordinance 97–75 has already been established as a matter of law in *SDJ*. This Court disagrees. In *SDJ*, the Fifth Circuit determined that the evidence before the City Council in 1983 and 1986 specifically supported the passage of Ordinance 86–323. However that evidence, which was eleven to fourteen years old at the time the City enacted Ordinance 97–75, does not address the additional or continuing secondary effects that the City claims currently exist and justify all its new regulations. In order to extend its prior restrictions on protected businesses, the City must demonstrate that the City Council had before it and considered evidence that unwanted secondary effects still exist and that the City Council had a reasonable basis for believing that the new restrictions it enacted would specifically address these effects.[49]

In order for the Court to determine that a given provision of Ordinance 97–75 is content-neutral, the justification for that new provision must have existed in the evidence the City Council considered at the time it enacted the Ordinance, not merely in evidence compiled later in the course of litigation. *See United States v. Virginia*, 518 U.S. 515, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996) (in defending government action against constitutional attack, the government's "justification must be genuine, not hypothesized or invented *post hoc* in response to litigation"). This issue raises no difficulty in the case at bar, however, because, in its attempt to show that the new restrictions enacted in Ordinance 97–75 are content-neutral, the City states that it relies solely on the legislative record that was produced by and available to the Houston City Council's Sexually Oriented Business Committee[50] in the course of its deliberations and

---

secondary effects associated with those businesses.

48. While the Fifth Circuit indicated in *Lakeland Lounge* some uncertainty about whether legislative findings are still necessary to justify cities' regulation of adult businesses, the court declined to abandon the Supreme Court's holding in *City of Renton* that a city that relies on evidence from other cities must show that the evidence was "reasonably believed to be relevant to the problem that the city addresses," 475 U.S. at 51–52, 106 S.Ct. 925:

In light of *Renton's* holding that a municipality may rely upon other cities' studies of secondary effect, 475 U.S. at 50, 106 S.Ct. 925 ... and discussion in *Barnes* of the possibility that ordinances may be justified by their secondary effects, without any actual legislative finding, [501 U.S. at 584, 111 S.Ct. 2456 (Souter, J., concurring)], one might argue that legislative findings are no longer necessary, as the record as to secondary effects has already been made. *We need not reach such a conclusion to decide this case, however.*

*Lakeland Lounge*, 973 F.2d at 1258 n. 1 (emphasis added). This Court therefore concludes that an ordinance regulating sexually oriented businesses must be supported by an appropriate legislative record. To dispense with this requirement would invite courts to engage in sheer and improper speculation as to the validity of a municipality's rationale for its regulations. Thus, this Court is bound by *City of Renton* and *SDJ* to make some inquiry into the legislative record in order to determine whether the challenged provisions of Ordinance 97–75 are actually justified by reference to negative secondary effects associated with adult businesses.

49. *See infra* note 103 for a discussion of the relevance to this case of the legislative records compiled for previous versions of the Ordinance.

50. The City Council established this Committee in 1996 to study various issues regarding sexually oriented businesses in the City and to recommend amendments to the entire City Council for the City's Ordinance regulating sexually oriented businesses. The Committee, composed of eight City Council members and co-chaired by Council Members Jew Don Boney, Jr., and Helen Huey, held fifteen meetings and three public hearings between June 1996 and January 1997.

The legislative record provided by the City contains a combination of minutes, transcripts, and videotapes of the Committee's meetings. In this Opinion, the Court refers to transcripts wherever possible and minutes only when a transcript is

that was available to the full City Council at the time it approved Ordinance 97–75.[51]

Because the City does not attempt to justify factually any provision of Ordinance 97–75 as content-neutral by reference to evidence that is not contained in this legislative record, for each challenged provision of Ordinance 97–75, the Court has carefully examined the legislative record to determine whether the Houston City Council had any basis for claiming that the provision was enacted for the purpose of addressing negative secondary effects of adult businesses.[52]

### 4. The Relevance of *Turner Broadcasting System v. F.C.C.*

■ A number of Plaintiffs argue at length that First Amendment law has materially changed since the time the Supreme Court decided *City of Renton* and the Fifth Circuit decided *SDJ*. Specifically, they urge that, in light of the Supreme Court's recent decision in *Turner Broadcasting System v. F.C.C.*, 520 U.S. 180, 117· S.Ct. 1174, 137 L.Ed.2d 369 (1997) (*Turner II*), financial impact of a regulation is now relevant to the First Amendment analysis. Under *City of Renton* and *Woodall*, 49 F.3d at 1122, economic impact on adult businesses is not relevant, at least with respect to the issue of whether a regulation allows reasonable "alternative avenues of communication" for adult entertainment. *See City of Renton*, 475 U.S. at 54, 106 S.Ct. 925 ("The inquiry for First Amendment purposes is not concerned with economic impact") (quoting

*American Mini Theatres*, 427 U.S. at 78, 96 S.Ct. 2440 (Powell, J., concurring)). In contrast, in *Turner II*, in judging the constitutionality of the must-carry provisions of the Cable Television Consumer Protection and Competition Act of 1992,[53] the Supreme Court engaged in a detailed consideration of the competing financial interests of cable and broadcast television system operators.[54]

This Court is not persuaded that *Turner II* has altered First Amendment doctrine in any way relevant to the case at bar. First and most importantly, *Turner II* involved an entirely different First Amendment context: commercial speech. In contrast, the challenge presented here primarily concerns adult entertainment,[55] a type of speech that has been consistently afforded less constitutional protection than other forms of speech. *See City of Renton*, 475 U.S. at 49 n. 2, 106 S.Ct. 925 (" 'it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate' ") (quoting *American Mini Theatres*, 427 U.S. at 70, 96 S.Ct. 2440 (plurality opinion)); *Woodall*, 49 F.3d at 1122 ("[e]rotic non-obscene printed matter, films, and live entertainment are sheltered by the First Amendment, but enjoy less protection than some other forms of speech, such as political speech"); *TK's Video*, 24 F.3d at 707; *SDJ*, 837 F.2d at 1273. Because *Turner II* concerns a context other than adult entertainment, until and unless the Supreme Court or Fifth Circuit reinterprets First Amendment

---

not included in the record for a particular meeting or hearing. *See infra* note 71 for a more detailed description of the legislative record.

51. At a pretrial conference, counsel for the City confirmed that the legislative record it has submitted for Ordinance 97–75 constitutes the "universe" of evidence upon which it relies to justify the Ordinance's new provisions. In addition, the Court notes that City Council members were repeatedly urged during the Sexually Oriented Business Committee meetings to send all evidence they had received regarding sexually oriented businesses, including citizen comments and materials from other cities, to the City's Legal Department for inclusion in the legislative record. *See, e.g.*, Minutes for July 22, 1996, Committee Meeting, Exhibit 4C to City's Motion [Doc. # 120], at 2.

52. While the Court specifically analyzed in detail the portions of the record to which various parties referred in their briefing, the Court also made a thorough independent review of the entire record.

53. Pub.L. 102–385, 106 Stat. 1460.

54. The Court upheld these provisions based on its conclusion that they were justified by sufficient evidence before Congress that a substantial governmental interest was at stake.

55. One new provision enacted in Ordinance 97–75, the provision which extends restrictions on permissible signage for adult businesses, does affect commercial speech. *See* § 28–130. This section of the Ordinance is addressed *infra* in Section V.F.

doctrine pertaining to adult entertainment in light of *Turner II*, this Court is bound by controlling authority specifically related to the adult entertainment context. As the Supreme Court recently explained, lower courts should not conclude that

> more recent [Supreme Court] cases have, by implication, overruled an earlier precedent.... "[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."

*Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).

■ Furthermore, in *Turner II*, the Supreme Court considered whether Congress had before it sufficient evidence that broadcast television operators had significant enough financial need to justify the challenged statutory provisions. *See Turner II,* 117 S.Ct. at 1196. In contrast, here, Plaintiffs appear to argue that the financial harm they will suffer as a result of various provisions of the Ordinance should itself invalidate those provisions. The Court rejects this argument. In the First Amendment context of adult entertainment, the Court's examination of the legislative record must center on the issue of whether the City Council had before it sufficient evidence of negative secondary effects that would justify its new restrictions on the plaintiff businesses. The Court declines to delve into the minutiae of the financial impact of Ordinance 97–75 and thus engage in a speculative interpretation of *Turner II*. Instead, the Court concludes that, in light of *City of Renton* and *Woodall*, economic impact is not itself dispositive of the constitutionality of restrictions on adult businesses.

■ However, without relying on *Turner II*, the Court agrees with Plaintiffs that evidence that the City Council was aware that a given provision of the Ordinance would have a significant, perhaps devastating, financial impact on the affected businesses is at least *relevant* to the Court's determination of whether that provision is content-neutral or was instead enacted for the primary purpose of restraining speech. *Cf. Simon and Schuster,* 502 U.S. at 115, 112 S.Ct. 501 ("[a] statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech") (citing *Leathers v. Medlock,* 499 U.S. 439, 447, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991)). In other words, if the Houston City Council knew that, although a given provision of Ordinance 97–75 did not expressly ban adult businesses, its financial impact was nonetheless likely to put a large proportion of them out of business, that fact would be relevant to, although not dispositive of, the issue of whether that provision is content-neutral.

### B. Businesses Not Entitled to Heightened First Amendment Scrutiny Receive Rational Basis Review for All Provisions of the Ordinance

■ All the Plaintiffs in this case contend that, because they are protected by the First Amendment, they are entitled to receive the Court's heightened scrutiny of the challenged provisions of Ordinance 97–75. The Court does not agree, however, that all the Plaintiffs are entitled to this protection under current case law. As mentioned earlier, the only types of adult businesses to which the Supreme Court has expressly extended First Amendment protection are adult bookstores, adult movie theatres, adult video stores, and enterprises that feature nude dancing. In the case at bar, Plaintiffs also include other types of sexually oriented businesses, such as adult modeling studios, adult tanning salons, and adult encounter parlors that do not appear to provide printed entertainment or live or recorded entertainment that features dancing.[56] For the reasons described below,

---

**56.** Most of the Plaintiff businesses in this lawsuit have not expressly indicated what type of businesses they are. However, from the names of the businesses, the Court has discerned that

Plaintiffs include some adult modeling studios and adult tanning salons. Also, because Ordinance 97–75 expressly purports to cover adult encounter parlors, *see* § 28–121, it appears prob-

the Court concludes that these other types of adult businesses are not covered by the First Amendment. Rational basis review will be applied to all provisions of Ordinance 97–75 applicable to these non-protected businesses. *See City of Cleburne,* 473 U.S. at 441–42, 105 S.Ct. 3249; *Village of Belle Terre,* 416 U.S. at 7–8, 94 S.Ct. 1536; *SDJ,* 837 F.2d at 1273.

In *FW/PBS,* the Supreme Court noted that adult businesses that do not "purvey[ ] sexually explicit *speech,*" such as "escort agencies and sexual encounter centers," are not protected by the First Amendment. *FW/PBS,* 493 U.S. at 224, 110 S.Ct. 596 (emphasis added). Although the issue of precisely which adult businesses receive heightened constitutional scrutiny has not been addressed by the Supreme Court or in recent Fifth Circuit cases,[57] in *Stansberry v. Holmes,* 613 F.2d 1285, 1286–88 (5th Cir. 1980), the Fifth Circuit expressly declined to extend First Amendment protection to "massage parlors, nude studios, modeling studios, love parlors, and other similar commercial enterprises." There the court concluded that, because the Supreme Court had not extended heightened protection to these types of businesses, "no First Amendment interests are at stake here." *Id.* at 1288.

In *Barnes,* 501 U.S. at 566, 111 S.Ct. 2456, a plurality of the Supreme Court reluctantly reaffirmed that nude dancing receives constitutional protection, concluding that "nude dancing ... is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so." However, in reaching this decision, the Court expressly rejected the proposition that nudity itself constitutes protected expressive activity. *See id.* at 570, 111 S.Ct. 2456.[58]

In *Hang On, Inc. v. City of Arlington,* 65 F.3d 1248, 1254 (5th Cir.1995), the Fifth Cir-

---

able that some adult encounter parlors are also included among Plaintiffs.

57. The ordinances which were challenged in the recent Fifth Circuit cases of *Grand Brittain, Inc. v. City of Amarillo, Texas,* 27 F.3d 1068, 1068 (5th Cir.1994); *TK's Video,* 24 F.3d at 707; *Lakeland Lounge,* 973 F.2d at 1257; and *SDJ,* 837 F.2d at 1271, applied broadly to many types of adult businesses, but the only plaintiffs in those cases were adult bookstores, adult movie theatres, adult video stores, and adult cabarets or lounges. Therefore, in each of these cases, the Fifth Circuit was not presented with the issue of whether other types of businesses would have had standing to raise the constitutional challenges brought there. It is not clear from the court's opinion in *Woodall* exactly what types of adult businesses challenged the El Paso ordinance, but in that case, the Fifth Circuit referred to the First Amendment test as applicable to "[e]rotic non-obscene printed matter, films, and live entertainment." 49 F.3d at 1122. Because in each of these cases the Fifth Circuit by and large upheld, rather than struck down, the challenged ordinances even applying heightened First Amendment scrutiny, the Fifth Circuit had no need to distinguish to which businesses its rulings applied.

58. The Court explained that:
It can be argued, of course, that almost limitless types of conduct—including appearing in the nude in public—are "expressive," and in one sense of the word this is true. People who go about in the nude in public may be expressing something about themselves by so doing. But the court rejected this expansive notion of "expressive conduct" in *O'Brien,* saying:

"We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." 391 U.S. at 376, 88 S.Ct. 1673.
And in *Dallas v. Stanglin,* 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989), we further observed:
"It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment. We think the activity of these dance-hall patrons coming together to engage in recreational dancing—is not protected by the First Amendment." *Id.* at 25, 109 S.Ct. 1591.
*Barnes,* 501 U.S. at 570, 111 S.Ct. 2456. Justice Souter, concurring in the judgment, repeated that:
Although [erotic] performance dancing is inherently expressive, nudity per se is not. It is a condition, not an activity, and the voluntary assumption of that condition, without more, apparently expresses nothing beyond the view that the condition is somehow appropriate to the circumstances. But every voluntary act implies some such idea, and the implication is thus so common and minimal that calling all voluntary activity expressive would reduce the concept of expression to the point of the meaninglessness.
*Id.* at 581, 111 S.Ct. 2456 (Souter, J., concurring in the judgment).

cuit explained that "nudity is protected speech only when combined with some other mode of expression which itself is entitled to first amendment protection." *See also DLS, Inc. v. City of Chattanooga,* 107 F.3d 403, 408–410 (6th Cir.1997) (court must make a case-by-case factual inquiry to determine whether erotic entertainment qualifies as speech for First Amendment purposes). The adult enterprises that are Plaintiffs in this case but that do not fall within a category of businesses that has previously been afforded First Amendment protection, including the adult modeling studios, adult tanning salons, and adult encounter parlors, appear to assume that they may piggyback on the First Amendment claims of the other Plaintiffs simply because they provide services involving nudity. However, these businesses have not provided any arguments as to why they should receive First Amendment protection; nor have they provided any evidence from which the Court may conclude that they convey any constitutionally protected "modes of expression." The Court therefore declines to extend heightened constitutional review to the challenged provisions of Ordinance 97–75, as applied to adult modeling studios, adult tanning salons, and adult encounter parlors.[59]

■ In describing heightened First Amendment review in *SDJ,* the Fifth Circuit explained the extreme level of deference courts must provide when applying rational basis review: "[U]nlike our review under a standard of rationality, we will not hypothesize such [a permissible] objective or accept a naked assertion." 837 F.2d at 1274. Thus, when an entity does not receive special constitutional protection and rational basis review applies, the Court may hypothesize permissible objectives and accept naked assertions. The Court therefore holds that

all provisions of the Ordinance are constitutionally valid as applied to enterprises that are not protected by the First Amendment. The Court accepts the City's contentions that the Ordinance as a whole is a valid exercise of its police power with respect to these enterprises. *See Stansberry,* 613 F.2d at 1288–89 (upholding locational. restrictions on adult businesses not protected by the First Amendment as a valid exercise of County's police power).

### C. Can the Ordinance's Validity Be Determined Through Summary Judgment?

#### 1. In General

In their original responses to the City's Motion, Plaintiffs strenuously argued that this case raises a variety of factual issues that preclude resolution through summary judgment.[60] In both *City of Renton* and *American Mini Theatres,* the Supreme Court concluded that "'the interests furthered by [the challenged] ordinance[s] are both important and substantial.'" *City of Renton,* 475 U.S. at 50, 106 S.Ct. 925 (quoting *American Mini Theatres,* 427 U.S. at 80, 96 S.Ct. 2440 (Powell, J., concurring)). However, Plaintiffs contend that the Court's conclusions in these cases, as well as the Fifth Circuit's decision to uphold a prior version of Ordinance 97–75 in *SDJ,* do not render the issue of whether Ordinance 97–75 is constitutional one of law and do not mandate the same finding in this case.[61] Instead, Plaintiffs insist that this Court must carefully examine the City's proffered justification for each provision challenged here.

■ As reflected in the previous section regarding the applicable legal standards, the Court agrees that the question of whether each challenged provision of the Ordinance is

---

**59.** In addition, if there are any other Plaintiff businesses in this lawsuit who do not fall into a category of businesses that has previously received First Amendment protection, as described in this section, then the Court's heightened constitutional review will not apply to them either.

**60.** As discussed earlier, most Plaintiffs argued in their original responses that, because of these factual issues, the Court could not grant summary judgment for the City. However, in their cross-motions, Plaintiffs shifted to the argument

that the Court could grant summary judgment *for Plaintiffs* based on the current record.

**61.** *See, e.g.,* FTU's Response [Doc. # 170], at 6 ("[m]erely because the Court of Appeals concluded that the *first* such comprehensive ordinance was a content-neutral effort, does not, *ipso facto,* compel the conclusion that successive and increasingly restrictive ordinances are automatically immune from scrutiny concerning whether they were content-neutral or content-based").

content-based or content-neutral, and thus is subject to strict or intermediate scrutiny for the Plaintiffs receiving First Amendment protection, is a factual matter that must be resolved upon the particularities of the current record. *See SDJ,* 837 F.2d at 1275 (noting that while the Fifth Circuit held in one case that the City of Galveston "had failed to prove a justifiable interest in [its adult business] regulation [62] ... the record in [*SDJ* ] supports exactly the opposite conclusion"). The Court therefore concludes that it must evaluate the validity of the changes enacted in Ordinance 97–75 based on the *current* legislative record. In order for the City to rely on records established in support of previous versions of the Ordinance, the City at least must identify from the current legislative record evidence that City Council members, their staffs, or the City's Legal Department specifically considered how evidence from the prior legislative histories supported the newly enacted provisions. Except with respect to a few challenged provisions, the City failed to make this showing.[63]

Although the answer as to whether a particular regulation of protected businesses is content-neutral varies from case to case and thus generally is a factual issue, the mere existence of a factual dispute will not defeat a proper summary judgment motion. A trial is only necessary where there is a *genuine issue of material fact. See Stafford v. True,* 123 F.3d 291, 294 (5th Cir.1997). A nonmovant is entitled to a trial only by demonstrating that it has "significant probative evidence" in support of its rendition of the facts, *Texas Manufactured Hous. Ass'n,* 101 F.3d at 1099, or by showing, pursuant Fed. R.Civ.P. 56(f), how it could obtain such evidence through further discovery.[64] In fact, in *City of Renton* itself, the Supreme Court approved the district court's granting of summary judgment for the City, after concluding that the district court made a proper factual finding.[65] *See also FW/PBS,* 493 U.S. at 221, 110 S.Ct. 596 ("[f]ollowing expedited discovery, petitioners' constitutional claims were resolved through cross-motions for summary judgment").

■ A number of Plaintiffs urge this Court, pursuant to Fed.R.Civ.P. 56(f), to defer ruling on the pending summary judgment motions until the parties have had the opportunity to conduct further discovery.[66] As described in the sections that follow, Plaintiffs have failed to establish the need at this

---

**62.** In *Basiardanes v. City of Galveston,* 682 F.2d 1203, 1215 (5th Cir.1982), the Fifth Circuit struck down a Galveston ordinance restricting permissible locations for adult theatres, based on its conclusion that "there [was] no evidence in the record that the Galveston City Council passed Ordinance 78–1 after careful consideration or study of the effects of adult theatres on urban life."

**63.** *See infra* note 103 for a discussion of the City's failure to make this showing with respect to the Ordinance's increased distance requirements.

**64.** Since all parties have waived their right to a jury, the Court will serve as the factfinder in this matter. Because the issues in this case do not turn on credibility assessments and because Plaintiffs have failed to show what relevant information they now lack, the Court finds that it can resolve most of the factual issues presented here through the parties' documentary evidence submitted with the summary judgment briefing. Although the Dee & Dee Plaintiffs argue that the complexity of this case should in itself preclude its resolution through summary judgment, *see* Dee & Dee's Response [Doc. # 178], at 6–7, the Court finds that the parties have already submitted a quantity of evidence and other material as

substantial as, if not more than, that which would be submitted in a trial. The current record fully equips the Court with sufficient expertise to decide most factual issues that may exist. In any event, all of the Plaintiffs have now submitted cross-motions for summary judgment, apparently conceding that most, if not all, of the issues in this case can be resolved through summary judgment.

**65.** In *City of Renton,* the Supreme Court referred to the district court's conclusions as "findings" but declined to announce expressly what standard of review it was applying:

> The Court of Appeals' rejection of the District Court's findings on this issue may have stemmed in part from the belief ... that ... appellate courts have a duty to review *de novo* all mixed findings of law and fact relevant to the application of First Amendment principles. We need not review the correctness of the Court of Appeals' [belief] since we determine that, under any standard of review, the District Court's findings should not have been disturbed.

475 U.S. at 53 n. 3, 106 S.Ct. 925.

**66.** *See supra* note 13.

time for additional discovery.[67] Plaintiffs' requests for further discovery are therefore denied.

### 2. Chil Soung's § 1983 and § 1985 Claims

The Chil Soung Plaintiffs argue that the City's summary judgment motion does not purport to address their conspiracy claim, brought under 42 U.S.C. §§ 1983 and 1985, and that they therefore have no obligation to address this claim at this time.[68] The City responds that its Motion and briefing address all issues raised meaningfully by all Plaintiffs' pleadings. *See* City of Houston's Reply to Chil Soung's Response [Doc. # 208], at 1–2. The Court concludes that the Chil Soung Plaintiffs have not meaningfully pursued their conspiracy claim and the claim as pleaded fails to state a legally viable cause of action.[69] These Plaintiffs have been on notice of the City's position and yet have failed to provide any detailed arguments on this claim. Because the Chil Soung Plaintiffs did not seek leave to amend their Complaint and did not set forth their legal theory in response to the City's Motion, their right to amend their Complaint and assert a new theory is waived. *See Spiller v. City of Texas City, Police Department*, 130 F.3d 162,

167 (5th Cir.1997) (court may dismiss claim when plaintiff simply " 'declares the adequacy of [her] complaint' in 'response to [a] motion to dismiss' " rather than amending complaint to provide more detailed basis for claim) (quoting *Jacquez v. Procunier*, 801 F.2d 789, 792–93 (5th Cir.1986)).

In any event, as for Chil Soung's § 1983 conspiracy claim, the Court holds, as a matter of law, that Plaintiff cannot state a claim upon which relief may be granted. In order to establish a claim of conspiracy under § 1983, Plaintiffs must prove that the City entered into a willful agreement with another person to deprive Plaintiffs of a constitutional right. *See Daniel v. Ferguson*, 839 F.2d 1124, 1131 (5th Cir.1988). Plaintiffs' conspiracy theory is not viable as a matter of law because the commission of a conspiracy requires two independent legal personalities, *see Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir.1994); *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir.1952), and Plaintiffs have not alleged any person with whom the City has conspired. *See id.* ("a corporation cannot conspire with itself anymore than a private individual can [and] the acts of the agent are the acts of the corporation").[70]

**67.** *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 28 F.3d 1388, 1396 (5th Cir.1994) ("the mere complaint that more discovery is needed, by itself, does not justify a Rule 56(f) continuance"); *Krim v. BancTexas Group*, 989 F.2d 1435, 1442–43 (5th Cir. 1993); *Robbins v. Amoco Prod. Co.*, 952 F.2d 901, 907 (5th Cir.1992).

**68.** Plaintiffs set forth their conspiracy claim as follows:
> [T]he City of Houston, acting in concert, unlawfully and unconstitutionally conspired together to eliminate all sexually oriented businesses from the City of Houston in furtherance of a campaign to impose a prior restraint on non-obscene forms of expression presumptively protected by the First Amendment to the United States Constitution and Article I, Section 8 of the Texas Constitution.

Chil Soung Plaintiffs' Response [Doc. # 155], at 4. *See also* Chil Soung Plaintiff's Complaint [Doc. # 103], at 3.

**69.** Although Plaintiffs have not supplied full briefing on this claim, they cite one district court case which they suggest allowed a similar conspiracy claim. *See Video Store, Inc. v. Holcomb*, 729 F.Supp. 579 (S.D.Ohio 1990). However, in *Holcomb*, the court was presented with the sole issue of whether federal abstention principles outlined in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), prevented the court's intervention in pending state court criminal cases brought against sellers and distributors of sexually explicit videotapes. The Court finds *Holcomb* to be factually and legally inapposite to the case at bar.

**70.** The Court notes also that, although other Plaintiffs here did not label their causes of action as § 1983 claims, the statute through which the entire federal constitutional attack on Ordinance 97–75 addressed by this Opinion is brought is § 1983. *See American Mini Theatres*, 427 U.S. at 55 n, 96 S.Ct. 2440. 9 (First Amendment claim properly brought under § 1983); *Clarke v. Stalder*, 121 F.3d 222 (5th Cir.1997), *reh'g granted*, 133 F.3d 940 (5th Cir.1997) (First Amendment challenge to prison rule properly pled under § 1983). Therefore, to the extent the Chil Soung Plaintiffs claim a violation of § 1983 separate from their conspiracy claim, the City's Motion and this Order address that claim.

As for Chil Soung's claim brought under § 1985, the Court finds this claim to be frivolous. The Fifth Circuit has recently made clear that a party may bring a claim under § 1985(3) only to challenge a conspiracy that is alleged to be motivated by racial animus. *See Word of Faith World Outreach Center Church, Inc. v. Sawyer,* 90 F.3d 118, 124 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1248, 137 L.Ed.2d 329 (declining "to extend the reach of section 1985(3) to include conspiracies motivated by religious, as opposed, to racial animus"). The current challenge displays no hint of an argument that Ordinance 97–75 was in any way motivated by racial animus. The Court therefore will not allow this claim to proceed.

### 3. Other Issues Plaintiffs Claim Have Not Been Addressed by the City's Summary Judgment Motion

Several groups of Plaintiffs deny that the City's Motion covers all issues raised by their Complaints. *See, e.g.,* FTU's Response [Doc. # 170], at 3–5; FTU's Supplemental Cross–Motion [Doc. # 270], at 2–3; Dee & Dee's Response [Doc. # 178], at 54–59; Dee & Dee's Locational Response [Doc. # 214], at 16–18. The Court disagrees. In its Motion, the City seeks a ruling that the Ordinance, as a matter of law, is valid in its entirety. Therefore the City has addressed all of Plaintiffs' claims. The only omissions that Plaintiffs note in the Motion's coverage are the City's failure to address various specific arguments raised by certain Plaintiffs. The Court rejects Plaintiffs' attempts to characterize numerous detailed arguments, many of

which have been addressed by the parties' briefing and by the Court in this Opinion, as discrete causes of action. Instead, the Court finds all of Plaintiffs' detailed arguments to be subsumed within Plaintiffs' more general attack to each of the challenged provisions of the Ordinance.

Moreover, since the City contends that its Motion establishes the validity of the Ordinance in its entirety, it is Plaintiffs' burden to point out to the Court any issues or claims that the City's Motion fails to address. The Court has considered all Plaintiffs' responses and the City's replies in determining whether the arguments that Plaintiffs claim the City has not addressed in its Motion actually raise any genuine issues of material fact precluding summary judgment.

Any arguments raised by Plaintiffs that are not addressed explicitly in this Opinion are rejected.

## IV. *GENERAL OBJECTIONS TO THE CITY'S EVIDENCE*

The City has submitted what it claims to be the Ordinance's entire legislative record, including all evidence considered by the City Council in passing the Ordinance as well as minutes, transcripts, and videotapes of the Council's Sexually Oriented Business Committee's meetings and public hearings and selected legislative history for prior versions of the Ordinance. *See* Exhibits A–D, 1–43 to the City's Motion for Summary Judgment [Doc. # 120], Supplement to City's Motion [Doc. # 158].[71] To support their claim that

---

**71.** The record consists of the following materials: prior versions of the Ordinance, Exhibits A–D to City's Motion [Doc. # 120]; a "briefing book" for the City Council's 1996–97 Sexually Oriented Business Committee containing background materials on the history of Houston's regulation of sexually oriented businesses, legislative reports for previous versions of the Ordinance, and secondary academic materials regarding pornography, Exhibit 1 to City's Motion; Committee meeting minutes and transcripts, Exhibits 2–4, 6–16, 19, 37; minutes and transcripts of public hearings held by the Committee, Exhibits 3, 5, 18; Committee meeting schedules, memoranda, press releases, and miscellaneous evidentiary materials, Exhibits 2–19, 37–38; a list of private parks in Houston, Exhibit 20; Vice Squad statistics regarding sexually oriented businesses, Exhibit 21; letters received by Council members

and the City's Legal Department regarding sexually oriented businesses, Exhibit 22; videotapes viewed by Committee members, Exhibits 40–41; videotapes of three Committee meetings, Exhibits 39, 42–43; transcripts of public hearings held in 1982–90 for earlier versions of the Ordinance, Exhibits 23–35; and two memoranda from City Attorney Gene Locke to the Committee, *see* Supplement to City's Motion [Doc. # 158]. Finally, a summary of the Committee's deliberations and section-by-section explanation of the Ordinance's new provisions are contained in the 1997 Legislative Report, Exhibit 36 to City's Motion.

The City Council relied virtually completely on the Sexually Oriented Business Committee, which was advised by the City's Legal Department, to analyze the issues, debate potential new Ordinance provisions, and to adopt proposed legislation. Indeed, the City did not even submit as

Ordinance 97–75 is a content-based restriction on speech and should be subjected to strict scrutiny, or in the alternative that the Ordinance is content-neutral but does not serve substantial governmental interests, Plaintiffs wage a multitude of attacks against the legislative record submitted by the City.

For example, Plaintiffs argue that the entire legislative record should be stricken because it is replete with hearsay; contains numerous unauthenticated documents; contains unqualified and unreliable expert testimony; contains conclusory evidence; contains evidence that is not reasonably believable, and, to the extent that it does not address actual secondary effects caused by sexually oriented businesses, is not relevant. *See* Dee & Dee's Motion to Strike [Doc. # 168]; FTU's Objections to City's Evidence [Doc. # 166]; A.H.D.'s Objections to City's Evidence [Doc. # 174]. For the following reasons, the Court rejects all of these arguments.

■ First, most of the materials contained within the legislative record do not constitute hearsay because they are not offered to prove the truth of the matters asserted within them. Instead, they are offered solely to reveal the scope of the City Council's Sexually Oriented Business Committee's investigation and deliberations and to disclose the evidence considered by the Committee in formulating the provisions of Ordinance 97–75. In other words, the City has not offered minutes and transcripts of Committee meetings and public hearings and evidence considered by Committee members in order to prove that sexually oriented businesses in Houston actually have the adverse impact the City claims to believe that they have. Instead, the City has offered them for the purpose of proving to the Court that the City Council, through its Committee and the City's legal staff, considered adequate amounts and types of evidence to support the new restrictions contained in the Ordinance.

■ Second, the Court rejects Plaintiffs' arguments that the exhibits comprising the legislative record must be stricken because they are not properly authenticated. In order to authenticate the exhibits as the legislative record, the City submitted an affidavit by the Sexually Oriented Business Committee's custodian of records, Elizabeth Dalheim, in which she avers that these exhibits "are a true and correct copy of the documents received, created and/or maintained by the Committee" in the course of its deliberations. Affidavit of Elizabeth Dalhein, Attachment to City's Motion [Doc. # 120]. The Court finds this authentication sufficient for the purposes for which the evidence is offered, namely to show the Court what evidence the Committee considered and what transpired during the Committee's meetings and hearings. It is not necessary for the City to have individually authenticated each piece of evidence that the Committee considered, nor was it necessary for the Committee to have only considered evidence that was itself properly authenticated so as to be admissible in court under the Federal Rules of Civil Procedure. Plaintiffs have not raised

part of the legislative record the minutes of the January 15, 1997, meeting in which the full City Council voted to enact Ordinance 97–75.

The Legislative Report for the Ordinance, dated January 7, 1997, was adopted by the Committee on the day after Committee members received it, which was one week before the full City Council voted on the proposed Ordinance. At the Committee's final meeting held on January 7, 1997, Committee members voiced strong concern that they were being asked to approve a document that they had not been given a chance to read. *See* Transcript of January 7, 1997, Committee Meeting, Exhibit 19D to City's Motion [Doc. # 120], at 8–14. Although the Report does not appear to contain information or evidence that was not included in the minutes and transcripts of the Committee's meetings and public hearings, this fact nevertheless reflects negatively on the reliability of the Report, which the City has offered to illuminate the City Council's intent in enacting various provisions of the Ordinance.

In addition to the legislative record filed with the City's Motion for Summary Judgment, the City also filed a unilateral "stipulation" regarding various matters, including decisions of the Ordinance hearing officers, lists of City ordinance numbers, and portions of the City Charter. *See* Exhibit 3 to City's Reply to FTU's Locational Response [Doc. # 244]. The FTU Plaintiffs have moved to strike this exhibit on the ground that a "stipulation" is, by definition, the result of an agreement and Plaintiffs did not agree to the admissibility of any of these items. This Motion [Doc. # 253] is **DENIED.** The Court deems these items "exhibits" and acknowledges they are not mutually agreed.

any serious question as to whether the minutes and transcripts are genuine and as to whether the prior legislative materials submitted by the City actually are materials previously created by the City in support of its earlier sexually oriented business ordinances. Plaintiffs' concerns regarding the authenticity or reliability of evidentiary materials submitted to the Committee are more properly raised as substantive attacks on those materials, and the Court has considered the merits of Plaintiffs' objections as such in assessing the adequacy of the legislative record for each challenged provision of the Ordinance.

Third, the Court declines to strike any of the City's exhibits from the legislative record on the grounds that they are conclusory, are not reliable, or are not reasonably believable. These arguments go to the weight that these materials should be given, not their admissibility. As shown in the following sections, the Court has made substantive decisions as to whether the City Council could have reasonably relied upon the proffered evidence in determining that the provisions of Ordinance 97–75 would address negative secondary effects associated with constitutionally protected adult businesses.

Finally, the Court rejects Plaintiffs' relevance objections. Plaintiffs contend that the materials in the legislative record are not relevant because they fail to address secondary effects of sexually oriented businesses. Again, this argument goes to the weight which this Court should afford those materials, rather than their admissibility for summary judgment purposes. The Court has therefore considered all legislative history materials submitted by the City in support of Ordinance 97–75.

For these reasons, the Court rejects Plaintiffs' procedural objections to the City's summary judgment evidence. Dee & Dee's

Motion to Strike [Doc. # 168] is therefore **DENIED.**[72] FTU's and A.H.D.'s Objections to Defendant's Evidence [Docs. # 166 and 174] and all other similar objections raised by other Plaintiffs are **OVERRULED.**

## V. OBJECTIONS TO SPECIFIC PROVISIONS OF THE ORDINANCE

### A. Coverage of the Ordinance

#### 1. Vagueness

■ The Marketing Organization and the Dee & Dee Plaintiffs argue at length that Ordinance 97–75 is unconstitutionally vague because it does not clearly define what businesses it covers. See Marketing Organization's Response [Doc. # 164], at 3–11; Dee & Dee's Response [Doc. # 178], at 38–42. In this argument, Plaintiffs challenge §§ 28–121 and 28–122, the provisions of the Ordinance that define what types of sexually oriented businesses are covered. These provisions, however, are unchanged from the prior version of the Ordinance.[73] Under both the prior and current version of the Ordinance, § 28–122 requires all "enterprises" to obtain a permit in order to operate in Houston. "Enterprise" is defined as:

> An adult bookstore, adult cabaret, adult encounter parlor, adult lounge, adult modeling studio, adult movie theatre or any establishment whose *primary business* is the offering of a service or the selling, renting or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to its customers, and which is distinguished by or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas.

§ 28–121 (emphasis added).

Plaintiffs contend that the Ordinance's failure to define "primary business" in the defi-

---

**72.** The Dee & Dee Plaintiffs have submitted two alternative responses to the City's Motion, depending on whether the Court grants or denies their Motion to Strike. Pursuant to the Dee & Dee Plaintiffs' instruction, the Court has considered the response designated for use if the Motion to Strike is *not* granted [Doc. # 178]; the Court has not considered the Dee & Dee Plaintiffs' alternative response [Doc. # 177].

**73.** The Ordinance's coverage is only expanded in that Article II, containing §§ 28–81 to 28–116, which previously applied only to adult arcades, now, under Ordinance 97–75, also applies to "adult mini-theatres." This expansion of coverage is addressed *infra* in Section V.A.4.

nition quoted above renders it void for vagueness, or at least creates a fact question regarding whether the Ordinance "give[s] person[s] of ordinary intelligence a reasonable opportunity to know what is prohibited, so that [they] may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Plaintiffs contend that the Ordinance constitutes an impermissible "prior restraint" by allowing City officials unbridled discretion in determining what businesses must obtain a permit in order to operate. *See Shuttlesworth v. City of Birmingham, Ala.,* 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (" '[an] ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms' ") (quoting *Staub v. City of Baxley,* 355 U.S. 313, 322, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958)).

■ In response, the City argues first that none of the enterprise Plaintiffs in this suit have standing to raise this argument because all have applied for permits or joined in this lawsuit and none have claimed that the Ordinance does not apply to them. The Court concludes that the City's argument on

this issue lacks merit since parties who are clearly covered by a law may nevertheless raise First Amendment vagueness challenges to that law on behalf of non-litigants who may not know whether or not they are covered. As the Supreme Court explained in *American Mini Theatres:*

[A]n exception from traditional rules of standing to raise constitutional issues has reflected the Court's judgment that the very existence of some statutes may cause persons not before the Court to refrain from engaging in constitutionally protected speech or expression. The exception is justified by the overriding importance of maintaining a free and open market for the interchange of ideas.

427 U.S. at 60, 96 S.Ct. 2440 (citations omitted).[74] *See also SDJ,* 636 F.Supp. at 1365 n. 2 ("opponents who challenge an ordinance on the basis of the first amendment are 'entitled to rely on the impact of the ordinance on the expressive activities of others as well as their own' ") (quoting *Schad,* 452 U.S. at 66, 101 S.Ct. 2176).[75]

As for the merits of Plaintiffs' vagueness claim, the City notes that a state court has already decided that the term "primary business," as used in Ordinance 91–187, the immediate predecessor to Ordinance 97–75, is not unconstitutionally vague. *See Mayo v. State,* 877 S.W.2d 385, 388–89 (Tex.App.—Houston [1st Dist.] 1994, no writ). *Accord 4330 Richmond,* No. 91–0665, slip. op. at 24.[76]

74. In *American Mini Theatres,* the Supreme Court continued its observations on standing by explaining that "the litigant is not permitted to assert the rights of third parties" if "the statute's deterrent effect on legitimate expression is not 'both real and substantial,' and if the statute is 'readily subject to a narrowing construction by the state courts.' " 427 U.S. at 60, 96 S.Ct. 2440 (citations omitted). However, this Court may only make these determinations in the course of addressing Plaintiffs' vagueness argument, which is raised on behalf of non-litigants.

75. There is some dispute among the parties in this action as to whether the current challenge to Ordinance 97–75 is a facial challenge or an "as applied" challenge. The Court need not specifically decide this issue. In *American Mini Theatres,* the Supreme Court found it unnecessary to state expressly whether the challenge at bar was facial or "as applied." Addressing the plaintiffs' argument that the ordinance was impermissibly vague, the Court stated that "even if there may be some uncertainty about the effect of the ordi-

nances on other litigants, they are unquestionably applicable to these respondents." 427 U.S. at 58–59, 96 S.Ct. 2440.

As to some provisions of the Ordinance, for instance the permit requirement for individual managers and entertainers, some Plaintiffs have clearly raised specific "as applied" challenges. These challenges are addressed *infra* at Section V.G.6. The N.W. Enterprises Plaintiffs filed their briefing under the apparent assumption that only facial challenges to the Ordinance are currently at issue and therefore that Plaintiffs would have further opportunity later to raise some "as applied" challenges. Because Plaintiffs have had ample notice that the City has requested the Court to evaluate the validity of the entire Ordinance at the present stage of the proceedings, the Court rejects Plaintiffs' request for further briefing on such unraised issues.

76. Judge John Rainey held that "a common sense reading of Ordinance 91–187 reveals that the Ordinance has 'excluded businesses whose

In *Basiardanes*, 682 F.2d at 1210, the Fifth Circuit rejected a claim that the phrase "showing adult films on a 'regular basis'" was unconstitutionally vague, based in part on its conclusion that "state courts may clarify it without insuperable difficulty."[77] Therefore, under *Basiardanes*, the narrowing construction that, for instance, the *Mayo* court has already judicially imposed on the term "primary business" immunizes the term from Plaintiffs' vagueness challenge.[78] The Court finds that Plaintiffs have failed to raise a genuine issue of material fact as to whether the Ordinance defines with sufficient clarity what businesses it regulates. The meaning of "primary business" in the Ordinance's definition of which entities it covers, § 28–121, is not unconstitutionally vague.[79]

### 2. Overbreadth

■ As discussed *infra* in Section V.B.3.a., many Plaintiffs argue that the Houston City Council did not have evidence that Plaintiffs' businesses produce undesirable secondary effects on surrounding areas. In addition, the Marketing Organization Plaintiffs contend that, even if some busi-

nesses covered by the Ordinance do produce undesirable secondary effects, the Ordinance is nevertheless overbroad because it also applies to businesses that do *not* produce undesirable secondary effects. Specifically, the Marketing Organization Plaintiffs argue that the Ordinance is overbroad "because it has the ability to sweep within its coverage mainstream bookstores and videostores that typically cannot be classified as 'sexually oriented businesses' and establishments that do not generally produce unwanted secondary effects." Marketing Organization's Response [Doc. # 164], at 13.

The City contends that a "main-stream" business which has, for example, only some material depicting simple nudity would not fall under the Ordinance's coverage because it would not meet the Ordinance's definition of engaging in a "primary business" of providing adult material. *See* City's Reply to Marketing Organization [Doc. # 203], at 7–8. If, however, a business that considers itself to be "main-stream" actually meets the Ordinance's definition of a covered enterprise,

---

activities might incidentally cause sexual stimulation' ... As such, Ordinance 91–187 is adequately precise; Plaintiffs have fair notice that they are subject to regulation under Ordinance 91–187." *4330 Richmond*, No. 91–0665, slip. op. at 24.

77. In reaching this conclusion, the *Basiardanes* court relied in part on the Supreme Court's statements in *American Mini Theatres* that a statute may be "'readily subject to a narrowing construction by the state courts.'" 427 U.S. at 60, 96 S.Ct. 2440 (quoting *Erznoznik v. City Jacksonville*, 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975)).

78. The Dee & Dee Plaintiffs incorrectly argue that this vagueness challenge cannot be resolved through summary judgment because it raises factual issues regarding whether or not the allegedly vague term will create a chilling effect on protected speech and whether persons of common intelligence may differ in their interpretations of its meaning. *See* Dee & Dee's Response [Doc. # 178], at 40–41. Under *Basiardanes*, the parties need not adduce a factual record on the vagueness or clarity of a term that has already been upheld as sufficiently clear in the same context by other courts. *See* 682 F.2d at 1210.

79. The term "primary business" in Ordinance 97–75 replaced the term "major business," which appeared in the pre–1991 versions of the

Ordinance. This change made the Ordinance consistent with the state enabling statute that allows counties and municipalities to regulate adult businesses, which was amended in 1989 in part to change the term "major business" to "primary business." *See* Tex.Loc. Gov't Code § 243.002 (previously codified at Tex Rev.Civ.Stat. art. 2372w). The Fifth Circuit has held that the previous term, "major business," was not unconstitutionally vague. *See SDJ*, 837 F.2d at 1278 ("[t]he grant of discretion is based on definitive, intelligible standards and is not unbridled"); *Stansberry*, 613 F.2d at 1290 (use of the term "major business" in the context of defining a sexually oriented business gave fair warning of the conduct described and "excluded businesses whose activities might incidentally cause sexual stimulation"). "[A] mere change of phraseology in the revision of a statute in force before will not change the law previously declared, unless it indisputably appears the Legislature intended a change." *Palmer v. Palmer*, 831 S.W.2d 479, 482 (Tex.App.—Texarkana 1992, no writ). Also, a substantive change is not presumed where, as here, the terms of the earlier statute and the revision have the same meaning. *See Walker v. Money*, 132 Tex. 132, 120 S.W.2d 428, 431 (1938). *See also 4330 Richmond*, No. 91–0665, slip op. at 24 ("Ordinance 91–187 is not unconstitutionally vague because it does not further define the term 'primary' nor is it unconstitutionally vague because it replaces the term 'primary' for the term 'major'").

then, in the judgment of the City Council, based on the evidence it considered in enacting the Ordinance, that business is in the class of businesses which produce undesirable secondary effects in need of City regulation.

The Court rejects the Marketing Organization Plaintiffs' overbreadth challenge. As described in the previous section, Ordinance 97–75 covers the same categories of businesses as the previous versions of the Ordinance which have been upheld. *See SDJ,* 837 F.2d at 1273–74. Although the Court will consider in the following sections whether the Houston City Council had sufficient evidence to support the increased restrictions of Ordinance 97–75 on constitutionally protected sexually oriented businesses, the Court has no basis on which to invalidate the Ordinance merely because of the breadth of the Ordinance's coverage.

### 3. Enterprises Containing Coin–Operated Machines

▆ The N.W. Enterprises Plaintiffs argue that Ordinance 97–75 cannot apply to adult arcades and adult mini-theatres containing coin-operated machines because, if it did, it would conflict with and thus be preempted by a provision of the state statute that enables Texas counties and municipalities to regulate sexually oriented businesses, TEX.LOC. GOV'T CODE § 243.005(b). *See* N.W. Enterprises' Response [Doc. # 151], at 10. The Court is not persuaded by this argument.

In *Dallas Merchant's and Concessionaire's Ass'n v. City of Dallas,* 852 S.W.2d 489 (Tex.1993), the Texas Supreme Court explained the law concerning state law preemption and the power of home-rule cities, such as Houston, as follows:

An ordinance of a home-rule city that attempts to regulate a subject matter preempted by a state statute is unenforceable to the extent it conflicts with the state statute. However, the mere fact that the legislature has enacted a law addressing a subject does not mean the complete subject matter is completely preempted. A general law and a city ordinance will not be held repugnant to each other if any other reasonable construction leaving both

in effect can be reached. Thus, if the Legislature chooses to preempt a subject matter usually encompassed by the broad powers of a home-rule city, it must do so with unmistakable clarity.

*Id.* at 491 (citations and quotation marks omitted).

Plaintiffs argue specifically that, to the extent that Ordinance 97–75 purports to regulate enterprises containing coin-operated machines, it is preempted by TEX.LOC. GOV'T CODE § 243.005(b). The Court does not find that § 243.005(b) conflicts with any part of Ordinance 97–75 with sufficient clarity to create preemption. This statute provides that:

A regulation adopted under this chapter *may not discriminate against a business* on the basis of whether the business holds a license or permit under the Alcoholic Beverage Code or *on the basis of whether it contains one or more coin-operated machines* that are subject to regulation or taxation, or both, under Chapter 8, Title 132, Revised Statutes.

TEX. LOC. GOV'T CODE § 243.005(b) (emphasis added). Ordinance 97–75 does not violate this statute. Provisions of the Ordinance which regulate businesses containing coin-operated machines do not regulate these businesses *on the basis that* they contain coin-operated machines, but instead on the basis that they provide adult entertainment.

In *SDJ,* the district court rejected a similar preemption argument regarding the City's regulation of adult businesses that hold licenses to sell alcohol. *See* 636 F.Supp. at 1373–74 ("the fact that a business has a liquor license does not insulate it from other forms of municipal regulation ... because the Ordinance does not regulate the land use of these businesses on the basis of their alcohol use, but regulates them as a result of the secondary affects [sic] they have on surrounding areas").

Moreover, Plaintiffs' interpretation of § 243.005(b) is in clear conflict with the statutory provision that immediately precedes it. Section 243.005(a) states that:

A business is not exempt from regulation under this chapter because it holds a license or permit under the Alcoholic Bever-

age Code authorizing the sale or service of alcoholic beverages or *because it contains one or more coin-operated machines* that are subject to regulation or taxation, or both, under Chapter 8, Title 132, Revised Statutes.

TEX. LOC. GOV'T CODE § 243.005(a) (emphasis added).

The Court therefore finds that Ordinance 97–75 is not in conflict with and is not preempted by TEX. LOC. GOV'T CODE § 243.005(b).[80]

#### 4. Extension of Ordinance's Coverage to Adult Mini–Theatres

 The Dee & Dee and N.W. Enterprises Plaintiffs appear to argue that the City had no basis for extending Article II of the Code of Ordinances, which previously applied only to adult arcades, to cover adult mini-theatres as well.[81] *See* Dee & Dee's Response [Doc. # 178], at 56; N.W. Enterprises' Response [Doc. # 151], at 24. The Court rejects this challenge.

In its deliberations, the City Council's Sexually Oriented Business Committee considered evidence that the previous version of Article II, that applied only to businesses providing adult entertainment through machine-operated devices intended for viewing by five or fewer patrons in the same room, was insufficient to meet the City's intended purpose of limiting negative secondary effects associated with businesses that provide adult entertainment through machine-operated devices. Specifically, the Committee concluded that Article II needed to be extended to cover businesses which provide viewing of such adult entertainment in the same room by *more than five* patrons. During one of their meetings, the Committee members were informed that Article II was originally based on a California statute that addressed the secondary effects produced by adult arcades. Arcades were defined in that statute as enterprises that provide coin-operated viewing of adult entertainment for five or fewer people in the same room. However, since the time Article II was enacted, a number of businesses in Houston began providing such viewing for more than five people in the same room. These businesses are similar in function to adult arcades, and the City's Legal Department believed that these businesses cause secondary effects similar to adult arcades.[82]

---

**80.** In *Hang On*, 65 F.3d at 1257, the Fifth Circuit rejected an analogous argument to the one raised here by the N.W. Enterprises Plaintiffs. There, the plaintiffs claimed that a city's "no-touch" ordinance that applied to adult cabarets, which held licenses to serve alcoholic beverages, but not to nude modeling studios, which did not hold licenses, violated a state statute prohibiting discrimination against businesses on the basis of whether they hold alcoholic beverage licenses. The court determined that because the ordinance had only a "loose fit" with businesses holding licenses to serve alcoholic beverages, it did not discriminate against businesses on this basis. The court reasoned that the ordinance had this loose fit because it was both underinclusive and overinclusive: underinclusive in that many businesses served alcohol but were not subject to the regulation because they were not adult cabarets, and overinclusive in that adult cabarets not required to have alcoholic beverage licenses were still subject to the regulation. Likewise in the case at bar, the provisions of Article II of the Code of Ordinances, which apply primarily to businesses containing coin-operated machines, namely adult arcades and adult mini-theatres, do not discriminate against those businesses on the basis that they contain coin-operated machines. As in *Hang On*, the provisions of Article II have only a "loose fit" with the prohibited classification. These provisions are extremely "underin-

clusive" in that many businesses that have coin-operated machines but do not provide adult entertainment are not affected by Article II. They are overinclusive because they also apply to businesses that dispense adult entertainment through electronically or mechanically controlled machines that are not specifically coin-operated. *See* § 28–81.

**81.** As described *supra* note 35, Article II includes §§ 28–81 to 28–116 of the Code of Ordinances. Article III, which includes §§ 28–121 to 28–136, covers *all* adult business enterprises, including adult arcades and mini-theatres.

**82.** An attorney from the City's Legal Department told the Committee that the arcade regulations contained in Article II were

designed to eliminate the kind of anonymous sexual contact and criminal activities in peep show facilities that the Committee heard testimony about from the Vice Division. [The attorney] said unfortunately it was modeled on a California ordinance which defined a peep show device as one intended for the viewing of five or fewer persons. He said the City did not get very far into the enforcement of the Arcade Ordinance before the operations that wanted to have this kind of enclosed both [sic] enter-

The Court finds that the City Council members could reasonably rely on this explanation and evidence to conclude that adding adult mini-theatres to Article II's coverage would help decrease negative secondary effects created by these businesses, including public lewdness violations and conditions which may contribute to the spread of sexually transmitted diseases. Therefore, the Court holds that the City had sufficient justification to extend Article II of the Code of Ordinances to cover adult mini-theatres, and thus this extension is a content-neutral amendment to the prior version of the Ordinance. The Court also holds that this extension to adult mini-theatres, like Article II's previous restrictions on adult arcades, is narrowly tailored to achieve a substantial governmental interest and allows operators of adult mini-theatres sufficient alternative avenues of communication. The extension of Article II to cover adult mini-theatres in addition to adult arcades is thus constitutionally permissible.[83]

## B. *Locational Restrictions*[84]

Plaintiffs' most fierce challenge to Ordinance 97–75 is against its increased locational restrictions on sexually oriented businesses. These new restrictions consist of four material changes to the earlier versions of the Ordinance. First and most significantly, Ordinance 97–75 increases the minimum distance between sexually oriented businesses and protected land uses from 750 to 1,500 feet. Second, it increases the radius for calculating whether 75% of the tracts in a surrounding area are residential from 1,000 to 1,500 feet. Third, it adds public parks to the list of protected land uses. Finally, it creates a new formula for determining whether an area is 75% residential, which gives greater weight than was previously given to multifamily dwellings.[85]

tainment figured out that by opening it up to six or more persons in terms of the size of the booth they could essentially evade the ordinance. [The Legal Department recommended that the Committee] change the Arcade Ordinance to include mini theatre booths or preview booths or entertainment booths, all of which do not presently fall within the purview [of Article II].

Minutes for October 3, 1996, Committee Meeting, Exhibit 10B to City's Motion [Doc. # 120], at 2.

**83.** The N.W. Enterprises Plaintiffs argue that there is a genuine issue of fact regarding whether the need for the Ordinance's application to adult movie theatres is supported by substantial evidence because the City has admitted that "there was no finding by the City Council with respect to adult movie theatres that problems were experienced at such establishments similar to .those experience [sic] at the enclosed booth businesses." N.W. Enterprises' Response [Doc. # 151], at 24 (citing City's Response to N.W. Enterprises Plaintiffs' First Set of Interrogatories, Exhibit 3 to N.W. Enterprises' Response, at 6). This argument is meritless. Adult movie theatres, other than mini-theatres and arcades, are not subject to the restrictions imposed by Article II. In the remainder of the pertinent interrogatory response, the City explains that the City Council's Sexually Oriented Business Committee found that different types of enterprises required different types of regulation and that the Committee attempted to tailor regulations to specific problems associated with the different types of enterprises. Thus, the City did not "admit" anything by stating that movie theatres experience different problems from enclosed booth businesses.

**84.** As described earlier, in accordance with the Court's prior scheduling orders, the parties briefed the summary judgment issues in two stages, first addressing all issues other than the Ordinance's locational restrictions and later addressing only the locational restrictions. In its replies, the City has included a number of motions to strike Plaintiffs' responses insofar as they include matters not pertaining the issues designated for briefing in that stage of the case. Because the bifurcation of briefing on the locational and non-locational issues was established as a matter of convenience for the parties and because the City has now had the opportunity to reply to all arguments raised by the Plaintiffs, the bifurcation is no longer relevant to the case. These motions to strike filed by the City [contained in Docs. # 234, 235, 236, 243, and 244] are all therefore **DENIED**.

**85.** These new restrictions appear in § 28–125(b), which provides that a sexually oriented business may not obtain an operating permit if "one (1) or more of the following conditions exist":

(1) The applicant's enterprise is located within *one thousand five hundred (1,500) feet* of any school, church, *public park*, or licensed day care center. Measurements shall be made in a straight line, without regard to intervening structures or objects, from the nearest point on the property line of the applicant's enterprise to the nearest point on the property line of such school, church, *public park*, or licensed day care center;

Plaintiffs wage both statutory and constitutional attacks on these new restrictions. First, they argue that these restrictions are essentially zoning regulations and are therefore impermissible under a recent amendment to the Houston City Charter which prohibits zoning without a voter referendum. *See, e.g.,* FTU's Locational Response [Doc. # 221], at 80–98. In addition, the N.W. Enterprises Plaintiffs argue that, to the extent that these restrictions apply to adult businesses containing coin-operated machines, they are preempted by two state statutes that already provide locational regulation of coin-operated machines. *See* N.W. Enterprises' Response [Doc. # 151], at 10–14. Finally and most strenuously, Plaintiffs contend that the new locational provisions constitute impermissible restrictions on speech under the First Amendment.

Before addressing the constitutionality of the Ordinance's new locational restrictions, the Court must first consider Plaintiffs' local and state statutory arguments. *See United States v. Wells Fargo Bank,* 485 U.S. 351, 354, 108 S.Ct. 1179, 99 L.Ed.2d 368 (1988) (court should "resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue"); *Railroad Commission of Tex. v. Pullman,* 312 U.S. 496, 498, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (a federal court should avoid addressing a "substantial constitutional issue … if a definitive ruling on the state issue would terminate the controversy"). However, before considering Plaintiffs' local and state statutory arguments, the Court must consider whether abstention is appropriate on these issues.

### 1. Abstention Question

■ In *Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 1072–75, 137 L.Ed.2d 170 (1997), the Supreme Court cautioned that federal courts should hesitate before addressing federal constitutional claims that could be rendered moot by the resolution of novel state law issues. The Court explained that a lower court, when confronted by such a situation, could avoid making an unnecessary federal constitutional ruling by invoking *Pullman* abstention, or, if available, the less costly option of certifying the state law issue for resolution by a high state court. However, this Court finds several material differences between the Supreme Court's recent pronouncements in *Arizona* and the case at bar, which militate against abstention here.

First, in *Arizona,* one party urged the lower federal courts—both the district court and the Court of Appeals—to certify the state law issue for resolution by the Arizona Supreme Court. *See Arizona,* 117 S.Ct. at 1073. Here, in contrast, no party has requested that this Court abstain from deciding any local or state law issues or certify them to the Texas Supreme Court. In fact, parties on both sides of this lawsuit have submitted briefs urging this Court *not* to exercise its abstention power. *See* FTU's Memorandum in Response to Court's Suggestion of *Pullman* Abstention [Doc. # 272]; City's Memorandum in Opposition to Abstention [Doc. # 321].[86] *See also* Dee & Dee's Memo-

---

(2) The applicant's enterprise is located within one thousand (1,000) feet of any other enterprise for which there is a permit. Measurements shall be made in a straight line, without regard to intervening structures or objects, from the nearest point on the property line of the applicant's enterprise to the nearest point on the property line of any other enterprise; (3) Seventy-five (75) percent or more of the tracts within a circular area, as described herein, are residential in character. The radius of such circular area shall be *one thousand five hundred (1,500) feet,* and the center of such circular area shall correspond to the midpoint of a line joining the two most distant points on the boundary of the tract on which the enterprise is located; *multifamily tracts shall be counted as multiple residential tracts based upon the tax records acreage of the multifamily*

tract according to the following formula: each one-eighth (1/8th) acre of land or fraction thereof shall be equivalent to one (1) residential tract. For purposes of this calculation a residential tract or multifamily tract shall be considered to be in the circular area in its entirety if any portion of it lies within the circular area.
§ 28–125(b) (new provisions italicized).

**86.** The FTU Plaintiffs have filed an Objection to the City's Memorandum in Opposition to Abstention [Doc. # 326] on the sole ground that the City's Memorandum was filed several weeks late. Because the Court requested these memoranda merely as a courtesy from parties that might be interested in a potentially tangential issue, by filing late the City merely risked the possibility that the Court would not consider the memorandum prior to making its decision on abstention.

randum of Law on Abstention [Doc. # 291] (declining to take position on abstention issue).

Second, the Court concludes that the local and state statutory issues raised here are not too novel or difficult for resolution in this forum. State law authorities provide sufficient guidance for this Court on these issues.

Third, with respect to the Houston City Charter issue, the Court finds additional differences between *Arizona* and the case at bar. One difference is that, here, the City Charter issue involves a question of municipal, not state, law. Although this Court looks to state law for guidance as to whether Ordinance 97–75 established "zoning," as that term was contemplated in the passage of the 1994 amendment to the Houston City Charter, there is no reason to believe that the Texas Supreme Court, which is an expert in state law but not necessarily municipal law, has any more insight than this Court into the intent of the Houston voters when they enacted this amendment.

Another difference between this case and *Arizona* is that, in *Arizona,* the Supreme Court was concerned about avoiding "friction-generating error" by allowing the state court the first opportunity to " 'ascertain whether a construction [of the state law] is fairly possible' that will contain the statute within constitutional bounds." 117 S.Ct. at 1074 (quoting *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). Here, however, the Houston City Charter issue is not one that might merely narrow the reach of the challenged locational restrictions but is instead one that might invalidate these new provisions in their entirety. In other words, in determining whether the locational restrictions were enacted in violation of the Houston City Charter, the Texas Supreme Court would have no judicial incentive to construe those restrictions narrowly in order to avoid constitution-

al difficulties, and thus this Court need not abstain in deference to the state court's ostensible desire to be guided by such an incentive.

Finally, the Court also notes that the Fifth Circuit has condoned, and has itself engaged in, federal court consideration of state statutory issues in the course of ruling on the constitutionality of municipal ordinances regulating adult entertainment. *See SDJ,* 837 F.2d at 1280. In addition, in *Louisiana Debating and Literary Ass'n v. City of New Orleans,* 42 F.3d 1483, 1491 n. 10 (5th Cir. 1995), the Fifth Circuit affirmed a district court's decision to decline a request for abstention, which the district court based in part on the observation that *"Pullman* abstention is generally inappropriate where First Amendment or fundamental rights are at issue." Noting that "abstention is the exception, not the rule," the Fifth Circuit explained that in determining whether to make

> "the extraordinary decision to stay federal adjudication ... [a] district court must carefully assess the totality of circumstances presented by a particular case. This requires a broad inquiry which should include consideration of the rights at stake and the costs of delay pending state court adjudication."

*Id.* at 1491 (quoting *Duncan v. Poythress,* 657 F.2d 691, 697 (5th Cir.1981)). *See also City of Houston v. Hill,* 482 U.S. 451, 467, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) ("we have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment").

In light of its assessment of the totality of the circumstances, this Court concludes that abstention is not warranted on the local and state statutory challenges to the Ordinance's locational restrictions. The Court will proceed to address these arguments in the following sections.[87]

Moreover, the FTU Plaintiffs' Motion to Strike is utterly frivolous because the City's Memorandum is substantively in complete *agreement* with the FTU Plaintiffs' position on the issue. FTU's Objection [Doc. # 326] is **OVERRULED.**

87. For similar reasons, the Court also declines to abstain from deciding Plaintiffs' other state statutory and constitutional claims, discussed in Sections V.A.3., V.E.1., V.F.4., V.G.4., V.G.5.c., and V.H.5. Because the Court concludes that abstention is not appropriate, the FTU Plaintiffs' Condi-

## 2. Local and State Statutory Arguments

### a. Zoning and the Houston City Charter

 Plaintiffs argue that the new locational restrictions contained in Ordinance 97–75 constitute zoning regulations and are therefore invalid under a 1994 amendment to the Houston City Charter, which prohibits the enactment of zoning within the City without a referendum. Specifically, this amendment provides that:

> The City of Houston shall have the power to adopt a zoning ordinance only by: (a) allowing a six month waiting period after publication of any proposed ordinance for public hearings and debate and (b) holding a binding referendum at a regularly scheduled election. Any existing zoning ordinance is hereby repealed.

Charter of the City of Houston, Article VIIb, § 13, Exhibit 33 to Appendix to FTU's Locational Response [Doc. # 223]. It is undisputed that Ordinance 97–75 was enacted by a simple vote of the Houston City Council, *not* pursuant to the six month waiting period and referendum requirements of this Charter provision.

The resolution of this issue turns on the meaning of "zoning" in this Charter amendment. The Charter itself does not contain a definition of "zoning."

The City contends that the Ordinance's locational restrictions do not violate the Charter referendum requirement because the restrictions do not constitute "zoning." It claims that "[a]lthough the parties and the courts have sometimes loosely characterized the City's locational restrictions under Ordinance 97–75 and its predecessors as 'zoning' requirements, this characterization is actually incorrect." City's Motion [Doc. # 120], at 58. Instead, the City argues that the term "zoning" within the Charter amendment should be construed as having a technical meaning, applicable only to more comprehensive land use plans. In support of this argument, the City cites a secondary legal reference, 101A C.J.S. *Zoning & Land Planning*

§ 2(a) (1979), which defines "zoning" as the "division of a municipality into districts, and the regulation of buildings and structures in such districts,"[88] as well as several Texas state court cases, including *City of Brookside Village v. Comeau*, 633 S.W.2d 790 (Tex. 1982); *MJR's Fare of Dallas v. City of Dallas*, 792 S.W.2d 569, 573 (Tex.App.—Dallas 1990, writ denied); and *City of Houston v. Johnny Frank's Auto Parts Co.*, 480 S.W.2d 774, 778 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.).

In response, Plaintiffs argue that the Charter amendment is not limited to comprehensive zoning and note that the federal and state cases analyzing locational restrictions on adult entertainment have consistently referred to such restrictions as "zoning." *See, e.g., City of Renton*, 475 U.S. at 49, 106 S.Ct. 925; *SDJ*, 837 F.2d at 1273–74 (specifically referring to Houston Ordinance).

The Court agrees with the City that the locational restrictions at issue in this case do not constitute "zoning" as contemplated by the 1994 Charter amendment. Although the federal courts have indeed used the term "zoning" in reference to locational restrictions on adult businesses, that terminology was not arrived at through litigation specifically addressing this issue.

When interpreting a statute that does not define a key term, a court must first look for a case specifically construing the term; if it cannot find such a case, it must then "look to the ordinary, contemporary, common meaning" of the term. *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 429 (5th Cir. 1997), *cert. denied,* ——— U.S. ———, 118 S.Ct. 700, 139 L.Ed.2d 643 (1998) (citing *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) (it is a "fundamental canon of statutory construction ... that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning")). Accordingly, this Court has first considered the state cases cited by the parties and has concluded that, under these cases, Plaintiffs' construction of

tional Motion for Injunction Pending Abstention [Doc. # 272] is **DENIED.**

---

88. It is undisputed that Houston does not have any comprehensive land use plan which divides the city into districts and affirmatively establishes permissible land uses for each district.

the term "zoning" is incorrect. This conclusion is further supported by a consideration of the "ordinary, contemporary, common meaning" of the term. Thus, both the case law and a plain meaning analysis lead the Court to conclude that the use of the word "zoning" in the 1994 Charter amendment refers to the context of a more comprehensive plan than is provided by the locational restrictions on sexually oriented businesses contained in Ordinance 97–75.

According to Plaintiffs, the Fifth Circuit conclusively ruled in *Stansberry* that locational restrictions on sexually oriented businesses which were adopted by Harris County, but are similar to the locational restrictions at issue here, constituted zoning, even though Harris County has no comprehensive zoning plan. This Court disagrees.

In *Stansberry*, the Fifth Circuit rejected the adult business owners' argument that they were even protected by the First Amendment and consequently accepted Harris County's contention that the issue in the case was whether the restrictions were a valid exercise of the County's police power. Although the court stated that because "no First Amendment interests [were] at stake," it would "therefore analyze the provisions by the traditional standards applicable to *zoning* regulations," 613 F.2d at 1288 (emphasis added), and proceeded to refer to the restrictions as zoning throughout the remainder of the opinion, the parties did not *litigate* the issue of whether the restrictions were actually "zoning" regulations *per se* or instead another similar example of the County's exercise of its police power. In other words, the crucial distinction raised in the case at bar was not at issue in *Stansberry*.

In any event, because the City Charter issue raises a question of local law, which is closely intertwined with state law, the Court finds Texas court cases which cast light on the meaning of the term "zoning" to be more relevant than the federal court opinions which appear to refer to locational restrictions on adult businesses as "zoning" simply as a matter of convenience.

Most significantly, in *City of Brookside Village*, 633 S.W.2d at 793, which was decided shortly *after Stansberry*, the Texas Supreme Court noted the possible distinction between a zoning ordinance and a less comprehensive regulation of land use. In that case, the Court upheld two city ordinances which restricted the permissible locations of mobile homes used as residences. Like the Fifth Circuit in *Stansberry*, the Texas Supreme Court did not specifically confront the question of whether the ordinances constituted zoning [89] but nevertheless held that, because the ordinances "have the *effect* of a zoning regulation," they "are to be scrutinized under ... principles relating to a municipality's exercise of general police power." *City of Brookside Village*, 633 S.W.2d at 793 (emphasis added). However, in a footnote, the Court suggested that these ordinances, which only restricted the permissible locations for a specific type of land use, did not constitute actual zoning:

> Because Brookside Village, a general law city, has no comprehensive zoning plan, the ordinances in question do not come under article 1011a, which embodies legislative authorization for zoning. *See* TEX.REV.CIV. STAT.ANN. art. 1011c (zoning power must be exercised under comprehensive plan). A city, however, may regulate land use under its general police powers.

*Id.* at 793 n. 4.[90] By noting that, under the relevant state statute, "zoning" power must be exercised under a comprehensive plan, the Texas Supreme Court clearly envisioned in this footnote that more specific locational restrictions, enacted under the City's general police powers and not under the authority of the state zoning statute, do not constitute "zoning" but are instead merely examples of other types of municipal regulation of land use.

Likewise, in *Johnny Frank's Auto Parts*, a Texas Court of Appeals applied the law es-

---

89. The Court did not have to make this decision because "[b]oth parties *concede[d]* that the ordinances in question are essentially zoning or land use ordinances." *City of Brookside Village*, 633 S.W.2d at 792 (emphasis added).

90. The statutory provision cited here, TEX.REV CIV. STAT. art. 1011c, is the predecessor to Chapter 211 of the Texas Local Government Code.

tablished by zoning cases, even though it expressly noted that the challenged ordinance was not itself a zoning ordinance. *See* 480 S.W.2d at 778 (because the ordinance was "somewhat akin to a zoning ordinance ... [t]he zoning ordinance cases ... furnish a guide for testing the validity of this exercise of the City's police power"). The court explained, however, that the ordinance, which regulated the operation of automotive wrecking and salvage yards, was not a zoning ordinance because "[i]t does not establish a comprehensive plan by which the city is divided into districts wherein property is limited to specified uses and it was not passed in accordance with the procedures specified for the passage of zoning ordinances." *Id.* Thus, under *Johnny Frank's Auto Parts,* the locational restrictions contained in Ordinance 97–75 do not constitute zoning because they do not establish a comprehensive plan.

Finally, *MJR's Fare of Dallas* does not support Plaintiffs' argument that the locational restrictions at issue here constitute zoning. In that case, a Texas appellate court upheld an ordinance placing locational restrictions on sexually oriented businesses in Dallas, finding no conflict between the restrictions and the Texas zoning enabling statute. There, the restrictions undisputably constituted zoning, but only because the city explicitly incorporated the restrictions into its official zoning ordinance. *See* 792 S.W.2d at 571.

These state cases therefore persuade the Court that Ordinance 97–75 does not violate the City Charter amendment. In further support of this conclusion, the Court agrees with the City that the "ordinary, contemporary, common meaning" of zoning refers to a comprehensive plan and encompasses regulations that establish affirmatively what land uses are permissible for certain geographic districts, not simply what uses are *not* permissible. This conclusion is supported by Black's Law Dictionary, which defines "zoning" as:

> The division of a city or town by legislative regulation into districts and the prescription and application in each district of regulations having to do with structural and architectural designs of buildings and of

regulations prescribing use to which buildings within designated districts may be put. Division of land into zones, and within those zones, regulation of both the nature of land usage and the physical dimensions of uses including height setbacks and minimum area.

BLACK'S LAW DICTIONARY 1618 (6th ed.1990).

The Dee & Dee Plaintiffs creatively argue that the locational restrictions contained in Ordinance 97–75 establish many little districts within the city, each one centered around a school, church, park, or daycare center. *See* Dee & Dee's Response [Doc. # 178], at 51. The Court, however, rejects this argument. Under the "ordinary, contemporary, common meaning" of "zoning," districts that constitute zones cannot be overlapping.

The Court is also unpersuaded by Plaintiffs' argument that the Ordinance's locational restrictions constitute zoning merely because the *Texas Digest* includes annotations to *SDJ* in its "Zoning and Planning" section located under the heading "Validity of Zoning Regulations." *See* 52 TEX.DIG.2d *Zoning and Planning* (Supp.1997). These headings are created by legal publishers and are not court-specified.

Finally, in determining the "ordinary, contemporary, common meaning" of "zoning," the Court finds it noteworthy that when the City passed the 1994 Charter amendment, no one at the time apparently believed that the amendment's reference to "zoning" would apply to the then-existing locational restrictions on sexually oriented businesses. Although the last sentence in the amendment states that "[a]ny existing zoning ordinance is hereby repealed," no sexually oriented business appears ever to have contended in a legal proceeding that the amendment's passage invalidated the 750 foot minimum distance requirement contained in the prior version of the Ordinance. Plaintiffs offer no reason as to why their City Charter argument would apply only to the new 1,500 foot distance requirement and not the former 750 foot distance requirement. Although Plaintiffs in the case at bar have raised, in their more than 600 pages of briefing, virtually every legal argument imaginable against the City's

attempt to regulate their businesses, they have not argued that the 1994 City Charter amendment provision invalidated the prior 750 foot distance requirement. Nor, apparently, did any Plaintiffs raise this argument in *4330 Richmond*, the case challenging the prior version of the Ordinance, which was tried after the 1994 City Charter amendment was passed.[91]

Finally, Plaintiffs argue that if the locational restrictions in Ordinance 97–75 are not deemed to constitute zoning, then the Houston City Council could circumvent the requirements of the Charter amendment by passing "a series of ordinances gradually regulating all land uses within Houston's limits, arriving in stages at what would amount to a comprehensive plan, without triggering the Charter requirement for a referendum." A.H.D.'s Cross–Motion and Response [Doc. # 173], at 13. The Court need not consider at what point enactments might cross such a line and become impermissible; the City's passage of the Ordinance in this case does not implicate this problem. Instead, the Or-

dinance merely restricts the potential locations for one type of business within the City; it does not create zones and affirmatively dictate how land may be used in different areas.[92]

### b. Locational Restrictions on Enterprises Containing Coin–Operated Machines

The N.W. Enterprises Plaintiffs argue that, to the extent that Ordinance 97–75 purports to impose locational restrictions on adult arcades and mini-theatres containing coin-operated machines, it conflicts with and is thus preempted by two state statutory provisions, TEX.REV.CIV.STAT. arts. 8814 and 8817, which concern state taxation and regulation of coin-operated machines.[93] The Court rejects this argument.

Article 8814 states that the regulation contained within it and Article 8817 do "not prohibit cities from restricting the exhibition of coin-operated amusement machines within three hundred (300) feet of a church, school, or hospital." Plaintiffs argue that this provision sets forth the only locational restrictions

91. Moreover, the leader of the citizen group which petitioned to put the 1994 amendment on the City ballot specifically stated in the local newspaper that the last sentence in the amendment was moot. He wrote: "[s]ince there is no existing zoning ordinance to repeal, the ... city charter referendum ... will determine only whether *future* efforts to zone Houston will require a popular vote." Jim Saltzman, *Require a Vote Before Houston Can Be Zoned*, HOUSTON CHRONICLE, January 12, 1994, Outlook Section, p. 23 (emphasis added). It appears, therefore, that even the drafter of this provision did not himself believe that the amendment would affect the City's then-existing locational restrictions on sexually oriented businesses.

92. In their argument discussed in this section, Plaintiffs primarily contend that the Ordinance's *locational* restrictions are invalid under the City Charter amendment. *See* A.H.D.'s Response [Doc. # 173], at 8–14; FTU's Locational Response [Doc. # 221], at 80–98; Dee & Dee's Response [Doc. # 178], at 47–52; N.W. Enterprises' Cross–Motion [Doc. # 268], at 2–3. However, the Dee & Dee Plaintiffs also appear to argue that other provisions of the Ordinance, including the restrictions on the businesses' signage, exterior decor, and internal structural configurations also violate the City Charter amendment. *See* Dee & Dee's Response [Doc. # 178], at 51–52. The FTU Plaintiffs also argue that the City's adoption of Ordinance 97–75 in violation of the City Charter constitutes a deprivation of

Plaintiffs' due process rights in violation of 42 U.S.C. § 1983. *See* FTU's Locational Response [Doc. # 221], at 98–101. For the reasons described above in the text, the Court rejects all of Plaintiffs' challenges brought under the Houston City Charter amendment.

Similar to their City Charter argument, the FTU Plaintiffs also argue that the Ordinance's locational restrictions violate state law because they constitute zoning and because TEX.LOC. GOV'T CODE § 211.004 mandates that a city may only enact zoning regulations pursuant to a comprehensive plan. *See* FTU's Locational Response [Doc. # 221], at 92. The Court rejects this argument. As discussed above, the locational restrictions contained in Ordinance 97–75 are not "zoning," as that term is properly used under state law. Moreover, in *City of Brookside Village*, the Texas Supreme Court addressed this very same argument, holding that, notwithstanding the predecessor statute to § 211.004, Texas cities can regulate land use under their general police powers without adopting a comprehensive zoning plan. *See* 633 S.W.2d at 793.

93. This argument is separate from the one addressed *supra* in Section V.A.3. That section considered Plaintiffs' broader state statutory challenge to the Ordinance's regulation of enterprises containing coin-operated machines, whereas this section considers the permissibility, under two state statutes, of the Ordinance's *locational restrictions* on such enterprises.

that cities may impose on any businesses that contain coin-operated amusement machines. Therefore, according to Plaintiffs, the locational restrictions in Ordinance 97–75 conflict with this provision because they prohibit adult businesses containing these machines from being located within 1,500 feet, rather than merely 300 feet, of churches and schools and because the Ordinance prohibits these businesses from locating near protected land uses other than churches, schools, or hospitals, namely daycare centers, public parks, and areas that are at least 75% residential.

The City argues that Article 8814 does not limit the locational restrictions a city may impose on businesses subject to regulation under other statutes. In support of this argument, the City relies in part on *Oniyide v. State*, 756 S.W.2d 370 (Tex.App.—Houston [14th Dist.] 1988, writ ref'd), where a court held that there was no conflict between Articles 8814 and 8817 and a city ordinance that regulated adult arcades. The *Oniyide* court reasoned that, while Articles 8814 and 8817 " 'provide comprehensive regulation of music and skill or pleasure coin-operated *machines*' . . . the purpose of the ordinance is to regulate the structural configuration and the operation of adult arcade business premises." 756 S.W.2d at 372 (quoting art. 8817). The N.W. Enterprises Plaintiffs contend, however, that *Oniyide* is not applicable here, since that case and other cases that followed its reasoning did not consider whether any *locational restrictions* on the businesses, as opposed to regulation of the businesses' *structural configurations,* conflicted with Article 8814. Because Articles 8814 and 8817 do not purport to regulate the structural configurations of the business premises but instead address only potential locational restrictions, Plaintiffs are correct that *Oniyide* does not resolve this issue.

In support of their argument that Articles 8814 and 8817 preempt the locational restric-

tions that Ordinance 97–75 imposes on businesses containing coin-operated machines, Plaintiffs rely primarily on *B & B Vending Co. v. City of Garland,* 711 S.W.2d 132 (Tex. App.—Tyler 1986, writ ref. n.r.e.). In *B & B,* the court struck down in part a city ordinance that prohibited the location of coin-operated machines within 300 feet of churches, schools, hospitals, or residentially zoned property. The *B & B* court reasoned that, by including residentially zoned property in the list of protected land uses, the ordinance impermissibly went beyond the exceptions allowed by Article 8814. The court explained that "[i]t is a familiar rule of statutory interpretation that an exception makes plain the intent that the statute should apply in all cases not excepted." *Id.* at 134 (citing *Federal Crude Oil Co. v. Yount–Lee Oil Co.,* 122 Tex. 21, 52 S.W.2d 56, 60 (1932)).

The Court finds Plaintiffs' reliance on *B & B* unavailing. In 1989, subsequent to the *B & B* decision, the Texas legislature enacted a statute specifically providing that municipalities could regulate sexually oriented businesses containing coin-operated machines that are regulated under Articles 8814 and 8817. *See* TEX.LOC. GOV'T CODE § 243.005(a).[94] Under § 243.006, permissible municipal regulation on these businesses includes locational restrictions. Thus, under § 243.005(a), read in conjunction with § 243.006, a city is permitted to set minimum distance requirements between sexually oriented businesses, including those businesses containing coin-operated machines, and whatever land uses the city "finds to be inconsistent with the operation of a sexually oriented business." TEX.LOC. GOV'T CODE § 243.006. Furthermore, since nothing in § 243.006 restricts the minimum distance requirement between sexually oriented businesses and protected land uses to 300 feet, § 243.006 implicitly allows cities to choose an appropriate minimum distance requirement.[95] Thus,

**94.** *See supra* at 53 for the language of § 243.005(a). Prior to the 1989 amendment, § 243.005(a) provided that sexually oriented businesses were not exempt from regulation simply because they hold liquor licenses. The 1989 amendment added to the statute language providing that businesses containing coin-operated machines regulated under Article 8801 *et seq.*

(which includes Articles 8814 and 8817) are likewise not exempt from regulation on that basis.

**95.** The Court's conclusion might be different here if Article 8814 were to contain an *affirmative prohibition* against cities enacting minimum distance requirements in excess of 300 feet or any language indicating that its regulation of

the *B & B* court's reasoning is no longer applicable to the issue raised here and does not invalidate either the Ordinance's 1,500 foot minimum distance requirement between protected land uses and sexually oriented businesses containing coin-operated machines, nor does it invalidate the Ordinance's inclusion of protected land uses not enumerated in Article 8814.

The Court therefore finds that the locational restrictions contained in Ordinance 97–75 are not in conflict with and are not preempted by TEX.REV.CIV.STAT. arts. 8814 and 8817. *See also Gordon v. State,* 757 S.W.2d 496, 502–03 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd) (finding no conflict between Article 8814 and prior version of Ordinance 97–75).

### 3. First Amendment Challenge

Having concluded that the locational restrictions contained in Ordinance 97–75 are not invalid under the local and state statutes cited by Plaintiffs in this action, the Court must now turn to the constitutional issues Plaintiffs raise in their attack on these restrictions. As described earlier in Section III.A.3., in order to determine what level of scrutiny should be imposed under the First Amendment on the Ordinance's new locational restrictions on constitutionally protected businesses, the Court must first decide whether the restrictions are content-based or content-neutral. For the reasons described below, the Court concludes that the legislative record does not support the City's contention that the Ordinance's increased distance requirements—namely, the increase in the minimum distance between the businesses and protected land uses from 750 to 1,500 feet and the increase in the radius for calculating whether a surrounding area is residential from 1,000 to 1,500 feet—were

enacted for the purpose of combatting negative secondary effects associated with adult businesses; thus these requirements must be subjected to strict scrutiny. However, the Court finds that the City had adequate evidence before it to justify, as content-neutral regulations, the addition of public parks to the list of protected land uses and the new formula which gives greater weight to multifamily dwellings in the calculation of whether an area is residential; therefore, these restrictions will be evaluated under intermediate scrutiny.

### a. Increased Distance Requirements: The New 1,500 Foot Rules

### i. Content–Based or Content–Neutral?[96]

■ *Plaintiff's Contentions.*—In challenging the new provisions in Ordinance 97–75 that increase the minimum distance between adult businesses and protected land uses from 750 to 1,500 feet and the radius for calculating residential areas from 1,000 to 1,500 feet, Plaintiffs argue primarily that the City enacted these increases without considering any new studies or evidence which establishes that the 750 and 1,000 foot distances required by the previous version of the Ordinance were insufficient to satisfy the legislative interests that the district court and Fifth Circuit acknowledged existed in *SDJ.* Plaintiffs contend that, although the City might have had evidence in 1986 upon which reasonable City Council members could have relied in enacting the 750 and 1,000 distances in the 1986 version of the Ordinance, which was upheld in *SDJ,* the City had no evidence supporting the need for increases in these distances to 1,500 feet in 1997. Therefore, Plaintiffs urge, the City's attempt to expand these distance requirements in Ordinance 97–75 must be analyzed

coin-operated machines is exclusive. *See Dallas Merchant's and Concessionaire's Ass'n,* 852 S.W.2d at 492–94 (interpreting TEX.ALCO BEV.CODE §§ 109.57(a) & (b)). However, Article 8814 does not include such a prohibition or language specifically indicating that its regulation of coin-operated machines is exclusive. Instead, it merely *permits* cities to enact a 300 foot distance restriction and makes no comment about whether other restrictions would also be permissible. Thus, the Court has no reason to believe that the statutory authorization for municipalities to en-

act distance requirements on sexually oriented businesses containing coin-operated machines, provided by the current version of § 243.005(a) and § 243.006, is limited to the 300 foot restriction allowed by Article 8814.

**96.** Although this section specifically focuses on the Ordinance's new distance requirements, much of the following discussion regarding the legal test for content-neutrality applies to other challenged provisions of the Ordinance as well.

as content-based regulation and subjected to strict scrutiny.

Plaintiffs further contend that the adverse secondary effects that the City claims these increased distance requirements will address do not actually exist, or at least that there are factual issues as to whether these alleged effects exist and whether the new requirements will actually alleviate such effects. *See, e.g.,* A.H.D.'s Response [Doc. # 173], at 39; Dee & Dee's Response [Doc. # 178], at 4. For example, they argue that there are factual issues regarding whether sexually oriented businesses currently operating in Houston decrease property values, are associated with higher rates of crime than other types of businesses,[97] and have dehumanizing influences on protected land uses.[98]

However, these arguments regarding the accuracy of the City's purported justifications for the increased distances miss the mark. It is not this Court's role to weigh competing evidence on these factual issues or even to determine whether the evidence upon which the City claims to have relied was highly probative or reliable. This Court is not permitted to examine Plaintiffs' substantive policy arguments regarding the accuracy of the Committee's purported findings or the impact, or lack of impact, sexually oriented businesses in Houston actually have on surrounding areas. In *SDJ*, the district court likewise declined to consider the plaintiffs' policy arguments against the 1986 version of the Ordinance and rejected the plaintiffs' proffered evidence by explaining that "[t]he fact that other experts hold conflicting opinions on the effects of sexually oriented businesses on property values is irrelevant to the Court's first amendment inquiry." 636 F.Supp. at 1367.

This Court's duty instead is merely to determine whether the City Council had before it at least a requisite, albeit relatively minimal, amount of evidence to support each of the challenged amendments to the Ordinance. As discussed *supra* in Section III. A.3., the relevant issue to the question of whether each challenged amendment is content-neutral is whether the City Council's Sexually Oriented Business Committee had before it even a minimal threshold amount of evidence upon which a reasonable Council member *could have* relied in determining whether the purported negative secondary effects actually exist and whether the amendment to the Ordinance would somehow help alleviate those effects. Thus, the Court must consider whether the City has met its burden of supporting the Ordinance's challenged new provisions with evidence *in the legislative record* tying those provisions to negative secondary effects caused by adult businesses.

*Legislative Record.*—After a thorough examination of the legislative record presented by the City, the Court has concluded that the City's decision to expand the distance requirements in the Ordinance's locational provisions was not based on any evidence of secondary effects that specifically justify these increases.[99] Rather, the preamble to Ordinance 97–75, as well as the minutes and transcripts of the meetings of the City Council's Sexually Oriented Business Committee, reveal that Committee members believed that they could impose whatever locational restrictions they wanted on adult businesses so long as the restrictions left those businesses with an adequate number of alternative sites to which they could legally relocate.

97. Plaintiffs argue that sexually oriented businesses are not responsible for any more crime than other types of businesses that are open late at night, *see, e.g.,* A.H.D.'s Response [Doc. # 173], at 36; FTU's Locational Response [Doc. # 221], at 68–72, or even than churches, schools, and other protected land uses that are located nowhere near any sexually oriented businesses, *see* Attachments to A.H.D.'s Reply [Doc. # 264].

98. Plaintiffs argue that adult entertainers express their erotic messages behind closed doors and behind solid, soundproof walls and that their messages are only perceived by willing and pay-

ing adult customers. They claim further that visitors to the protected land uses, already located at least two football field lengths away from adult businesses, simply cannot hear or see Plaintiffs' erotic messages. *See* A.H.D.'s Locational Response [Doc. # 218], at 17.

99. In reaching this conclusion, the Court reviewed the *entire* legislative record, but paid particular attention to the portions of the record specifically cited by the City in support of its arguments. *See, e.g.,* citations listed in City's Motion [Doc. # 120], at 14 & n. 5, 15.

The following clauses in the preamble to Ordinance 97–75 are the only clauses that indicate a legislative purpose behind the increased distance requirements. These clauses show that the City's justification for the increased distance requirements rests entirely on the availability of alternative sites:

WHEREAS, the City Council finds that the distance of 750 feet previously required between sexually oriented businesses and protected land uses and the radius of 1,000 feet previously used to calculate the percentage of residential tracts in the vicinity of a sexually oriented business ... were based upon initial studies by the Department of Planning and Development and a concern on the part of the City Council that greater distances might unduly affect the ability of sexually oriented businesses to find conforming locations to operate within the City; and

WHEREAS, the City Council finds that comprehensive new land use studies by the Department of Planning and Development demonstrate that increasing such distances to 1,500 feet would not unduly impact the availability of conforming sites for sexually oriented businesses; and

WHEREAS, the City Council finds that increasing such distances to 1,500 feet would provide additional and needed protection to the community from the adverse effects of sexually oriented businesses without depriving such businesses of adequate opportunities to locate within the City....

Preamble to Ordinance 97–75, at 3. In addition, the Committee's discussions about modifying the Ordinance's distance requirements

focused exclusively on the issue of the number of alternative sites that would be available if the distances were increased. *See, e.g.,* Transcript of October 23, 1996, Committee Meeting, Exhibit 12D to City's Motion [Doc. # 120]; Minutes for November 4, 1996, Committee Meeting, Exhibit 14B to City's Motion, at 2; Transcript of November 20, 1996, Committee Meeting, Exhibit 15C to City's Motion, at 3–36.

The Committee was assured by the City's Legal Department that the City had already compiled a sufficient legislative record of negative secondary effects caused by sexually oriented businesses when, more than ten years earlier in 1983 and 1986, it passed previous versions of the Ordinance, and that therefore the only constitutional obstacle for imposing stricter locational requirements was ensuring the existence of sufficient alternative sites.[100] The Committee members were told that they had the opportunity to expand the distance requirements because the City now had a more comprehensive database of land uses throughout the City which allowed City planners to make more accurate estimates of the number of sites that would be available under various restrictions.[101]

Thus, the City expanded the distance requirements based on an incorrect assessment of First Amendment law. The City's argument that there is a sufficient number of alternative sites available to which the businesses may relocate does not address the *threshold* issue raised by Plaintiffs of whether the Ordinance's increased distance requirements were enacted on a content-neutral basis, or whether instead they were enacted in a content-based manner

---

100. *See, e.g.,* Minutes for October 30, 1996, Committee Meeting, Exhibit 13B to City's Motion, at 20 (Legal Department informed Committee that, although City cannot prohibit sexually oriented businesses altogether, it can enact new regulations as long as there are sufficient alternative sites to which they can relocate).

101. *See, e.g.,* Minutes for June 17, 1996, Committee Meeting, Exhibit 2C to City's Motion [Doc. # 120], at 13 (Legal Department representative told Committee that "we now have a data base that would give the Committee perhaps the opportunity to take a closer look at what types of schemes could be developed that would be constitutional but would perhaps strengthen the lan-

guage [sic.—probably should be "locational"] provisions of the "ordinance")"; Minutes for October 3, 1996, Committee Meeting, Exhibit 10B to City's Motion, at 8 ("[thc] Legal [Department] does think there is substantial room for improving the present distance requirements from churches, schools and daycare centers perhaps to as much as 1500 feet.... [T]hat is feasible based on Planning [Department]'s data without placing undue restrictions on the market for the businesses."); Legislative Report for Ordinance 97–75, Exhibit 36 to City's Motion, at 24 ("[a]dvance [sic] computer technology has brought about a more sophisticated program for determining site availability").

with the primary purpose of closing or greatly restricting the number of sexually oriented businesses within the City. Prior to evaluating the issue of whether increased distance requirements would allow a sufficient number of alternative sites for protected businesses, the Committee should have considered evidence that these increases were justified on the basis of combatting negative secondary effects produced by the businesses. At a minimum, the Committee should have discussed or somehow considered why the increased distances would address the purported negative secondary effects, already established in the prior legislative records, better than the previous distances.

Indeed, in defending the Ordinance's new distance requirements, most of the evidence upon which the City relies concerning secondary effects is documented in the legislative history for the City's previous versions of the Ordinance. This evidence is the type that might be relevant to the current Ordinance and to this case if it in fact had been considered. However, there is no indication that Council members, their staff, or the City's Legal Department actually contemplated how this eleven to fourteen year-old factual matter could support the increased distance requirements the City enacted.[102] *See Almeda Books, Inc. v. City of Los Angeles*, No. CV–95–7771 (C.D.Cal. Jan. 8, 1998), at 23–38 (evidence contained in legislative history supporting prior adult business ordinance may only justify new ordinance if evidence specifically pertains to problem sought to be addressed by new ordinance). After a thorough examination of the full legislative record, the Court concludes that none of the evidence in the prior legislative histories constitutes sufficient justification for the *new* distance requirements.[103]

102. Although it is not necessary that City Council members themselves reviewed studies from other cities, *see Lakeland Lounge*, 973 F.2d at 1258 ("[w]e perceive no constitutional requirement that the council members personally physically review the studies of secondary effects; such a holding would fly in the face of legislative reality"), the Court has searched the legislative record in vain for evidence that *someone*, such as Council members, staff, or legal advisers looked at specific evidence from Houston's earlier legislative histories, or even studies from other cities, in the process of formulating the new distance requirements in Ordinance 97–75.

103. As part of the legislative history of Ordinance 97–75, the City has submitted sections of the legislative records for its previous sexually oriented businesses ordinances. *See* Exhibits 1, 23–34 to the City's Motion [Doc. # 120] (legislative reports and transcripts of public hearings held in preparation for enactment of previous ordinances). The Court agrees with the City that these materials may be *relevant* to the justifications behind the various challenged provisions of Ordinance 97–75—but only to the extent that the Houston City Council, the Council's Sexually Oriented Business Committee, or the City's legal staff specifically considered them in enacting Ordinance 97–75. The Court has read every set of minutes for each of the Committee's meetings in 1996–97, as well as the transcripts for the Committee's public hearings, and has failed to find any evidence that anyone on the Committee, Council, or legal staff considered—indeed, even looked at—this prior legislative history with specific reference to whether it supported the increased distance requirements enacted in Ordinance 97–75. Although Committee members made occasional references to the fact that the City previously had compiled a legislative record supporting regulation of adult businesses, *no references* were ever made as to *how* that record specifically supported the increased distances. Instead, the Committee seemed to assume that, because a detailed record had previously been compiled and because its 1986 ordinance was upheld in *SDJ* on the basis of that record, it had virtually *carte blanche* to impose whatever new restrictions it wanted so long as adult businesses retain sufficient alternative avenues of communication. This assumption is not correct. The mere fact that the previous distance requirements have been upheld on the basis of a documented record of negative secondary effects does not release the City from the requirement of compiling a record relevant to *current* secondary effects or at least giving some consideration as to how and whether the negative secondary effects documented by that city in the past, or by other cities, currently exist and would be addressed by the new requirements under discussion. *See City of Renton*, 475 U.S. at 51–52, 106 S.Ct. 925 (evidence taken from another context must be "reasonably believed to be relevant to the problem that the City addresses").

Although there is no evidence in the record that anyone looked at this prior legislative history with an eye toward considering whether increased distance requirements would be justified, the Court has nevertheless examined the portions of the prior legislative history that the City has cited in support of the Ordinance's increased distance requirements. The Court has found no evidence in this history that specifically supports a 1,500 foot minimum distance between sexually oriented businesses and protected land uses or a 1,500 radius for calculating whether an area

At the Sexually Oriented Business Committee's first meeting, a city attorney told the Committee generally that "there is an extensive legislative history for the [existing] ordinance." *See* Minutes for June 17, 1996, Committee Meeting, Exhibit 2C to City's Motion [Doc. # 120], at 11–12. This attorney then told the Committee that his office could make reports from earlier City hearings available for the current Council members. *See id.* However, there is no indication anywhere in the record that any Council members, their staffs, or even the City's Legal Department itself considered how the evidence from this prior history would support the specific amendments to the distance requirements eventually enacted in Ordinance 97–75.

Any references in the Committee's deliberations regarding the current Ordinance by Council members to this earlier history were in passing at best. In fact, the closest reference the Court has found in the record to an analysis of the relevance of the prior history is the following remark, made by Committee Co–Chair Huey at the Committee's second public hearing:

> What I'm looking down at is the legislative history behind the adoption of the council's 1983 ordinance.... The—and the important negative effects that were found back in 1990—back in 1983 were the adverse consequences on the neighborhood protection and enhancement and an adverse effect on property values and a contribution to criminal activities that were ancillary to the operation of crim—sexually oriented businesses. And that's a direct reading.

Transcript of July 29, 1996, Public Hearing, Exhibit 5B to City's Motion [Doc. # 120], at 29–30. This vague reference to the 1983 legislative record illustrates the complete superficiality of the Committee's consideration of the evidence compiled in the earlier legislative records and the utter lack of analysis by the Committee as to how the proposed new distance requirements would address the effects described in the earlier records.

In *SDJ*, in contrast, the Fifth Circuit found that evidence compiled in the record for the City's 1983 ordinance provided sufficient justification for the City's 1986 ordinance, which was enacted a mere three years after the 1983 legislative record was compiled. In *SDJ*, the evidence in the earlier record was specifically relevant to the 1986 enactments. The most significant change brought about by the 1986 ordinance was the inclusion of topless bars in the Ordinance's locational restrictions. The Fifth Circuit found that the legislative record for the 1983 ordinance had included evidence of negative secondary effects caused by topless bars that could be addressed by the locational restrictions, but the City did not include topless bars in the 1983 ordinance due to limitations imposed at the time by state law. By 1986, state law had been amended to permit cities to impose such regulations on topless bars. Thus the City was able to amend its Ordinance to include these establishments by referencing the evidence in the 1983 legislative record specifically related to them. *See SDJ*, 837 F.2d at 1273 ("[a]lthough the 1986 supplemental report relates no empirical evidence of the effects of topless bars, that report incorporates the 1982 report, which does refer to topless bars"). *See also* Minutes for June 17, 1996, Committee Meeting, Exhibit 2C to City's Motion [Doc. # 120], at 12 (City attorney explains that "[t]here is quite a lengthy explanation in the 1986 report as to the reasons for the changes" from the 1983 ordinance). In the case at bar, in contrast, no evidence in the legislative records compiled in support of the earlier versions of the Ordinance supports the specific increases in the distance requirements enacted in Ordinance 97–75, and Ordinance 97–75 does not contain any specific explanation for the increases related to negative secondary effects, as opposed to availability of alternative sites under the new restrictions.

In the first Committee meeting, Co–Chair Boney explained that one of the Committee's purposes was "[t]o assess and analyze the ordinance with regard to its strengths and weaknesses and review them with regard to

surrounding a sexually oriented business is residential. Thus, even if this evidence must be considered in determining whether the increased distance requirements are content-neutral, the Court finds no support for these requirements in this evidence.

how effectively this ordinance protects the interests of the public as well as the rights of the businesses and the purpose for which it was developed." *See* Minutes for June 17, 1996, Committee Meeting, Exhibit 2C to City's Motion, at 1. As discussed in later sections of this Opinion, the Committee achieved this purpose with respect to most of the issues addressed by the new provisions of the Ordinance. Most of the new provisions were properly developed as a result of the Committee's efforts to consider specific reasons why the previous versions of the Ordinance failed to address various negative secondary effects the Committee believed to be associated with sexually oriented businesses. However, the Committee utterly failed to achieve this goal with respect to the increased distance requirements. It is clear from a review of the record that the Committee simply wished to impose the most stringent distance requirements they thought the law would allow. *See, e.g.,* Minutes for November 4, 1996, Committee Meeting, Exhibit 14B to City's Motion, at 3 (Boney stated that Committee's efforts were intended "to make sure the City imposed the greatest possible distance requirement that would pass Constitutional muster").

The Committee received testimony, both orally at public hearings and in writing by mail, from numerous Houston residents who made clear that they did not like sexually oriented businesses and did not want such businesses in their neighborhoods. However, the Committee received no evidence suggesting that any specific or even identified negative secondary effects continued to exist *because of* any weakness in the prior distance requirements. In other words, the Committee did not receive evidence specifically indicating that, nor did the Committee even engage in any discussion speculating that, sexually oriented businesses cause specific negative secondary effects to protected land uses located more than 750 but less than 1,500 feet away, and on residential areas located within more than a 1,000 foot radius. Instead, the Committee's assumption was clearly that increased distance requirements would alleviate purported negative secondary effects by simply eliminating many of the sexually oriented businesses en-

tirely. The Committee relied exclusively on the type of evidence illustrated by the testimony of one resident contained in the Transcript of the July 29, 1996, Public Hearing, Exhibit 5B to City's Motion, at 110 (testimony of Walt Plowski), in which the resident stated categorically that sexually oriented businesses have invaded his neighborhood, changed its character, and caused an increase in crime, but made *no* mention of *how far away* these businesses now are from any protected land uses or residential areas.

The record created in support of Ordinance 97–75 contains only a handful of vague references to, and other conclusory testimony regarding, the effects sexually oriented businesses have on surrounding areas. For instance, one resident who testified before the Committee asserted that:

> Studies in Austin, Los Angeles and Indianapolis show that property values around these businesses go down because of the increased crime, noise and objectionable people that are attracted to these places. Phoenix, Arizona, found that areas with sexually oriented businesses endure 40 percent more property crimes and 500 percent more sex crimes than do areas without such establishments.

Transcript of July 29, 1996, Public Hearing, Exhibit 5B to City's Motion [Doc. # 120], at 106–07 (testimony of Chris Branson). After the resident made this statement, Huey stated that she had received some unidentified material he was distributing and that she had requested that the City's Legal Department verify his statistics and other information. *See id.* at 109. However, no such materials are included in the legislative record; nor is there any indication that the City's Legal Department, the other Council members or even the other Committee members ever obtained the material or pursued such investigation. In addition, although several generalized references were made in the Committee's meetings and public hearings to "studies" of other cities regarding effects of adult businesses on nearby areas, no actual study from any other city is included anywhere in the legislative record for

Ordinance 97–75.[104] Therefore, the Court has before it no evidence that the Committee, its staff, or the City's Legal Department actually considered the contents of any studies of secondary effects of sexually oriented businesses in other cities.

Another illustrative example of the type of testimony the Committee heard that related to property values was the vague and unsubstantiated assertion by one city resident at the first public hearing that "I'm a homeowner who is concerned about the value of my house in which much of my savings are invested." Transcript of July 15, 1996, Public Hearing, Exhibit 3H to City's Motion, at 119 (testimony of Scott Johnson). Another resident testified that several non-sexually oriented businesses have closed in his neighborhood in the past two or three years when sexually oriented businesses came to the area. See Transcript of July 29, 1996, Public Hearing, Exhibit 5B to City's Motion, at 79 (testimony of Tony Henshaw). This resident also complained about traffic problems created by a topless club in his area. See id. at 76–77. Also, at the Committee's final meeting, Council Member Martha Wong stated generally that undesirable behaviors from topless clubs spill into surrounding neighborhoods. See Transcript of January 7, 1997, Committee Meeting, Exhibit 19D to City's Motion, at 48.

However, nowhere in the legislative record did any of these speakers, or any Council member, discuss any specific relationship between these observations and the Ordinance's *old or new* distance restrictions. Thus, *even if* these pieces of testimony could be considered to be evidence of actual negative secondary effects sexually oriented businesses impose on surrounding areas, they still do not indicate why increasing the distance requirements in the Ordinance to 1,500 feet would alleviate or even address these effects any more effectively than the existing 750 and 1,000 foot distance requirements.

At the Committee's public hearing held on July 15, 1996, a psychologist testified, based generally on his knowledge of the field, and not from any specific empirical data, that sexually oriented businesses create a "fertile field for solicitation." See Transcript of July 15, 1996, Public Hearing, Exhibit 3H to City's Motion [Doc. # 120], at 53–57 (testimony of Rob Devinney). However, neither he nor any Council member sought to analyze the import of this statement in connection with specific distances between sexually oriented businesses and protected land uses. For instance, no one asked him how far away from a business this "field for solicitation" might extend, or even whether the 750 foot and 1,000 foot distance requirements were inadequate to alleviate this alleged problem. Another speaker, the psychologist's wife, testified vaguely that she has been stalked by someone in a car who thought she was a prostitute and that her son has also been stalked. See id. at 61 (testimony of Laura Devinney). However, this speaker did not even say whether she or her son were in the vicinity of a sexually oriented business at the time.

Police officers presented general evidence to the Committee regarding crime associated with sexually oriented businesses, but there is no testimony in the record suggesting that these crimes have any effect on areas more than 750 feet away from the businesses. For example, at the first Committee meeting, Lieutenant Larry Smith of the Houston Police Department Vice Division testified that the types of crimes associated with topless clubs include public lewdness, indecent exposure, prostitution, and auto theft. See Minutes for June 17, 1996, Committee Meeting,

---

104. On several occasions, Co–Chair Boney asked speakers who mentioned such studies to forward copies to the Council, but apparently no one heeded his request. See, e.g., Transcript of August 19, 1996, Committee Meeting, Exhibit 7G to City's Motion [Doc. # 120], at 56–57. See also Transcript of July 29, 1996, Public Hearing, Exhibit 5B to City's Motion, at 154 (Resident Reese Baker testified that topless bars contribute to the proliferation of child pornography. Boney then asked if he had any sources or studies about child pornography in Houston. Baker replied that he did not, and stated instead, "[t]hat is just my understanding."). In addition, at the Committee's second meeting, Co–Chair "Huey said that the Committee is receiving written offers of support and sharing of experiences from other cities, legal departments and foundations," Minutes for July 15, 1996, Committee Meeting, Exhibit 3D to City's Motion [Doc. # 120], at 5. None of these materials are included in the legislative record presented to the Court.

Exhibit 2C to City's Motion [Doc. # 120], at 8. The first three of these crimes purportedly occur *inside* the businesses (or in the case of prostitution, at locations entirely away from the businesses [105]), and auto theft presumably occurs immediately outside the businesses, often in their parking lots.[106]

The only actual crime statistics in the current legislative record are two compilations by the Houston Police Department Vice Division which list in graphical form the number of arrests and convictions made in each of the City's sexually oriented businesses from 1994 to 1996. *See* Exhibit 6B to City's Motion [Doc. # 120]; Sexually Oriented Business Statistics Amended, Exhibit 21 to City's Motion.[107] These statistics are not at all helpful to the City's defense of its new distance requirements. First of all, the graphs do not even indicate what crimes serve as the bases for the reported arrests and convictions. According to Lieutenant Smith, the arrests and convictions depicted in these graphs were exclusively for crimes that occurred *inside* the businesses, such as liquor violations, public lewdness, and prostitution. *See* Minutes for July 15, 1996, Committee Meeting, Exhibit 3D to City's Motion, at 6. Thus, these statistics provide no evidence of

negative secondary effects the businesses might have on surrounding areas outside the businesses and thus provide no justification for increasing the Ordinance's distance requirements.[108] In addition, even if it could be assumed that these crimes which are committed inside the businesses somehow spill over to affect surrounding outside areas, the graphs do not elucidate whether or not the prior distance requirements were effective or instead needed to be amended. The graphs contain no comparisons of crime rates over time; thus, no comparison may be made regarding the number of criminal incidents that occurred recently versus those that occurred close to the time of enactment of any earlier versions of the Ordinance. Finally, these statistics do not compare the crime rate within or around sexually oriented businesses with the crime rates in or near other businesses that are not subjected to any distance requirements. Lieutenant Smith told the Committee that the Vice Squad staff was compiling a comparison of crime rates in areas with and without sexually oriented businesses but that such an analysis would take a few weeks, *see id.*, but no such report appears in the legislative record.[109]

---

105. At another meeting, Lieutenant Smith explained that prostitution stemming from sexually oriented businesses occurs either on-site at the businesses, or away from the businesses, such as when a patron and entertainer on-site make an agreement to meet "at a hotel or somewhere else." *See* Minutes for July 22, 1996, Committee Meeting, Exhibit 4C to City's Motion [Doc. # 120], at 5. No one testified before the Committee that prostitution occurs more than 750 but less than 1,500 feet from the businesses. Accordingly, the Committee had no basis for concluding that the crime of prostitution might "spill over" into areas that are within the 750 to 1,500 foot ring around each of the sexually oriented businesses.

106. Lieutenant Smith testified that auto theft was a problem outside sexually oriented businesses because thieves know that patrons will probably be inside a topless club for an hour and a half. However, he gave no explanation as to why this problem would not be an issue for other establishments as well, such as movie theatres.

107. At the Committee's second public hearing, a City resident told the Committee that his local civic group had been keeping logs of the criminal activities or adverse activities that occur in his neighborhood, *See* Transcript of July 29, 1996, Public Hearing, Exhibit 5B to City's Motion

[Doc. # 120], at 78 (testimony of Tony Henshaw). Even if the Court presumes the logs somehow related to sexually oriented businesses, the logs are not included in the legislative record. Nor is there any indication that they were ever given to the Committee members or to the City's Legal Department.

108. Instead, they provide support only for the City's new regulations that attempt to curb criminal activity *inside* the businesses, namely the new interior structural requirements, discussed *infra* in Section V.E.; the new permit requirement for individuals who work in sexually oriented businesses, discussed *infra* in Section V.G.; and the new "no-touch" and "three-foot" rules, discussed *infra* in Section V.H.

109. Lieutenant Smith and other officers discussed extensively with the Committee what difficulties police officers face in trying to obtain convictions for crimes allegedly committed in sexually oriented businesses. The police department submitted a number of suggestions as to how the Ordinance could be modified to increase the enforceability of criminal laws, but these suggestions all related to behavior that occurs inside the businesses, not outside the businesses in nearby surrounding areas. Thus, these sug-

In sum, no one presented any testimony whatsoever that would allow a City Council member to compare the relative effectiveness of a 750 foot distance requirement and a 1,500 foot distance requirement between sexually oriented businesses and protected land uses or to compare the relative effectiveness of a 1,000 foot radius defining residential areas and a 1,500 foot radius. The record simply does not contain any references to substantive reasons related to secondary effects for expanding the Ordinance's distance requirements.

Primarily, the current record contains denunciations of sexually oriented businesses, not evidence of, or even specific comments regarding, their actual effects on surrounding areas. In Committee hearings, members of the public testified generally that they do not like sexually oriented businesses, that they do not want these businesses in their neighborhoods, and that these businesses cause them and their fellow residents psychological harm.[110] The record is replete with comments that the City needs to "protect our neighborhoods and our children," but the speakers never say how increasing the Ordinance's distance requirements would achieve this goal or specifically decrease any negative secondary effects. Instead, the obvious assumption behind these speakers' words is that the City can help them by simply reducing the number of (or eliminating) sexually

oriented businesses within their neighborhoods. The city residents and Council members who made these statements clearly believed that the mere existence of sexually oriented businesses in Houston is what harms neighborhoods and families, and not any excessive proximity between these businesses and protected land uses.[111]

***Legal Analysis.***—The Supreme Court has specifically held that the types of complaints regarding the impact of sexually oriented businesses outside the business premises that are contained in this record and are described above are not evidence of negative secondary effects that may justify the enactment of a restriction on protected speech. In *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988), the Court explained that:

> Listeners' reactions to speech are not the type of "secondary effects" we referred to in *Renton.* To take an example factually close to *Renton,* if the ordinance there was justified by the city's desire to prevent the psychological damage it felt was associated with viewing adult movies, then analysis of the measure as a content-based statute would have been appropriate. The hypothetical regulation targets the direct impact of a particular category of speech, not a secondary feature that happens to be associated with that type of speech.[112]

gestions do not provide a basis for the City's decision to increase the Ordinance's distance requirements.

**110.** *See, e.g.,* Transcript of July 15, 1996, Public Hearing, Exhibit 3H to City's Motion [Doc. # 120], at 10–12 (testimony of Karen Kay Kristopher); *id.,* at 27–28 (testimony of Tom Warmath); Transcript of July 29, 1996, Public Hearing, Exhibit 5B to City's Motion, at 142 (testimony of Hope Dyson).

**111.** *See, e.g.,* Co–Chair Huey's Thoughts on Sexually Oriented Businesses, Exhibit 3B to City's Motion, at 1; Transcript of July 15, 1996, Public Hearing, Exhibit 3H to City's Motion, at 83 (testimony of Dolly Madison McKenna) (urging Council to put a "maximum set of strict regulations to the extent possible within the law," explaining conclusorily that, "I do not want to have to explain to my daughter what people are doing there. I do not want to have my son harassed on the street"); *id.* at 116 (testimony of Shirley Hamner) ("[t]he most crucial [issue] as far as our residential area is concerned is the distance of

S.O.B.s from residential areas," but no specific evidence provided on what distances would affect any negative secondary effects); Transcript of July 29, 1996, Public Hearing, Exhibit 5B to City's Motion, at 83–84 (testimony of Pete Patterson) (stating that his civic association has been trying to shut down sexually oriented businesses for the last two years).

**112.** The record contains frequent vague references to "dehumanizing effects" sexually oriented businesses impose on surrounding communities. In light of the Supreme Court's statement in *Boos* quoted above, it is not clear whether mere references to "dehumanizing effects" may qualify as evidence of negative secondary effects. As the Dee & Dee Plaintiffs argue, references in the record to dehumanizing effects caused by and immorality exhibited at sexually oriented businesses might more appropriately be characterized as "primary effects" of these businesses. *See* Dee & Dee's Response [Doc. # 178], at 20–21 (citing *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 116 S.Ct. 1495, 1505, 134 L.Ed.2d 711

In Committee meetings, City Council members repeatedly expressed their desire to close down sexually oriented businesses in the City, or, if that was not feasible, then to impose as many restrictions as possible on these businesses. For example, at the first Committee meeting, Council Member Judson Robinson asked a police officer what sorts of restrictions seem to be a disincentive to sexually oriented businesses in other cities.[113] In a memorandum distributed to the Committee, Co–Chair Huey stated that "[a]ll of us hear the pleas to just outlaw such businesses. Even though most (maybe all) of us would personally like to do so, we cannot." Exhibit 3B to City's Motion [Doc. # 120], at 1. At the

hearing held on July 15, 1996, Council Member John Kelley stated that: "We're going to put every bit of the teeth in this thing that . . . we possibly can to get rid, if possible, without being illegal, to get rid of or at least to give them a lot of problems or trouble about having sexually oriented businesses. That's what this is all about." Transcript of July 15, 1996, Public Hearing, Exhibit 3H to City's Motion [Doc. # 120], at 31.[114] Several Committee meetings were dominated by discussion of the Council members' desire to find new ways of shutting down sexually oriented businesses.[115]

In the course of their discussions, Committee members repeatedly paid lip service to

(1996) (primary effects are those which are directly caused by the objectionable speech)). *But see City of Renton,* 475 U.S. at 59 n. 3, 106 S.Ct. 925 (Brennan, J., dissenting) (noting that City justified Ordinance based on the following types of evidence: " '[l]ocation of adult entertainment land uses on the main commercial thoroughfares of the City gives an impression of legitimacy to, and causes a loss of sensitivity to the adverse effect of pornography upon children, established family relations, respect for marital relationship and for the sanctity of marriage relations of others, and the concept of non-aggressive, consensual sexual relations' " and that " '[l]ocation of adult land uses in close proximity to residential uses, churches, parks, and other public facilities, and schools, will cause a degradation of the community standard of morality. Pornographic material has a degrading effect upon the relationship between spouses.' "). *It is not clear* whether the Supreme Court based its decision to uphold the Renton ordinance on the conclusion that such findings related to "secondary" effects, or whether the Court held instead that although these findings did not relate to secondary effects, they did not comprise a "predominate" motivation behind the ordinance's passage.

Even if such evidence and the references to "dehumanizing effects" of sexually oriented businesses could qualify as a secondary effect, the City has still failed to provide any reference in the legislative record as to how the Ordinance's new distance requirements will specifically alleviate such effects any better than the previous distance requirements, other than by simply decreasing the number of sexually oriented businesses located in the City.

113. *See* Minutes for June 17, 1996, Committee Meeting, Exhibit 2C to City's Motion [Doc. # 120], at 9 ("[h]e thought that kind of information would be helpful . . . . he thought those were things we could put in an ordinance and perhaps some of these other cities with fewer SOBs have these restrictions in their ordinances").

114. The Court recognizes that statements by individual City Council members are not *dispositive* of the intent of the City Council as an entity. As the Supreme Court noted in *O'Brien* and *City of Renton:*

It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an *alleged* illicit legislative motive. . . . What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."

*City of Renton,* 475 U.S. at 48, 106 S.Ct. 925 (quoting *O'Brien,* 391 U.S. at 383–84, 88 S.Ct. 1673) (emphasis added). However, when a court reviews legislative history with the purpose of discerning legislative intent, such statements are clearly *relevant* to the court's analysis.

115. *See, e.g.,* Minutes for June 17, 1996, Committee Meeting, Exhibit 2C to City's Motion [Doc. # 120], at 6 (Council member asked what the process is for closing down sexually oriented businesses); *id.* at 10 (Council member asked if sexually oriented businesses could be closed down if there have been charges brought for public lewdness on the premises); *id.* at 11 (representative of Council member asked if Council members could be notified earlier when an enterprise applies for a sexually oriented business permit because usually by the time members find out "there is nothing to be done"); *id.* at 16–18 (discussion of difficulties in revoking sexually oriented business permits under existing law); Minutes for July 15, 1996, Committee Meeting, Exhibit 3D to City's Motion, at 6–7 (discussion of why City has not revoked more sexually oriented business permits); Minutes for July 22, 1996, Committee Meeting, Exhibit 4C to City's Motion, at 2–5 (discussion of police officers' difficulties in obtaining convictions that could lead to revocations of sexually oriented business permits); Transcript of January 7, 1997, Committee Meeting, Exhibit 19D to City's Motion, at 59 (Huey discussed having "a tool box of options to use in order to close those operations down").

the fact that sexually oriented businesses receive some protection under the First Amendment and that the City cannot ban their existence entirely. For example, at the Committee's first public hearing, Co–Chair Boney told the audience that:

> We are quite sensitive and cognizant of the fact that sexually oriented businesses are constitutionally protected. There will be no efforts or intentions or actions by this mayoral council to eliminate sexually oriented businesses for the City of Houston because, quite frankly, the United States Supreme Court has already determined that they do have a right to exist under the First Amendment.

Transcript of July 15, 1996, Public Hearing, Exhibit 3H to City's Motion, at 6.[116] However, this type of conclusory statement does not satisfy the City's burden of showing that the Ordinance's new distance requirements were enacted in order to address negative secondary effects associated with the businesses. Mere recognition that constitutional issues are at stake does not satisfy the constitutional requirements for imposing restrictions on protected speech.

Despite conclusory statements in the Ordinance's preamble and by some Council members that the purpose behind the increased distance requirements was to combat negative secondary effects of adult businesses, the clear message imparted from the minutes and transcripts of the Committee's discussions is the Committee's belief that the mere existence of sexually oriented businesses is itself what hurts communities in the City, not the precise proximity of these businesses to protected land uses or residential areas. The Committee's emphasis was thus on fighting the businesses themselves, not merely containing secondary effects that may be associated with those businesses. Even the Committee's final Legislative Report demonstrates this fact by stating that the Committee's work "evolved as a result of increasing community concern regarding"—*not* secondary effects caused by, but instead—"the *proliferation* of Sexually Oriented Businesses under the existing regulations." Legislative Report for Ordinance 97–75, Exhibit 36 to City's Motion, at 4.

In determining whether the Ordinance's new distance requirements are content-neutral or content-based, the Court appreciates and has applied the Supreme Court's admonition in *City of Renton* that a regulation is not invalid if restricting adult businesses' First Amendment rights was merely "*a motivating factor*" in the City's decision to enact the ordinance. *See* 475 U.S. at 47–48, 106 S.Ct. 925. The mere fact that Council members made the statements cited above does not preclude the City's enactment of valid increases in the distance requirements it imposes on adult businesses. Had these statements been supplemented by substantive legislative evidence about the need for *increases* in the distance requirements to alleviate or to address identified secondary effects, or even specific discussion as to why the previous distances were not sufficient, the Court may well have found the new distance requirements to be content-neutral. However, the record does not contain any specific discussion by witnesses or City Council members of this nature.

In sum, the Court has considered the comments by the public and by City Council members in the context of the entire legislative record the City has offered in support of Ordinance 97–75 and concludes that the increased distance requirements were enacted with an impermissible content-based motive.

In *Lakeland Lounge*, the Fifth Circuit upheld locational restrictions on adult businesses as valid content-neutral regulation

---

116. *See also* Legislative Report for Ordinance 97–75, Exhibit 36 to City's Motion [Doc. # 120], at 3 ("SOBs enjoy Constitutional protection and must be allowed to exist and operate regardless of feelings about them"); Minutes for June 17, 1996, Committee Meeting, Exhibit 2C to City's Motion, at 1, 20; Minutes for July 15, 1996, Committee Meeting, Exhibit 3D to City's Motion, at 1; Transcript of July 15, 1996, Public Hearing, Exhibit 3H to City's Motion, at 32. In its Motion for Summary Judgment, the City improperly cited a number of conclusory and irrelevant statements, including the statement by Boney quoted in the text, in a string cite in support of its contention that "[t]he legislative history represents compelling evidence of both a need for the challenged regulations *and their consistency with established constitutional requirements*." City's Motion [Doc. # 120], at 15 (emphasis added).

even though the city admitted to actions that could easily be construed as demonstrating an improper, content-based legislative purpose. Specifically, the City acknowledged that it passed its restrictions in response to the public's opposition to the opening of two topless clubs and acknowledged its frustration with the fact that its earlier attempt to close one adult business down for technical code violations had failed. *See Lakeland Lounge*, 973 F.2d at 1256–57. However, in that case, the city supplemented these admissions with a legislative record tying its new regulations to specific negative secondary effects associated with the adult businesses in issue. *See id.* at 1257–59 (explaining that city attorney's office received studies about effects of adult businesses on other communities and that these studies were discussed at a hearing with members of the community).

In the case at bar, the minutes and transcripts of the Sexually Oriented Business Committee's meetings and hearings contain oblique references to presumed "secondary effects" generally and passing vague references to unsupported assumptions about problems in other cities. However, no actual studies or evidence regarding other cities appears anywhere in the legislative record. In *MD II Entertainment, Inc. v. City of Dallas, Tex.*, 28 F.3d 492, 496 (5th Cir.1994), the Fifth Circuit struck down a restriction on advertising by adult businesses because "the city relied on no studies showing a link between advertising and property values or crime." Similarly, in *FW/PBS*, motel owners challenged their inclusion in the City of Dallas' 1986 sexually oriented business ordinance, arguing that the City had no basis on which to conclude that rental of motel rooms for fewer than ten hours produced adverse secondary effects. The Supreme Court rejected this argument, holding that, because the Dallas City Council had before it a 1977 study by the city of Los Angeles that considered, albeit cursorily, the effect of adult mo-

tels on surrounding neighborhoods, this evidence, combined with the reasonableness of the legislative judgment, was "adequate to support the city's determination that [these] motels ... should be included within the licensing scheme." *FW/PBS*, 493 U.S. at 236, 110 S.Ct. 596. The circumstances here are just as the Fifth Circuit noted in *MD II Entertainment*: "We have no doubt that the interests the city seeks to protect merit protection, but like the district court, we are unable to conclude *on this record* that those interests are served ... by the ordinance." 28 F.3d at 496 (emphasis added).

The Court agrees with the City that it has the prerogative of experimenting with different possible solutions to municipal problems even when dealing with First Amendment interests.[117] However, each time a City chooses to impose new restrictions on protected speech, such as Houston has done by increasing its Ordinance's distance requirements for sexually oriented businesses, it must satisfy the requisite constitutional test. Thus, the City overstates its authority when it asserts that "[t]he Supreme Court teaches that cities have *an absolute right* to experiment with measures controlling the undisputed adverse secondary effects of sexually oriented businesses." City's Reply to FTU's Response [Doc. # 225], at 26–27 (emphasis added).

When the City first enacted its distance requirements for sexually oriented businesses, it could have chosen to set the minimum distance between the businesses and protected land uses, and the radius for calculating whether a surrounding area is residential, at 1,500 feet, provided, of course, that these restrictions met the requisite elements of the constitutional test.[118] However, the City instead chose respective distance requirements, not of 1,500 feet, but instead of 750 and 1,000 feet. Now that numerous businesses have relied on that earlier regulatory choice, the City may not make the require-

117. In *City of Renton*, the Supreme Court explained that " '[i]t is not [the Court's] function to appraise the wisdom of [the city's] decision to require adult theatres to be separated rather than concentrated in the same areas.... [T]he city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.' " 475 U.S. at 52, 106 S.Ct. 925

(quoting *American Mini Theatres*, 427 U.S. at 71, 96 S.Ct. 2440 (plurality opinion)).

118. In *SDJ*, the Fifth Circuit declined to "second-guess the Council's decision that 750 feet is the most appropriate distance." 837 F.2d at 1276.

ments more stringent without somehow justifying those increases by reference to how the revision might better address the negative secondary effects believed to exist. In other words, although "reform may take one step at a time," *Hang On,* 65 F.3d at 1256 (quoting *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955)), the City must adduce some justification tied to secondary effects for each step it takes. *See MD II Entertainment, Inc. v. City of Dallas,* 935 F.Supp. 1394, 1397–99 (N.D.Tex.1995) (city prohibited from expanding its adult business restrictions in the absence of new studies which were specifically created for the purpose of justifying the additional restrictions).

Finally, while not relying exclusively on such evidence, the Court finds it relevant that when the Council's Sexually Oriented Business Committee was considering whether to increase the Ordinance's distance requirements, Committee members specifically requested information regarding how many businesses would be affected by the proposed increases. In response, the Committee was told that these increases would force 103 of the City's 119 adult businesses to close down or relocate. *See* Exhibit 19C to City's Motion [Doc. # 120].[119] Although not alone dispositive of the issue, this evidence buttresses the Court's conclusion that the Houston City Council enacted the increased distance requirements in Ordinance 97–75 with the specific intention of closing many, if not most, of the City's sexually oriented businesses.[120]

For the reasons discussed above, because the City failed to justify either of the two increased distance requirements in Ordinance 97–75 with specific reference to negative secondary effects caused by sexually ori-

119. The City argues that this evidence is inadmissible and has moved to have it stricken on the ground that it is irrelevant and constitutes hearsay. *See* City's Objections to A.H.D. Plaintiffs' Evidence in Support of their Cross–Motion for Summary Judgment [Doc. # 232], at 3. These objections are **OVERRULED.** This evidence is relevant because it is part of the legislative record and thus may be considered in determining the City Council's motive in enacting the Ordinance's new distance requirements. In addition, this evidence is not hearsay because it is not offered for the truth of the matter asserted, namely the number of businesses that would actually be required to close or relocate, but is instead offered to show what information City Council members received and apparently relied upon in deciding to increase the distance requirements.

120. This early estimate has apparently proven to be relatively accurate. According to evidence submitted by the N.W. Enterprises Plaintiffs, as of June 26, 1997, only 12 out of 113 existing sexually oriented businesses obtained licenses under Ordinance 97–75, and 101 enterprises were denied licenses, closed, or let their licenses expire. *See* N.W. Enterprises' Response [Doc. # 151], at 24–25 (citing City's "Stipulation Regarding Certain Matters and Documents" and Affidavit of Officer R.F. Foulis).

A number of Plaintiffs argue that, if the new locational requirements are allowed to go into effect, then, due to excessive costs, they will shut down their businesses entirely, rather than relocate to new sites. In support of this claim, several FTU Plaintiffs have submitted declarations in which they estimate the costs they would incur in relocating their businesses. *See* Declarations of Marc Diedrich ($1,305,450 for Babe's Cabaret), David Fairchild ($5,030,500 for The Men's Club of Houston), Dallas Fontenot ($6,272,650 for Colorado Bar & Grill), Exhibits Nos. 38–40 to Appendix to FTU's Locational Response [Doc. # 223]. The City has moved to strike these declarations on the grounds that they constitute unsupported lay opinions and that, since they merely allege economic harm, they are not relevant. The Court **DENIES** this Motion to Strike [Doc. # 245]. Under Fed.R.Evidence 701, lay opinions may be admissible when they are based on personal perception and are helpful to a clear understanding of a fact in issue. *See United States v. Riddle,* 103 F.3d 423, 428 (5th Cir.1997). In addition, this evidence has some relevance to the FTU Plaintiffs' claim, since the enormity of these figures suggests that City Council members might have, or should have, realized that forcing enterprises to relocate would be, in many cases, tantamount to shutting them down.

In this same Motion to Strike [Doc. # 245], the City also objects to the submission of some of the FTU Plaintiff's interrogatories and the City's responses to those interrogatories, Exhibits 31 and 32 to Appendix to FTU's Locational Response [Doc. # 223], as irrelevant. The FTU Plaintiffs submitted these exhibits in an effort to demonstrate to the Court why they request further time for discovery. Since the Court is denying requests for further discovery, the City's Motion to Strike these exhibits is **DENIED AS MOOT.**

The City also objects to the FTU Plaintiffs' submission of pretrial conference transcript excerpts as irrelevant. These excerpts were provided as a courtesy to the Court to illustrate various points made in Plaintiffs' briefing. The City's Motion to Strike these excerpts [Doc. # 245] is therefore **DENIED.**

ented businesses or to evidence that or to analysis concluding that the prior distance requirements did not adequately address those effects, the Court holds that these increased distance requirements are not content-neutral. Thus, with respect to constitutionally protected businesses, these increased distance requirements must be reviewed under strict scrutiny.

The Court's conclusion that the City has failed to show that the Ordinance's new distance requirements were enacted in a content-neutral manner is not a *per se* ruling that the City cannot revise its previously enacted distance requirements. The City could have validly increased the distances if it had first, in some way, tied these increases to evidence in the legislative record demonstrating that, or at least supported them with some rationale as to why, the earlier distance requirements did not adequately address the negative secondary effects previously found to exist. However, the record before this Court contains no evidence, nor even discussion by City Council members, that sexually oriented businesses have a negative impact *on protected land uses located more than 750 and less than 1,500 feet away*, or located on residential areas located within a radius of between 1,000 and 1,500 feet. Nor does the record even contain any useful evidence or

discussion regarding whether, since the time the previous distance requirements were adopted, sexually oriented businesses have continued to exert specific negative secondary effects, such as decreased property values, increased drug use, prostitution, or other crime, on surrounding areas.

**ii. Conclusion as to Validity of Increased Distance Requirements for Protected Businesses**

 Since the Court has determined that the increased distance requirements for constitutionally protected businesses contained in Ordinance 97–75 must be evaluated under strict scrutiny, these requirements may only be upheld for protected businesses if the City demonstrates that compelling reasons justify their enactment. As described in the previous section, the legislative record contains no specific evidence showing a need for increased distance requirements to combat negative secondary effects caused by adult businesses. The Court therefore concludes that these provisions may not be enforced against businesses that are protected by the First Amendment to the United States Constitution.[121]

In the alternative, even if the Court should evaluate these restrictions under intermediate scrutiny, the Court concludes that they

121. Because of the Court's conclusion that the Ordinance's new 1,500 foot distance requirements were enacted in an impermissible content-based manner, it need not consider the parties' arguments regarding whether these new requirements would allow an adequate number of alternative sites to which Plaintiffs could relocate their businesses. However, the Court notes a significant problem in the legislative record with respect to these new distance requirements, in the event the City attempts to enact a similar measure in the future. In deciding to recommend the increased distance requirements to the full Council, the Committee specifically relied on evidence presented by Joseph Chow, from the City's Planning Department, which suggested that the new locational restrictions under consideration would still allow more than 7,000 alternative sites to which sexually oriented businesses could legally operate within the City. The City's Legal Department and the Committee concluded that this number would be far more than adequate to accommodate all existing sexually oriented businesses, since only about 120 of these businesses currently exist in the City. *See, e.g.,* Transcript of November 20, 1996, Committee Meeting, Exhibit 15C to City's Motion [Doc.

# 120], at 49. However, the calculations that created the estimate that more than 7,000 sites would be available does not in any way take into account the spacing requirement in the Ordinance, § 28–125(b)(2), which prohibits (with limited exceptions) *sexually oriented businesses* from operating within 1,000 feet of each other. It appears patently clear that factoring in the spacing requirement would likely diminish substantially the number of sites at which sexually oriented businesses could simultaneously operate. *See Woodall,* 49 F.3d at 1125 ("[w]here a zoning ordinance requires that adult businesses maintain a certain distance from one another, merely knowing the number of acres available is not particularly enlightening.... What is important is the number of adult business locations that the acreage will support given the spacing requirements."). In the Committee's extensive deliberations regarding alternative sites, not one person ever mentioned this issue. Because of the spacing requirement, the Court believes that a reasonable City Council member should *not* have concluded that the new restrictions would actually allow space for more than 7,000 adult businesses in the City.

are invalid because the City has failed to demonstrate that they serve substantial governmental interests.[122]

### b. Public Parks

#### i. Content–Based or Content–Neutral?

In contrast to the increased distance requirements discussed in the previous section, the Court finds that the legislative record contains adequate content-neutral justification for the City's decision to add public parks to the list of protected land uses from which adult businesses may not locate closer than 750 feet. Specifically, the City Council's Sexually Oriented Business Committee heard evidence regarding the impact of having sexually oriented businesses located near public parks, and Committee members specifically discussed their concerns about having lewd behavior or other crimes spill over from the businesses to nearby parks which are used for family recreation. *See* Minutes for November 4, 1996, Committee Meeting, Exhibit 14B to City's Motion [Doc. # 120], at 3 (Boney stated that parks should be added to list of protected land uses because "there are children [in the parks] who would be unprotected and unsupervised"), 7–9 (representative from City Parks department spoke about the possibility of prostitution and drugs from sexually oriented businesses spilling over into parks and stated that harassment of children walking by sexually oriented businesses inhibits some children from coming to parks located near these businesses).[123]

The Court finds this legislative evidence in support of adding public parks to the list of protected land uses to be exceedingly slim, but it is sufficiently specific to render this amendment to the Ordinance content-neutral. The Committee did not receive any firsthand or empirical evidence indicating that sexually oriented businesses actually impose negative secondary effects on public parks in Houston; nor did the Committee examine any studies from other cities regarding public parks. However, since negative secondary effects of some sort have been generally shown over the years to exist in areas immediately surrounding sexually oriented businesses (based on the legislative records for previous versions of the Ordinance and based on the Fifth Circuit's conclusions in *SDJ* ), the Court holds that this new testimony and discussion regarding public parks is sufficient—although only marginally—to justify the City's addition of this category of protected land uses to the Ordinance's locational restrictions. In other words, the Court concludes that a City Council member could have reasonably relied upon the combination of previously adduced evidence and the Committee's new discussion of the issue to conclude that the City had the same interest in protecting public parks that it had in protecting schools, churches, daycare centers, and residential areas.[124]

Because the addition of public parks to the Ordinance's list of protected land uses was

---

122. The Court reaches this alternative conclusion out of an abundance of caution because the Fifth Circuit has noted that there is uncertainty in First Amendment doctrine regarding whether content-based restrictions on commercial speech should receive intermediate or strict scrutiny. *See MD II Entertainment*, 28 F.3d at 495. If content-based restrictions on commercial speech are afforded only intermediate scrutiny, then, because adult entertainment enjoys less constitutional protection than other forms of speech, it would logically follow that content-based restrictions on adult entertainment could not be subject to more than intermediate scrutiny. However, this conclusion appears to contradict the Supreme Court's holding in *City of Renton* that, even in the context of adult entertainment, "regulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment," 475 U.S. at 46–47, 106 S.Ct. 925.

123. The Committee also heard testimony from a City resident, who was the chair of local park advisory council, describing the improvements the City has made to public parks in recent years and noting that families and unattended children have been using public parks more often than in the past. *See* Minutes for November 4, 1996, Committee Meeting, Exhibit 14B to City's Motion [Doc. # 120], at 7 (testimony of Marcia Olivares).

124. Thus, the Committee specifically considered why the previous list of protected land uses was not sufficient to alleviate problems the Ordinance was intended to address. In contrast, as discussed in the previous section, the record does not contain any specific discussion regarding why the Ordinance's prior distance requirements needed to be amended.

justified with specific reference to negative secondary effects and to evidence that the previous version of the Ordinance was not adequately addressing those effects near public parks, the Court finds that this addition is content-neutral and thus should be reviewed under intermediate scrutiny.

### ii. Narrowly Tailored to Serve Substantial Governmental Interests?

The Court concludes that the Ordinance's addition of public parks to the list of protected land uses is narrowly tailored to serve a substantial governmental interest. The inherent similarity between public parks and schools makes the locational restrictions with respect to public parks just as reasonable and sufficiently well-tailored as those restrictions are with respect to schools.

### iii. Alternative Avenues of Communication

Based on the evidence contained in the current record, the Court concludes that, although the addition of public parks to the list of protected land uses may require some sexually oriented businesses to close or relocate, this new restriction will not significantly reduce the number of sites available in Houston for sexually oriented businesses. Specifically, at one Sexually Oriented Business Committee meeting, a representative from the City's Planning Department estimated that the addition of parks to the list of protected land uses would eliminate only 1,000 out of roughly 19,000 potential sites for sexually oriented businesses. *See* Transcript of October 23, 1996, Committee Meeting, Exhibit 12D to City's Motion [Doc. # 120], at 15.

Thus, although the question of whether a regulation which restricts permissible locations for sexually oriented businesses allows a sufficient number of alternate sites appears ordinarily to be a question of fact, *see, e.g., Woodall,* 49 F.3d at 1124, the Court concludes that in this case, no genuine issue of *material* fact exists which would necessitate a trial on this issue. Plaintiffs have not argued, and this Court does not find, that the enforcement of this new locational restriction would, on its own, reduce the number of alternative available sites significantly enough to prevent those businesses that will have to close or move from finding new locations.

### iv. Conclusion as to Validity of New Provision Regarding Public Parks

As indicated by the preceding analysis, the Court concludes that the new provision in Ordinance 97–75 that adds public parks to the list of protected land uses near which sexually oriented businesses may not locate is sustainable under the intermediate scrutiny test. This provision is therefore valid under the First Amendment to the United States Constitution.

### c. Multifamily Dwellings

### i. Content–Based or Content–Neutral?

As with the Ordinance's new provision regarding public parks, the Court finds sufficient content-neutral justification in the legislative record for the Committee's decision to revise the method by which multifamily dwellings are factored into the calculation of whether an area surrounding a sexually oriented business is residential. Specifically, the Committee heard evidence that the formula contained in the prior version of the Ordinance for calculating whether an area is residential did not adequately take measure of the true nature of an area. The Committee determined that this shortcoming existed because multifamily dwellings, including large apartment complexes, were treated under the prior formula as though they held only one family each. In the Committee meetings, the Legal Department discussed with Council members that it had encountered a problem under the prior Ordinance in that the City does not protect residents in condominiums, apartment buildings, and town homes equally with those in single family residences. *See* Minutes for July 15, 1996, Committee Meeting, Exhibit 3D to City's Motion [Doc. # 120], at 3; Minutes for October 3, 1996, Committee Meeting, Exhibit 10B to City's Motion, at 8. Thus, the record contains specific evidence that the City enacted this amendment with the purpose of merely refining, or clarifying, what it had earlier intended to achieve, in 1983 and 1986, by

prohibiting sexually oriented businesses from locating in residential areas.

### ii. Narrowly Tailored to Serve Substantial Governmental Interests?

The Court finds that the new formula for multifamily dwellings is sufficiently well-tailored to achieve the specific purpose for which the City originally adopted its restriction on the location of sexually oriented businesses in residential areas. As described above, it appears that the new formula merely clarifies what the City earlier intended to mean by a "residential area."

The Court therefore concludes that the new provision in Ordinance 97–75 that revises the formula for determining whether an area is residential to give greater weight to multifamily dwellings meets the constitutional requirement that a restriction on protected businesses be narrowly tailored to serve substantial governmental interests.

### iii. Alternative Avenues of Communication

The current record, however, contains no evidence whatsoever by which the Court could estimate how many sites will become unavailable for adult businesses under the new formula for calculating residential areas. With respect to public parks, the legislative record at least contains a rough estimate that persuades the Court that there is no genuine issue of material fact here regarding whether the addition of public parks to the list of protected land uses will significantly affect the number of available sites for protected businesses. However, with respect to the new formula for multifamily dwellings, the Court currently has no information before it that would allow the entry of summary judgment on this issue.

Plaintiffs' challenge to the Ordinance's new locational restrictions have exclusively focused on the number of sites that would be available if *all* of the new locational restric-

tions contained in Ordinance 97–75 were enforced. The parties thus have not dissected for the Court what impact the new formula for multifamily dwellings would have alone, if implemented separately from the Ordinance's other new locational restrictions.

Plaintiffs have placed most of their emphasis on their challenge to the Ordinance's new 1,500 foot minimum distance between adult businesses and protected land uses. It appears that Plaintiffs have attacked this provision most strongly because it is the restriction that would have the most substantial impact on the City's adult businesses and would apparently force a majority of the businesses to close or relocate. However, because the Court has found the 1,500 foot distance requirement to be constitutionally invalid on the ground that it is a content-based restriction, and thus unenforceable for the protected businesses, it is unclear how significant the issue of alternative avenues of communication remains in this case.

Thus, the Court will allow the parties opportunity for further briefing on the limited issue of what impact the new formula accounting for multifamily dwellings will have on protected adult businesses. Within ten business days from entry of this Order, the City shall submit a memorandum of law on the issue of alternative avenues of communication with specific reference to the multifamily dwelling provision of the Ordinance. The City shall also submit an affidavit by an individual with knowledge of this issue regarding how the City expects that the new formula for multifamily dwellings will affect the Plaintiffs in this action. Plaintiffs will have ten days to file a responsive memorandum and other materials they deem necessary. In their memoranda, the parties are specifically directed to indicate to the Court what factual evidence currently exists regarding the potential impact of this provision and, if this evidence is now lacking, what measures would need to be taken to produce such evidence.[125]

125. On July 1, 1997, the Court entered an Order regarding what burden of proof would apply in this case as to the issue of alternative avenues of communication. Following entry of that Order, the FTU Plaintiffs filed a Motion for Reconsidera-

tion [Doc. # 138]. The Court has considered this Motion, the City's Response [Doc. # 186], and FTU's Reply [Doc. # 199], and is unpersuaded that its July 1st ruling was in error. The Court therefore reaffirms its earlier ruling regarding

#### iv. Conclusion as to Validity of New Formula Regarding Multifamily Dwellings

For the reasons discussed above, the Court concludes that the Ordinance's new formula which assigns greater weight to multifamily dwellings in its calculation of residential areas is content-neutral and narrowly tailored to serve substantial governmental interests. It is therefore constitutionally valid so long as implementation of this formula will still allow a sufficient number of permissible sites for affected protected businesses. However, the Court will not make a final ruling on the formula's validity at this time because it does not have any evidence before it regarding the number of sites that will be available if the formula is implemented.

#### C. *Amortization*

■ Plaintiffs contend that, if the Court upholds provisions of Ordinance 97–75 which will cause sexually oriented businesses to lose substantial sums of money by requiring them to close, relocate, or undertake substantial interior renovations, then the Ordinance is invalid because it does not provide for adequate amortization for the affected businesses. *See* N.W. Enterprises' Response [Doc. # 151], at 16–21, 25–26; Dee & Dee's Response [Doc. # 178], at 42–45. Plaintiffs have primarily framed their arguments re-

garding amortization based on the contingency that the Court upholds the Ordinance's locational restrictions in full. Because the Court has found the new distance requirements to be *invalid* for protected businesses, fewer Plaintiffs will be affected by the new locational restrictions than the parties apparently expected when they briefed the amortization issue. However, because *some* protected businesses will most likely have to close or relocate, as a result of the Court's partial upholding of the Ordinance's new locational restrictions, the Court must nevertheless address Plaintiffs' arguments regarding amortization.[126]

In *SDJ*, the district court described amortization as one of three methods that a city may employ, when implementing new land use restrictions, to immunize itself from constitutional takings claims. *See SDJ*, 636 F.Supp. at 1370.[127] However, on appeal, the Fifth Circuit peremptorily disposed of this issue by holding that Ordinance 86–323 could not constitute a taking because "the Ordinance … does not prevent all reasonable uses of plaintiff's property." *SDJ*, 837 F.2d at 1278 (citing *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, Cal.*, 482 U.S. 304, 321, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)).[128] This Court likewise concludes that Ordinance 97–75 can-

the burden of proof and **DENIES** FTU's Motion for Reconsideration [Doc. # 138]. The Court will issue a more detailed order on this issue at a later date if it becomes necessary to hold a trial on whether the new multifamily dwelling formula allows a sufficient number of alternative sites for the affected businesses.

The parties have filed several motions to strike evidence regarding the issue of alternative avenues of communication. Because this evidence was submitted to provide support for the parties' arguments with respect to whether the implementation of *all* of the Ordinance's new locational restrictions would allow a sufficient number of alternative sites, the Court has not needed to consider this evidence. These Motions to Strike [Docs. # 245, 252, 266] are therefore **DENIED AS MOOT.**

**126.** These businesses include those that are located within 750 feet of a public park and, depending on the outcome of the issue regarding the new formula for multifamily dwellings, may also include those that are within a 1,000 foot radius of a residential area, as calculated under

the new formula. The amortization provisions might also affect those businesses that the Court has determined are not protected by the First Amendment.

**127.** According to the court, "[o]ne [method] is to include a grandfather clause exempting existing businesses, the second method is to compensate owners for the taking of their property, and the third is to amortize the value of the property over a period of time." *SDJ*, 636 F.Supp. at 1370.

**128.** The N.W. Enterprises Plaintiffs asserted that "[t]he Fifth Circuit held that with adequate amortization provisions there is no taking." N.W. Enterprises' Response [Doc. # 151], at 17–18 (citing *SDJ*, 837 F.2d at 1278). The Fifth Circuit, however, did not actually hold that adequate amortization provisions are necessary at all; instead, it rejected the *SDJ* plaintiffs' argument regarding the adequacy of the Ordinance's amortization provision on the more preliminary ground that the Ordinance cannot be a taking because it does not prevent all reasonable uses of Plaintiffs' property. *See SDJ*, 837 F.2d at 1278.

not be a taking. Ordinance 97–75 does not prevent all reasonable uses of Plaintiffs' property. If Plaintiffs wish to avoid all the restrictions imposed by Ordinance 97–75, they could do so by converting their businesses into non-sexually oriented businesses.

However, in light of the parties' more detailed arguments regarding the sufficiency of the amortization provisions of Ordinance 97–75, and following the example of the district courts in both *SDJ* and *4330 Richmond*, which carefully considered the amortization provisions in the earlier versions of the Ordinance,[129] this Court will address Plaintiffs' claims regarding amortization.

The N.W. Enterprises Plaintiffs challenge the Ordinance's amortization provision on several grounds. First, they contend that the provision, contained in § 8(c) of the Ordinance, is facially unconstitutional as a prior restraint because it fails to provide adequate guidelines for granting amortization extensions. Second, they claim that it fails to provide adequate time limits on the amortization decisionmaker. Third, they argue that the amortization issue should not be decided through summary judgment because whether or not the Ordinance allows adequate amortization is a question of fact. Finally, they argue that, although § 8(c) provides for amortization for other types of sexually oriented businesses, the Ordinance contains no amortization provision whatsoever for adult arcades and mini-theatres. *See* N.W. Enterprises' Response [Doc. # 151], at 16–17.

The Dee & Dee Plaintiffs challenge the adequacy of amortization under the Ordinance on different grounds. First, they contend that Ordinance 97–75 does not provide amortization for those businesses that, at the time of the Ordinance's passage, were challenging Ordinance No. 91–187 in *4330 Richmond* and thus did not hold valid permits under the prior version of the Ordinance. Second, they argue that the amortization provisions of Ordinance 97–75 are inadequate because under relevant takings law, owners are entitled to the market value of their businesses at the time of the Ordinance's passage, whereas the Ordinance's amortization provisions consider only whether the owners have recouped their business investment. *See* Dee & Dee's Response [Doc. # 178], at 42–44.

Finally, the FTU Plaintiffs argue that the Ordinance provides a shorter amortization period than the City allows for other kinds of businesses subject to municipal regulation.

The Court addresses each of these arguments in the same order as they have just been described. For the following reasons, the Court rejects all of Plaintiffs' arguments that Ordinance 97–75 is in any way invalid on the basis of its amortization provisions.

### 1. Guidelines for Providing Amortization Extensions

Pursuant to § 8 of Ordinance 97–75, sexually oriented businesses were given 180 days from the date on which the Ordinance was passed, January 15, 1997, in which to conform to the new locational and structural requirements contained in Article III. The City enacted this section in order "to provide an initial period for recoupment of investment." Ordinance 97–75, § 8(a). Businesses that could not recoup their investments in this period of time were permitted to apply for extensions under § 8(c).[130] In applying for an extension, a business was required to supply to the amortization hearing officer

---

**129.** *See 4330 Richmond*, No. 91–0665, slip. op. at 26–27; *SDJ*, 636 F.Supp. at 1370–71. In *SDJ*, the district court held that "[a]n Ordinance which terminates, over time, preexisting nonconforming uses should be carefully scrutinized where first amendment interests are affected. Under any set of factors, the standard for amortizing a particular use must be reasonable and must satisfy the concerns of due process." *Id.* at 1370 (citations omitted).

**130.** According to the FTU Plaintiffs, 52 adult businesses sought amortization extensions under this provision, and all were denied except for one. *See* FTU's Response [Doc. # 170], at 16–17 (citing Stipulation No. 1, contained within Defendant City of Houston's Stipulation Regarding Certain Matters and Documents [Doc. # 143]). However, because the City has agreed to a standstill arrangement in which it is not enforcing the Ordinance pending the Court's consideration of the summary judgment motions, this 180 day period has, as a practical matter, been extended for all parties to the lawsuit. As of the date of this Order, all Plaintiffs have already had a *de facto* amortization period of more than one year.

evidence of four items of information set forth in § 8(c).[131]

The N.W. Enterprises Plaintiffs first contend that § 8(c) is facially inadequate because it contains no guidelines setting forth precisely how the hearing officer should determine whether a business will be able to recoup its investment within the initial 180 day period, and thus whether the business is eligible for an extension, nor any criteria for determining how long of an extension a business should receive if one is granted.

As for the length of the extension if one is granted, the Court rejects Plaintiffs' contention that § 8(c) does not provide sufficient guidance to the decisionmaker. In *4330 Richmond*, Judge Rainey recently upheld the 1991 amortization extension provision, which was practically identical to § 8(c), explaining that:

> The Ordinance cites to specific information an enterprise must provide; by including that information, it is necessarily implied that the Director, or his designee, will rely on that information in determining whether to grant an extension. Therefore, the amortization provisions do not provide the Director with standardless discretion.

*4330 Richmond*, No. 91–0665, slip. op. at 27. Similarly, with regard to Plaintiffs' challenge here, this Court concludes that the new Ordinance's requirement that businesses applying for extensions submit information regarding their investment establishes that the hearing officer will rely on that information in determining the length of an extension if one is needed. Ordinance 97–75 therefore provides

sufficient guidance with respect to the length of extensions.

As for the hearing officer's determination of whether a business is even eligible for an extension, the N.W. Enterprises Plaintiffs point out that, although in applying for an extension a business must submit evidence regarding the amount of its investment and the realization of that investment, the Ordinance provides no definitions for the terms "investment" and "realize." In *SDJ*, however, the district court rejected this same argument which the plaintiff businesses made with respect to an amortization extension provision in the 1986 version of the Ordinance that utilized the same terminology as Ordinance 97–75. The court there found that the Ordinance's amortization period and extension process were reasonable even though the Ordinance did not provide a precise definition for the term in issue. *See SDJ*, 636 F.Supp. at 1370. The court determined that, in the absence of a more specific definition, a plain meaning definition of the term would apply and would provide adequate guidance to the decisionmaker. This Court agrees. The drafters of Ordinance 97–75 envisioned that the amortization decisionmaker would apply the ordinary definitions of the terms "investment" and "realize." These terms have technical meanings in law and accounting that are sufficiently specific to provide adequate guidance to the decisionmaker. The Court therefore rejects Plaintiffs' contention that these terms provide the decisionmaker with too much discretion.[132]

Therefore, the Court rejects Plaintiffs' argument that the amortization extension provision, § 8(c) of Ordinance 97–75, is facially

---

131. These items of information include the following:
(1) The amount of the owner's investment in the existing enterprise through the date of passage and approval of the Ordinance;
(2) The amount of such investment that has been or will be realized through the effective date;
(3) The life expectancy of the existing enterprise;
(4) The existence or nonexistence of lease obligations, as well as any contingency clauses therein permitting termination of such lease. Ordinance 97–75, § 8(c).

132. Moreover, Plaintiffs' argument here also fails because Ordinance 97–75 provides even *less* dis-

cretion to the amortization decisionmaker than the 1986 version of the Ordinance, which was upheld in *SDJ*. Ordinance 97–75 states, in mandatory terms, that "[t]he director *shall* grant an extension for the continued operation of the enterprise in the event that the owner proves that he will be unable to recoup his investment in the business," Ordinance 97–75, § 8(c) (emphasis added), whereas Ordinance 86–323 provided only that "the Director '*may*, in his discretion, grant an extension ... if the owner ... proves that he is unable to recoup his investment,'" *SDJ*, 636 F.Supp. at 1370 (quoting Ordinance 86–323, § 5(c)).

invalid for not providing sufficient guidance to the decisionmaker.[133]

## 2. Time Limits on Amortization Decisionmaker

The N.W. Enterprises Plaintiffs also argue that § 8(c) is facially invalid because it does not provide a maximum time period within which the decisionmaker must provide to an applicant a hearing or must render a decision regarding whether the applicant will receive an amortization extension. In support of this argument, Plaintiffs rely primarily on *FW/PBS*, 493 U.S. at 227, 110 S.Ct. 596, in which the Supreme Court struck down the Dallas adult business ordinance as unconstitutional because it failed to provide limitations on the time within which a licensor's decision must be made.

■ Although Ordinance 97–75 does not set out specific deadlines for scheduling amortization hearings or issuing decisions, Plaintiffs lack standing to raise this argument. All of the amortization hearings that were requested have already been held, either prior to the effective date of the Ordinance or shortly thereafter, and it appears that many, if not all, rulings have been issued. Thus, to this extent, Plaintiffs' argument regarding the lack of time limits for hearings and obtaining initial determinations appears to be moot.[134]

■ Even if some Plaintiffs have not yet received an initial administrative decision regarding their applications for amortization extensions, the Court finds Plaintiffs' comparison to the ordinance invalidated in *FW/PBS* unavailing. In that case, the decisionmaker was given no time limitations within which to grant or withhold licenses allowing the plaintiffs to engage in constitutionally protected speech. *See FW/PBS*, 493 U.S. at 227, 110 S.Ct. 596 (stating that the amortization scheme at issue permitted the "indefinite postponement of the issuance of the license"). During the period in which those plaintiffs were waiting for a final decision, their speech

was restricted. *See id.* In contrast, here, the amortization provision of Ordinance 97–75 merely neglects to provide a time limitation on the decision of whether a business should have an *extended period of time* within which to comply with the new locational restrictions. So long as Plaintiffs' businesses are not closed for failure to comply with the Ordinance while awaiting a final decision on their extension applications, their speech is not restricted pending the decisionmaker's consideration of their applications, and there is no constitutional infirmity with the challenged provision.

■ The N.W. Enterprises Plaintiffs also argue that § 8 of the Ordinance is unconstitutional because it does not provide a time certain for appeals of amortization rulings. *See* N.W. Enterprises' Cross–Motion [Doc. # 268], at 7–8. Section 8 incorporates by reference the procedures set forth in § 28–135, which provide for judicial review by way of writ of mandamus or other available remedy in a court of competent jurisdiction. *See* § 28–135(a). Section 28–135(b) provides that "[t]he person aggrieved by the decision of the city may seek judicial review of such decision immediately following the decision." Plaintiffs contend that the word "immediately" in this section is unconstitutionally vague, noting that the City suggested at the October 17th pretrial conference that "immediately" could mean anything from one day to thirty days. Plaintiffs claim that the City can construe the procedures of § 28–135 in its favor and therefore this provision generally is also unconstitutionally vague.

In response, the City argues that the term "immediately" is not unconstitutionally vague because *FW/PBS* merely requires that the opportunity for judicial review be "prompt." The City also requests that the Court take judicial notice of the fact that the City has consistently sought expedited resolution of all of Plaintiffs' complaints and that it is Plaintiffs who have sought delays. *See* City's

---

**133.** In any event, the Plaintiffs who disagree with the hearing officer's determination have a fair review process involving the state courts.

**134.** In addition, because the Court has invalidated the Ordinance's new 1,500 foot distance re-

quirements for protected businesses and therefore, under this Court's Order, many Plaintiffs will not have to relocate, many of these amortization hearings may now be moot.

Response to N.W. Enterprises' Cross–Motion [Doc. # 302], at 7.

The Court rejects Plaintiffs' vagueness argument. The term "immediately" in § 28–135(b) permits appeal by an applicant without delay for a period before which an order of denial becomes final. In addition, § 28–135(c) establishes for an aggrieved applicant various rights associated with reasonable time frames, including a 60 day stay of enforcement if the applicant initiates litigation protesting a denial within 20 days of its issuance. These provisions sufficiently protect the rights of aggrieved applicants. The Court simply finds no merit to the N.W. Enterprises' arguments regarding the sufficiency of the time limits on the amortization decisions and appeals.

### 3. Adequacy of Amortization

The N.W. Enterprises Plaintiffs also contend that summary judgment on the issue of amortization is inappropriate because the issue of whether or not Ordinance 97–75 provides adequate amortization is a factual question. In contrast, the City argues that the amortization provision, § 8 of the Ordinance, is adequate as a matter of law because it is virtually identical to the provisions that were upheld in *SDJ* and *4330 Richmond.*

In both *SDJ* and *4330 Richmond,* the district courts determined that the six month amortization period, plus the possibility of extensions, contained in the City's prior ordinances was constitutionally sufficient. However, in making this determination, both courts specifically noted that the plaintiffs in those cases presented no evidence that they were unable to recoup their investments within six months. *See 4330 Richmond,* No. 91–0665, slip. op. at 27; *SDJ,* 636 F.Supp. at 1371. In this case, Plaintiffs contend that they should have the opportunity to present such factual evidence.[135]

While the Court agrees with Plaintiffs' argument that the adequacy of amortization may be a fact issue under the district court decisions in *SDJ* and 4330 *Richmond,* under the Fifth Circuit's opinion in *SDJ,* the Ordi-

nance does not even raise a constitutional takings issue at all. *See* 837 F.2d at 1278. Therefore, under the appellate law that binds this Court, Plaintiffs simply lack a legally viable challenge to the adequacy of amortization under the Ordinance as a taking.

### 4. Amortization for Adult Arcades and Mini–Theatres

■ Finally, the N.W. Enterprises Plaintiffs argue that, even if the amortization provision contained in § 8 of Ordinance 97–75 is adequate to address the problems created for businesses that must close or relocate under the new locational restrictions of Article III (which apply to all sexually oriented businesses in the City), the Ordinance is nevertheless invalid in that it does not provide any amortization for adult arcades and mini-theatres that are affected by costly new structural regulations under Article II. *See* N.W. Enterprises' Cross–Motion [Doc. # 268], at 526. Plaintiffs are correct that the amortization provisions contained in § 8 of Ordinance 97–75 apply only to businesses affected by the new regulations that the Ordinance adds to Article III and not to businesses that are only affected by the amendments to Article II.

However, as the City points out, Plaintiffs' argument ignores § 7 of the Ordinance, which specifically governs amortization for adult arcades and mini-theatres. Section 7 provides that these businesses have 120 days after the passage date of the Ordinance until they must be in compliance with the new Article II regulations and that they may receive a 30 day extension beyond that in order to perform any remodeling that may be necessary. The City argues that adult arcades and mini-theatres that are not being forced to close or relocate do not need the more elaborate amortization protections of § 8 because the new Article II regulations only require interior construction work. To the extent that any adult arcades and mini-theatres must close or relocate under the new locational restrictions in Article III,

135. In fact, the N.W. Enterprises Plaintiffs have already submitted certified copies of amortization decisions and affidavits purporting to show their lost investments, restructuring costs, and inadequacy of the amortization provisions. *See* Affidavit of Steve Sewell, Attachment to N.W. Enterprises' Cross–Motion [Doc. # 268].

these businesses are protected by the more elaborate § 8 amortization provisions.

The Court therefore concludes that Ordinance 97–75 provides sufficient amortization for adult arcades and mini-theatres. The City's choices as to amortization in this regard are clearly within its prerogative, especially in light of the Fifth Circuit's holding in *SDJ* that this type of regulation simply raises no takings issue.

### 5. Amortization for Plaintiffs in *4330 Richmond*

■ Section 8 of Ordinance 97–75 only permits amortization for businesses which, at the time of the Ordinance's passage, held valid permits under the previous version of the Ordinance. Thus, the Dee & Dee Plaintiffs argue that the Ordinance constitutes a taking for those businesses that challenged the validity of the previous version of the Ordinance in court. Because of the challenge raised in *4330 Richmond*, a number of businesses were not, at the time Ordinance 97–75 was passed, in compliance with Ordinance 91–187. The Dee & Dee Plaintiffs claim that the exclusion of these businesses from the amortization provisions of Ordinance 97–75 punishes them for having been plaintiffs in *4330 Richmond*.[136]

The Court rejects this argument. In *4330 Richmond*, Judge Rainey upheld the locational provisions of Ordinance 91–187. If that decision is affirmed on appeal, then the affected businesses will have had an enormously long *de facto* amortization period under Ordinance 91–187—the seven years since that ordinance was passed plus the period during which the *4330 Richmond* decision remains on appeal. That period is obviously constitutionally adequate. *Cf. SDJ*, 636 F.Supp. at 1371 ("preexisting nonconforming uses are not to be perpetual"). If Ordinance 91–187 is upheld, and thus the courts have determined that the City acted lawfully when it enacted Ordinance 91–187, then there would be no basis for the Dee & Dee Plaintiffs' complaint that businesses affected by Ordinance 91–187 should be entitled to even *more* time to recoup their investments simply because the City chose to enact yet another Ordinance.

The Dee & Dee Plaintiffs' argument makes sense only in the unlikely event that some businesses are not affected by Ordinance 91–187 because the district court's decision in *4330 Richmond* is reversed (and as a result, the locational restrictions in Ordinance 91–187 are struck down) but that those businesses are affected by the locational restrictions that are upheld in Ordinance 97–75. This Court need not address these circumstances until and unless they in fact occur.

### 6. Measure of Compensation

The Dee & Dee Plaintiffs also argue that the amortization scheme included in Ordinance 97–75 is inadequate because it does not allow owners the opportunity to recoup the "market value of the interest taken" at the time of the taking. *See* Dee & Dee's Response [Doc. # 178], at 44–45 (citing *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973)). The Court rejects this argument.

The Court is unpersuaded by Plaintiff's citation to a 25 year-old Supreme Court case arising in a completely unrelated context. Instead, the Court is bound by the Fifth Circuit's decision in *SDJ* that this type of Ordinance simply does not constitute a taking. In any event, the district court, which gave more detailed review to the parties' arguments regarding amortization, also held that there was no taking where the amortization scheme, practically identical to the one challenged here, only compensated for an owner's "investment" in the business. *See SDJ*, 636 F.Supp. at 1370–71. *Accord, 4330 Richmond*, No. 91–0665, slip. op. at 26–27.[137]

---

**136.** The Dee & Dee Plaintiffs raise this argument only on behalf of Hi–Houston, Inc. and Charles Wesley, who are apparently also plaintiffs in *4330 Richmond*. *See* Dee & Dee's Response [Doc. # 178], at 43.

**137.** The Dee & Dee Plaintiffs also contend that they are not claiming a taking of their interest in the real property upon which their businesses are located, but instead claim a taking of "their property right in the established, ongoing businesses themselves." Dee & Dee's Response [Doc. # 178], at 43–44. In *SDJ*, however, the Fifth Circuit did not specifically limit its rejection of the plaintiffs' takings argument to claims involving real property, as opposed to the "going

The Court does not need to reach the Dee & Dee Plaintiffs' contention that summary judgment is precluded because there is a genuine issue of material fact concerning what the actual values of Plaintiffs' businesses were before the passage of the Ordinance. Even if such specific calculations were necessary, they would be properly made in the amortization hearings and appeals of those hearings. To the extent that Plaintiffs argue that the hearings and administrative appeals process are nonetheless inadequate, the Court has addressed this issue *supra* in Section V.C.3., in response to the N.W. Enterprises Plaintiffs' allegations of insufficient amortization procedures.

### 7. Length of Amortization Period

Finally, the FTU Plaintiffs argue that Ordinance 97–75 provides inadequate amortization because 180 days is a shorter amortization period than the City allows for other kinds of regulated businesses. *See* FTU's Locational Response [Doc. # 221], at 66–68. The FTU Plaintiffs have not submitted evidence in support of this claim, but instead request further opportunity for discovery to confirm this suspicion. There is no valid justification for the FTU Plaintiffs' delay in submission of such material, since it is presumably a matter of statute or ordinance and is publicly available without discovery.

In any event, the Court will not reach this argument because Plaintiffs do not have standing to raise it. Because of the current standstill, pending the disposition of the summary judgment motions, no Plaintiffs have been required to comply with the Ordinance's new locational restrictions. Effectively, they have all received, so far, more than a six month extension beyond the 180 day period provided by § 8 of the Ordinance. In any event, the Ordinance's six month amortiza-

tion period does not appear constitutionally infirm.

### D. *Notice Provision*

 The Dee & Dee Plaintiffs argue that the City has advanced no substantial governmental interest behind the new requirement in Ordinance 97–75 that a sexually oriented business applying for a license in a new location must place a notice warning the community of the application.[138] *See* Dee & Dee's Response [Doc. # 178], at 59. According to these Plaintiffs, the City has no legitimate interest in this requirement since the public's input cannot have an effect on whether a license is granted or denied. The Court rejects this argument. The City Council based this provision upon a reasonable content-neutral determination that community residents would like to have advance warning before new adult businesses enter their neighborhoods, even if they have no legal means for preventing such openings. In *TK's Video*, the Fifth Circuit upheld such a notice requirement as sufficiently well-tailored to achieve a substantial government interest. There, the court explained:

> An applicant requesting a license must post a sign on the business premises disclosing his request. . . . The . . . notice provisions . . . ensure that potential neighbors know about the impending arrival of adult businesses. Notice to others . . . is supported by a substantial state interest, serving the practical role of allowing effected [sic] persons an opportunity to examine the request and test its accuracy. These notice requirements are not onerous. . . . We are persuaded that the notice require-

concern" value of the businesses on that real property. The Fifth Circuit concluded simply that the Ordinance did not prevent all reasonable uses of plaintiff's property. *See SDJ*, 837 F.2d at 1278.

**138.** Section 28–123(f) provides that:
Every applicant shall give notice of the application by publication at his own expense in two consecutive issues of a newspaper published in Houston, Texas with a daily circulation of not less than 100,000 copies. The notice shall be printed in 10–point boldface types and

shall include: (1) the fact that a sexually oriented business permit has been applied for; (2) the street address, including suite or unit number, if any, of the place of business for which the permit is sought; (3) the names of the business and, if the business is operated under an assumed name, the trade name, and (4) if the applicant is a corporation, the names and titles of all officers. The notices shall be published within seven (7) days after the application is filed with the director.

ments are sufficiently tailored to the regulatory objective.

24 F.3d at 710.

For these reasons, the Court rejects Plaintiffs' challenge to the notice provision contained in Ordinance 97–75. The Court finds no constitutional defect in this provision.

### E. *Structural, Visibility, and Lighting Requirements*

### 1. Permissibility of Non–Locational Regulation of Sexually Oriented Businesses Under Texas State Law

■ Before moving on to consideration of the Ordinance's non-locational provisions, the Court will first address briefly the Dee & Dee Plaintiffs' argument that Texas law confines municipal regulation of sexually oriented businesses to issues of location and geographical density. *See* Dee & Dee's Response [Doc. # 178], at 52–54. According to these Plaintiffs, TEX.LOC. GOV'T CODE § 243 defines the outer boundaries of cities' permissible regulation of sexually oriented businesses, and because § 243.006 only provides for regulation of the businesses' location and density, all other types of regulation contained in Ordinance 97–75 are invalid.[139]

Here, Plaintiffs are clearly mistaken. Section 243 does not place limits on Houston's regulatory power. In fact, § 243.001(b) expressly states that "[t]his chapter does not diminish the authority of a local government to regulate sexually oriented businesses with regard to *any matters*" (emphasis added). Furthermore, a Texas appellate court recently disposed of Plaintiffs' argument with the following historical explanation:

Prior to August 28, 1989, Chapter 243 of the Texas Local Government Code authorized municipal and county authorities to regulate sexually oriented businesses only as to location.... However, the Seventy-first Legislature amended Chapter 243, effective August 29, 1989, which thereafter in section 243.003(a) provided: "A municipality by ordinance or a county by order of the commissioners court may adopt regulations regarding sexually oriented businesses as the municipality or county considers necessary to promote the public health, safety, or welfare." TEX.LOC. GOV'T.CODE § 243.003(a) (Vernon 1996). By deleting the word "location" in this section, the Legislature intended that regulations other than "location" could be adopted by municipalities governing sexually oriented businesses since a municipality was already authorized to regulate the location and density of these businesses.

*Robinson v. City of Longview,* 936 S.W.2d 413, 416–17 (Tex.App.—Tyler 1996, no writ). The Court therefore rejects Plaintiffs' argument that Texas law confines Houston's regulation of sexually oriented businesses to issues of location and density.[140]

### 2. What These New Requirements Prohibit

As noted earlier, Ordinance 97–75 extends the application of Article II, which previously applied only to adult arcades, to cover adult mini-theatres as well. Thus, two provisions of Article II, §§ 28–101 and 28–103, which require businesses to maintain unobstructed views of their entire premises from one or two managers' stations and to maintain a specified minimum level of interior lighting, newly apply under the Ordinance to adult mini-theatres.

---

**139.** The Dee & Dee Plaintiffs appear also to argue that this alleged state statutory limitation renders the Ordinance invalid under the federal constitution. Plaintiffs contend that since Houston has purported to go beyond protecting what the state has recognized as a substantial city interest, the Ordinance cannot have been designed to satisfy, and cannot be narrowly tailored to advance, a substantial government interest. *See* Dee & Dee's Response [Doc. # 178], at 33–36. The Court rejects Plaintiffs' attempt to bootstrap this state law issue into federal constitutional law. Plaintiffs have cited no authority for the proposition that, for federal constitutional purposes, a city's legitimate governmental interests are limited to those described by state statute.

**140.** Plaintiffs also assert that, to the extent the City's regulation is beyond the scope of authority provided by TEX LOC GOV'T CODE § 243, the regulation is a violation of due process. *See* Dee & Dee's Response [Doc. # 178], at 56. Because the Court does not find the City exceeded its statutory authority here, Plaintiffs' due process argument must fail.

Ordinance 97–75 also creates an entirely new section, § 28–136, that establishes visibility, lighting, supervision, and police access requirements in Article III for all sexually oriented businesses. Of these requirements, Plaintiffs are most concerned by § 28–136(b), which prohibits adult entertainment from being provided in enclosed areas. This section states that:

> It shall be unlawful for any owner, operator or manager of any enterprise to permit any employee to provide any entertainment to any customer in any separate area within an enterprise to which entry or access is blocked or obscured by any door, curtain or other barrier, regardless of whether entry to such separate area is by invitation, admission fee, club membership fee or any form of gratuity or consideration.

§ 28–136(b). Ordinance 97–75 also establishes a new provision, § 28–258(c), which specifically prohibits entertainers from violating this rule by providing entertainment in enclosed areas. Section 28–258(c) provides that:

> It shall be unlawful for any employee to engage in entertainment or to expose any specified anatomical areas or engage in any specified sexual activities in the presence of a customer in any separate area within an enterprise to which entry or access is blocked or obscured by any door, curtain or other barrier separating entry to such area from any other area of the enterprise.

It appears that § 28–136(b) will affect adult arcades and mini-theatres by forcing them to remodel their facilities to eliminate enclosed booths, which are small private areas in which patrons view adult entertainment provided by coin- or other mechanically-operated machines. It also appears that § 28–136(b), along with § 28–258(c), will af-fect other businesses, such as adult cabarets and lounges, by prohibiting small closed-off areas in which patrons may view live adult entertainment.

It is unclear, however, what effect these provisions would have on large open areas of adult cabarets and lounges that are separated from the main rooms of these businesses. One of the FTU Plaintiffs, Ice Embassy, has apparently unsuccessfully sought clarification from the City as to whether these restrictions prohibit the operation of large "VIP rooms" that are separate from the main areas of adult business but that themselves allow clear visibility within them and thus conform to the Ordinance's other structural restrictions.

Although the FTU Plaintiffs originally stated that they were not challenging the Ordinance's prohibition against providing sexually oriented entertainment in enclosed, private areas, *see* FTU's Response [Doc. # 170], at 2, Ice Embassy later moved to amend its Complaint to include a challenge to this provision. *See* Motion for Leave to File Supplemental Complaint [Doc. # 255]. In its Supplemental Complaint, Ice Embassy requests an adjudication of whether § 28–136(b) would prohibit its construction of a large, separately enclosed "VIP room" on its business premises that would occupy more than 4,000 square feet and provide sufficient space to hold more than 200 patrons.

The City objects to Ice Embassy's Motion for Leave on the grounds that it is untimely [141] and unnecessary in light of the fact that several other groups of Plaintiffs have already challenged § 28–136(b).[142] With respect to the timeliness issue, Ice Embassy argues that the City will suffer no prejudice from the amendment and that, because it only recently commenced plans to construct a private VIP room, it only recently acquired standing to raise this challenge. Ice Embas-

---

**141.** Ice Embassy's Motion for Leave was filed on October 10, 1997. The deadline for amending complaints was June 17, 1997. *See* Order [Doc. # 121].

**142.** In addition, the City has objected to several affidavits submitted by Ice Embassy, in which affiants attest to facts regarding Ice Embassy's attempt to obtain a determination from the City of whether its proposed VIP room would violate the Ordinance. *See* City's Response to Ice Embassy's Motion for Leave [Doc. # 278]. The City claims that these affidavits are irrelevant, constitute inadmissible expert conclusions, contain hearsay, and are not supported by adequate foundations. The City's objections [Doc. # 278] are **OVERRULED.** The Court has considered the evidence for the limited purposes of attempting to ascertain the current status of this issue.

sy argues further that it would be a waste of judicial resources for this Court to disallow the amendment and require Ice Embassy to raise an as applied challenge to the provision in a separate lawsuit. With respect to the City's second argument, Ice Embassy strenuously argues that no other Plaintiff has standing to raise this precise challenge because no other Plaintiff has the type of VIP room which Ice Embassy plans to construct.

The Court will allow the amendment to Ice Embassy's Complaint. In light of the fact that other Plaintiffs have challenged the Ordinance's prohibition on entertainment in private rooms, the City will suffer little, if any, prejudice from the amendment. In addition, the Court agrees that judicial economy mitigates in favor of addressing all related issues in this lawsuit. *See* Fed.R.Civ.P. 15(a) ("leave [to amend] shall be freely given when justice so requires"); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Lowrey v. Texas A & M University System,* 117 F.3d 242, 245–46 (5th Cir.1997) ("Rule 15(a) expresses a strong presumption in favor of liberal pleading.... [T]he touchstone of the inquiry under rule 15(a) is whether the proposed amendment would unfairly prejudice the defense by denying the defendants notice of the nature of the complaint").[143]

### 3. Legislative Justification for These Requirements

■ Plaintiffs argue that the legislative record contains no evidence of any need for the Ordinance's new structural, visibility, and lighting requirements and therefore these requirements should be struck down as content-based burdens on speech. *See* Dee & Dee's Response [Doc. # 178], at 28. The Court disagrees. The Court has found ample evidence in the legislative record that the City enacted these requirements in order to combat documented secondary effects that occur inside sexually oriented businesses.

Most notably, the record is replete with testimony and discussion of criminal offenses, such as public lewdness, that occur most frequently when physical obstructions and low levels of lighting exist within these businesses. *See, e.g.,* Minutes for August 8, 1996, Committee Meeting, Exhibit 6D to City's Motion [Doc. # 120], at 10–11; Transcript of August 29, 1996, Committee Meeting, Exhibit 8E to City's Motion, at 85–86. The record also contains testimony regarding, and much discussion of the fact that, requiring minimal levels of lighting and clear lines of sight inside sexually oriented businesses would allow police officers to make arrests for such crimes as public lewdness without needing to participate in the criminal activities themselves. *See, e.g.,* Minutes for August 8, 1996, Committee Meeting, Exhibit 6D to City's Motion, at 10–11; Transcript of August 19, 1996, Committee Meeting, Exhibit 7G to City's Motion, at 142–43.[144]

In addition, the Court notes that the structural, visibility, and lighting requirements

---

**143.** The City argues that Ice Embassy does not have standing to raise this challenge because it has not yet constructed the proposed VIP room. The Court rejects this argument. Ice Embassy has submitted evidence that it will cost approximately $400,000 to build the room. The Court agrees that Ice Embassy is entitled to a ruling on the constitutionality of the Ordinance provision before it makes this investment.

**144.** It is unclear whether any Plaintiffs are also challenging § 28–102, which requires adult arcades and mini-theatres to seal their interior walls in order to eliminate so-called "glory holes," on the ground that this provision is unsupported by a substantial governmental interest. This section provides that "no adult arcade or adult mini-theatre shall be configured in such a manner as to have any opening in any partition, screen, wall or other barrier that separates viewing areas for arcade devices or adult mini-theatre devices from other viewing for arcade devices or adult mini-theatre devices." As discussed *infra* in Section V.E.5, the Court rejects the N.W. Enterprises Plaintiffs' argument that this provision will impose economic harm on businesses that must undertake costly renovations to comply with the requirement. The Court also declines to strike it down as a content-based provision. The legislative record contains sufficient evidence to justify this requirement as a content-neutral, narrowly tailored means of achieving a substantial governmental interest. Specifically, the City Council's Sexually Oriented Business Committee heard testimony from Houston police officers that patrons use these holes to engage in anonymous sexual activity. *See, e.g.,* Transcript of August 29, 1996, Committee Meeting, Exhibit 8E to City's Motion [Doc. # 120], at 101–04. Thus, the City constitutionally enacted this provision in order to achieve substantial governmental interests, such as decreasing the spread of sexually transmitted diseases.

which now apply to all sexually oriented businesses and are contained in the new §§ 28–136(b) and (d) are very similar to the requirements that previously applied only to adult arcades and were upheld in *SDJ*. Likewise, the structural, visibility, and lighting requirements that now apply to adult mini-theatres in §§ 28–101 and 103 are *identical* to the requirements that previously applied to adult arcades. As the Fifth Circuit has noted, a city may take one step at a time in adopting new regulations for adult businesses. *See Hang On*, 65 F.3d at 1256. The Court finds that the City has adduced ample evidence supporting the extension of these requirements to businesses other than adult arcades.

Thus, the Court concludes that these requirements are content-neutral and should be evaluated under intermediate scrutiny. Applying this constitutional test, the Court finds that these restrictions are narrowly tailored to serve the City's substantial governmental interest in decreasing the commission of such crimes as public lewdness and prostitution inside sexually oriented businesses. The Court therefore finds that these requirements are facially valid under the First Amendment.

However, this ruling does not purport to address the "as applied" challenge Ice Embassy has raised to §§ 28–136(b) and 28–258(c) with respect to large VIP rooms. Ice Embassy has filed a Motion for Partial Summary Judgment [Doc. # 258] declaring that these provisions are unconstitutional as applied to its own proposed VIP room. It does not appear that the City has responded to

this motion, most likely because the City was uncertain as to whether the Court would allow Ice Embassy to amend its Complaint.

The Court finds that the issue regarding large VIP rooms, on which the City's position remains somewhat unclear, is not ripe for disposition at this time. If the City intends to construe and enforce §§ 28–136(b) and 28–258(c) so as to prevent such a large room to exist within a sexually oriented business, the City must submit a response to Ice Embassy's Motion for Partial Summary Judgment [Doc. # 258] within ten business days of entry of this Order.[145]

### 4. Patrons' Right to Privacy

 The N.W. Enterprises Plaintiffs contend that § 28–101(a), which requires that the interior of adult arcades and mini-theatres be configured so as to allow an unobstructed view of each area to which patrons are permitted access,[146] violates patrons' right of privacy. *See* N.W. Enterprises' Response [Doc. # 151], at 15–16. Although these Plaintiffs acknowledge that federal courts have generally rejected this asserted privacy right, *see Matney v. County of Kenosha*, 86 F.3d 692, 698–99 (7th Cir.1996); *Ellwest Stereo Theatres, Inc. v. Wenner*, 681 F.2d 1243, 1247–48 (9th Cir.1982), they argue that Texas state courts have accepted it. In support of this argument, they cite *Wilkins v. State*, 829 S.W.2d 818, 821–22 (Tex.App.— Austin 1992, no writ), and *Liebman v. State*, 652 S.W.2d 942, 948–49 (Tex.Crim.App.1983, en banc).

145. The Court cannot conceive, based on the current legislative record, how §§ 28–136(b) and 28–258(c) could serve any substantial governmental interest as applied to large, well lit VIP rooms that hold 200 patrons and permit access for City police officers. The governmental interests justifying these provisions' prohibition of adult entertainment being provided in small enclosed rooms—including the prevention of such crimes as public lewdness and prostitution and the prevention of the spread of sexually transmitted diseases—do not appear to be at stake in the context of large rooms that just happen to be separated from the businesses' main areas. The VIP room which Ice Embassy has proposed is large enough in fact to be its own enterprise separate from Ice Embassy's main room. So long as businesses containing these large separate rooms comply with the other regulations in

the Ordinance within these rooms, such as the visibility, lighting, and police access requirements, the Court fails to see what legitimate interest the City could have in prohibiting them.

146. As noted above in Section V.E.2., § 28–101 previously applied only to adult arcades, but under Ordinance 97–75, now applies to adult mini-theatres as well. Section 28–101 provides, in relevant part, that "the interior of the adult arcade or adult mini-theatre shall be configured in such a manner that there is an unobstructed view of every area of the adult arcade or adult mini-theatre to which any patron is permitted access for any purpose from that manager's station." As applied to adult arcades, this regulation was upheld against constitutional attack in *Rahmani*, 748 S.W.2d 618.

The Court is not persuaded by Plaintiffs' argument. First, this Court is not obligated to defer to state court decisions on this issue in lieu of applicable federal case law. In the Texas cases cited by Plaintiffs, the courts' decisions were not based on a broader interpretation of state constitutional privacy law than is provided by federal law. Instead, these state courts purported to construe the Fourth Amendment to the United States Constitution. *See Wilkins*, 829 S.W.2d at 820; *Liebman*, 652 S.W.2d at 945 n. 6 ("our disposition of these appeals is predicated only upon the Fourth Amendment to the Federal Constitution since no independent State grounds have been advanced"). On matters of federal constitutional interpretation, opinions of federal appellate courts provide greater precedential value than those of state appellate courts. *See Grantham v. Avondale Industries, Inc.*, 964 F.2d 471, 473 (5th Cir.1992) (" '[t]he federal district court ... takes as its authority on federal constitutional issues decisions of the United States courts of appeals and the United States Supreme Court, rather than those of the state supreme court' ") (quoting *In re Asbestos Litigation*, 829 F.2d 1233, 1237 (3rd Cir. 1987)).

Second, in any event, Plaintiffs' Texas cases do not hold, as Plaintiffs contend, that patrons have any generalized right to privacy in adult arcades or adult mini-theatres. Instead, the courts' decisions were fact-specific. In *Liebman*, the court based its decision, that a patron had a right of privacy in an adult theatre booth that contained a "glory hole," on its specific determination that the configuration of the booth led the patron to have a reasonable expectation of privacy in that booth. The court concluded that a police officer who peered over a seven foot wall by standing on another officer's cupped hands, in order to see one patron masturbate another through a hole in the wall of an adjoining booth, engaged in an illegal warrantless search in violation of the Fourth Amendment. In reaching this decision, the court noted that the theatre management took affirmative steps to assure the privacy of its patrons. *See id.* at 947–48. Likewise, in *Wilkins*, the court concluded that a patron had a justifiable expectation of privacy because the booth he entered had "a curtain which excluded outside viewers and a light which reflected that the booth was 'in use.' " 829 S.W.2d at 821.

By requiring sexually oriented businesses to configure their premises so as to allow an unobstructed view to all areas, Ordinance 97–75 simply obviates the possibility that patrons of these businesses, unlike the patrons described in *Liebman* and *Wilkins*, will have any subjective, reasonable expectation of privacy while on the premises. If patrons have no *expectation* of privacy in this circumstance, then they have no *right* of privacy under the Fourth Amendment. *See Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Ishmael*, 48 F.3d 850, 854 (5th Cir.1995).

Plaintiffs have offered no legal authority for the proposition that the City is precluded from denying patrons of adult businesses any expectation of privacy while on the premises of those businesses. The Court therefore rejects Plaintiffs' contention that § 28–101(a) violates patrons' right of privacy.[147]

## 5. Economic Harm to Plaintiffs

The N.W. Enterprises Plaintiffs have submitted evidence purporting to show that they will suffer a substantial economic burden in complying with the new structural and visibility requirements imposed by Ordinance 97–75.[148] They contend that this evidence is relevant to the Court's consideration of the

147. The A.H.D. Plaintiffs have also briefly raised the argument that §§ 28–136(b) and 28–258(c), which prohibit adult entertainment in enclosed areas, violates patrons' right to privacy. *See* A.H.D.'s Response [Doc. # 173], at 43. In addition, the Dee & Dee Plaintiffs have briefly argued that the Ordinance is invalid in that it bans all private or semi-private participation in protected speech. *See* Dee & Dee's Response [Doc. # 178], at 58. The Court's analysis above with respect to the N.W. Plaintiffs' privacy argument applies with equal force to the A.H.D. and Dee & Dee Plaintiffs' privacy arguments. Plaintiffs have not cited any authority for the proposition that there is a constitutional right to participate in private speech in a non-private setting such as a commercial sexually oriented business.

148. Specifically, the N.W. Enterprises Plaintiffs have submitted estimates, based on construction bids, of how much it would cost to remodel their mini-theatre devices in order to conform with the

validity of these requirements, first, because it shows that the Ordinance constitutes a taking and, second, because financial harm is, under *Turner*, now a relevant factor under the First Amendment inquiry. However, the N.W. Enterprises Plaintiffs concede that if the Court finds the *Turner* standard inapplicable, these requirements are "probably constitutional" under the prior case law. *See* N.W. Enterprises' Response [Doc. # 151], at 9 (citing, *e.g.*, *TK's Video*, 24 F.3d 705).

The N.W. Enterprises Plaintiffs' economic argument fails in light of this Court's holding in Section V.C.4. that the Ordinance does not constitute a taking for adult arcades and mini-theatres and in light of this Court's conclusions regarding *Turner*, discussed *supra* in Section III.A.4. *See also DLS*, 107 F.3d at 413 (holding that expensive renovations to adult cabarets to accommodate regulations are constitutional; "we consider the economic effects of the ordinance in the aggregate, not at the individual level; if the ordinance were intended to destroy the market for adult cabarets, it might run afoul of the First Amendment, but not if it merely has adverse effects on the individual [business]").

## F. *Signage and Exterior Portions Restrictions*

The FTU Plaintiffs argue that the restrictions imposed on sexually oriented businesses' signage and exterior portions in §§ 28–129 and 28–130 violate their federal and state constitutional rights and state statutory rights. *See* FTU's Response [Doc. # 170], at 109–35. Although Plaintiffs attack these provisions in full, Ordinance 97–75 has only modified them in one narrow respect, namely in extending the signage restrictions contained in § 28–130 to sexually oriented businesses located in multi-unit commercial centers. Other than this one modification, Ordinance 97–75 leaves these provisions unchanged from the previous versions of the Ordinance. Because these provisions were specifically upheld in *SDJ*, the only issue actually presented to this Court with respect to signage and exterior decor is whether the City was justified in enacting the one modification in Ordinance 97–75 that extended the scope of the signage restrictions to businesses located in multi-unit centers.

### 1. The Restrictions

With respect to exteriors, § 28–129 requires that sexually oriented businesses maintain "achromatic" "exterior portions." This section allows the outer walls of sexually oriented businesses to be gray, tan, or light earth tones, but not white, black, or any bold color.[149] Ordinance 97–75 does not modify this provision in any way. Therefore, the

---

Ordinance's visibility requirement. *See* Affidavit of Cecil Eugene Ethridge (President of N.W. Enterprises) [Doc. # 202] ($197,698.70 to remodel 36 devices); Affidavit of Steve L. Collins (President of Campus Investments, Inc.) [Doc. # 241] ($348,890.00 to remodel 84 devices); Affidavit of Steve Sewell (Manager of Executive Adult Video Superstore), Attachment to N.W. Enterprises' Cross–Motion [Doc. # 268] ($120,000.00 to remodel 13 devices). In addition, Plaintiffs claim that if they do not remodel their devices, but instead simply remove these devices altogether, their businesses' revenues would be reduced by approximately two-thirds.

The City objects to these affidavits because "[n]one of the affiants claim to have applied for permits under Article II and been denied, so their legal conclusions as to whether or not they have to comply with the provisions of the Ordinance, and in what manner, are highly suspect." City's Response to N.W. Enterprises' Cross–Motion [Doc. # 302], at 4–5. This objection is **OVERRULED.** Plaintiffs, like all persons under the law, are charged with the responsibility of interpreting the law to assess its application to

them. Plaintiffs are reasonable in their view that their devices, which they concede are currently contained in enclosed booths, violate the Ordinance.

The City has also filed a Motion to Strike the Collins Affidavit [Doc. # 246] because it was filed after the deadline for Plaintiffs' responses. Since the City has had the opportunity to review the affidavit for months before the Court's ruling on the pending motions, the City had ample time to respond to the matters in the affidavit. The City's Motion to Strike [Doc. # 246] is therefore **DENIED.**

149. "Achromatic" is defined as:

Colorless, lacking in saturation or hue. Without limitation, grays, tans and light earth tones shall be included, but white and black and any bold coloration that attracts attention shall be excluded from the definition of achromatic. § 28–121. "Exterior portion" is defined as:

Any part of the physical structure of an enterprise, including a wall, veneer, door, fence, roof, roof covering, or window, which is visible from any public way or public property.

current restrictions on sexually oriented businesses' exterior portions is entirely unchanged from the previous version of the Ordinance and has already been upheld against attack in *SDJ. See* 636 F.Supp. at 1369.[150]

With respect to signage, § 28–130 limits sexually oriented businesses to the use of two simple on-site signs: one "primary sign" and one "secondary sign." A primary sign may be no larger than seventy-five square feet, and a secondary sign may be no larger than twenty square feet. A primary sign may contain words only, which are limited to the name and a description of the business, such as "adult cabaret" or "adult entertainment." All signs must have a "uniform and solid color" background, and their lettering must have a uniform print-type, size, and color.[151] Any violation of these restrictions can subject an operator of a sexually oriented business to a license revocation and misdemeanor punishment of a $4,000 fine and/or one year in jail, under TEX. PENAL CODE § 12.21. *See* §§ 28–127(a)(2) and 28–133(a).[152]

§ 28–121.

**150.** In *SDJ*, the district court addressed the Ordinance's provisions regarding signage and exterior portions in the same discussion, holding that "[a]. restriction on the signage and exterior portions which allows modest, subdued advertising is appropriate in order to prevent a decline in the values of surrounding properties, and thus prevent deterioration of neighborhoods." 636 F.Supp. at 1369. Although the Fifth Circuit affirmed the district court's decision with respect to signage, it did not specifically refer to the Ordinance's provision regarding exterior portions.

**151.** In full, subsections (a)–(f) of § 28–130 provide as follows:

(a) Notwithstanding chapter 46 of the *City of Houston* Building Code—*General Provisions* or any other city ordinance, code, or regulation to the contrary, it shall be unlawful for the owner or operator of any enterprise or any other person to erect, construct, or maintain any sign for the enterprise other than one (1) primary sign and one (1) secondary sign, as provided herein.
(b) Primary signs shall have no more than two (2) display surfaces. Each such display surface shall:
 (1) Not contain any flashing lights;
 (2) Be a flat plane, rectangular in shape;
 (3) Not exceed seventy-five (75) square feet in area; and
 (4) Not exceed ten (10) feet in height or ten (10) feet in length.
(c) Primary signs shall contain no photographs, silhouettes, drawings or pictorial representations of any manner, and may contain only:
 (1) The name of the enterprise; and/or
 (2) One (1) or more of the following phrases:
 (a) 'Adult bookstore.'
 (b) 'Adult movie theatre.'
 (c) 'Adult encounter parlor.'
 (d) 'Adult cabaret.'
 (e) 'Adult lounge.'
 (f) 'Adult novelties.'
 (g) 'Adult entertainment.'
 (h) 'Adult modeling studio.'
 (3) Primary signs for adult movie theatres may contain the additional phrase, 'Movie Titles Posted on Premises.'
(d) Each letter forming a word on a primary sign shall be of a solid color, and each such letter shall be the same print-type, size and color. The background behind such lettering on the display surface of a primary sign shall be of a uniform and solid color.
(e) Secondary signs shall have only one (1) display surface. Such display surface shall:
 (1) Be a flat plane, rectangular in shape;
 (2) Not exceed twenty (20) square feet in area;
 (3) Not exceed five (5) feet in height and four (4) feet in width; and
 (4) Be affixed or attached to any wall or door of the enterprise.
(f) The provisions of item (1) of subsection (b) and subsections (c) and (d) shall also apply to secondary signs.

**152.** The City has submitted information regarding its interpretation of the Ordinance's signage requirements in the form of an affidavit by an official in the Houston Sign Administration Division, the department that is responsible for the implementation and enforcement of the City's signage regulation. *See* Affidavit of Ollie Schiller, Exhibit C to City's Response to FTU's Cross–Motion [Doc. # 225]. The FTU Plaintiffs have moved to strike this affidavit [Doc. # 247] as a sanction against the City for not identifying this official earlier or making her available for a deposition and on the grounds that her testimony constitutes inadmissible legal conclusions by a lay witness, exceeds her stated expertise, fails to provide adequate factual foundation, and constitutes inadmissible hearsay. Because the Court has not relied on this affidavit, this motion [Doc. # 247] is **DENIED AS MOOT.** However, should the affidavit become necessary for any reason, the Court would find it admissible. The City has explained to the Court's satisfaction that it did not identify this affiant earlier because it did not know that the facts to which she has testified would be in issue until the FTU Plaintiffs filed their Cross–Motion for Summary Judgment. Her testimony does not include legal conclusions but instead assists the Court by providing an

The only substantive modification that Ordinance 97–75 makes to these signage provisions is the addition of one new subsection, § 28–130(g), which merely clarifies that, when a sexually oriented business is located in a commercial multi-unit center, any sign located in that center that identifies the sexually oriented business will count toward the business's two-sign limit. In other words, if a sign connected with a multi-unit center identifies, along with other businesses, a sexually oriented business located in that center, then that sexually oriented business cannot also have its own additional primary and secondary signs.[153]

The City claims that it added this new provision in order to close what was perceived as a loophole in the previous version of the Ordinance that allowed sexually oriented businesses in multi-unit centers to use signs connected with the centers in addition to their own primary and secondary signs. According to the Legislative Report for Ordinance 97–75, "[h]istorical evidence indicates that enterprises have evaded the size limitation of the sign ordinance by renting out a portion of their building thus changing their status to a 'multi-unit center.' In turn, they directly advertise on the allowed over sized signs." Exhibit 36 to City's Motion for Summary Judgment [Doc. # 120], at 25–26.

Plaintiffs raise numerous arguments as to why the Ordinance's signage restrictions are too stringent and violate their constitutional rights. For instance, they contend that these restrictions discriminate against sexually oriented businesses by limiting their signage far more than the City regulates signage for other types of businesses.[154] They argue that the City has failed to present evidence in the legislative record of the need for these restrictions and that therefore the Court should strike them down as content-based restrictions on speech under a strict scrutiny standard of review. They also contend that the severe limitations on their secondary signs prevent them from posting political signage and therefore restrict their rights to engage in political speech.[155] They

interpretation of the Ordinance by the City agency charged with implementing its provisions. The affiant's testimony does not constitute hearsay because she bases her opinions on her personal knowledge and experience. Plaintiffs other objections go to the weight of this evidence, not to its admissibility.

153. Specifically, § 28–130(g) provides that:

Any sign located on the premises of a commercial multi-unit center containing an enterprise that displays the name, or any portion of the name of the enterprise, any name under which any enterprise was formerly operated on the premises, or that contains any of the terms set forth in item (2) of subsection (c) or any other terminology that is commonly used to identify, or is associated with the presence of a sexually oriented business, shall comply with all restrictions of this section. The intent of this subsection is to prevent the use of signage identifying the commercial multi-tenant center itself from being used as a subterfuge to evade the restrictions on sexually oriented business signs set forth in this section.

154. Plaintiffs have submitted evidence that other types of similar businesses, such as bars or restaurants that do not provide sexually oriented entertainment, do not have such stringent limitations on the content and design of their signs and are allowed to have five on-site signs that may each be up to 750 square feet in size. *See* Exhibit 3 to Furlow Affidavit, Appendix in Support of FTU's Response [Doc. # 171], at 29–34

(reproducing City Sign Code § 4609, which details the structural requirements for permissible signs in the City of Houston); Exhibit 4 to Furlow Affidavit, at 5 (identifying various types of signs, such as ground, roof, wall, and marquee signs, which are available to non-sexually oriented businesses).

155. In support of this argument, Plaintiffs point out that the Ordinance fails to contain an exemption for on-premises political speech like the exemption that appears in the City's general Sign Code, *see* Exhibit 3 to Furlow Affidavit, Appendix in Support of FTU's Response [Doc. # 171], at 22 (citing City Sign Code § 4608(b)), and thus contend that the signage restrictions for sexually oriented businesses constitute a total ban on political speech. Plaintiffs also argue that, by requiring a business's primary sign to identify the business, the Ordinance mandates a preference for commercial speech over non-commercial messages. Plaintiffs argue that this preference constitutes viewpoint discrimination in violation of the First Amendment and, in support, cite *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 512–13, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (striking down city ordinance which permitted on-site commercial speech but not non-commercial messages).

The FTU Plaintiffs also briefly argue that the signage restrictions deprive them of their property interest in their corporate names and logos, as well as their right to advertise their names and other commercial information regarding such

claim that ambiguities in the signage provisions and in the City's enforcement of those provisions render them void for vagueness.[156] They argue that, even if the restrictions could withstand federal constitutional review, they cannot survive a challenge under the Texas Constitution, which provides broader protection for speech than does the federal constitution.[157] Finally, they claim that the modification to the City's prior signage requirements violates a state procedural statute and constitutes a federal constitutional taking by depriving them of their property interests in their now non-conforming signs without providing them with any compensation.

The Court finds that Plaintiffs' full-scale attack on these restrictions is misplaced. With the possible exception of Plaintiffs' state statutory argument, discussed *infra* in Section V.F.4., Plaintiffs' arguments must fail. As previously noted, these exact same signage provisions, as applied to all sexually oriented businesses except those located in commercial multi-unit centers, were upheld by the district court and the Fifth Circuit in *SDJ*. As described in the next section, Plaintiffs have failed to persuade this Court that the Fifth Circuit's holding in *SDJ* with regard to these signage provisions is no longer binding authority.

## 2. The Continued Applicability of *SDJ*

The FTU Plaintiffs contend that the Fifth Circuit's cursory affirmation in *SDJ* of the City's previous signage restrictions [158] has been superseded or repudiated by subsequent Supreme Court authority. Although the Court finds some merit in Plaintiffs' arguments and has serious concerns regarding the severity of the City's restrictions on sexually oriented businesses' signage and exterior portions, the Court will not reconsider these issues that have been previously adjudicated. Until and unless the Fifth Circuit reconsiders its conclusions on these restrictions, this Court is bound by *SDJ. See Agostini*, —— U.S. at ——, 117 S.Ct. at 2017

---

topics as prices and hours. The Court finds no merit in this undeveloped argument. The Ordinance does not deprive Plaintiffs of their property interest in their names and logos but instead merely regulates how they may display such information.

**156.** The FTU Plaintiffs argue that § 28–130(g) is void for vagueness because it gives inadequate notice to those charged with obeying it. *See* FTU's Response [Doc. # 170], at 130–32. Specifically, they challenge the provision's language that indicates that the extension of the signage restrictions to businesses located in multi-tenant shopping centers is intended "to prevent the use of signage identifying the commercial multi-tenant center itself from being used as a subterfuge to evade the restrictions on sexually oriented business signs set forth in this section." § 28–130(g). Plaintiffs claim to be uncertain as to what this provision means and what exactly would constitute an impermissible "subterfuge." They argue that the vagueness of this provision makes it especially susceptible to selective enforcement, allows unbridled discretion by the decisionmaker, and therefore will chill protected speech. The Court is unpersuaded. This statement which Plaintiffs challenge was obviously included in the provision as a statement of intent by the drafters the language. The statement simply explains how the new provision alters the prior version of this section of the Ordinance. The language Plaintiffs attack does not itself directly limit Plaintiffs' conduct.

**157.** Plaintiffs also contend that, insofar as the restrictions limit political signage, they violate Article I, Section 27 of the Texas Constitution, which provides for the rights of citizens to petition for redress of grievance. This argument is frivolous. The Ordinance's signage restrictions do not prevent any individual or business from petitioning for redress of their grievances. If anything, the restrictions only limit one form of petition. Plaintiffs also argue that the restrictions violate Article I, Section 29 of the Texas Constitution, which provides for the "reservation of rights to the people." The Court finds no merit in this undeveloped argument.

**158.** In *SDJ*, the district court found that the City had met its burden in justifying the restrictions on signage and exterior portions, reasoning that "[a] restriction on the signage and exterior portions which allows modest, subdued advertising is appropriate in order to prevent a decline in the values of surrounding properties, and thus prevent deterioration of neighborhoods." 636 F.Supp. at 1369. In affirming the district court's decision on this issue, the Fifth Circuit provided only the following brief explanation:

The Houston Ordinance ... does not ban advertising completely; it merely requires appellants to employ "simple signs." Governments have the right to regulate and limit the content of advertisements within reason, and we are not persuaded that the City here has overstepped its bounds.

*SDJ*, 837 F.2d at 1278 (footnote omitted).

(quoted *supra* at 29).[159]

In any event, the Court notes some prominent distinctions between this case and the cases that Plaintiffs cite in support of their argument that the legal standards relevant to the signage and exterior portions issues have changed since *SDJ* was decided.

First, Plaintiffs note that the City originally defended these restrictions in part by reference to its "interest in preventing detrimental effects on minors." *SDJ*, 837 F.2d at 1280.[160] They claim that this interest now requires a different balancing in light of *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), in which the Supreme Court struck down portions of the Communications Decency Act,[161] a law that criminalized the knowing transmission of obscene material to minors through the Internet. In *Reno*, the Court declared that:

> [T]he Government may not "reduce the adult population ... to ... only what is fit for children." ... "Regardless of the strength of the government's interest [in protecting children], the level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox."

*Id.* at 2346 (quoting *Denver Area Educ. Telecomm. Consortium v. F.C.C.*, 518 U.S. 727, 116 S.Ct. 2374, 2393, 135 L.Ed.2d 888 (1996), and *Bolger v. Youngs Drug Prods. Co.*, 463 U.S. 60, 74–75, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983)). Despite this strong statement, *Reno* did not *alter* the constitutional test that would apply to *every* law that is justified in any part by reference to protecting minors. Instead, in *Reno*, the Supreme Court was faced with a new technological medium and simply sought to apply existing doctrine to a novel context.[162] Moreover, *Reno* concerned

an issue of access to constitutionally protected speech and not merely the advertising of such speech. Thus, the Court is not persuaded that *Reno* requires it to reevaluate the Fifth Circuit's condonation in *SDJ* of the City's partial justification of protecting minors in support of its restrictions on sexually oriented businesses' signage and exterior portions.

Second, Plaintiffs cite *44 Liquormart*, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711, in which the Court struck down a state's statutory ban on price advertising for alcoholic beverages, and *City of Ladue v. Gilleo*, 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), in which the Court struck down a city ordinance banning most signs erected on residential property. These cases involved *total* bans on certain types of signs, not merely restrictions on those signs. Ordinance 97–75, in contrast, does not *ban* advertising by sexually oriented businesses altogether and is therefore not implicated by the Supreme Court's holdings in these cases.

Finally, Plaintiffs cite *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), a First Amendment religious freedom case. Plaintiffs have failed to persuade the Court that this case is applicable to the issues presented here.

Plaintiffs also argue that the free speech provision of the Texas Constitution has developed since *SDJ*. *See* FTU's Supplemental Letter Brief [Doc. # 172]. However, in support of this argument, Plaintiffs are unable to cite any cases specifically applicable to the context presented in the case at bar. They instead note that the Texas Supreme Court has held *generally* that the Texas Constitution affords more protection for speech than

---

**159.** The Court also notes that, although *SDJ* was decided in 1986, one Fifth Circuit Judge as recently as 1994 expressly noted approval of the *SDJ* court's upholding of Houston's restrictions on sexually oriented business signage. *See MD II Entertainment*, 28 F.3d at 497 (Jones, J., concurring).

**160.** As previously noted, the City also justified its signage and exterior portions restrictions with reference to protecting property values. *See SDJ*, 636 F.Supp. at 1369.

**161.** 47 U.S.C. §§ 223(a)(1) and 223(d).

**162.** In particular, the Court concluded that the Internet is more similar to traditional, protected speech than it is to "invasive" broadcast media such as radio and television; the Court therefore chose to apply the First Amendment test that had previously been established for non-broadcast media. *See Reno*, 521 U.S. 844, 117 S.Ct. at 2343.

the United States Constitution. The cases that have recognized greater speech protections under the Texas Constitution have been in such contexts as abortion clinic protests, see Ex parte Tucci, 859 S.W.2d 1, 7 (Tex. 1993), and judicial gag orders, see Davenport v. Garcia, 834 S.W.2d 4, 8–9 (Tex.1992). In light of other Texas courts' holdings that this enhanced protection does not apply to adult entertainment, see Schleuter v. City of Fort Worth, 947 S.W.2d 920, 926 (Tex.App.—Ft. Worth 1997, writ denied), this Court declines to apply a separate Texas constitutional analysis to the Ordinance's signage and exterior portions provisions.

### 3. Extension of Signage Restrictions to Enterprises in Multi–Unit Centers

 Because the Court concludes that it may not reexamine the constitutionality of the Ordinance's signage and exterior portions provisions that have already been upheld, the constitutional analysis here must focus solely on whether the City has satisfied the appropriate First Amendment test in enacting § 28–130(g), the modification that clarifies the signage provision's applicability to sexually oriented businesses located in multi-unit centers. The Court concludes that the City has met its burden on this issue.

163. The minutes to the October 3 meeting explain the Committee's discussion of the rationale for this new provision as follows:

[This issue is] of concern to Legal and HPD and has been for a number of years. When the signage provision was originally enacted it was thought that tenants in centers should be treated differently than those in stand alone structures. The reason is that the signage and exterior provisions are to minimize as much as possible the secondary impact of the SOB on surrounding property values.... [S]ign control was designed to be a protection against garish advertising. Freestanding buildings are permitted two small signs ... achromatic in color .... Someone asked at the time of the development of the ordinance: what if the business is in a strip center which is uniform architecturally and has one pole sign for all its tenants. It would make SOBs stand out to paint them a different color or have different signs. But what has happened as a result is that some of the businesses with enough space have added a barber shop or other businesses within their building and then call themselves a center. So they avoid the effect of the sign/color restrictions.

First, the Court is persuaded that this modification is content-neutral. The legislative record for Ordinance 97–75 indicates that the City Council's Sexually Oriented Business Committee heard specific testimony relevant to negative secondary effects believed to be created by excessive signage of sexually oriented businesses located in multi-unit centers. According to this testimony, the previous version of the Ordinance did not effectively limit these businesses to two simple signs, as other sexually oriented businesses were limited. See, e.g, Minutes for June 17, 1996, Committee Meeting, Exhibit 2C to City's Motion [Doc. # 120], at 16; Minutes for October 3, 1996, Committee Meeting, Exhibit 10B to City's Motion, at 8 [163]; Memorandum from Sam Nuchia, Chief of Police, to Helen Huey, Exhibit 9C to City's Motion, at 4; Minutes for October 11, 1996, Committee Meeting, Exhibit 11A to City's Motion, at 9–10 [164]; Minutes for October 30, 1996, Committee Meeting, Exhibit 13B to City's Motion, at 9–10 (Committee discussed that original purpose of signage restrictions was to alleviate undesirable effects on property values of huge spectacular signs and that the exception for multi-unit centers has allowed this problem to persist).[165]

Minutes for October 3, 1996, Committee Meeting, Exhibit 10B to City's Motion [Doc. # 120], at 8.

164. One Council member provided the following firsthand testimony: "If you drive along the Southwest Freeway south of Hillcroft on the right hand side ... you will see the sign which is right out of Las Vegas. The reason the building can have such a sign is because it simply punched another door in the building." Minutes for October 11, 1996, Committee Meeting, Exhibit 11A to City's Motion, at 10 (statement by Council member Ray Driscoll).

165. An attorney from the City's Legal Department explained that:

[T]he present ordinance allows multi unit centers to get out from under the more restrictive signage and exterior appearance requirements that apply to free standing SOBs. In practice this has led to some very large and spectacular signage and decor by the simple expediency of some of the SOBs adding another small business or two to their premises and calling it a multi unit center. This was a Legal Department recommendation initially based on some years of frustration in trying to enforce the

Because the modification is content-neutral, the Court must evaluate it under intermediate scrutiny. Based on the testimony cited and quoted above, the Court concludes that the extension in the coverage of the Ordinance's restrictions is narrowly tailored to serve a substantial government interest and allows sufficient alternative avenues of communication. The provisions which allow the businesses to use two simple signs provide them with sufficient opportunity to convey their exterior messages. The Court therefore concludes that the Ordinance's amendment to the previous signage restrictions, § 28–130(g), is valid under the First Amendment.[166]

### 4. State Law Requirements for Revising Signage Restrictions

As mentioned earlier, the FTU Plaintiffs have briefly raised the constitutional argument that the Ordinance's new signage provision constitutes an unlawful taking of the affected businesses' signs without any compensation. *See* FTU's Response [Doc. # 170], at 132. However, the Court does not yet need to address this constitutional claim because it must first consider Plaintiffs' related statutory arguments that the new signage provision fails to provide procedural and compensatory protection required under state law. *See Wells Fargo Bank*, 485 U.S. at 354, 108 S.Ct. 1179 (court should "resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue").

The FTU Plaintiffs' statutory argument against the new signage provision is that enforcement of this expansion of the Ordinance's previous signage restrictions would violate § 216.001 *et seq.* of the Texas Local Government Code. This statute establishes procedural requirements for a municipality's removal and alteration of signs. *See* FTU's Response [Doc. # 170], at 132. Specifically, § 216.004(a) provides that:

> If a municipality requires the relocation, reconstruction, or removal of a sign within its corporate limits or extraterritorial jurisdiction, the presiding officer of the governing body of the municipality shall appoint a municipal board on sign control.

The FTU Plaintiffs contend that the Ordinance requires them to alter or remove a number of their expensive signs but that the City has not appointed any compensation board as required by this state statutory provision. Plaintiffs also claim that the City has failed to comply with §§ 216.005 and 216.010, which require the newly created board to compile a list of non-conforming signs. Finally, Plaintiffs argue the City has failed to comply with §§ 216.009 and 216.012, which provide for compensation for owners of non-conforming signs when a municipality extends or strengthens its signage regulations.

In response to these arguments, the City merely contends that the FTU Plaintiffs did not include this state statutory claim in their original Complaint and thus moves to strike these arguments. *See* City's Reply to FTU's Response [Doc. # 225], at 32–33. Because Plaintiffs' arguments appear on the surface to have merit, the Court will allow the FTU Plaintiffs an opportunity to amend their Complaint. These Plaintiffs and the City then may develop their arguments more ful-

---

original intention of the ordinance to keep the signage simple.
Minutes for October 30, 1996, Committee Meeting, Exhibit 13B to City's Motion, at 9.

**166.** Plaintiffs contend that the Ordinance's signage provisions should be evaluated, not under the First Amendment standard that applies to adult entertainment, but instead under the constitutional test for commercial speech regulation. *See* FTU's Response [Doc. # 170], at 125–27, (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). In *Central Hudson Gas*, the Supreme Court held that, when evaluating the validity of a restriction on commercial speech, a court must consider: (1) whether the speech is protected by the First Amendment; (2) whether the asserted governmental interest is substantial; (3) whether the regulation directly advances the governmental interest; and (4) whether the restriction is more extensive than necessary to satisfy the governmental interest. These factors appear substantially similar to the factors applicable to adult entertainment. Plaintiffs have not persuaded the Court that application of this set of factors would produce a different result here. Thus, the Court concludes that, under either set of factors, the City has justified its enactment of § 28–130(g).

ly. The City's Motion to Strike [Doc. # 225] is therefore **DENIED**.[167]

Thus, although the Court upholds the Ordinance's signage restrictions under the First Amendment, further factual development, through affidavits and some briefing of applicable law in light of the parties' positions on this state statutory issue, is necessary before the City may enforce the new amendment to the Ordinance's signage restrictions. Therefore, if the City will not continue to voluntarily forebear from enforcement of § 28–130(g), the Court will entertain a request for a preliminary injunction preventing the City from enforcing this provision until this issue is resolved. The Court will establish a briefing schedule on this issue by a separate Order, if necessary.

### G. *Entertainer and Manager Permit Requirement*

In Ordinance 97–75, the City has established, for the first time, a requirement that all entertainers and managers must hold individual permits in order to work in sexually oriented businesses. *See* § 28–253.[168] Under the Ordinance, in order to obtain a permit, entertainers and managers must provide the following information: name; home street address; mailing address; proof of birth date; one photographic identity card issued by a governmental agency; a list of any criminal charges pending, convictions,

and time of service in jail or prison related to certain offenses; two passport-type photographs; a $29.00 processing fee; fingerprints to be used for identity and criminal history information verification; and a waiver authorizing the City to obtain the individual's criminal history reports from the Texas Department of Public Safety and appropriate federal agencies. *See* § 28–254. In addition, the City's application form also requires each individual applying for a permit to provide the individual's stage name, if any; home, work, and emergency telephone numbers; place of birth; social security number; driver's license number; and descriptors, including hair and eye color, height, weight, and the description and location of any tattoos. *See* City of Houston Sexually Oriented Business Manager and Entertainer License Application, Exhibit C to City's Legal Brief on Plaintiffs' Applications for Temporary Restraining Order [Doc. # 57].

Section 28–254(c) requires that the City issue a permit for an applicant unless the applicant has been found to have "been convicted of or spent time in jail or prison for" certain enumerated offenses.[169] The City must issue a response to every applicant within ten days from the date an application is filed. *See* § 28–254(c). An unsuccessful applicant may appeal the denial of a permit, first to a hearing officer and then to state court. *See* §§ 28–254(c) and (e).[170] If the

---

**167.** In the alternative to its Motion to Strike, the City argues that the statutory provisions contained in Tex. Loc. Gov't Code § 216.001 *et seq.* do not preclude enforcement of the Ordinance's signage provisions because the Ordinance "does not address the kinds of regulatory action contemplated by Chapter 216." City's Reply to FTU's Response [Doc. # 225], at 33. The City has not developed this argument nor explained adequately to the Court why the Ordinance's signage provisions are not subject to the dictates of § 216.001 *et seq.*

**168.** The Dee & Dee Plaintiffs argue that the Ordinance's permit requirement for individuals is too broad in that it covers too many categories of employees, including "almost any person who comes onto the premises for a commercial purpose, whether or not they have direct contact with the clientele of the business." *See* Dee & Dee's Response [Doc. # 178], at 57–58. However, these Plaintiffs are mistaken. Section 28–253(a) on its face only requires entertainers and

managers to obtain permits, not other employees.

**169.** These offenses appear to include prostitution; promotion of prostitution; aggravated promotion of prostitution; compelling prostitution; obscenity; sale, distribution or display of harmful material to a minor; sexual performance by a child; employment harmful to children; possession or promotion of child pornography; public lewdness; indecent exposure; indecency with a child; sexual assault; aggravated sexual assault; harboring a runaway child; criminal attempt, conspiracy or solicitation to commit any of these offenses; and any violation of Article VIII of the Ordinance (the article related to individual employee conduct). *See* § 5, Ordinance 97–75 (amending § 1–10 of the Houston, Tex. Code of Ordinances).

**170.** Section 28–254(c) provides in pertinent part that:

If the application is not granted, then the applicant shall be mailed notice of the grounds

City fails to meet these deadlines, the applicant, upon written request, shall immediately be issued a temporary permit pending the application processing. *See* § 28–254(f).[171]

When an individual obtains a permit to work in a sexually oriented business, she or he is given two identification cards. The individual must conspicuously wear one of these cards (the "personal card") at all times while working. *See* § 28–256(a).[172] The other card (the "on-site card") must remain in the possession of the enterprise's "on-site manager" at all times while the individual is on the premises of the sexually oriented business. *See* § 28–256(b).[173]

Plaintiffs challenge these provisions on several constitutional grounds.[174] First, they contend that the individual permit requirement is *per se* invalid because of the severe chilling effect it will have on speech. Second, they argue that the legislative record does not contain sufficient evidence to justify the requirement and that therefore the Court should strike it down under strict scrutiny as a content-based restriction on speech. Third, they argue that, even if the requirement is content-neutral, it is not narrowly tailored to serve a substantial governmental interest. Fourth, they contend that the re-

quirement is not narrowly tailored because the City failed to exempt information supplied in the individual permit applications from public disclosure under the Texas Public Information Act (known prior to 1995 as the Texas Open Records Act, *see* 1995 Tex. Gen. Laws 5127); they argue that such disclosure would be a dangerous invasion of privacy for entertainers and managers working in sexually oriented businesses. Fifth, they argue that the requirement is invalid because it is an unconstitutional prior restraint. Sixth, they raise several "as applied" challenges to the manner in which the Houston Police Department has conducted the initial permit application process. Finally, they argue that, even if the permit requirement is valid, the requirement that adult entertainers must conspicuously wear their personal identification cards while working is unjustified and therefore invalid.

For the reasons discussed below, the Court concludes that the permit requirement is, in most respects, constitutionally valid. However, because the Ordinance and the permit application form request more personal information than is justified to fulfill the City's stated purpose and more than has been condoned by relevant legal authority, the City

---

and of their right to provide evidence and request a hearing as provided by section 1–9(a) of this Code [of Ordinances], within ten days from the date of filing of the application.

Section 28–254(e) provides that:

Any applicant whose application is denied and who requests a hearing on the denial shall be granted a hearing within ten days following the receipt of the request by the vice division of the police department. The hearing shall be conducted as provided in section 1–9(c) of the Code [of Ordinances]. If the hearing officer rules against the applicant, then the applicant shall be given notice of the right to seek an injunction or judicial review of the decision as provided in section 1–9 of the Code and applicable laws, including article 6252–13d of the Texas Revised Civil Statutes.

171. Section 28–254(f) provides that:

In the event that the director fails to issue or deny a permit application within the time specified in subsection (c) or to provide a hearing within the time specified in subsection (e), then the applicant shall, upon written request, be immediately issued a temporary permit which shall be valid until the third day after the applicant is given notice of the decision of the director or the hearing officer.

172. Section 28–256(a) provides that "[e]ach manager or entertainer shall conspicuously display his [sic] personal card upon his [sic] person at all times while acting as an entertainer or manager of or in an enterprise."

173. Section 28–256(b) provides that "[e]ach manager or entertainer shall provide his [sic] on-site card to the manager or on-site manager in charge of the enterprise to hold while the manager or entertainer is on the premises."

174. The Dee & Dee Plaintiffs also raise a cursory statutory argument that the individual permit requirement is invalid because Texas Loc. Gov't Code § 243.007 allows cities to require licenses for owners and operators of sexually oriented businesses but does not provide for licensing of other employees. *See* Dee & Dee's Response [Doc. # 178], at 53–54. The Court rejects this argument for the same reasons described *supra* in Section V.E.1. In particular, § 243.001(b) specifically authorizes local governments to regulate sexually oriented businesses "with regard to any matters."

must reduce the types of information it requires permit applicants to disclose. In addition, the Court finds that the release of permit application information to the public through the Texas Public Information Act would create a substantial danger to entertainers and managers that is unjustified by any conceivable municipal purpose; the Court therefore declares that this information is to remain confidential and is not subject to disclosure under the Act. Finally, because the City has not provided any logical justification for its requirement that entertainers wear their personal identification cards while working, the Court strikes down the conspicuous display requirement as an impermissible content-based intrusion on speech.

### 1. Permissibility of Individual Permit Requirement

■ Plaintiffs first argue that the individual permit requirement constitutes too great an intrusion on the privacy of managers and entertainers who work in sexually oriented businesses and thus will create an impermissibly severe chilling effect on constitutionally protected activities. *See* A.H.D.'s Response [Doc. # 173], at 46–47; FTU's Response [Doc. # 170], at 23–30. In support of these arguments, Plaintiffs cite several cases from other constitutional contexts that have stressed the right of individuals to engage in protected activities without being chilled by intrusive disclosure requirements. *See, e.g., McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 342, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (distributing campaign literature); *Hynes v. Mayor and Council of Borough of Oradell,* 425 U.S. 610, 621, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976) (conducting door-to-door solicitations); *Talley v. California,* 362 U.S. 60, 64, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (distributing handbills). However, as noted earlier, the Constitution provides less protection for adult entertainment than for other

types of protected First Amendment activities. *See City of Renton,* 475 U.S. at 49 n. 2, 106 S.Ct. 925; *Woodall,* 49 F.3d at 1122. Therefore, in considering this issue, the Court must look to controlling authority specifically from the context of adult entertainment.

In *SDJ,* the district court struck down a provision that required operators of sexually oriented businesses to furnish lists of all their employees in order to obtain enterprise permits. The court held that

> [w]hile City government officials may have some legitimate interest in assuring that persons of proper age are employed within these enterprises, that interest is outweighed by the chilling or suppressive effect that Section 28–123(a)(6) would have on potential employees and contractors of topless dancing bars.

*SDJ,* 636 F.Supp. at 1371.[175] Although the *SDJ* district court's ruling in 1986 would appear to preclude the City's newly enacted permitting scheme for individuals, the Fifth Circuit in 1994 ruled otherwise and upheld licensing requirements for employees of sexually oriented businesses. In *TK's Video,* 24 F.3d at 710, the Fifth Circuit, rejecting contrary conclusions reached by other jurisdictions,[176] held that "requiring owners and employees to supply information about their age and certain prior regulatory infraction and sexual offenses substantially relates to the substantial government interest of curtailing pernicious side effects of adult businesses." Specifically, the Fifth Circuit found that "[l]icensing clerks and employees ensures that only persons who satisfy basic legal and hygienic standards work in adult businesses." *Id.* at 709.

Thus, controlling legal authority in this Circuit now generally allows cities to require that individuals working in sexually oriented businesses obtain licenses.[177] The Court's

---

**175.** In *SDJ,* the Fifth Circuit did not address the district court's decision to strike down this disclosure requirement.

**176.** The court noted that the Seventh and Ninth Circuits have invalidated similar disclosure requirements. *See Acorn Investments, Inc. v. City of Seattle,* 887 F.2d 219, 224–26 (9th Cir.1989);

*Genusa v. City of Peoria,* 619 F.2d 1203 (7th Cir.1980).

**177.** The A.H.D. Plaintiffs argue that *TK's Video* does not authorize licensing of entertainers who work for sexually oriented businesses as *independent contractors,* as many entertainers in Houston apparently do, because the Denton licensing requirement upheld in that case applied only to

next task therefore is to consider whether the particular provisions enacted in Ordinance 97–75 regarding individual permits are constitutionally valid.[178]

### 2. Content–Based or Content–Neutral?

■ Although a licensing requirement for individuals working in sexually oriented businesses has been upheld in general in *TK's Video*, Plaintiffs argue that the Court should nevertheless strike down Houston's individual permit requirement under strict scrutiny as a content-based restriction on speech because the legislative record for Ordinance 97–75 contains no evidence of a need for this requirement. *See* Dee & Dee's Response

employees. *See* A.H.D.'s Reply [Doc. # 287], at 8 (citing *TK's Video*, 24 F.3d at 716). The Court rejects this argument. Plaintiffs have suggested no reason why the Fifth Circuit's rationale in upholding the licensing provision covering employees in *TK's Video* would not apply with equal force to entertainers working as independent contractors.

The A.H.D. and FTU Plaintiffs raise other general arguments against the individual permit requirement which are also preempted by *TK's Video*. *See* A.H.D.'s Response [Doc. # 173], at 48; FTU's Response [Doc. # 170], at 63. For instance, these Plaintiffs argue that the requirement is discriminatory, and thus violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in addition to the First Amendment, because entertainers in sexually oriented businesses are the only entertainers in Houston who have to obtain permits as a condition of performing. In support of this argument, Plaintiffs cite *Arkansas Writer's Project, Inc.*, 481 U.S. 221, 107 S.Ct. 1722 (striking down, under strict scrutiny, sales tax scheme that taxed general interest magazines but exempted newspapers and religious, professional, trade, and sports journals); *Minneapolis Star and Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) (striking down a use tax on the cost of paper and ink which applied to only a small group of newspapers). The A.H.D. Plaintiffs also argue that the criminal record check constitutes a bill of attainder because it punishes on the basis of prior acts, *see United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965); *SBC Communications, Inc. v. Federal Communications Commission*, 981 F.Supp. 996 (N.D.Tex.1997), and constitutes an ex post facto law because it imposes additional punishment to what was prescribed at the time of commission of an earlier criminal act, *see Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984). The Court need not dwell on these arguments, since Fifth Circuit authority clearly permits licensing of

[Doc. # 178], at 30–32; FTU's Response [Doc. # 170], at 22–23, 33.[179]

The Court disagrees. The legislative record for Ordinance 97–75 contains a great deal of evidence regarding negative secondary effects addressed by the permitting requirement for individuals. Specifically, the City Council's Sexually Oriented Business Committee was presented with statistical evidence from the Houston Police Department Vice Squad, as well as with numerous anecdotal descriptions by testifying police officers, indicating the extent of criminal activity by entertainers and managers within sexually oriented businesses. *See* Sexually Oriented Business Statistics Amended, Exhibit 21 to City's Motion [Doc. # 120].[180] *See also*

adult entertainers, including criminal background checks, even when other types of entertainers are not subject to this requirement. Furthermore, Plaintiffs do not cite any cases in which a court has applied heightened *equal protection* scrutiny to sexually oriented business regulation. This Court will not do so here.

**178.** The City points out in several of its briefs that some representatives of the Houston sexually oriented business industry endorsed the concept of employee licensing at the time the City Council was considering amendments to the Ordinance. *See, e.g.*, City's Motion for Summary Judgment [Doc. # 120], at 14–15. This evidence, however, is not relevant to the Court's analysis of whether the licensing provisions meet the requisite tests for constitutionality.

**179.** In addition, the FTU Plaintiffs argue that the requirement is content-based because a significant amount of evidence exists in the record which demonstrates that the Houston City Council adopted the requirement with a predominate censorial purpose. *See* FTU's Response [Doc. # 170], at 50–53. As discussed *supra* at Section III.A.3., in determining whether to evaluate a provision as content-based or content-neutral, the Court will look primarily at whether the legislative record contains sufficient evidence justifying the requirement on the basis of reducing negative secondary effects associated with adult businesses.

**180.** As discussed *supra* in Section V.B.3.a., Lieutenant Smith informed the Committee that the crimes depicted in this document consist entirely of crimes committed inside sexually oriented businesses, mostly public lewdness. *See* Minutes for July 15, 1996, Committee Meeting, Exhibit 3D to City's Motion [Doc. # 120], at 6. The other police testimony presented to the Committee implicated crimes such as public lewdness, prostitution, promotion of prostitution, obscenity, and indecent exposure.

Transcript of September 16, 1996, Committee Meeting, Exhibit 9D to City's Motion [Doc. # 120], at 7 (discussion of fact that managers have responsibility for behavior by entertainers and patrons). The Court concludes that a City Council member could have reasonably relied on this evidence to determine that a permit requirement for individuals would assist the City's criminal law enforcement by allowing only individuals to work in sexually oriented businesses who have not shown, by their previous criminal records, a propensity to engage in unlawful acts commonly associated with such businesses.

In addition, the Committee heard evidence that police have discovered underage entertainers working in sexually oriented businesses and testimony that a permit requirement would assist the City's law enforcement officials to prevent underage entertainers from obtaining such employment. *See* Minutes for August 8, 1996, Committee Meeting, Exhibit 6D to City's Motion, at 10; Transcript of August 29, 1996, Committee Meeting, Exhibit 8E to City's Motion, at 107.

Because the City has justified the Ordinance's new permit requirement for individuals by reference to specific evidence in the legislative record that the requirement would help alleviate negative secondary effects associated with adult businesses, the Court will evaluate the requirement as a content-neutral provision under intermediate First Amendment scrutiny.

### 3. Narrowly Tailored to Serve Substantial Governmental Interests?

■ To determine whether the Ordinance's new individual permit requirement survives intermediate scrutiny, the Court must next decide whether the requirement serves a substantial governmental interest and is sufficiently narrowly tailored.[181]

As ·discussed in the previous section, the City has shown sufficient evidence that it enacted this permit requirement with the purpose of decreasing criminal activity within sexually oriented businesses. The Fifth Circuit has recognized that cities have a substantial governmental interest in "monitor[ing] persons with a history of regulatory violations or sexual misconduct who would manage or work in" sexually oriented businesses and has approved the use of licensing of individuals to achieve this goal. *TK's Video*, 24 F.3d at 710. Thus, this Court likewise concludes that the individual permit requirement for managers and entertainers contained in Ordinance 97–75 generally serves a substantial governmental interest.

The Court also concludes, however, that certain of the specific information requirements for individual permit applicants are not narrowly tailored to achieve that substantial governmental interest.

Plaintiffs contend that managers and entertainers who work in sexually oriented businesses must divulge more personal information than is necessary for the City to conduct criminal background checks on them. Plaintiffs fear that the breadth of information requested on a permit application will chill a substantial amount of speech because some managers and even more entertainers will forgo employment at Houston-area sexually oriented businesses rather than comply with the permit requirement. *See* FTU Plaintiffs' Response [Doc. # 170], at 26 (citing declarations by individuals affected by the permitting requirement). For instance, Plaintiffs argue that entertainers and managers may be stalked and harassed at home if the requested personal information is disclosed to the City.

The Court agrees that the information the City has requested from permit applicants is overbroad. This information is more than is even authorized by the Ordinance and is more than the City needs to conduct the criminal background checks, to verify that underage entertainers do not work in sexually oriented businesses, and to facilitate identification of individuals who commit crimes at sexually oriented businesses. The information the City has requested also goes beyond that which the Fifth Circuit has previously approved. In *TK's Video*, the Fifth Circuit

---

181. It does not appear that the alternative avenues of communication test should apply here. In *TK's Video,* the Fifth Circuit did not consider this issue in connection with licensing of individuals.

specifically upheld only the required disclosure of an applicant's "age and certain prior regulatory infractions [related to sexually oriented businesses] and sexual offenses." *TK's Video*, 24 F.3d at 710. The Court of Appeals took special note that "[t]he Denton County order does not demand comprehensive disclosure of personal information, but only information reflecting ability to function responsibly in the adult business setting." *Id.* In addition, the court cautioned that because

> [c]ompelled content-neutral disclosure of owner and employee information can chill protected expression . . . [w]e insist that countervailing state interests must further a substantial government interest. This protective skirt requires a "relevant correlation" or "substantial relation" between the information required and the government interest.

*Id.* at 709–10 (citations omitted).

Certain information required by the City, such as fingerprints and social security numbers, are obviously necessary for the criminal background checks. The Court can also conceive that an individual's name, stage name, social security number, height, weight, eye and hair color, tattoo descriptions, and driver's license numbers would be helpful in identifying individuals in the case of an arrest. However, the City has indicated no reason why it needs managers' and entertainers' phone numbers and home addresses, which may be often and easily changed.[182] The Court therefore enjoins the City from requiring managers and entertainers to disclose their phone numbers and home addresses on their permit applications.

Plaintiffs also object to the criminal history information required by the City's permit applications. Specifically, pursuant to § 28–254(a)(3), the form requires applicants to indicate a "list of any criminal charges pending, convictions, and time of service in jail or prison as related to any applicable offense." Plaintiffs argue that this information goes

beyond that which the Ordinance allows to be considered in the decision to issue or deny an individual a permit. Section 28–254(c), which incorporates by reference § 1–10 of the Code of Ordinances, provides that a permit may only be denied on the basis of a specified criminal conviction that occurred "within the five year period immediately preceding the date of the filing of the application or has spent time in jail or prison during [said] five year period." HOUSTON, TEX., CODE OF ORDINANCES § 1–10(b). Thus, the Court agrees that the Ordinance is not narrowly tailored to the extent that it requires applicants to divulge criminal convictions prior to five years before the application, convictions for crimes other than those enumerated in § 5 of the Ordinance, or time spent in jail other than time spent serving a sentence for an enumerated criminal conviction.[183] The Court therefore enjoins the City from requiring individual permit applicants to supply this overbroad information.

### 4. Public Disclosure of Permit Application Information Under Texas Public Information Act

A number of Plaintiffs have raised concerns that the individual permit requirement constitutes an onerous invasion of privacy because information provided in the permit applications is subject to public disclosure under the Texas Public Information Act ("TPIA"). *See* TEX. GOV'T CODE § 552.002(a)(1) (information is subject to public disclosure upon request if it is "information that is collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business . . . by a governmental body"). Plaintiffs contend that the requirement is therefore not narrowly tailored because the City could have drafted the Ordinance so as to exempt permit application information from disclosure under this Act. *See* FTU's Response [Doc. # 170], at 30–32. According to these Plaintiffs, the City could have easily spared managers and entertainers who work in sexually oriented businesses from the risks at-

---

**182.** It also appears to be the release of this information which Plaintiffs most fear will chill protected expression.

**183.** The City may not deny a permit on the basis of arrests that did not result in convictions. *See TK's Video*, 24 F.3d at 709, 718 (upholding provision that prevents applicant with certain prior *convictions* from obtaining a permit).

tendant to having personal information about themselves released into the public domain by expressly providing that permit applications are to remain confidential.

The Court is not persuaded that the City's failure to include a confidentiality provision in itself invalidates the permit requirement. Pursuant to § 552.101 of the Texas Government Code, information is not subject to public disclosure under the TPIA "if it is information considered to be confidential by law, either constitutional, statutory, or by judicial decision." Thus, under the TPIA itself, this Court may decide whether to declare such information confidential.[184]

Plaintiffs have offered evidence purporting to establish that many individuals who currently work in sexually oriented businesses, especially entertainers, will not apply for permits because they fear having personal information about themselves become a matter of public record. Specifically, entertainers are afraid that, if their personal identifying information is made available to the public, they will experience unwelcome harassment from aggressive suitors and overzealous opponents of sexually oriented businesses, stalking, damage to their reputations, and other dangers.[185]

The City argues that Plaintiffs' arguments regarding the entertainers' fears of having

their personal information available in public records are speculative. The City further argues that entertainers working in sexually oriented businesses already voluntarily put themselves on public display and make themselves vulnerable to strangers who frequent these businesses. See City's Reply to FTU's Response [Doc. # 225], at 11 n. 10. However, in its Motion for Summary Judgment, the City essentially states that it would not object to the Court declaring this information confidential. See City's Motion [Doc. # 120], at 46 (stating that the City expresses no opinion as to whether the employees are protected by a right of privacy that would prevent dissemination of their personal information under the TPIA).[186]

The Court is persuaded that Plaintiffs' concerns about public disclosure of the permit application information are not inconsequential. Adult entertainers may anonymously (or through stage names) put their bodies on display in front of strangers, but these actions do not imply a willingness to publicize the entertainers' personal information through which customers or other private persons may trace the entertainers to their homes or otherwise invade their privacy without permission. The fact that an entertainer is willing to dance publicly or a manager is willing to be employed in a sexually

---

**184.** On August 19, 1997, the Court entered a preliminary injunction enjoing disclosure of application information already collected, pending the Court's final determination of this issue. See Preliminary Injunction Enjoining Release of Licensing Application Information [Doc. # 196].

**185.** Plaintiffs have submitted affidavits of a number of adult entertainers describing these fears. See Declarations in Support of Plaintiffs' Motion for Temporary Restraining Order [Docs. # 29–50].

Plaintiffs assert that as many as one-third of Houston's adult entertainers will be so afraid of making the disclosures necessary to comply with the permit requirement that they will stop working in Houston rather than apply for a permit. In support of this contention, Plaintiffs have submitted declarations by individuals who claim to have spoken with many of the City's estimated 5,000 adult entertainers. See Declaration of Robert Furey (estimating that 40–45% of the entertainers at his establishment will abandon work in Houston rather than comply with new requirements); Declarations

of Letitia McGinley, Cheryl Thompson, and William Altes, Exhibits 4–6 in Appendix to FTU's Response [Doc. # 171]. To the extent the declarations report the fears of persons other than the affiants, the Court declines to rely on these materials in reaching the foregoing findings and conclusions; these averments are hearsay and contain impermissible speculation.

**186.** It is not clear what the City's current position is on this issue. In a later brief, the City contends that neither it nor this Court would be able to declare information contained in the individual permit applications to be confidential in such a way as to avoid the requirements of the TPIA. See City's Reply to FTU's Response [Doc. # 225], at 13 & n. 13. In contrast, the legislative record indicates that members of the City Council's Sexually Oriented Business Committee wanted to make the application forms confidential, but they were advised that the City did not have the power to restrict public access to this information. See, e.g., Minutes for October 11, 1996, Committee Meeting, Exhibit 11A to City's Motion [Doc. # 120], at 4.

oriented business that deals with the public, or the fact that a determined harasser or stalker might conceivably follow an entertainer home after she leaves work, does not mean that adult entertainers and managers have voluntarily sacrificed all privacy rights and need for safety protections.

The Court finds that there is meaningful potential danger to individuals working in sexually oriented businesses if the information in their permit applications is disclosed to the public. The Court concludes further that the potential for disclosure is likely to have a chilling effect on the applicants' protected speech.[187] These dangerous and chilling effects are sufficiently severe that the information should be held confidential by the City.

In addition, some Plaintiffs are also concerned about having this personal information in the hands of City officials. *See* A.H.D.'s Reply [Doc. # 264], at 19–20 n. 3. However, because the law of this Circuit now allows cities to collect personal information about individuals working in sexually oriented businesses, *see TK's Video*, 24 F.3d at 709–10, this issue is beyond reach; Plaintiffs have no legal basis for challenging the City's possession of such information.[188]

In sum, the Court concludes that the dangers inherent in having personal information made available to the general public regarding individuals who work in a controversial and potentially dangerous setting, and whose work is entitled to some First Amendment protection, mandate a ruling that the information disclosed on adult entertainer and manager permit applications be kept confidential by the City. The Court reaches this conclusion by reference to the constitutional interests at stake in the adult entertainment setting and therefore relies on the provision

of TEX. GOV'T CODE § 552.101 that information may be exempt from disclosure under the TPIA because it is considered to be confidential under constitutional law.[189]

### 5. Prior Restraint

Several groups of Plaintiffs challenge the individual permit requirement as an impermissible prior restraint. In support of this argument, they argue that the permitting procedure lacks adequate procedural safeguards and challenge the required criminal background check. In addition, they argue that, even if the requirement is valid under the federal constitution, it is invalid under the broader protection of the Texas Constitution.

#### a. Procedural Safeguards

In support of their argument that the permit requirement is an invalid prior restraint because it lacks adequate procedural safeguards, Plaintiffs rely most heavily on *FW/PBS*. In that case, the Supreme Court struck down a sexually oriented business licensing requirement because it failed to provide a reasonable time limit on the city's decision whether to issue a license and because it failed to provide an avenue for prompt judicial review of a license denial. *See FW/PBS*, 493 U.S. at 222–231, 110 S.Ct. at 603–07.

In particular, the A.H.D. Plaintiffs argue that the permit requirement is an impermissible prior restraint because: (i) § 28–254(c) allows as much as a ten day delay between the submission of an application and the issuance of a permit; (ii) the burden is on the applicant who has not received a response within ten days to request the issuance of a temporary permit; (iii) the ten day delay could be extended if the City mails the permit on the tenth day or if the applicant must

187. According to the City, as of November 6, 1997, only 1,352 individuals out of the City's estimated 5,000 adult entertainers had applied for permits under the Ordinance.

188. Nevertheless, the Fifth Circuit recognized in *TK's Video*, 24 F.3d at 709–10, the possible chilling effect that can result even from collection of such information by city officials. These concerns, while insufficient to overcome the City's interest in collection of the data for law enforcement purposes, strongly suggest that such infor-

mation should be withheld from dissemination to the general public.

189. Because the Court reaches this decision from consideration of the likely chilling effect such disclosure would have on constitutionally protected activities, the Court is not limited to the specific statutory exceptions contained in the TPIA itself, as discussed in *Industrial Foundation of the South v. Texas Industrial Accident Board*, 540 S.W.2d 668, 681 (Tex.1976).

request a temporary permit; and (iv) an individual may be denied a permit, or have a permit revoked, based on prior criminal offenses. In addition, the A.H.D. Plaintiffs contend that the Ordinance does not meet other necessary, but unspecified, procedural safeguards. *See* A.H.D.'s Response [Doc. # 173], at 43–45.

The FTU Plaintiffs challenge the ten day application processing delay, the lack of a requirement that the City provide notice of its decision on the same day that it makes the decision, and the lack of a requirement that the City must go to court to justify a denial of a permit. *See* FTU's Response [Doc. # 170], at 34–49.

The Dee & Dee Plaintiffs challenge the ten day application processing delay and the criminal background check and also advance several somewhat different reasons for their contention that the permit requirement is an impermissible prior restraint. *See* Dee & Dee's Response [Doc. # 178], at 45–47, 57–58. They argue that the application process is invalid because the Ordinance: (i) provides no remedy if the City refuses to issue or deny a permit; (ii) provides no remedy if the City refuses to issue a requested temporary permit; (iii) provides no remedy if the City refuses to issue or deny a permit and thus requires all applicants to proceed through the appellate process; (iv) does not allow an applicant to obtain a temporary permit while appealing an adverse decision denying her permit application; and (v) does not maintain the status quo pending issuance of a permit.

In *TK's Video*, the Fifth Circuit held that "[c]ontent-neutral regulations contain adequate procedural safeguards when (1) any prior restraint before judicial review of the licensing process is for a specified brief period during which the status quo is maintained; and (2) there is prompt judicial review after denial of a license." 24 F.3d at 707–08 (cit-

ing *FW/PBS*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603). In addition to these two elements, the FTU and A.H.D. Plaintiffs urge the Court to recognize one other procedural requirement for the City's licensing of individual employees. Specifically, they contend that, under *Freedman v. State of Maryland*, 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 560, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), the City should bear the burden of going to court to justify permit denials for individual applicants. The Court will consider Plaintiffs' arguments regarding procedural safeguards in the context of these three factors.

### i. Application Processing Period

▮ With respect to the period of time the Ordinance allows the City to process an application, Plaintiffs argue that a ten day delay is excessive and thus renders the permit requirement an impermissible prior restraint.[190] In support of this argument, Plaintiffs cite *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1060 (9th Cir.1986), in which the Ninth Circuit found that a five day processing period for a similar type of application was unreasonable and thus unconstitutional.

Notwithstanding the Ninth Circuit's opinion on the matter, this Court is bound by a contrary rule established by the Fifth Circuit. In *TK's Video*, the Fifth Circuit upheld a *sixty* day processing period for operator *and* employee license applications. The court found this period to allow a reasonable amount of time for the county to complete such procedures as reviewing applications, performing background checks, and making identification cards. *See TK's Video*, 24 F.3d at 708. In light of that decision, this Court holds that, as a matter of law, the ten day processing period allowed by Ordinance 97–75 is constitutionally adequate.[191] Given the

190. In its summary judgment motion, the City indicates that "[i]n most cases, the application process can take less than 10 days, and often as little as 2 or 3 days." City's Motion for Summary Judgment [Doc. # 120], at 55. In determining the validity of the processing period, the Court may not rely on this promise. As the Fifth Circuit explained in *TK's Video*, 24 F.3d at 708, "[i]t is no answer that the [governmental entity] has not elected to do [something that is permit-

ted under the ordinance]. . . . Businesses engaged in activity protected by the First Amendment are entitled to more than the grace of the State."

191. The Dee & Dee and FTU Plaintiffs attempt to distinguish *TK's Video* on the factual ground that the Fifth Circuit upheld a much longer processing period there because that period applied to processing of licenses for businesses, rather than for individual employees. The Court is not per-

budget constraints and vagaries of administrative processing by a large municipality with thousands of employees, a ten day period is not an excessive amount of time to allow the City to reach decisions on permit applications.[192]

For the same reason, the Court finds no constitutional infirmity in the further delays that may arise if the City mails a permit on the tenth day or if an applicant does not receive the permit shortly after ten days have elapsed and must request a temporary permit.[193] Even with these delays, the Ordinance provides a procedure in which applicants should receive their licenses well within the amount of time that was sanctioned in *TK's Video*.[194]

The A.H.D. and FTU Plaintiffs further contend that an applicant who does not receive a permit within roughly ten days should not have the burden of requesting a temporary permit. The FTU Plaintiffs suggest that a far less restrictive alternative would be one that automatically temporarily exempts an employee from the permit requirement who has not received notice of a ruling ten days after submitting an application. In support of this suggestion, they cite *Redner v. Dean*, 29 F.3d 1495, 1501–03 (11th Cir. 1994), in which the Eleventh Circuit invalidated a licensing procedure for sexually oriented business establishments that did not mandate that an applicant be permitted to begin operating if it had not received a decision within the promised time period.

The Court is not persuaded by Plaintiffs' argument. Under *Ward*, 491 U.S. at 799, 109 S.Ct. 2746, the City is not required to adopt the "least restrictive means" of achiev-

---

suaded by this argument. As noted above in the text, the Fifth Circuit expressly stated that the sixty day period upheld in *TK's Video* applied to *both* business and individual employee applications, thus allowing a period six times longer than the Houston Ordinance allows for processing individual permit applications. *See* 24 F.3d at 708.

**192.** In addition, the legislative record contains justification for the City's enacting a processing period of more than a day or two. In particular, the City's Legal Department discussed with the City Council's Sexually Oriented Business Committee some of the reasons delays might occur in processing individual applications. *See, e.g.,* Minutes for October 11, 1996, Committee Meeting, Exhibit 11A to City's Motion [Doc. # 120], at 10; Minutes for October 30, 1996, Committee Meeting, Exhibit 13B to City's Motion, at 17.

The Dee & Dee Plaintiffs argue that the question of whether the ten day period is reasonable is a factual issue and that summary judgment is inappropriate here because the City has not put forward its justification for needing that period of time. Further, these Plaintiffs argue that the City's statement that applications could often be processed in as little as two to three days constitutes a concession that ten days is unreasonable. Although the Court agrees generally with Plaintiffs that the issue of whether a city actually needs a given period of time to process license applications is a factual issue, in light of the Fifth Circuit's determination in *TK's Video* that a sixty day period is not unreasonable, the Court concludes that the reasonableness of the ten day period does not create a genuine issue of *material* fact precluding summary judgment here. The Court must defer to the City of Houston's judgment that a ten day period is necessary to allow

for the unusual case where processing is complicated.

**193.** The Court rejects the FTU Plaintiffs' wishful assertion that the permit processing for entertainers and managers must be "for the *shortest* fixed period compatible with sound administrative decision making." FTU's Response [Doc. # 170], at 36 (emphasis added). This alleged requirement is not supported by the case law. Instead, *FW/PBS* and *TK's Video* provide that the processing period must merely be reasonable. *See FW/PBS*, 493 U.S. at 228, 110 S.Ct. 596 ("the license for a First Amendment-protected business must be issued within a reasonable period of time").

**194.** The FTU Plaintiffs have offered evidence that some applicants did not receive their licenses until weeks after the promised ten day deadline. *See* Declaration of Manager Cheryl Thompson, Exhibit 6 of Appendix to FTU's Response [Doc. # 171], ¶ 13 (received decision 16 days after 10th day); Declaration of Dancer Ann Marie Hasselbach, Exhibit 10 of Appendix to FTU's Response, ¶ 9 (received decision more than one month after 10th day). Although Plaintiffs argue that these extended waiting periods "illustrate the dangers inherent in a system which requires speech rights to be restrained while one awaits the vagaries of delivery from the U.S. mail," FTU's Response [Doc. # 170], at 47, and thus are indicative of what future applicants can expect even after the Ordinance goes into effect, these few apparent administrative errors do not invalidate the entire application process. Due to the current standstill, the City has not yet begun enforcing the Ordinance, and these individuals have suffered no harm nor infringement of the First Amendment rights. Thus, the Court finds no probative value in the proffered declarations.

ing its governmental purpose. In addition, in contrast to the ordinance in *Redner*, § 28–254(f) of Ordinance 97–75 provides for *mandatory* issuance of a temporary permit if the City fails to grant a permit within ten days or if the City (after initial denial of an application) fails to provide a hearing within ten days of the applicant's request. Finally, pursuant to § 28–254(f), the temporary permit shall be issued "immediately" upon written request of the applicant. Plaintiffs therefore have failed to persuade the Court that there is any real danger that the City will surpass the processing period sanctioned in *TK's Video*.

Thus, the Court finds no constitutional infirmity in the Ordinance's provisions regarding application processing.

### ii. Prompt Judicial Review

■ As noted above, the A.H.D. and Dee & Dee Plaintiffs also argue that the Ordinance does not meet the constitutional requirements for prompt judicial review of the licensing decisions.

The A.H.D. Plaintiffs do not explain the specific basis for their objection. The Court sees no constitutional difficulty with the judicial review process provided by the Ordinance, which allows an unsuccessful applicant to have a prompt hearing before a hearing officer within ten days of the denial and requires that the applicant receive a notice of the right to seek an injunction or judicial review of the decision. *See* § 28–254(e).

The Court also concludes that this provision satisfies the concerns raised by the Dee & Dee Plaintiffs that the City may simply refuse to issue or deny a permit or issue a requested temporary permit. In such an unlikely case, an applicant has the right, under other applicable law, to seek an injunction or mandamus forcing the City to act.[195]

The Dee & Dee Plaintiffs also argue that the Ordinance's permit requirement for individuals is invalid because it does not allow an applicant to obtain a temporary permit while appealing a permit denial and because it does

not maintain the status quo pending the issuance of a permit. Although Plaintiffs are correct that the City must maintain the status quo during the permit application process, *see TK's Video*, 24 F.3d at 708–09, their arguments do not render the permit requirement itself invalid, *see id.* at 725. The Court simply holds that the City, in order to comply with *TK's Video*, may enforce the permit requirement so long as a manager or entertainer who is working at a sexually oriented business immediately before the permit requirement goes into effect is allowed to continue working, whether or not a temporary permit is obtained, pending the processing of her or his permit application and pending any appeal of a permit denial; in contrast, the City is not required to allow a manager or entertainer who has *not* been working in a sexually oriented business immediately before the requirement goes into effect to commence such work until a permit is actually issued.

### iii. Burden on City to Justify Permit Denials in Court

■ Finally, the FTU and A.H.D. Plaintiffs contend that, for purposes of the individual permit requirement, the burden should be on the City to institute judicial proceedings to justify a denial of a permit, rather than on the individual managers and entertainers. Plaintiffs acknowledge that the two requirements addressed above, namely a reasonably brief application processing period and prompt judicial review, constitute the only procedural safeguards that are required under *FW/PBS* and *TK's Video* for municipal licensing of sexually oriented *businesses*. However, they contend that the rationale behind the Supreme Court's decision in *FW/PBS* not to adopt this third factor, which was used by the Supreme Court in *Freedman*, 380 U.S. at 58, 85 S.Ct. 734, and *Southeastern Promotions*, 420 U.S. at 560, 95 S.Ct. 1239, should not apply in the context of licensing for *individuals*. *See* FTU's Response [Doc. # 170], at 35 & n. 15.

---

**195.** As for the Dee & Dee Plaintiffs' concern that the City may simply refuse to act and require all applicants to proceed solely through the appellate process, there is no evidence that the City

has thus far adopted such an approach. Therefore, no Plaintiff has standing to raise this argument.

These Plaintiffs claim that, in *FW/PBS*, the Supreme Court dispensed with the requirement that the government must have the burden to go to court to justify license denials for sexually oriented business establishments because a business establishment that is denied a license would have sufficient motivation and wherewithal to initiate its own judicial review. In contrast, Plaintiffs urge, individual managers and entertainers who are denied permits would have much less incentive and economic ability than business establishments to initiate judicial proceedings and would be more likely simply to abandon their line or work or move on to another city.

The Court is not persuaded. Although in *FW/PBS* the Supreme Court did give some consideration to the degree of incentive an unsuccessful applicant would have to seek judicial review of a permit denial, the Supreme Court's primary justification for shifting the burden away from the City was the fact that the City's decision of whether to issue a permit was merely a ministerial action based on a review of the general qualifications of each license applicant. *See* 493 U.S. at 229–30, 110 S.Ct. 596. Likewise, in the case at bar, the issuance of an individual permit is a ministerial action that does not require the City to "exercise discretion by passing judgment on the content of any protected speech." *Id.* Therefore, the Court holds that there is no constitutional infirmity in the fact that Ordinance 97–75 assigns to unsuccessful applicants the burden of challenging permit denials in court.

#### b. Criminal Background Check

 Plaintiffs also argue that the provisions of Ordinance 97–75 that allow the City to deny or revoke a permit for an applicant who has committed certain criminal offenses during the prior five years is an impermissible prior restraint. In support of this contention, they cite *Near v. State of Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), in which the Supreme Court held that prior criminal speech violations could not justify a prospective injunction which would directly restrain future speech activities; *Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980); *Fernandes v. Limmer*, 663 F.2d 619, 629 (5th Cir.1981) ("[p]ersons with prior records are not First Amendment outcasts"); *International Soc. For Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 833 (5th Cir.1979); *City of Seattle v. Bittner*, 81 Wash.2d 747, 505 P.2d 126, 131 (Wa.1973); and *DCR Entertainment, Inc. v. Pierce County*, 55 Wash.App. 505, 778 P.2d 1060 (Wa.App.1989) (adult entertainers could not be denied the right to continue engaging in protected expression simply because they have "abused that freedom in the past").

This Court is bound, however, by more recent Fifth Circuit authority, which has upheld licensing of adult entertainers that includes criminal background checks. *See TK's Video*, 24 F.3d at 709. Therefore, the Court rejects Plaintiffs' claim that a criminal background check is an impermissible prerequisite to obtaining an individual permit to work in a sexually oriented business.[196]

#### c. Texas Constitution

 The FTU Plaintiffs contend that, even if the Ordinance's individual permit provisions are valid under the federal constitution, they are nevertheless invalid under the Texas Constitution because Article 1, Section 8 of the Texas Constitution provides greater protection for speech than the federal constitution. *See Ex parte Tucci*, 859 S.W.2d at 7; *Davenport*, 834 S.W.2d at 8–9. The Court rejects this argument.

In *Woodall*, the Fifth Circuit affirmed the district court's determination that the broader free speech rights recognized by the Tex-

---

196. The FTU Plaintiffs also argue briefly that some of the criminal record criteria are unconstitutional. *See* FTU's Response [Doc. # 170], at 3–4. However, no Plaintiff has shown standing to challenge these criteria. In *FW/PBS*, the Supreme Court expressly declined to reach the merits of a similar challenge precisely because the plaintiffs failed to show they had the requisite standing. *See* 493 U.S. at 234, 110 S.Ct. 596 (in order to have standing to challenge such provisions, an individual must show "(1) a conviction of one or more of the enumerated crimes. And (2) that the conviction or release from confinement occurred recently enough to disable the applicant under the ordinance"). This Court is therefore likewise precluded from addressing these concerns.

as Supreme Court under the Texas Constitution than have been recognized under the federal constitution do not apply to municipal land use restrictions on sexually oriented businesses. *See* 49 F.3d at 1127–28. However, in that case, the Fifth Circuit noted that the district court determined that the greater protections under the Texas Constitution *do* apply to prior restraints. *See id.* at 1127. Thus, according to Plaintiffs, the Fifth Circuit has implicitly recognized that provisions regarding license applications connected with sexually oriented businesses may be held to a higher standard of scrutiny under the Texas Constitution than under the federal constitution. This Court disagrees. Although it briefly mentioned this statement by the district court that heightened state constitutional protection may apply to prior restraints, the Fifth Circuit in *Woodall* expressed no opinion on this particular conclusion, and the issue was not even presented for decision by the Fifth Circuit.

In any event, the district court's conclusion regarding the Texas Constitution and prior restraints on adult entertainment appears to be at odds with the only Texas appellate authorities on the subject. The Texas Courts of Appeal have rejected outright the proposition that adult entertainment is entitled to any more protection from the Texas Constitution than from the federal constitution. *See Schleuter,* 947 S.W.2d at 926 ("Article I, section 8 provides broader rights of free speech than the First Amendment. But, Article I, section 8 does not extend those broader rights to topless dancing") (citing *Davenport,* 834 S.W.2d at 8; *2300, Inc. v. City of Arlington, Texas,* 888 S.W.2d 123, 127 (Tex.App.—Fort Worth 1994, no writ)). The Court will follow these relevant Texas state cases and rejects Plaintiffs' attempt to read more meaning than is warranted into undeveloped dicta by the Fifth Circuit in *Woodall.*[197]

### 6. "As Applied" Challenge

Various Plaintiffs also challenge the individual permit requirement on the ground that the City has applied it in a discriminatory fashion. For instance, the FTU Plaintiffs claim that the City specifically chose to accept permit applications in person only between the hours of 8:00 a.m. and 12:00 p.m. three days a week for the purpose of harassing and intimidating permit applicants, since the City should know that adult entertainers and managers work late-night hours. In addition, Plaintiffs claim that applications are accepted only in a dangerous and deserted neighborhood (one block away from the federal courthouse), that entertainers were videotaped as they filled out their permit applications, and that one entertainer was not allowed to bring her young child with her when she filled out her application. *See* FTU's Response [Doc. # 170], at 64–65.

The Court is not persuaded that Plaintiffs' complaints about the permit application process rise to the magnitude of a constitutional violation.

However, the Court is concerned about the possible chilling effect that may result from the videotaping of individuals applying for permits. The Ordinance itself does not authorize the Houston Police Department to make these videotapes, and nothing in the legislative record for the Ordinance suggests a justification for such action. The Court therefore seriously questions the City's decision to make these videotapes.

### 7. Conspicuous Display Requirement

In the event that the Court upholds the permit requirement for individual managers and entertainers, Plaintiffs seek a declaration invalidating the Ordinance's requirement that entertainers conspicuously wear personal identification cards while performing. Plaintiffs argue that requiring entertainers to wear identification cards while working violates the entertainers' right to privacy and anonymity. *See* FTU's Response [Doc. # 170], at 68–76; A.H.D.'s Response [Doc. # 173], at 46–47. Plaintiffs also assert that this requirement is unconstitutional because

---

**197.** The Court does not find abstention to be warranted on this issue which presents a relatively clear issue of state constitutional law. According to the Fifth Circuit, "[t]he only time that a state constitutional provision may warrant abstention is when that constitutional provision is so interrelated with the statute or ordinance at issue that it can be said state law is ambiguous." *Louisiana Debating,* 42 F.3d at 1492. *See also* abstention discussion *supra* in Section V.B.1.

it directly interferes with the entertainers' expressive activity, is not necessary for any valid municipal purpose, and is intended instead merely to harass and intimidate adult entertainers. Plaintiffs claim that the City's stated interest could be equally well achieved by requiring licensed entertainers to keep identification cards on site at the premises where they are working and available for display to police officers upon request. Plaintiffs fear that the conspicuous display requirement will have an impermissible chilling effect on entertainers, especially because it may allow unwanted suitors, harassers, or stalkers an even easier opportunity to track down personal information on individual entertainers than if the information were merely kept in City records. Finally, Plaintiffs argue that the City provided no justification whatsoever in the Ordinance for the conspicuous display requirement.

In response, the City argues that in *TK's Video* the Fifth Circuit upheld a requirement that employees of adult businesses wear identification cards while at work. However, it is not clear whether this display requirement was challenged before the Fifth Circuit because the court's opinion does not specifically address this issue. In any event, the plaintiffs in *TK's Video* were adult video stores and bookstores, not enterprises that featured live erotic dancers. Thus, the Fifth Circuit certainly did not consider the question of whether such a requirement would be permissible as applied to erotic dancers.

This Court agrees with Plaintiffs that the conspicuous identification card display requirement for adult entertainers contained in Ordinance 97–75 is an overly intrusive invasion of privacy, unjustified by the legislative record. In enacting this requirement, the City Council set forth no specific justification whatsoever. When the Committee members discussed this requirement, they simply indicated to the City's Legal Department that they wished to impose it on entertainers, without explanation for its rationale.[198] The Houston Police Department recommended to the Committee that "[o]wners, managers and employees of a S.O.B. shall have their license immediately available while at work," but this recommendation did not specify that entertainers should have to *wear* their licenses while performing.[199]

The City appears to suggest that the justification for this requirement is that it would help police officers identify entertainers they want to arrest. However, the legislative record contains no evidence that police officers have had any difficulty in making these identifications.[200]

The only other rationale for the conspicuous display requirement mentioned even in passing in the legislative record is the police department's recommendation that, if entertainers working in adult enterprises were wearing identification cards, then patrons

198. *See, e.g.,* Transcript of August 19, 1996, Committee Meeting, Exhibit 7G to City's Motion [Doc. # 120], at 17 (Council member Castillo indicated that "I think we ought to find some mechanism where a license is actually required to be held by the dancer while he or she is engaged in the employment"); Minutes for October 11, 1996, Committee Meeting, Exhibit 11A to City's Motion, at 6–7.

199. Memorandum from Sam Nuchia, Chief of Police, to Helen Huey, Exhibit 9C to City's Motion, at 2.

200. At one Committee meeting, Assistant District Attorney Don Smith informed the Houston City Council members that the rationale for the Harris County conspicuous display requirement was that "[t]his does away with the ... problem [of] the unknown dancer, when the officer doesn't want to make the arrest at the time they observe the incident." Transcript of August 19, 1996,

Committee Meeting, Exhibit 7G to City's Motion [Doc. # 120], at 33. Beyond this conclusory statement that such a problem may hypothetically exist, the legislative record for Ordinance 97–75 contains no evidence whatsoever that police officers in Houston or Harris County actually have any problem in identifying entertainers whom they would like to arrest. In fact, when Co–Chair Boney followed upon Smith's explanation by asking whether Smith had any comments on the enforcement of Houston's current ordinance, Smith solely discussed the problems police officers have in getting juries to convict entertainers and patrons for public lewdness.

Harris County's most recent sexually oriented business ordinance also requires entertainers to wear identification cards while performing. This provision has been preliminarily enjoined by Judge Vanessa Gilmore pending resolution of a similar constitutional challenge. *See Riva Corp. v. Harris County, Texas,* No. H–96–3277 (S.D.Tex. March 18, 1997).

who had complaints about specific entertainers could more easily report them to an establishment's management or to the police. *See* Transcript of September 16, 1996, Committee Meeting, Exhibit 9D to City's Motion [Doc. # 120], at 30. However, the record contains no evidence of any specific incidents in which a patron was unable to report a complaint for lack of ability to identify an entertainer.

Because the City has shown no legislative justification for imposing the burden of the conspicuous display requirement on adult entertainers engaged in protected activities, rather than merely requiring that entertainers keep their licenses somewhere on the premises where they could easily and quickly retrieve them, the Court is obligated to review this requirement as a content-based restriction on speech. Accordingly, the Court strikes it down under strict scrutiny.[201]

Since it does not appear that Plaintiffs are challenging the conspicuous display requirement for *managers*, the Court does not reach this issue.

### H. *No–Touch and Three–Foot Rules*

Finally, Plaintiffs challenge two provisions of Ordinance 97–75 that regulate the conduct of adult entertainers: § 28–258(a), which prohibits touching between patrons and adult entertainers (the "no-touch rule"),[202] and § 28–258(b), which establishes a three-foot buffer zone between patrons and adult entertainers (the "three-foot rule").[203]

Plaintiffs contend that these provisions are invalid because they are content-based restrictions on speech and because they are not narrowly tailored to serve the City's asserted interest in reducing criminal activity within adult enterprises. They also argue that the three-foot rule interferes with expressive conduct and is vague and therefore subject to arbitrary enforcement. For the reasons discussed below, the Court upholds both of these provisions.

### 1. Content–Based or Content–Neutral?

Plaintiffs primarily argue that the no-touch rule and especially the three-foot rule are invalid content-based regulations because the City enacted them with the predominate purpose of severely restricting expressive activity rather than of addressing any negative secondary effects that may be caused by this type of speech. In addition, the FTU Plaintiffs argue that the three-foot rule must be struck down as an impermissible infringement on speech because enforcement of the

---

**201.** The Court's conclusion here is further supported by its concerns regarding the chilling effect the conspicuous display requirement would likely have an adult entertainers. The Court's concern is well expressed in a recent Tenth Circuit opinion that struck down a similar requirement, albeit in the context of political speech. In *American Constitutional Law Foundation, Inc. v. Meyer*, 120 F.3d 1092 (10th Cir. 1997), *cert. granted*, —— U.S. ——, 118 S.Ct. 1033, 140 L.Ed.2d 100 (1998), the court invalidated a statute that required initiative and referendum petition circulators to wear identification badges while seeking petition signatures, explaining that:

> Information contained on an identification badge is much more accessible than information attached to a filed petition and, unlike the affidavit requirement, the badge requirement forces circulators to reveal their identities at the same time they deliver their political message. The badge requirement operates when the reaction to their message may be the most intense, emotional, and unreasoned. Thus, as opposed to the affidavit requirement, the badge requirement deprives circulators of their anonymity at the precise moment their interest in anonymity is greatest. The record amply supports the court's finding that the badge requirement chills circulation.

*Id.* at 1102. In striking down this conspicuous display requirement, the Tenth Circuit rejected arguments that "the badges enable the state to pursue more efficiently individuals who engage in misconduct," noting that " 'the First Amendment does not permit the State to sacrifice speech for efficiency.' " *Id.* at 1102–03 (quoting *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 795, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988)).

**202.** Section 28–258(a) provides that: "[i]t shall be unlawful for any entertainer to touch a customer or the clothing of a customer while engaging in entertainment or while exposing any specified anatomical areas or engaging in any specified sexual activities." Not all Plaintiffs are challenging the Ordinance's "no-touch" rule. *See, e.g.*, FTU's Response [Doc. # 170], at 2.

**203.** Section 28–258(b) provides that: "[i]t shall be unlawful for any entertainer to approach closer than three (3) feet to any customer while engaging in entertainment or while exposing any specified anatomical areas or engaging in any specified sexual activities."

rule will economically devastate their businesses.

### a. Legislative Justification for these Requirements

██ Once again, in order to determine whether a regulation contained in Ordinance 97–75 is content-based or content-neutral, and thus what standard of scrutiny should apply to it, the Court must consider whether the City has justified the regulation by specific reference to evidence in the legislative record upon which a reasonable City Council member could have relied in determining that the regulation would address negative secondary effects caused by the adult entertainment. *See supra* Section III.A.3. The Court concludes that the record contains ample justification for both the no-touch rule and the three-foot rule and therefore reviews them as content-neutral regulations under intermediate scrutiny.

In its deliberations, the City Council's Sexually Oriented Business Committee received testimony from Houston police officers and statistical evidence from the Houston Police Department Vice Division indicating the frequency of arrests and convictions made for crimes committed inside adult enterprises. *See* Sexually Oriented Business Statistics Amended, Exhibit 21 to City's Motion [Doc. # 120]. According to Lieutenant Smith, these arrests were primarily for the offense of public lewdness committed by erotic entertainers. Lieutenant Smith testified that lewdness occurs when an entertainer touches a patron and that therefore this crime could be prevented if entertainers were prohibited from touching patrons. *See* Minutes for June 17, 1996, Committee Meeting, Exhibit 2C to City's Motion [Doc. # 120], at 8; Minutes for July 22, 1996, Committee Meeting, Exhibit 4C to City's Motion, at 6–7; Minutes for October 30, 1996, Committee Meeting, Exhibit 13B to City's Motion, at 4. In addition, in order to familiarize Council members with the problem they sought to regulate, the Committee watched a video of a "table dance," a dance in which an entertainer performs in close proximity to a patron. This video was made during an undercover operation at an adult cabaret. *See id.;* "Table Dances" Video, Exhibit 41 to City's Motion.

The Committee also heard testimony about the difficulties police officers have in making arrests and obtaining convictions for public lewdness in adult cabarets. According to this testimony, Houston police officers are currently only able to make sufficiently accurate observations to support lewdness convictions in court by participating in the lewd behavior themselves. The Committee heard testimony that it is too difficult for police officers to discern what behavior would constitute criminal lewdness from across a crowded room or even from another table in an adult cabaret and difficult, as a practical matter, to make an arrest based on such an observation. *See, e.g.,* Transcript of August 29, 1996, Committee Meeting, Exhibit 8E to City's Motion [Doc. # 120], at 89–91. Thus, the Committee was advised that a buffer zone between entertainers and patrons would make it easier for police officers to enforce the law against public lewdness by making it easier for them to see from a distance whether the law is being violated. The Committee was also advised that a buffer zone would make it possible for arrests to be made without police officers themselves taking part in any criminal activity. *See* Transcript of August 19, 1996, Committee Meeting, Exhibit 7G to City's Motion, at 61–63 (describing police officers' participation in lewd behavior during sting operation).

Based on this evidence, the Court concludes that the City has presented sufficient evidence that both the no-touch rule and the three-foot rule were enacted for the purpose of combatting negative secondary effects associated with adult entertainment, mostly the prevalence of criminal public lewdness. It will therefore review these provisions as content-neutral restrictions on speech.

### b. Economic Impact

The FTU Plaintiffs also claim that the Ordinance's three-foot rule is a content-based restriction on speech because the City knew that the provision would cause severe economic hardship to the Plaintiffs' businesses. In support of this contention, Plaintiffs have submitted evidence purporting to show that the three-foot rule would force adult cabarets to remodel their premises in such a way as to allow only one-tenth as many dancers to be

able to perform simultaneously as are currently able to do so. *See* Affidavit of C. Davis Wilson (architect), Attachment to FTU's Supplemental Response [Doc. # 254] (estimating that FTU Plaintiffs will have to eliminate 75–80% of the tables in their adult cabarets in order to comply with the three-foot rule) and accompanying architectural plans. Plaintiffs have also submitted declarations by several cabaret owners stating that this rule therefore will force them out of business.[204] Furthermore, these Plaintiffs claim that the City Council was aware that the rule would have this effect on their businesses and that this knowledge therefore demonstrates that the Council's predominate motivation in enacting the three-foot rule was content-based suppression of speech. *See* FTU's Response [Doc. # 170], at 20, 82 n. 28 (citing evidence that City Council was expressly told that three-foot rule would reduce number of dancers who could simultaneously perform in one facility from fifty dancers to five or ten).

The Court is unmoved by Plaintiffs' evidence. As noted previously, " '[t]he inquiry for First Amendment purposes is not concerned with economic impact,' " *City of Renton*, 475 U.S. at 54, 106 S.Ct. 925 (quoting *American Mini Theatres*, 427 U.S. at 78, 96 S.Ct. 2440 (Powell, J., concurring)), and the Supreme Court's decision in *Turner II*, 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369, has not altered this rule in the context of adult entertainment. *See supra* Section III. A.4. Although the Fifth Circuit has not yet addressed the issue of buffer zones between patrons and adult entertainers, another federal Court of Appeals has specifically reject-

ed the economic arguments Plaintiffs raise here. In *DLS*, 107 F.3d at 413, the Sixth Circuit, relying on *City of Renton*, upheld a six foot buffer zone despite the plaintiffs' arguments that the buffer zone would force them to engage in expensive renovations of their premises and would reduce the entertainers' tips. *See also Kev, Inc.*, 793 F.2d at 1061 (upholding ten foot buffer zone); *DFW Vending, Inc. v. Jefferson County, Texas*, No. 97–CV–611 (E.D.Tex. Nov. 27, 1997) (upholding six foot buffer zone).

However, even if this Court were to consider Plaintiffs' economic arguments regarding the three-foot rule, Plaintiffs' proffered evidence does not demonstrate that the rule would have as significant a financial impact as Plaintiffs claim.[205] The Court has reviewed the FTU Plaintiffs' proffered architectural plans and finds that they do not support Plaintiffs' specific arguments regarding the financial impact they claim they will suffer under the three-foot rule.

First of all, it is clear from these plans that compliance with the three-foot rule will *not* force Plaintiffs to eliminate a substantial number of tables from their cabarets. On the contrary, the plans suggest that the cabarets will need to remove few, if any, tables at all. Instead, the rule will only reduce the number of seats at which patrons may view a performance in immediate proximity to the entertainer. According to the plans, under the three-foot rule, these performances, or "table dances," may take place only in designated areas clearly marked at least three feet away from any seat. In calculating that 75–80% of the space currently available for table dances would be eliminated under the

---

204. On August 18, 1997, the FTU Plaintiffs filed an Unopposed Motion for Leave to File Supplemental Response and an Emergency Motion for Consideration [Doc. # 189], requesting that the Court allow them time to consult with architectural experts and submit evidence regarding the economic impact that compliance with the three-foot rule would impose on their businesses. On October 10, 1997, the FTU Plaintiffs submitted this evidence. *See* Attachment to FTU's Supplemental Response [Doc. # 254]. On October 24, 1997, the City filed objections to this evidence [Doc. # 277] on the grounds of untimeliness and irrelevance. It was the Court's understanding that the City did not respond to the FTU Plaintiffs' August 18, 1997, Motion for Consideration

because the City did not object to allowing these Plaintiffs some additional time to submit this evidence. Because the evidence was submitted in time for the Court to review it before ruling on the pending summary judgment motions, the FTU Plaintiffs' Motion for Leave and for Consideration [Doc. # 189] is **GRANTED,** and the City's objections [Doc. # 277] are **DENIED.**

205. The *DLS* court did note that it would "consider the economic effects of the ordinance in the aggregate, not at the individual level; if the ordinance were intended to destroy the market for adult cabarets, it might run afoul of the First Amendment." 107 F.3d at 413.

Ordinance, Plaintiffs have apparently only counted those seats that are located right at the three-foot line. A cursory review of the plans clearly indicates that patrons sitting in other nearby seats could also view table dances performed in the designated areas, albeit from slightly more than three feet away. The fact that only a relatively few patrons could sit as close to these areas as the Ordinance would allow does not render the Ordinance unduly burdensome nor does it support Plaintiffs' contention that compliance with the three-foot rule would economically devastate their businesses.[206]

As already noted, federal courts have upheld buffer zones as large as six or ten feet. The fact that the Houston City Council specifically chose a smaller distance, three feet,[207] detracts from Plaintiffs' implicit argument that a performance that occurs perhaps five feet away from a patron, as opposed to three feet, cannot count as a close-proximity table dance and therefore will economically ruin their businesses. In any event, for reasons discussed *infra* at Section V.H.3., the Court rejects Plaintiffs' argument that there is any constitutional right to provide or engage in close-proximity table dances at all.

Finally, although Plaintiffs claim that compliance with the three-foot rule will significantly reduce the number of table dances that may occur simultaneously, Plaintiffs have failed to submit any evidence indicating how many such dances typically do occur simultaneously and thus whether the three-foot rule will actually force a reduction in the number of table dances that occur in an adult

cabaret on any given night. Although Plaintiffs may claim, for instance, that their current floor plans allow one hundred dancers to perform table dances simultaneously, the Court is skeptical, and has indeed received no evidence indicating, that this number of entertainers ever actually performs at the same time in any one cabaret. If Plaintiffs' argument is not that so many entertainers do perform simultaneously, but instead that the three-foot rule reduces the number of seats from which patrons may view the closest table dances allowed, then the Court sees no reason why patrons could not simply switch seats in order to view a table dance from three feet away, as opposed to, say, five feet away. In other words, the seats that are closest to the designated table dance performance areas could be reserved for patrons currently viewing, and presumably paying for, a table dance.

Thus, even if the Court were to consider the economic impact of the three-foot rule on Plaintiffs' businesses, Plaintiffs have failed to demonstrate that the rule would actually cause a severe burden. At most, it appears that Plaintiffs may have to spread their tables out somewhat more, but not nearly so much as to eliminate a significant portion of their seating area.[208]

### 2. Narrowly Tailored to Serve Substantial Governmental Interests?

▆ Since the Court has determined that the City enacted the no-touch and three-foot rules in a content-neutral manner, it must

---

206. Further, it is unclear to the Court why Plaintiffs contend, through the architectural plans, that seats located right next to the main performance stages should not count as seats for which close viewing of table dances is available. A substantial number of seats that have been marked as unavailable for these dances in the plans appear to be only three feet or so away from the main performance stages. Plaintiffs may not have considered these to be seats available for table dances because the stages might be elevated from the floor. However, the Ordinance does not require Plaintiffs to elevate their stages. Nor, in any event, would this distinction between the types of performances available support Plaintiffs' contention that the three-foot rule will require Plaintiffs to remodel their facilities in an economically unviable manner.

207. The Houston Police Department recommended the enactment of a six-foot zone, *see* Transcript of September 16, 1996, Committee Meeting, Exhibit 9D to City's Motion [Doc. # 120], at 38–39; Memorandum from Sam Nuchia, Chief of Police, to Helen Huey, Exhibit 9C to City's Motion, at 2, but the Committee eventually decided upon three feet.

208. The Court thus rejects the FTU Plaintiffs' request to defer judgment on the issue of the three-foot rule because they have served pertinent discovery requests upon the City. *See* FTU's Response [Doc. # 170], at 80–83. The Court holds that Plaintiffs have failed to establish that the requested discovery or expected responses will raise genuine issues of *material* fact precluding summary judgment on this provision of the Ordinance.

next consider, under the intermediate scrutiny test, whether these rules are narrowly tailored to serve substantial governmental interests. Plaintiffs argue that, even if these rules were enacted for the purpose of addressing negative secondary effects, they are nevertheless invalid because they are not narrowly tailored to serve the City's asserted interest. Plaintiffs raise a variety of arguments that the City could easily advance its goals with less intrusive methods. For example, the A.H.D. Plaintiffs suggest that the City could increase licensing fees for sexually oriented businesses as a means of increasing resources available to law enforcement to combat crime allegedly associated with the businesses. *See* A.H.D.'s Response [Doc. # 173], at 40. However, Plaintiffs do not explain exactly how this half-hearted suggestion could address the problems the City seeks to alleviate through these new rules.[209]

The FTU Plaintiffs argue that the three-foot rule is not sufficiently narrowly tailored because the no-touch rule renders it unnecessary. *See* FTU's Response [Doc. # 170], at 82–84. However, it is not the Court's role to consider whether the City made the best policy judgment in deciding to enact both rules. The Court may only assess whether the City's decision is supportable by evidence in the legislative record that the rules it enacted would address negative secondary effects, in this case the prevalence of criminal public lewdness. The record reveals that the Sexually Oriented Business Committee engaged in a great deal of discussion regarding whether to enact both rules. *See, e.g.,* Minutes for October 11, 1996, Committee Meeting, Exhibit 11A to City's Motion [Doc. # 120], at 7; Minutes for October 30, 1996, Committee Meeting, Exhibit 13B to City's Motion, at 3–7; Transcript of January 7, 1997, Committee Meeting, Exhibit 19D to City's Motion, at 81–93.[210] Based on testimony from police officers, the Committee concluded that the three-foot rule would provide police officers with an easier means of enforcing the no-touch rule.[211] The Court holds that this rationale is an adequate justification for the three-foot rule under applicable constitutional standards.

In sum, the Court rejects Plaintiffs' arguments that the no-touch and three-foot rules are not sufficiently narrowly tailored. It is well established that the City need not employ the least restrictive means of achieving its desired goals. *See Ward,* 491 U.S. at 798, 109 S.Ct. 2746; *SDJ,* 837 F.2d at 1276. Furthermore, the Fifth Circuit has specifically upheld a no-touch rule in sexually oriented businesses as narrowly tailored to serve a substantial government interest, *see Hang On,* 65 F.3d at 1254, and other federal courts have upheld even less narrowly tailored buff-

**209.** In fact, another set of Plaintiffs has challenged, in their Complaint, the City's decision to increase the licensing fees for sexually oriented businesses in Ordinance 97–75. *See* N.W. Enterprises' First Amended Complaint [Doc. # 84], at 19. Although the City has defended its decision to increase the license fees, *see* City's Motion [Doc. # 120], at 40–41, and City's Reply to A.H.D.'s Locational Response [Doc. # 243], at 13, it does not appear that any Plaintiffs have seriously raised this issue in their responses to the City's Motion for Summary Judgment. In any event, the Court finds that the modest fee increases contained in Ordinance 97–75 (now $475 for an enterprise permit and $29 for an individual permit) are justified by the legislative record, *see* Minutes for November 4, 1996, Committee Meeting, Exhibit 14B to City's Motion, at 11 (discussing fact that fees need to be raised because of increases in costs of investigation), and are thus constitutionally valid. *See TK's Video,* 24 F.3d at 710 (upholding license fees of $500 for enterprises and $50 for individuals).

**210.** While there is no question that the three-foot rule is in the Ordinance as enacted by the full City Council, it is not clear how the provision was reinstated after the Committee voted on January 7, 1997, to delete this rule from the proposed Ordinance. *See* Transcript of January 7, 1997, Committee Meeting, Exhibit 19D to City's Motion [Doc. # 120], at 187–88. As mentioned earlier, the legislative record which the City has submitted does not contain any minutes or transcripts of the January 15, 1997, Council meeting in which the Ordinance was enacted.

**211.** At one meeting, Committee Co–Chair Boney explained that:

[T]his distance is, primarily, for enforcing a no-touch provision.... [I]t is not for the purpose of measuring whether someone is two feet or three feet away but, primarily, to allow the Department to have easy enforcement of no touching while the entertainer is in a state of partial nudity or entertaining. Transcript of November 20, 1996, Committee Meeting, Exhibit 15C to City's Motion for Summary Judgment [Doc. # 120], at 87.

er zones, *see DLS,* 107 F.3d at 413 (six feet); *Kev, Inc.,* 793 F.2d at 1061 (ten feet); *DFW Vending,* No. 97–CV–621 (six feet). The Court therefore rejects Plaintiffs' contention that these new rules are not sufficiently narrowly tailored.[212]

### 3. Interference With Expressive Content

■■■ The FTU and A.H.D. Plaintiffs also contend that the three-foot rule is invalid because it impermissibly interferes with the expression of the adult entertainer by creating a separation between the entertainer and the audience. *See* FTU's Response [Doc. # 170], at 76–79, 84–94; A.H.D.'s Response [Doc. # 173], at 41. Plaintiffs argue that, because of the loud noise that is typical in adult cabarets, this buffer zone will make oral verbal communication very difficult and will destroy the possibility of a personal connection developing between an entertainer and a patron.

The FTU Plaintiffs strenuously assert several creative arguments in support of their contention that the quality of expression of erotic entertainment is itself protected by the First Amendment. For example, they urge that the availability of "intimate conversation" is at the core of constitutionally protected erotic entertainment:

> One of the key elements of the expressive intimate fantasy of dancing in close-proximity is the softly spoken verbal communication between entertainer and customer. It is a critical interpersonal intimate verbal communication which cannot be replicated when the dancer is compelled to maintain a

distance of three feet from her customer. . . . Close proximity dancing *is not simply the enhancement* of the erotic message of a dance which could take place at a greater distance from the customer. Close proximity dancing is *sui generis* . . . . [T]he proximity additionally serves to create a special sense of heightened theatricality that can not be achieved or created at a distance.

FTU's Response [Doc. # 170], at 77–78. In support of this argument, Plaintiffs have submitted declarations by a number of adult entertainers describing the importance of close-proximity dancing to their trade. *See* Exhibits 7–9, 11–14, and 16–21 to Appendix to FTU's Response [Doc. # 171]. Plaintiffs argue that, although not all types of artistic performances require close proximity, in adult erotic entertainment, "the medium is the message." FTU's Response [Doc. # 170], at 88. Moreover, they contend that the only other way to provide the same quality of expression in a loud and crowded cabaret environment would be to allow private entertainment in separate rooms but that this possibility is foreclosed by another provision of the Ordinance, § 28–258(c), which prohibits entertainment in enclosed areas. As a practical matter, as well, Plaintiffs contend that the three-foot rule actually requires a more burdensome separation than three feet because, in order to ensure compliance with the three-foot rule, a prudent entertainer must actually perform four or five feet away from a patron so that her moving

---

212. The question of whether the Ordinance's three-foot rule is narrowly tailored raises interesting similarities to the recent case of *Schenck v. Pro–Choice Network of Western New York,* 519 U.S. 357, 117 S.Ct. 855, 866–68, 137 L.Ed.2d 1 (1997), in which the Supreme Court struck down a floating buffer zone between protesters and people entering and leaving abortion clinics. On first blush, *Schenck* appears to cast doubt on the validity of the City's three-foot rule. Like the floating buffer zone in *Schenck,* the three-foot rule makes it difficult for individuals to engage in desired speech; was enacted for the actual purpose of preventing other, more narrow behavior; may be difficult to enforce; and may burden more speech than is intended by causing individuals to remain, overcautiously, even further away from their intended listeners or observers than the rule allows, due to a lack of certainty about whether they are inside or outside the buffer

zone. However, because *Schenck* involved an entirely different category of speech, political speech, which receives greater First Amendment protection than adult entertainment, this Court will follow the federal authorities that have specifically considered buffer zones in the context of topless dancing. The Court also notes two additional distinctions between these cases. In *Schenck,* the restricted speech took place on public sidewalks, which have long been noted to constitute "a prototypical example of a traditional public forum." *Id.* at 867. Also, the floating buffer zone struck down in *Schenck* was fifteen feet, a distance that the Court noted prevented "communicating a message from a normal conversational distance." *Id.* Despite Plaintiffs' concerns about the loud noise in adult cabarets, three feet is certainly "a normal conversational distance."

shoulders or arms do not accidentally stray over the three-foot "line." *See* FTU's Response [Doc. # 170], at 89 n. 34. In sum, Plaintiffs insist that the three-foot rule raises various genuine questions of material fact and urge that they be permitted to develop the issue at trial.[213]

Plaintiffs are unable to cite any case law supporting their creative arguments, but they argue that this is because no court has even considered the argument they raise here regarding the impact of a buffer zone on the expressive nature of adult entertainment. Plaintiffs insist that courts have up until now only been presented with the question of the economic impact of such buffer zones. *See, e.g., DLS,* 107 F.3d at 409–10; *Zanganeh v. Hymes,* 844 F.Supp. 1087, 1091 (D.Md.1994). This Court disagrees. Adult entertainment receives less protection than other forms of constitutionally protected speech, and the courts have consistently rejected similar arguments to the ones Plaintiffs raise here. For instance, in upholding a ten-foot buffer zone, the Ninth Circuit explained that the regulation did "not significantly burden first amendment rights. While the dancer's erotic message may be slightly less effective from ten feet, the ability to engage in the protected expression is not significantly impaired. Erotic dancers still have reasonable access to their market." *Kev, Inc.,* 793 F.2d at 1061. *See also Colacurcio v. City of Kent,* 944 F.Supp. 1470, 1476 (W.D.Wash.1996) (acknowledging that the "customer's experience is more intense, more personal, more erotic if the dancer is close," but concluding that nothing in the law suggests that "patrons are entitled under the First Amendment to the maximum erotic experience possible").[214]

In sum, this Court concludes that Plaintiffs' argument here amounts to a distinction without a difference. All of the courts that have addressed this issue have rejected the notion that close-proximity dancing is itself protected speech, no matter whether such dancing is considered *enhancement* of a particular form of expression or is instead a distinct type of expression in and of itself. Thus, under prevailing federal constitutional doctrine, the Court holds that the three-foot rule is constitutionally valid.

### 4. Vagueness and Arbitrary Enforcement

■ The A.H.D. Plaintiffs also argue that the no-touch and three-foot rules are void for vagueness because they allow for arbitrary enforcement. *See* A.H.D.'s Response [Doc. # 173], at 41. For example, they suggest that it would be difficult for a law enforcement officer to know if an entertainer was an unacceptable 32 inches away from a patron or an acceptable 36 inches away. They also suggest that it would be unclear whether an entertainer was in violation of the three-foot rule if a customer inadvertently passed by close behind her back. These arguments have no merit.

With respect to the first scenario, a rule is not invalid merely because it might, as a practical matter, be difficult to determine compliance. This contention amounts to nothing more than an individual alleged violator's defense to a particular prosecution. As with any criminal case, the City would bear the burden of proving that a violation had occurred. With respect to the second scenario, the Fifth Circuit has already established that only intentional violations of a no-touch rule qualify as violations. *See Hang On,* 65 F.3d at 1254 (concluding that because a no-touch rule did not prescribe a culpable

---

213. Plaintiffs state that, if permitted, at trial they would present expert testimony by a drama or communications expert regarding the artistic need for intimacy in successful erotic performances and by a mental health professional regarding the psychology of close-proximity entertainment. *See* FTU's Response [Doc. # 170], at 79–80 n. 027. The Court concludes there is no need for further factual development of the record on this issue. The arguments are amply illustrated by the existing evidence.

214. Plaintiffs vigorously argue that the *Colacurcio* court was not asked to consider whether a buffer zone merely fails to allow enhancement of the particular expression erotic entertainers attempt to achieve or instead actually *destroys* an entire type of expression. The Court finds Plaintiffs' distinction unavailing. In *Colacurcio,* the court noted and rejected the plaintiffs' argument that the ordinance's ten-foot rule "effectively eliminates 'table dancing,' which they contend[ed] was a unique medium of expression protected by the First Amendment." 944 F.Supp. at 1471.

mental state, under Texas criminal law the rule did not criminalize "inadvertent or negligent touching"). This reasoning applies with equal force to a buffer zone requirement.

### 5. Texas Constitution

■ Finally, the FTU Plaintiffs argue that even if the three-foot and no-touch rules pass federal constitutional muster, the combined effect of these rules is not sufficiently narrowly tailored to survive the more stringent free speech test imposed by the Texas Constitution. *See* FTU's Response [Doc. # 170], at 95–108. They contend that, even though the United States Supreme Court rejected the "least restrictive means" test in *Ward*, the Texas Supreme Court has held that a government body must employ the least restrictive means possible to achieve its goal when regulation affects protected expressive activity.[215]

As noted earlier, Plaintiffs are correct that the Texas Supreme Court has chosen to interpret the free speech guarantees of the state constitution, contained in Article I, Section 8, independently from and more broadly than the federal courts' interpretation of the First Amendment to the United States Constitution. *See, e.g., Tucci*, 859 S.W.2d at 8; *Davenport*, 834 S.W.2d at 14 n. 28; *O'Quinn v. State Bar of Texas*, 763 S.W.2d 397, 402 (Tex.1988).

However, despite Plaintiffs' vigorous arguments, this Court is not persuaded that it would be appropriate to apply a more stringent free speech analysis under the Texas Constitution than under the federal constitution in the case at bar. Since the time *Davenport* and *Tucci* were decided, the only Texas appellate courts to address this issue have declined to apply more expansive state constitutional protection to adult entertainment. For instance, in *Schleuter*, a Texas Court of Appeals explained that:

Article I, section 8 provides broader rights of free speech than the First Amendment. But, Article I, section 8 does not extend those broader rights to topless dancing. Therefore, we will only analyze Fantasy

Sports' claim under First Amendment jurisprudence.

947 S.W.2d at 926 (citing *2300, Inc.*, 888 S.W.2d at 127; *Tucci*, 859 S.W.2d 1; *Davenport v. Garcia*, 834 S.W.2d at 8). In *2300, Inc.*, another Texas Court of Appeals held that:

The cases interpreting this [free speech] protection have been limited in scope and *thus far* have not included topless/exotic dancing.... [T]he trial court reasonably concluded that topless/exotic dancing probably was not contemplated as being included in the expanded protections of the Texas Constitution when Article I section 8 was drafted.

888 S.W.2d at 127. This Court will follow the lead of these Texas appellate authorities. If the Texas Supreme Court disagrees and believes that its broad interpretation of Article I, section 8 should apply to adult entertainment, then it may so rule when the issue is presented to it.

## VI. CONCLUSION

For the reasons elaborated in detail above, it is hereby

**ORDERED** that the City of Houston's Motion for Summary Judgment [Doc. # 120] is **GRANTED IN PART** and **DENIED IN PART** in accordance with this Memorandum Opinion and Order. It is further

**ORDERED** that Plaintiffs' Cross–Motions for Summary Judgment [Docs. # 170, 173, 218, 221, 258, 268, 270, 289, and 290] are **GRANTED IN PART** and **DENIED IN PART** in accordance with this Memorandum Opinion and Order. It is further

**ORDERED** that Ordinance 97–75 is valid and enforceable except in the following respects. The City is hereby **PERMANENTLY ENJOINED** from enforcing the following amendments to the HOUSTON, TEX., CODE OF ORDINANCES with respect to constitutionally protected enterprises, which include adult movie theatres, adult arcades, adult mini-theatres, adult bookstores, adult video stores, adult cabarets, adult lounges, and other es-

---

**215.** Again, the Court does not find abstention to be warranted on this issue which presents a relatively clear issue of state constitutional law.

*See Louisiana Debating*, 42 F.3d at 1492, and abstention discussion *supra* in Section V.B.1.

tablishments that feature nude or topless dancing:

(i) The amendment of § 28–125(b)(1) to increase the minimum distance between an enterprise and a protected land use from 750 to 1,500 feet;[216]

(ii) The amendment of § 28–125(b)(3) to increase the radius for calculating whether a surrounding area is residential from 1,000 to 1,500 feet;[217]

(iii) §§ 28–253 and 28–254 to the extent that they require managers and entertainers to disclose the following information on their permit applications: phone numbers; home addresses; and information regarding criminal convictions obtained prior to five years before the application, convictions for crimes other than those enumerated in § 5 of Ordinance 97–75, and time spent in jail other than time spent serving a sentence for an enumerated criminal conviction;[218] and

(iv) § 28–256 to the extent that it requires entertainers to wear personal identification cards while they are working in protected enterprises.[219]

It is further

**ORDERED** that the issue of the validity of the new formula in § 28–125(b)(3) for accounting for multifamily dwellings in the determination of whether an area is residential is **SEVERED** from the parties' current summary judgment motions. Within ten business days from entry of this Order, the City shall submit a memorandum of law on the issue of alternative avenues of communication with specific reference to the new multifamily dwelling provision of the Ordinance. The City shall also submit an affidavit by an individual with knowledge of this issue regarding how the City expects that the new formula for multifamily dwellings will affect the Plaintiffs in this action. Plaintiffs will

have ten days to file a responsive memorandum and other materials they deem necessary. In their memoranda, the parties are specifically directed to indicate to the Court what factual evidence currently exists regarding the potential impact of this provision and, if this evidence is now lacking, what measures would need to be taken to produce such evidence.[220] It is further

**ORDERED** that all information provided by managers and entertainers in their applications for permits under §§ 28–253 and 28–254 is hereby declared **CONFIDENTIAL.** The City is **PERMANENTLY ENJOINED** from disclosing this information in response to any requests made under the Texas Public Information Act.[221] It is further

**ORDERED** that any manager or entertainer who is working at a protected enterprise immediately before the individual permit requirement goes into effect must be allowed to continue working, whether or not a temporary permit is obtained, pending the processing of her or his permit application and pending any appeal of a permit denial.[222] It is further

**ORDERED** that the issue of the validity of §§ 28–136(b) and 28–258(c) as applied to large VIP rooms in adult cabarets and lounges is **SEVERED** from the parties' current summary judgment motions. The City shall respond to Ice Embassy's "Motion for Partial Summary Judgment Determining that H.C.O. §§ 28–136(b) and 28–258(c) are Unconstitutional as Applied to Ice Embassy's Proposed 'VIP Room'" [Doc. # 258] within ten business days of entry of this Order. All Plaintiffs interested in this issue must file their replies within ten business days of receipt of the City's response.[223] It is further

**ORDERED** that the City must report to the Court at a pretrial conference to be held March 2, 1998, whether or not the City intends to commence enforcement of § 28–130(g), which extends the Ordinance's previ-

---

**216.** *See* discussion *supra* Section V.B.3.a.

**217.** *See* discussion *supra* Section V.B.3.a.

**218.** *See* discussion *supra* Section V.G.3.

**219.** *See* discussion *supra* Section V.G.7.

**220.** *See* discussion *supra* Section V.B.3.c.

**221.** *See* discussion *supra* Section V.G.4.

**222.** *See* discussion *supra* Section V.G.5.a.ii.

**223.** *See* discussion *supra* Section V.E.3.

ous signage restrictions to sexually oriented businesses located in multi-unit commercial centers, without complying with TEX.LOC. GOV'T CODE § 216.001 *et seq.* This issue is also **SEVERED** from the parties' current summary judgment motions and shall be addressed by the Court as necessary in light of the City's current intent concerning enforcement of § 28–130(g). Interested Plaintiffs are granted leave to amend their Complaints to include this state statutory claim. The Court will deem all Plaintiffs asserting such a claim to have raised the issue and to be governed by the foregoing ruling. The City will be required to file answers to any such Amended Complaints. If the City seeks to enforce § 28–130(g) without complying with TEX.LOC. GOV'T CODE § 216.001 *et seq.*, the City will be required to file a motion for summary judgment setting forth the applicable law and facts that mandate such result. The Court will establish the briefing schedule for this issue, if necessary, at the conference on March 2, 1998.[224]

The Court also makes the following evidentiary and procedural rulings. It is

**ORDERED** that FTU's Motion for Reconsideration [Doc. # 138] is **DENIED.**[225] It is further

**ORDERED** that FTU's Objections to City's Evidence [Doc. # 166] are **OVERRULED.**[226] It is further

**ORDERED** that Dee & Dee's Motion to Strike [Doc. # 168] is **DENIED.**[227] It is further

**ORDERED** that A.H.D.'s Objections to City's Evidence [Doc. # 174] are **OVERRULED.**[228] It is further

**ORDERED** that FTU's Unopposed Motion for Leave to File Supplemental Response and Emergency Motion for Consideration [Doc. # 189] is **GRANTED.**[229] It is further

**ORDERED** that Dee & Dee's Motion to File Two Hours Late [Doc. # 213] is **GRANTED.**[230] It is further

**ORDERED** that the City's Motion to Strike Plaintiffs' Arguments regarding TEX. LOC. GOV'T CODE § 216 [Doc. # 225] is **DENIED.**[231] It is further

**ORDERED** that the City's Motion to Strike Jane Doe Plaintiffs [Doc. # 229] is **DENIED.**[232] It is further

**ORDERED** that the City's Objections to A.H.D. Plaintiffs' Evidence in Support of their Cross–Motion for Summary Judgment [Doc. # 232] are **OVERRULED.**[233] It is further

**ORDERED** that the City's Motion to Strike the Language "And Others Similarly Situated" from Chil Soung Plaintiffs' Case Style Heading [Doc. # 233] is **GRANTED.**[234] It is further

**ORDERED** that the City's Motions to Strike Non–Locational Briefing [contained in Docs. # 234, 235, 236, 243 and 244] are **DENIED.**[235] It is further

**ORDERED** that the City's Motion to Strike FTU Plaintiffs' Exhibits [Doc. # 245] is **DENIED.**[236] It is further

**ORDERED** that the City's Motion to Strike N.W. Plaintiffs' Affidavit of Steve Collins [Doc. # 246] is **DENIED.**[237] It is further

---

**224.** *See* discussion *supra* Section V.F.4.

**225.** *See* discussion *supra* note 125.

**226.** *See* discussion *supra* Section IV.

**227.** *See* discussion *supra* Section IV.

**228.** *See* discussion *supra* Section IV.

**229.** *See* discussion *supra* note 204.

**230.** *See* discussion *supra* note 3.

**231.** *See* discussion *supra* Section V.F.4.

**232.** *See* discussion *supra* note 7.

**233.** *See* discussion *supra* note 119.

**234.** *See* discussion *supra* note 11.

**235.** *See* discussion *supra* note 84.

**236.** *See* discussion *supra* note 125.

**237.** *See* discussion *supra* note 148.

**ORDERED** that FTU's Motion to Strike the Affidavit of Ollie Schiller [Doc. # 247] is **DENIED.**[238] It is further

**ORDERED** that FTU's Motion to Strike the City's Affidavit of Steve Andrews [Doc. # 252] is **DENIED.**[239] It is further

**ORDERED** that FTU's Motion to Strike the City's Stipulation Regarding Certain Matters and Documents [Doc. # 253] is **DENIED.**[240] It is further

**ORDERED** that Ice Embassy's Motion for Leave to File Supplemental Complaint [Doc. # 255] is **GRANTED.**[241] It is further

**ORDERED** that N.W. Enterprises' Motion to Strike the City's Affidavit of Steve Andrews [Doc. 266] is **DENIED.**[242] It is further

**ORDERED** that the FTU Plaintiffs' Conditional Motion for Injunction Pending Abstention [Doc. # 272] is **DENIED.**[243] It is further

**ORDERED** that the City's Objections to the FTU's Affidavit of C. Davis Wilson [Doc. # 277] are **OVERRULED.**[244] It is further

**ORDERED** that the City's Objections to Ice Embassy's Affidavits, contained in the City's Response to Ice Embassy's Motion for Leave [Doc. # 278], are **OVERRULED.**[245] It is further

**ORDERED** that KQ Investments' Motion for Leave to File Complaint in Intervention [Doc. # 280] is **GRANTED.**[246] It is further

**ORDERED** that the City's Objection to the N.W. Enterprises' Affidavits, contained in the City's Response to N.W. Enterprises' Cross–Motion [Doc. # 302] is **OVER-RULED.**[247] It is further

**ORDERED** that FTU's Objection to the City's Memorandum in Opposition to Abstention [Doc. # 326] is **OVERRULED.**[248] It is further

**ORDERED** that all requests for further discovery are at this time **DENIED.**

## SUPPLEMENTAL MEMORANDUM OPINION AND ORDER

### TABLE OF CONTENTS

I. *INTRODUCTION* ........................................... 861
II. *PLAINTIFFS' GLOBAL CHALLENGE TO THE ORDINANCE* .............. 863
III. *LOCATIONAL RESTRICTIONS* ...................................... 865
 A. *Increased Distance Requirements* ................................... 865
 1. Evidence in the 1996–97 Legislative Record ........................ 866
 2. Prior Legislative History ......................................... 872
 3. Remarks by City Council Members ................................ 873
 4. Justification for Specific Increases ................................ 875
 5. Legislative Reliance on Other Agencies and Staff .................. 876
 B. *Public Parks* ...................................................... 876
 1. Content–Neutrality of Protected use Status ....................... 876
 2. Alternative Avenues of Communication............................ 877
 C. *Multifamily Dwellings* ............................................. 878
 1. Content–Neutrality of Revised Formula ........................... 878
 2. Alternative Avenues of Communication............................ 879
 D. *Plaintiffs' Global Challenges to Locational Restrictions* ................ 881
 1. "Shell Game" Argument ......................................... 881
 2. Equal Protection ............................................... 882
 3. "Spot Zoning" ................................................. 883

---

**238.** *See* discussion *supra* note 152.

**239.** *See* discussion *supra* note 125.

**240.** *See* discussion *supra* note 71.

**241.** *See* discussion *supra* Section V.E.2.

**242.** *See* discussion *supra* note 125.

**243.** *See* discussion *supra* note 87.

**244.** *See* discussion *supra* note 204.

**245.** *See* discussion *supra* note 142.

**246.** *See* discussion *supra* note 12.

**247.** *See* discussion *supra* note 148.

**248.** *See* discussion *supra* note 86.

 4. Protected Use Status for Schools, Churches, and Daycare Centers .... 883
 E. *New Issue Regarding "Grandfathering"* ............................... 884
 1. Plaintiffs' Standing to Raise this Challenge ...................... 885
 2. Analysis on the Merits ......................................... 885
 F. *Maintenance of Status Quo Pending Licensing Application Process and*
 *Administrative and Judicial Review of License Denials* ............... 887
 IV. *AMORTIZATION* ...................................................... 888
 A. *Equal Protection Argument* ........................................ 888
 B. *Requests for Clarification* ......................................... 889
 V. *NOTICE PROVISION* ................................................. 890
 VI. *STRUCTURAL, VISIBILITY, AND LIGHTING REQUIREMENTS* .......... 891
 A. *Adequacy of City's Justification* ................................... 891
 B. *Deadline for Compliance* .......................................... 891
 C. *VIP Rooms* ....................................................... 892
 1. Procedural Background ......................................... 892
 2. Analysis ...................................................... 892
 VII. *SIGNAGE* ............................................................ 896
 A. *First Amendment and Texas Constitution Challenge* ................. 896
 B. *Texas Statutory Challenge* ........................................ 896
 1. Procedural Background ......................................... 896
 2. Analysis ...................................................... 897
 3. A.H.D. Plaintiff's Motion to Join ............................... 899
VIII. *ENTERTAINER AND MANAGER PERMIT REQUIREMENT* ............. 899
 A. *Date on Which Enforcement May Begin* ............................ 899
 1. Permit Requirement in General ................................. 899
 2. Individuals Who Have Already Been Working at Adult Businesses .... 900
 B. *Collection of Personal Information* ................................. 901
 1. Phone Numbers and Home Addresses .......................... 901
 2. Criminal History ............................................. 901
 a. Propriety of Court's Injunction ............................ 901
 b. Constitutionality of Criminal Background Checks ............... 902
 3. Other Information ............................................. 902
 C. *Confidentiality of Application Information* .......................... 903
 D. *Permit Revocation Provisions* ...................................... 903
 E. *"As Applied" Challenges* ........................................... 903
 1. Videotaping of Application Process ............................. 903
 2. Permissibility of Bringing Young Children into Application Room ... 907
 F. *Conspicuous Display Requirement* .................................. 907
 IX. *CLASSIFICATION OF ADULT MOVIE THEATRES SEATING LESS THAN*
 *100 PATRONS* ..................................................... 909
 X. *FTU PLAINTIFFS' MOTION FOR LEAVE TO FILE THIRD AMENDED*
 *COMPLAINT* ...................................................... 910
 XI. *ATTORNEYS' FEES* .................................................. 911
XII. *CONCLUSION* ....................................................... 911

## I. *INTRODUCTION*

In this action, Plaintiffs challenge the validity of Ordinance 97–75 ("Ordinance"), the City of Houston's most recent amendments to its sexually oriented business regulatory ordinance. On February 18, 1998, the Court issued a Memorandum Opinion and Order ("Summary Judgment Opinion"),[1] which disposed of the majority of Plaintiffs' claims through summary judgment.[2] Since that

---

1. On June 9, 1998, the Court issued an Amended Memorandum Opinion and Order [Doc. # 472], which incorporates corrections, primarily of a clerical nature, to the original Memorandum Opinion and Order [Doc. # 331]. These corrections are described in a *Nunc Pro Tunc* Order [Doc. # 471], also issued on June 9, 1998. All citations here to the "Summary Judgment Opinion" are to the Amended Memorandum Opinion and Order [Doc. # 472], filed on June 9, 1998.

2. In footnotes 4 through 12 of the Summary Judgment Opinion, the Court identified the Plaintiffs in this action, based on the pleadings that were on file at the time the Opinion was issued. Since that time, the parties have brought to the Court's attention several errors on those lists. Thus, these footnotes should not be relied upon for complete and accurate identification of all Plaintiffs in this action. In the *Nunc Pro Tunc* Order [Doc. # 471], the Court requested the par-

time, all the parties have submitted Motions for Reconsideration, in which they urge the Court to revise its rulings on various issues, as well as miscellaneous other motions and evidentiary objections.

This Supplemental Memorandum Opinion and Order ("Reconsideration Opinion") addresses the pending motions and objections,[3] as well as three major issues that were not resolved by the Summary Judgment Opinion: (1) the constitutionality of the Ordinance's new formula regarding multifamily dwellings; (2) the constitutionality of applying the Ordinance's prohibition against providing adult entertainment in enclosed areas to Plaintiff Ice Embassy's large VIP room; and (3) the applicability of TEX.LOC. GOV'T CODE § 216 to the Ordinance's extension of its previous signage regulations.

In sum, the Court rejects most of the parties' requests for reconsideration and reaffirms its previous rulings, with the following exceptions. First, the Court withdraws its ruling that the addition of public parks to the Ordinance's list of protected land uses is constitutional; the Court rules instead that, although the addition of parks is a content-neutral act by the City, there is a genuine issue of material fact regarding the number of permissible sites that would exist for adult businesses under this amendment and thus that the constitutionality of this amendment cannot be determined through summary judgment at this time.[4] Second, the Court withdraws its ruling that invalidated the requirement that entertainers in adult establishments must wear identification cards while working; the Court now upholds this requirement for both entertainers and managers.[5] Finally, the Court withdraws its ruling that any entertainer or manager who was working in an adult business prior to the time that the individual permit requirement went into effect, who applied for a permit by the application deadline, and whose application was denied, must be allowed to continue working pending the completion of the entire judicial appeal of the applicant's permit denial; the Court now holds instead that such individual must be allowed to continue working for thirty days following the denial of the permit, while further relief may be sought from the state court by way of an application for an injunction or mandamus prohibiting the City's enforcement of the permit requirement pending judicial review.[6]

As for the issues left open following the issuance of the Summary Judgment Opinion, the Court concludes that, as with the new

---

ties to submit a stipulation containing the definitive list of Plaintiffs.

**3.** There is currently an issue as to whether the Court has jurisdiction to consider the City's Motion for Reconsideration [Doc. # 364] because the City has filed an appeal of the Court's rulings that were adverse to the City in the Summary Judgment Opinion. Plaintiffs have filed a motion, that is currently pending in the Court of Appeals, to dismiss the City's appeal as premature. The Dee & Dee Plaintiffs argue that, by filing the appeal, the City has divested this Court of jurisdiction to consider the City's Motion for Reconsideration. *See* Dee & Dee Plaintiffs' Response to City's Motion for Reconsideration [Doc. # 404], at 1–2. In the interest of efficiency and because the Court expects the Fifth Circuit to find that the City's appeal is premature, the Court will address the City's Motion for Reconsideration at this time. At the conference held on March 2, 1998, the Court issued a final appealable order *only* with respect to the denial of the stay pending completion of this case and appeal of the three-foot and no-touch rules. As demonstrated by the fact that the Court did not issue a final judgment along with the Summary Judgment Opinion, which granted summary judgment on many, but not all, of the issues raised by the parties, the Court did not intend for any of its other rulings to be final. *See* Fed. R.Civ.P. 54(b) (district court order that adjudicates fewer than all the claims in a lawsuit is not appealable unless district court clearly enters final judgment on adjudicated claims); *Kelly v. Lee's Old Fashioned Hamburgers, Inc.*, 908 F.2d 1218, 1219–20 (5th Cir.1990) ("Where neither the order appealed from nor related portions of the record reflect an intent by the district judge to enter a partial final judgment, we refuse to consider the order appealable as a final judgment."); *Pettinelli v. Danzig*, 644 F.2d 1160 (5th Cir. Unit B 1981). If, however, the Fifth Circuit concludes that the City's appeal was proper and that this Court lacks jurisdiction to consider the City's Motion for Reconsideration, then the sections of this Opinion that pertain to the City's Motion for Reconsideration, contained in Sections III.A., VIII.B.1., VIII.B.2.a., VIII.C., and VIII.F, may be disregarded.

**4.** *See infra* Section III.B.2.

**5.** *See infra* Section VIII.F.

**6.** *See infra* Section VIII.A.2.

provision regarding public parks, it cannot determine the constitutionality of the new multifamily dwelling formula based on the current factual record; the Court will need further factual development regarding the number of permissible sites that would exist for adult businesses under this formula.[7] In addition, the Court concludes that the City cannot constitutionally apply the Ordinance's prohibition against providing adult entertainment in enclosed areas to Plaintiff Ice Embassy's large VIP room.[8] Finally, the Court holds that the City must comply with the provisions of Tex.Loc. Gov't Code § 216 before it may enforce the Ordinance's new signage provision.[9]

As a matter of convenience, this Reconsideration Opinion is organized to address the issues, to the extent possible, in the same order that they were addressed in the Summary Judgment Opinion.

## II. PLAINTIFFS' GLOBAL CHALLENGE TO THE ORDINANCE

In the Summary Judgment Opinion, the Court struck down new restrictions in Ordinance 97–75 that would have required all adult businesses in the City to be located at least 1,500 feet away from certain protected land uses, including schools, churches, daycare centers, public parks, and residential areas. The Court based this ruling on its conclusion that the City Council's decision to enact the new 1,500 foot distance requirements was content-based and therefore subject to strict scrutiny under the First Amendment. *See* Sum. Jmt. Opinion, Section V.B.3.a. The Court concluded, however, that most other amendments to the Ordinance were content-neutral and, when evaluated under intermediate scrutiny, were constitutional.

In their Motions for Reconsideration, the A.H.D. and Dee & Dee Plaintiffs argue that the Court's holding that City Council members enacted the new distance requirements in Ordinance 97–75 in a content-based manner should apply to the entire Ordinance and not just the distance requirements. *See* A.H.D. Plaintiffs' Motion for Reconsideration [Doc. # 370], at 1–4; Dee & Dee Plaintiffs' Corrected Motion for Reconsideration [Doc. # 376], at 1–4.[10]

In support of this contention, the A.H.D. Plaintiffs cite comments by City Council members that the Court quoted in the Summary Judgment Opinion, at 95–97, as well as other comments that allegedly demonstrate content-based intent. Plaintiffs urge the Court to recognize that these comments were not made exclusively in the context of the Sexually Oriented Business Committee's discussions about new distance requirements. Instead, they argue that these comments demonstrate that *all* provisions of the Ordinance were passed by the Committee with the specific intent of closing down many, if not most, of the City's sexually oriented businesses.

The Dee & Dee Plaintiffs strenuously argue that the Committee's intent cannot be severed with respect to different provisions of the Ordinance. In other words, Plaintiffs contend, if the Committee acted with content-based intent as to one set of provisions, then it must have acted with content-based intent as to all the provisions. Plaintiffs therefore request that the Court reconsider its Summary Judgment Opinion by declaring the entire Ordinance to be content-based and striking the Ordinance down in its entirety under First Amendment strict scrutiny.[11]

---

7. *See infra* Section III.C.2.

8. *See infra* Section VI.C.

9. *See infra* Section VII.B.

10. The Dee & Dee Plaintiffs' Corrected Motion [Doc. # 376] supersedes two earlier Motions for Reconsideration filed by these Plaintiffs [Docs. # 369 and 375]. Plaintiffs' Motion for Leave to File their Corrected Motion [Doc. # 374] is **GRANTED.**

11. The City argues that it was appropriate for the Court to reach different conclusions regarding various provisions of the Ordinance, noting that the Ordinance contains a severability clause. *See* Ordinance 97–75, § 11. However, Plaintiffs are correct that the severability clause is not relevant to this issue. The issue is not whether the Ordinance can, as a matter of law, be upheld in some respects and stricken down in others. Instead, Plaintiffs are arguing that it is simply not possible for the City Council to have had one, lawful, intent regarding some provisions of the Ordi-

The Court declines Plaintiffs' invitation and largely reaffirms its previous holdings regarding which provisions of the Ordinance were enacted in a permissible content-neutral manner and which were enacted in an impermissible content-based manner. As the Court explained in its Summary Judgment Opinion, statements by City Council members are *relevant* to, but not *dispositive* of, the issue of the City Council's intent as an entity. *See* Sum. Jmt. Opinion, at 809 n. 114 (citing *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)). The Court quoted statements made by City Council members illustrating a content-based intent merely to augment the factual basis for its conclusion that the Ordinance was in part enacted in an impermissible content-based manner. However, the Court also explained that:

> The mere fact that Council members made the statements cited above does not preclude the City's enactment of valid increases in the distance requirements it imposes on adult businesses. Had these statements been supplemented by substantive legislative evidence about the need for *increases* in the distance requirements to alleviate or to address identified secondary effects, or even specific discussion as to why the previous distances were not sufficient, the Court may well have found the new distance requirements to be content-neutral. However, the record does not contain any specific discussion by witnesses or City Council members of this nature.

Sum. Jmt. Opinion, at 810.

■ As the Supreme Court established in *City of Renton* and the Fifth Circuit elaborated on in *SDJ, Inc. v. City of Houston,* 837 F.2d 1268 (5th Cir.1988), the primary test that a court must apply in order to determine whether regulations on sexually oriented businesses are content-based or content-neutral is whether the legislative body considered evidence that such regulations would combat negative secondary effects associated with sexually oriented businesses. In its Summary Judgment Opinion, this Court applied the following test articulated by the Fifth Circuit in *SDJ:*

> [A]s the Court explained in *City of Renton,* a city may establish its "substantial interest" in the regulation by compiling a record with *evidence that it may be "reasonably believed to be relevant to the problem that the city addresses."* [475 U.S. at 51–52, 106 S.Ct. 925] We do not ask whether the regulator subjectively believed or was motivated by other concerns, but rather whether an objective lawmaker could have so concluded, supported by an actual basis for the conclusion. Legitimate purpose may be shown by reasonable inferences from specific testimony of individuals, local studies, or the experiences of other cities. This level of scrutiny best accommodates the need to ensure proper purposes with the limited competence of courts to discern ephemeral legislative motivations.

Sum. Jmt. Opinion, at 777 (quoting *SDJ,* 837 F.2d at 1274). Applying this test, the Court scoured the legislative record and found evidence tying almost all of the provisions of Ordinance 97–75 to negative secondary effects, except for the new distance requirements and several other limited requirements.

■ Applying the test dictated by *City of Renton* and *SDJ,* the Court must determine legislative intent primarily by examining the legislative record for evidence of negative. secondary effects and cannot rely on the more precarious exercise of discerning ephemeral legislative intentions from statements of individual legislators. It is very possible, as is the case in the suit at bar, that, under this test, a city may satisfy its constitutional burden as to some regulations, but not as to others. Even if the City Council did act with improper motivation regarding the entire Ordinance, under the applicable law, the fact that the City was nevertheless able to justify some portions of the Ordinance with evidence in the legislative record upon which *an objective lawmaker could have relied* in forming a content-neutral intent, then the Court must conclude that those portions of the Ordinance are con-

nance and another, unlawful, intent regarding others.

tent-neutral and must subject those portions to intermediate scrutiny.[12]

In addition, the Dee & Dee Plaintiffs argue that, in order to determine whether a City Council member could have reasonably relied on the evidence contained in the legislative record to conclude that various provisions of the Ordinance would address negative secondary effects associated with adult businesses, the Court needs to make some determination regarding the probativeness and reliability of the evidence in the record. *See* Dee & Dee Plaintiffs' Motion for Reconsideration [Doc. # 376], at 8–10. In support of this argument, Plaintiffs quote statements from *SDJ* which this Court also quoted in its Summary Judgment Opinion:

> [E]vidence of legitimate purpose is supported by proof that secondary effects *actually exist* and *are the result of the business subject to the regulation*. . . . We do not ask whether the regulator subjectively believed or was motivated by other concerns, but rather whether an objective lawmaker could have so concluded, supported by an *actual basis* for the conclusion.

Sum. Jmt. Opinion, at 777 (quoting *SDJ*, 837 F.2d at 1274).

Plaintiffs in essence ask this Court to assume a legislative function—which the Court cannot and will not do. It was the role of City Council, consisting of duly elected and representative officers, to weigh the competing policy arguments, as reflected in their ultimate votes on the final version of Ordinance 97–75. This Court will not second-guess those judgments where the record before the Council, its Committee, and legal staff contains evidence of even minimal quality and quantity sufficient to support the City's enacted legislation.

The Dee & Dee Plaintiffs also reassert the same arguments they raised previously that the Ordinance as a whole constitutes an un-

lawful taking of their businesses. In support of this argument, Plaintiffs contend that business owners should be compensated for the going concern value of their businesses if governmental action, such as the enactment of Ordinance 97–75, results in the effective end of their businesses. *See* Dee & Dee Plaintiffs' Corrected Motion for Reconsideration [Doc. # 376], at 22–24. However, Plaintiffs do not specify what provisions of the Ordinance they are challenging here that they claim will cause their businesses to close.[13] In addition, Plaintiffs do not cite any new authority to persuade the Court to reconsider its rejection of their arguments that the Ordinance constitutes an impermissible taking. *See* Sum. Jmt. Opinion, at 822–23 & n. 137. The Court therefore reaffirms its rejection of the Dee & Dee Plaintiffs' takings argument.

## III. *LOCATIONAL RESTRICTIONS*

### A. *Increased Distance Requirements*

In its Motion for Reconsideration, the City requests that the Court reverse its prior invalidation of the Ordinance's increased distance requirements. The City argues that the Court's holding was in error because the new 1,500 foot distance requirements enacted in Ordinance 97–75 are content-neutral and therefore should be evaluated under intermediate scrutiny, rather than strict scrutiny. In support of this argument, the City contends that, contrary to the Court's holding, the legislative record contains adequate evidence of adverse secondary effects caused by adult businesses; that it was proper for the City to rely upon prior legislative history of adverse secondary effects in order to justify increasing the distance requirements; that isolated remarks by some City Council members do not indicate content-based legislative intent; that the City was not required to justify the specific increases in distances;

---

**12.** Although cases abound in which courts have upheld sexually oriented business ordinances in part and struck them down in part, *see, e.g., SDJ*, the Court has not found any other cases in which a court reached different opinions concerning the content-neutrality of various provisions of the same ordinance. As the Dee & Dee Plaintiffs note, this may well because this is the first case that presents such a situation.

**13.** In the Court's prior ruling, Plaintiffs succeeded in their attack on the Ordinance's new distance requirements, which were the provisions most Plaintiffs specifically claimed would cause this result.

and that City Council members were entitled to rely on evidence of negative secondary effects reviewed by others.

The Court has reviewed the City's arguments as well as the portions of the legislative record that it cites in support of its Motion for Reconsideration and reaffirms its earlier ruling invalidating the Ordinance's increased distance requirements. The City has not brought any new arguments nor evidence to the Court's attention on this issue. Nevertheless, in an exercise of caution and in order to detail its reasoning on the issue even further, the Court specifically addresses each of the City's arguments below.

### 1. Evidence in the 1996–97 Legislative Record

The City cites a number of portions of the legislative record which it claims constitute valid evidence of negative secondary effects caused by adult businesses upon which City Council members reasonably relied in increasing the Ordinance's distance requirements. However, as the Court noted in the Summary Judgment Opinion, none of this evidence indicates how these purported negative effects would be addressed by the expansion of the distance requirements, other than that increased distance requirements were

expected to lead to the closing of the vast majority of existing adult businesses in the City.

Initially, the Court notes that, because the validity of the earlier distance requirements is not at issue in this case, the Court will not revisit the propriety of the City's earlier decision contained in the 1983 and 1986 Ordinances to require that adult businesses be located at least 1,000 feet away from residential areas and 750 feet away from other protected land uses. Based on the authority of the Fifth Circuit and district court's rulings in *SDJ*, the Court assumes that the pre–1996 legislative records contained sufficient evidence demonstrating negative secondary effects caused by adult businesses that were located very close to the protected land uses and therefore justified the enactment of some distance requirements.[14]

However, there is no evidence in either the earlier legislative records or in the legislative record for Ordinance 97–75 upon which a City Council member could have reasonably relied to conclude that the earlier distances of 750 and 1,000 feet (which are more than the length of two football fields) were not adequate to address the negative secondary effects documented in the earlier legislative records. Nor is there evidence, based on the

---

**14.** In *SDJ*, the district court cited the following Houston legislative materials from which that court determined that the initial distance requirements were content-neutral: the 1983 Legislative Report of the City's Sexually Oriented Business Committee, at 7–9, and the 1986 Amended Legislative Report, at 6–11. *See SDJ, Inc. v. City of Houston*, 636 F.Supp. 1359, 1364–65 (S.D.Tex.1986). These reports are contained in the Briefing Book for the 1996–97 Committee, Exhibit 1, Tabs 2 and 3, to the City's Motion for Summary Judgment [Doc. # 120]. These cited materials provide specific references to documented negative secondary effects that the initial distance requirements were expected to address. For example, the 1983 Legislative Report states that the Sexually Oriented Business Committee concluded, based on testimony gathered at a public hearing, that

sexually oriented businesses are likely contributory factors to criminal activities that are encouraged as ancillary to these enterprises ... [and that] the criminal activity that does tend to occur in the vicinity of sexually oriented businesses, particularly where those businesses have clustered, has an adverse effect on property values.

1983 Legislative Report, at 8. In addition, the Committee received specific evidence regarding sexually oriented businesses and property values:

Several real estate brokers with substantial experiences in areas affected by sexually oriented businesses offered documented instances in which property values had been affected by the establishment of sexually oriented businesses.

1983 Legislative Report, at 7. Three years later, the Committee assessed the impact of the 1983 Ordinance and "found that the [1983] Ordinance ... had a substantial positive impact on encouraging neighborhood stability and economic development." 1986 Legislative Report, at 9. Nevertheless, the Committee found that negative secondary effects continued to exist, in part due to the fact that the 1983 Ordinance had not covered sexually oriented businesses licensed to sell alcoholic beverages. The 1986 Committee justified enacting amendments to the Ordinance, that expanded the Ordinance to cover sexually oriented businesses licensed to sell alcoholic beverages, based on findings that its earlier conclusions, from the 1983 Legislative Report, applied to this type of sexually oriented business as well. *See* 1986 Legislative Report, at 8.

*See also* discussion of prior legislative history *infra* in Section III.A.2.

experience of Houston or any other city, that a city could reduce secondary effects more effectively by implementing distance requirements as great as 1,500 feet or by increasing previously enacted distance requirements. The record contains simply no information from which a City Council member could have inferred that negative secondary effects would be reduced by increasing the Ordinance's distance requirements, other than through its likely effect of shutting down most of the adult businesses in the City. The only possible inference the Court can conceive, as to why the City desired to impose greater distances, is that the City assumed that greater distances would force more adult businesses to close.[15]

The City argues generally that the Court should not be so exacting as to demand that the City produce local studies or even evidence regarding experiences of other cities because, under *SDJ*, testimony from citizens regarding their own experiences is sufficient to justify the Ordinance's new restrictions as content-neutral. *See* City's Motion for Reconsideration [Doc. # 364], at 6. The Court does not disagree with the City on this point in principle; however, the Court notes that the portion of *SDJ* which the City cites in support of this argument indicates that "[l]egitimate purpose may be shown by reasonable inferences from *specific* testimony of individuals, local studies, or the experiences of other cities." 837 F.2d at 1274 (emphasis added). The City is correct that testimony of individuals may show legitimate purpose, but, as noted here, such testimony must be "specific."

Before ruling on the summary judgment motions, the Court examined the entire legislative record for Ordinance 97–75 and found no testimony by citizens that specifically described negative secondary effects on the protected land uses caused by existing adult businesses. In its Motion for Reconsideration, the City cites portions of the record that it insists support the increased distance requirements. The Court has examined this evidence again and concludes that none of this testimony from individuals is sufficiently "specific" to justify the substantial increased distance requirements as content-neutral under the standard of *SDJ*.

*Citations to Houston's Legislative Record.*—An example of the testimony upon which the City relies is a letter that a City resident sent to the Mayor and City Council that states:

> Houston has more S.O.B.s than any other city per capita and with them come the prostitution, drug dealing, drunk driving, vandalism, reckless driving, vagrants, panhandlers, auto thefts, burglary of motor vehicles, rapes, graffiti, burglaries, etc. Avondale has more crime than all the rest of Central One and new S.O.B.s continue to impact the Montrose and Kirby Districts. Crime has also climbed in The Original Hyde Park and other areas of Montrose.

Letter from Patsy M. Teer, Exhibit 22A to City's Motion for Summary Judgment [Doc. # 120], at 44. This letter does not assist the City under the applicable legal standards. Conclusory statements that adult businesses are associated with increased crime in surrounding areas is not "specific" as required by *SDJ*. Moreover, this letter makes no reference to adult businesses' impact on protected land uses nor any reference as to how increasing the distances between adult businesses and protected land uses would alleviate the crime described in the letter. The author appears simply to object categorically to the existence of adult businesses. The prime—if not only—inference to be drawn from this letter is that the author wants the City to take measures to reduce the number of adult businesses regardless of their precise proximity to protected land uses. Noth-

---

**15.** This inference is supported by the fact that, before enacting Ordinance 97–75, City Council members specifically requested information regarding how many businesses would be affected by the proposed amendments to the locational restrictions and were told that, under the amendments, 81% (103 out of 119) of City's businesses would have to close or relocate. *See* Sum. Jmt. Opinion, at 812 (citing Exhibit 19C to City's Motion for Summary Judgment [Doc. # 120]). While the Court does not place great reliance on this evidence, it merely notes it to show that the City Council was aware of the dramatic adverse impact the new locational amendments would, in combination, have on sexually oriented businesses.

ing in the letter mentions schools, churches, daycare centers, or even residences. Nothing in the letter indicates that the author believes that the problem with adult businesses is the negative secondary effects they create by their *excessive proximity* to protected land uses. The City's decision to increase the buffer zones around protected land uses in response to citizen complaints such as this one was clearly a ruse for simply decreasing the number of adult businesses that would be allowed to stay open.

The City also cites a number of portions of the record in which citizens specifically suggested that the distance requirements between adult businesses and protected land uses be increased. *See* City's Motion for Reconsideration [Doc. # 364], at 4–5 (citing City's Motion for Summary Judgment [Doc. # 120], Exhibit 3H, at 27–28, 61, 72–73, 119, 121; Exhibit 5B, at 85; Exhibit 22A, at 2, 11–12, 45–46, 66–75, 93–95, 104–05; and Exhibit 22B, at 27–34). However, these portions of testimony is not evidence of negative secondary effects. These portions of testimony are merely evidence of a suggested strategy for reducing the prevalence of adult businesses in Houston, made by people who expressly indicated their dislike for the existence of these businesses in the City. Unlike evidence in the record that supported, for example, visibility requirements inside adult businesses in order to decrease the occurrence of public lewdness, this evidence does not in any way tie a potential restriction—increased distance requirements—to nega-

tive secondary effects. There is simply no evidence in the record suggesting that negative secondary effects that adult businesses purportedly inflict *outside* of their premises are caused by the adult businesses being located too close to the protected land uses or suggesting that these putative secondary effects could be reduced if the businesses were simply required to move somewhat further away.

The City argues that, even if testimony in the record does not specifically address the precise distances that have been or could be required, evidence in the record regarding citizens' generalized complaints about adult businesses is sufficient to meet the City's burden. The City claims that this generalized evidence constitutes content-neutral justification for the increased distance requirements because the citizens had these complaints at the time that the earlier distance requirements were in effect and therefore this evidence shows the inadequacy of the earlier requirements in combatting negative secondary effects created by adult businesses. *See* City's Motion for Reconsideration [Doc. # 364], at 5–6 (citing City's Motion for Summary Judgment [Doc. # 120], Exhibit 3H, at 34, 61–62, 82–83, 89, 116, 119–20; Exhibit 5B, at 60–62, 75–82, 88; Exhibit 22A, at 35–36, 39, 60–64, 79–80, 107). However, a review of this cited evidence [16] reveals simply more content-based condemnation of adult businesses [17] and strategies for eliminating them.[18] This evi-

16. Much of this evidence is the same evidence that the City cited in its Motion for Summary Judgment and that the Court specifically addressed in its Summary Judgment Opinion. In its Motion for Reconsideration, the City has largely repeated arguments from its summary judgment motion without addressing the specific concerns the Court raised regarding the usefulness of this evidence. The Court has closely examined the evidence cited by the City and finds that it cannot rely on the City's assurances that its arguments are supported by its lengthy string cites to the legislative record such as the one cited above in the text. Indeed, one piece of evidence from this string cite comes from a citizen *opposed* to the City's regulation of adult businesses. *See* Exhibit 22A to City's Motion for Summary Judgment [Doc. # 120], at 39.

17. For example, in a letter to Committee Co-Chair Helen Huey cited by the City, a resident

writes that adult businesses "are demoralizing and demeaning to all those involved ... Do we really want business and professional leaders with this kind of mentality to lead us in our community? ... This city is in trouble if it doesn't clean up its act. We must put an end to this." Exhibit 22A to City's Motion for Summary Judgment [Doc. # 120], at 79–80.

18. The City cites testimony like comments by one resident who discussed with a Council member how to stop expansion of adult businesses in various neighborhoods, including strategies such as creating variable distance requirements depending on the neighborhood. *See* Transcript for July 29, 1996, Public Hearing, Exhibit 5B to City's Motion [Doc. # 120], at 60–62. However, there is no evidence of what secondary effect the resident or Council member were seeking to address. Rather, the only goal articulated is clos-

dence includes no discussion of secondary effects created by adult businesses. To the extent that these citizens complained about the inadequacy of the previous distance requirements, their complaints were not that the previous requirements did not go far enough toward reducing adverse secondary effects but were instead that they did not go far enough toward eliminating adult businesses altogether.

Much of the evidence of residents' ongoing complaints about adult businesses does not even address negative secondary effects, such as crime and property values.[19] Of the evidence that does address these issues, each is a speculative opinion or conclusory statement, rather than an observation of provable or specific facts.[20] Also, much of the evidence simply does not connect these issues specifically to adult businesses. For example, the City cites oral testimony by a resident describing a proposed new location for an adult business near residential homes; the evidence consists of the resident's state-

ment that "I'm going to feel quite bad for the people who have children and the kind of crowd that that place is going to attract for their families and their property values and such." Transcript for July 15, 1996, Public Hearing, Exhibit 3H to City's Motion for Summary Judgment [Doc. # 120], at 34. Another resident testified about his fears regarding that same proposed business moving into his neighborhood:

I just want to say if Rick's is allowed to proceed in that location that I believe the City would be degraded, that my community will be degraded, that my home value will be impaired and I know that I, my wife and my two children will be confronted at least twice everyday and sometimes many more times each day with the spectacle of sex for sale as we pass by that location.

*Id.* at 120.[21]

Although these condemnations of adult businesses contain passing references to

---

ing, or at least arresting the growth of, adult businesses.

19. For example, the City once again cites oral testimony by Dolly Madison McKenna, who stated that "I drive by the location where this [proposed new adult] business is going to be every single day of my life and I do not want to have to explain to my daughter what people are doing there." Transcript for July 15, 1996, Public Hearing, Exhibit 3H to City's Motion for Summary Judgment [Doc. # 120], at 83. The City also cites testimony that contains nothing more than conclusory opinions such as "we do not need sexually oriented businesses in residential areas." *Id.* at 116. Much of the evidence is from residents concerned about the possible opening of an adult cabaret, Rick's, in an upscale neighborhood. The City cites complaints about this proposed cabaret location that include concerns about alcohol sales and traffic congestion in the neighborhood with no reference to negative secondary effects related to its status as an adult business. *See* Exhibit 22A to City's Motion for Summary Judgment [Doc. # 120], at 60–64. Moreover, since the proposed business had not opened when the letters were written (and there is no evidence that it ever opened), these letters were not addressing secondary effects of any actual business. The letters instead constitute mere speculation about issues such as traffic congestion, which, if factually based at all, would have applied to any popular large restaurant. Thus, these letters lack any relevance to secondary effects of adult businesses.

20. For instance, the City also cites a letter in which a resident states that:

We strongly feel that the location of any Sexually Oriented Business so close to existing residential neighborhoods is detrimental to efforts to maintain and improve the quality of daily life in Houston. I am particularly concerned about the reported incidence of crime and police complaints in residential neighborhoods in the vicinity of Sexually Oriented Businesses and, in particular, in the vicinity of Rick's Cabaret on Richmond.

Exhibit 22A to City's Motion for Summary Judgment [Doc. # 120], at 107. Although this letter could have provided support for the City's decision to increase the minimum distance between adult businesses and residential neighborhoods, it contains only a passing conclusory reference to reports of crime in the vicinity of adult businesses. The record, however, contains no actual evidence of crime outside the cabaret mentioned, or any other adult business, and no mention of how close any crimes purportedly related to any adult business are to residences or other protected land uses. Thus, the letter is mere overgeneralized speculation and does not constitute evidence upon which City Council members could have reasonably relied in determining that the previous distance requirements were inadequate and that there was a fact-based reason for the extending the distances to 1,500 feet.

21. As another example, the City cites testimony from a resident claiming that she "was stalked by a car who thought that I was a hooker" and that her son has been stalked as well. Transcript for July 15, 1996, Public Hearing, Exhibit 3H to City's Motion for Summary Judgment [Doc.

property values, these statements are not actual evidence that adult businesses are causing, or may cause, reduced values for property located more than 750 or 1,000 feet away from the businesses.

Therefore, while some evidence in the new legislative record contains superficial references to topics that might, at first blush, appear relevant to secondary effects, a parsing of these cited materials reveals no specific evidence that supports the increased distance requirements as content-neutral amendments. Rather, the portions of the record cited by the City contain no more than general diatribes against adult businesses and indicate residents' desire to eliminate these businesses if at all possible.

Had there been fact-based references to the inadequacy of the current distance requirements and specific reasons why the 1,500 foot distance requirements—or simply some other distances greater than those contained in the previous version of the Ordinance—would address factually supported inadequacies of the current requirements, this Court would have upheld the new require-

# 120], at 61–62. However, this resident does not even indicate whether she or her son were near an adult business when they saw the alleged stalkers. The City also cites McKenna's testimony that "I do not want to have my son harassed on the street"; this vague testimony is also not connected to any existing or potential adult business. *Id.* at 83.

22. Evidence that the Court would have deemed adequate would have demonstrated, or at least suggested, that negative secondary effects spill out from adult businesses to distances greater than 1,000 feet with respect to residential areas and greater than 750 feet with respect to other protected land uses. Evidence that the 750 foot and 1,000 foot distance requirements were deemed by disgruntled citizens not to be working, simply because adult businesses still existed and the number of adult businesses in the City was growing, does not support the City's contention that the increased distance requirements were enacted for a content-neutral purpose.

23. In *SDJ*, the Fifth Circuit was persuaded that, in enacting an earlier version of the Ordinance, the Houston City Council considered actual studies of other cities. The Fifth Circuit emphasized that, when looking at the experiences of other cities, legislators must consider *more* than simply what ordinances have been adopted by those cities and been upheld by courts:

ments. No such evidence exists, however, in this record.[22]

The City also claims that the legislative record for Ordinance 97–75 contains actual studies and evidence from other cities regarding the impact of adult businesses on surrounding areas. *See* City's Motion for Reconsideration [Doc. # 364], at 13. In support of this claim, the City cites the City Council's Sexually Oriented Business Committee Briefing Book, Exhibit 1 to City's Motion for Summary Judgment [Doc. # 120], Tab 2, at 16–21. These pages, however, do not discuss negative secondary effects found in other cities which could support the City's decision to increase its distance requirements. Instead, these pages merely describe what types of regulations a number of different cities have put into their sexually oriented business ordinances and whether the ordinances have stood up in court to constitutional challenges.[23] Moreover, none of the descriptions of regulations by other cities indicate that any city has implemented distance requirements as great as 1,500 feet; nor do any indicate that any city has experimented with increasing previously enacted distance requirements.[24]

> While it may not be enough simply to tailor one ordinance to another that has survived judicial review, we are persuaded that the City Council considered those studies themselves and not merely the ordinances for which the studies provided support.

*SDJ*, 837 F.2d at 1274. Although such studies may have been included in the legislative record for prior versions of the Ordinance, *no such studies* are included in the legislative record for Ordinance 97–75. Instead, as indicated in the text, the only evidence regarding other cities in the record for Ordinance 97–75 is the summaries of the ordinances adopted by several other cities—and description of whether they withstood constitutional challenges.

24. In support of its claim that the City Council relied on studies of other cities, the City also cites a portion of a transcript from one of the Committee's public hearings, in which Committee Co-Chair Helen Huey questioned a witness. *See* (Transcript for July 29, 1996, Public Hearing, Exhibit 5B to City's Motion for Summary Judgment [Doc. # 120], at 29–32). This dialogue, however, cited no evidence of negative secondary effects in other cities. *See* Sum. Jmt. Opinion, at 804 (quoting part of this dialogue). Moreover, as the Court indicated in the Summary Judgment Opinion, this dialogue does not indicate that Huey even looked at the contents of the prior

*Other Cities' Records.*—After examining numerous other cases involving cities' locational restrictions on adult businesses, the Court finds that the evidence proffered by the City of Houston in support of the increased distance requirements contained in Ordinance 97–75 is sorely lacking. Indeed, the City of Houston has made the most meager attempt at showing content-neutrality of its new locational restrictions of any case the Court has examined.

As one example of a city that compiled a satisfactory legislative record, the City of New York recently passed an ordinance that imposes similar locational restrictions on adult businesses to those contained in Ordinance 97–75. Under the New York ordinance, adult businesses must be located at least 500 feet away from schools, daycare centers, houses of worship, residential areas, and other adult businesses. *See Buzzetti v. City of New York*, 140 F.3d 134 (2d Cir.1998), *petition for cert. filed*, 66 U.S.L.W. 3774 (U.S. May 29, 1998) (No. 97–1900). Both the Second Circuit and New York's highest state court have upheld these locational restrictions as constitutional content-neutral enactments. *See id.; Stringfellow's of New York, Ltd. v. City*, 91 N.Y.2d 382, 671 N.Y.S.2d 406, 694 N.E.2d 407, 1998 WL 77749 (1998). In reaching this conclusion, the courts were persuaded that New York City decided, based on an extensive and directly pertinent legislative record, that these restrictions would be likely to combat negative secondary effects created by adult businesses. Specifically, the New York City Council received public testimony, examined studies of adult businesses conducted in nine other localities, conducted its own study in order "to identify the *specific* adverse secondary effects caused by adult establishments in New York City itself," and

compared its new study to earlier studies of adult businesses in New York. *Id.* at 391, 671 N.Y.S.2d at 411, 694 N.E.2d at 412 (emphasis added). *See also Buzzetti*, 140 F.3d at 136. Its new study compared areas immediately near adult businesses to other areas and determined "that there were significant adverse impacts attributable to adult enterprises in the City, including downward pressure on property values and increased crime rate in areas where adult uses are most concentrated." *Stringfellow's*, 91 N.Y.2d at 391, 671 N.Y.S.2d at 411, 694 N.E.2d at 412. The study revealed that "[m]ore than 80% of the real estate brokers responding to the survey reported that an adult establishment tends to depress the market value of property within 500 feet." *Id.* at 398, 671 N.Y.S.2d at 415, 694 N.E.2d at 416. Another study considered by the New York City Council also used control groups and reached similar results.[25]

The Court does not hold that the legislative record compiled by the City of New York sets any minimum standard of what type and amount of evidence would be sufficient to demonstrate content-neutral intent. However, this case serves as an important source of comparison because it shows what kind of specific data and evidence of actual secondary effects a city could evaluate if it were truly interested in undertaking a content-neutral approach to regulating the locations of adult businesses. Had some of this type of evidence been present in the legislative record for Ordinance 97–75, this Court may well have determined that the increased distance requirements were permissible content-neutral enactments.

It should be noted that the adequacy of New York's legislative record cannot remedy the inadequacy of Houston's legislative record. First of all, the City of Houston does

legislative history to which she was referring, let alone actually considered it, or shared the contents with other Council members.

25. This study
identified four study blocks (those containing at least one adult enterprise) and four neighboring control blocks (those with no sex-related establishments), and then compared those data with similar statistics for the District as a whole, the wider Times Square area, all of Manhattan, and all of New York City. The data

included crime statistics, property valuations and 53 formal interviews with business and real estate enterprises.... [Among other findings,] [t]he study also found significant "patterns," notably that there were many more criminal complaints on the study blocks than the control blocks and that the heaviest incidence of prostitution arrests occurred in the three block study area of dense concentration of adult establishments.
*Stringfellow's*, 91 N.Y.2d 382, 398, 671 N.Y.S.2d 406, 415, 694 N.E.2d 407, 416.

not claim that anyone advising the Houston City Council ever saw the New York evidence. In any event, because cities differ in their characteristics, such as geographic layout and population and building density, the mere existence of studies in New York or other cities regarding secondary effects of adult businesses does not support the increased distance requirements the Houston City Council enacted in Ordinance 97–75.[26] In any event, neither the Houston City Council nor this Court has any pertinent information regarding the relevance to Houston of studies from other cities because Houston City Council members undertook no consideration of this issue. Current case law does not permit a city simply to presume that the mere existence of studies of negative secondary effects caused by adult businesses in other cities automatically renders its own restrictions on adult businesses content-neutral. A city is not required to conduct its own studies, but it must rely on evidence that may "reasonably believed to be relevant to the problem that the city addresses." *City of Renton,* 475 U.S. at 51–52, 106 S.Ct. 925. In the case at bar, neither Houston City Council members nor witnesses discussed any similarities or differences between Houston and other cities. Furthermore, there is no indication in the record that the Council ever considered whether specific studies from other cities, which are vaguely referred to but are not even contained in the actual legislative record, might be relevant to Houston.

## 2. Prior Legislative History

The City contends that the Court erred in its Summary Judgment Opinion by holding that, in enacting the increased distance requirements in Ordinance 97–75, the City could not rely upon the legislative record for prior versions of the Ordinance. The City argues that, in *City of Renton,* the Supreme Court specifically held that local governments do not need to conduct new studies of negative secondary effects in order to regulate adult businesses but could instead rely

upon evidence found in studies of other cities. *See* 475 U.S. at 51, 106 S.Ct. 925. Presumably, the City contends that if it could have relied upon evidence from other cities, then surely it could rely upon its own prior evidence. In support of this point, the City also cites *Schleuter v. City of Fort Worth,* 947 S.W.2d 920, 926–27 (Tex.App.—Fort Worth 1997, writ denied), in which a Texas court rejected the argument that the City of Fort Worth's failure to conduct new studies each time it enacted amendments to its sexually oriented business ordinance showed that the amendments were not intended to limit negative secondary effects.

The City has misread this Court's original holding on this issue. This Court never held that the City of Houston had to conduct new studies or even conduct its own studies in order to document negative secondary effects. A city's reliance on past studies or studies from other cities would be sufficient to demonstrate content-neutrality so long as someone involved in the legislative process actually relied on the studies, *see Lakeland Lounge of Jackson, Inc. v. City of Jackson,* 973 F.2d 1255, 1258 (5th Cir.1992), and "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses," *City of Renton,* 475 U.S. at 51–52, 106 S.Ct. 925. In the Summary Judgment Opinion, the Court emphasized that, as a legal matter, the City *could have* relied upon its past legislative record in enacting amendments to its Ordinance. However, a review of the current record does not reveal that anyone involved in the drafting or enacting of Ordinance 97–75 *actually did* rely on the prior legislative records in determining that the new distance requirements would address negative secondary effects of adult businesses. *See* Sum. Jmt. Opinion, at 802–05 & nn. 102–03. In addition, the Court noted that, even if someone had looked at the prior record, the Court could not find any evidence in that record that could reasonably be considered relevant to the City's decision to *increase* the Ordi-

26. For example, in New York, residential areas are far more densely populated than they are in most of Houston. Also, in New York, people generally do not own cars and instead they frequently walk or use public transportation, where-

as, in Houston, private cars are a more common means of transportation. Thus, adult businesses might have different effects on surrounding areas in New York and in Houston.

nance's distance requirements or to use distance requirements larger than the City had enacted earlier. *See* Sum. Jmt. Opinion, at 802–05.

In contrast, in *City of Renton,* the trial court concluded—on the record before it—that the city had indeed considered probative studies from other cities, and it was this conclusion that the Supreme Court affirmed. *See* 475 U.S. at 51, 106 S.Ct. 925. Likewise, in *Schleuter,* the court was able to discern that "the City relied on studies, its on-going experiences, and public comment when adopting the ordinances *and their amendments.".* 947 S.W.2d at 927 (emphasis in original). This factual predicate is absent in the case at bar as to Ordinance 97–75.

### 3. Remarks by City Council Members

The City argues that the Court placed too much weight on isolated remarks by individual City Council members in reaching its conclusion that the Ordinance's new distance requirements were enacted in a content-based manner. In its Summary Judgment Opinion, the Court cited statements in the legislative record that clearly reflected content-based intent, *see* Sum. Jmt. Opinion, at 809–10, but emphasized that these statements alone would not have compelled the Court to reach this conclusion, *see id.* at 96 n. 114 ("[t]he Court recognizes that statements by individual City Council members are *not dispositive* of the intent of the City Council as an entity") (citing *City of Renton,* 475 U.S. at 48, 106 S.Ct. 925).[27] These statements were cited merely as further support of the Court's conclusion, which was founded on other evidence, that at least part of the Ordinance was enacted with content-based intent.[28] The Court referenced the quoted

comments merely to provide additional support for that conclusion.

In considering the legal relevance of statements by City Council members, the Court notes an interesting comparison between this case and *Dumas v. City of Dallas,* 648 F.Supp. 1061 (N.D.Tex.1986), *aff'd sub nom. FW/PBS, Inc. v. City of Dallas,* 837 F.2d 1298 (5th Cir.1988), *rev'd in part on other grounds,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), which upheld locational restrictions on adult businesses in Dallas. In *Dumas,* the district court acknowledged that "[d]ivining the intent of a legislative body is inherently problematic." 648 F.Supp. at 1064. However, because the court had before it the entire legislative record—as this Court does in the case at bar—it noted that:

> Determining legislative intent here does not involve the thorny problems courts have associated with drawing intent from incomplete journals of congressional debates. The record here reflects the entire remarks of each legislator and witness, and the Court may divine intent from the proceedings as an integrated whole.

*Id.* at 1064 n. 7 (citations omitted).

The *Dumas* court recognized that a number of non-legislator citizens who supported the Dallas ordinance may well have been acting with content-based intent. However, the court determined that such an intent could not be attributed to members of the Dallas City Council, explaining that:

> There is little doubt that the most vocal supporters of the ordinance—from such groups as the Dallas Association for Decency, the American Renewal Foundation, and the Citizens for Decency Through Law—applauded the ordinance for its incidental impact on speech. Although such

---

**27.** *See also supra* at 6 (quoting Sum. Jmt. Opinion, at 810).

**28.** In the Summary Judgment Opinion, the Court primarily cited remarks by City Council members that directly indicated their individual intent. The legislative record also contains statements by City Council members that indicate less directly their intention of minimizing opportunities for sexually oriented businesses to stay open. For example, during one Committee meeting, in an exchange with Joseph Chow of the City's Planning Department, Co–Chair Huey asked

whether the City would "be better off" using 1,000 feet or 1,500 feet as the radius for calculating whether an area is 75% residential. From Chow's response, it is clear that both he and Huey understood "better off" to mean fewer permissible sites for adult businesses. *See* Transcript of November 20, 1996, Committee Meeting, Exhibit 15C to City's Motion [Doc. # 120], at 13 (Chow responded that "it may not be advisable to go back" to 1,000 feet and that "it may still be advantage[ou]s to do the 1500" because fewer parcels of land would be available for adult businesses using a 1,500 foot radius).

witnesses may have had the intent to zone sexually oriented businesses out of existence by a law that was the strongest vehicle toward elimination of such businesses, the City evinced no such illegal motive.

*Id.* at 1065 n. 11 (citations omitted). The court concluded that the Dallas legislators did not rely on this content-based motive but instead acted with content-neutral intent because the record revealed that they had considered studies of secondary effects of sexually oriented businesses in other cities, as well as a controlled study in Dallas that compared crime rates in areas near sexually oriented businesses to the city as a whole. *See id.* at 1065 n. 10. In addition, the court was persuaded that City Council members sufficiently distanced themselves from the clear content-based intentions of some of their constituents.[29]

29. According to the court,

Five·of the 15 members of the Commission and four of the 11 members of the Council stated unequivocally—to no dissent—that the Ordinance was concerned solely with controlling the secondary effects of sexually oriented businesses on surrounding neighborhoods. Both groups stated that they were concerned not with the content of the speech associated with sexually oriented businesses, but with the crime, urban blight, and plummeting property values that inevitably seize the neighborhoods where such businesses locate.... It is of no moment that the public speakers in favor of the Ordinance supported it almost singularly in hopes that it would indeed suppress the speech purveyed by sexually oriented businesses, as neither the Council nor the Commission relied on the specious view that pornography "causes" various social ills and should thus be eliminated.

*Dumas*, 648 F.Supp. at 1064–65 (citations omitted).

30. These acknowledgments included statements such as the following from Co–Chair Boney:

We are quite sensitive and cognizant of the fact that sexually oriented businesses are constitutionally protected. There will be no efforts or intentions or actions by this mayoral council to eliminate sexually oriented businesses for the City of Houston because, quite frankly, the United States Supreme Court has already determined that they do have a right to exist under the First Amendment.

Sum. Jmt. Opinion, at 810 (quoting Transcript of July 15, 1996, Public Hearing, Exhibit 3H to City's Motion for Summary Judgment [Doc. # 120], at 6). In the Summary Judgment Opinion, the Court cited these statements as showing

In contrast, the statements made by Houston City Council members that were attempts to show content-neutrality regarding the Ordinance's increased distance requirements were little more than half-hearted attempts to distance themselves from citizens who clearly supported increasing the distances because they opposed the protected activities that occur inside adult businesses. While some Houston City Council members may have acknowledged that adult businesses have First Amendment rights, *see* Sum. Jmt. Opinion, at 809–10,[30] these statements are not the type made by Dallas legislators that showed that the proposed restrictions were actually intended to address specified negative secondary effects, such as crime outside the adult businesses or decreased property values, based on some factual analysis.[31]

that some Committee members "paid lip service to the fact that sexually oriented businesses receive some protection under the First Amendment" but held that:

this type of conclusory statement does not satisfy the City's burden of showing that the Ordinance's new distance requirements were enacted in order to address negative secondary effects associated with the businesses. Mere recognition that constitutional issues are at stake does not satisfy the constitutional requirements for imposing restrictions on protected speech.

Sum. Jmt. Opinion, at 810.

31. According to the *Dumas* court, the Dallas Commission and Council members made remarks such as:

• "[T]he content has absolutely nothing to do with it."
• "[I]t isn't the product itself that we're attempting to address here, but rather it's the problems that are caused by a certain type of business."
• "[W]e're not deciding today whether people should or should not read, watch, do any of these activities."
• "[The] compelling government objective [is] controlling the crime associated with the concentration of commercial establishments of this type."

*Dumas*, 648 F.Supp. at 1064 n. 8.
Unlike the statements by the Dallas legislators, some statements by Houston City Council members do not reveal any attempt to distance themselves from their constituents' content-based viewpoints. *See* Sum. Jmt. Opinion, at 809–10 (quoting Co–Chair Huey's statement that "[a]ll of us hear the pleas to just outlaw such businesses.

Discussions by the Houston City Council Sexually Oriented Business Committee indicate a clear understanding by Council members that the goal of increasing the Ordinance's distance requirements was simply to eliminate as many opportunities for adult businesses to operate in Houston as possible. This implication stems from the fact that the distance requirements discussions focused exclusively on the issue of how many alternative sites various proposed increases would allow.[32] Thus, rather than increasing the Ordinance's distance requirements in order to better address negative secondary effects, the record reveals that the City Council enacted the increase only in order to reduce the number of parcels available for adult businesses.

#### 4. Justification for Specific Increases

The City argues that the Court has held it to too high of a standard to show that its new distance requirements were specifically justified by evidence in the legislative record. The City contends that, once secondary effects have been demonstrated, the choice of a particular distance, rather than some other distance, was within the ambit of the City's legislative discretion.

In its Summary Judgment Opinion, the Court agreed that the City "has the prerogative of experimenting with different possible solutions to municipal problems even when dealing with First Amendment interests" and that the first time the City enacted distance requirements between adult businesses and

protected land uses, it could have chosen whatever distances it deemed appropriate, so long as those distances allowed sufficient alternative sites for the businesses to operate. Sum. Jmt. Opinion, at 811–12. However, the Court also held that, after the City has enacted such distance requirements and invited reliance by businesses as to where they may engage in protected First Amendment activity, the City may not amend these distances without once again following the prerequisite constitutional test. This test requires that the City justify the need for amendments by reliance on evidence that could reasonably be believed to show that those amendments could decrease negative secondary effects—other than by simply putting the protected entities out of business. *See id.* at 101 ("although 'reform may take one step at a time,' the City must adduce some justification tied to secondary effects for each step it takes") (quoting *Hang On, Inc. v. City of Arlington,* 65 F.3d 1248, 1256 (5th Cir.1995)).

Even if the City's evidence was sufficient to show that sexually oriented businesses continue to exert negative secondary effects on surrounding areas, nothing in the legislative record provides any indication that effects occur up to 1,500 feet away from the businesses or that negative effects could be reduced by requiring adult businesses to be located at least 1,500 feet away from protected land uses, as opposed to 750 or 1,000 feet away.[33]

Even though most (maybe all) of us would personally like to do so, we cannot").

**32.** In his reports to the Committee regarding the Planning Department's progress on the project of calculating numbers of available sites, Joseph Chow indicated his understanding that the Committee wanted him to figure out what new restrictions would provide the greatest reductions in the number of available sites without bringing the number down so low as to create legal difficulties. For example, at one meeting he reported that: "[b]y using [a 1,500 foot distance], we were able to reduce the number of parcels inside the city down to 9,928." Transcript of November 20, 1996, Committee meeting, Exhibit 15C to City's Motion for Summary Judgment [Doc. # 120], at 3.

**33.** In the Summary Judgment Opinion, the Court held in the alternative that, even if it should

analyze the Ordinance's increased distance requirements as content-neutral amendments, they were nevertheless unconstitutional because the City has failed to show that they serve substantial governmental interests. *See* Sum. Jmt. Opinion, at 813–14. The Court also now holds, in the further alternative, that the increased distance requirements are invalid because the City has failed to show that they are sufficiently "narrowly tailored." If the problem the City sought to address was the negative secondary effects produced by the location of sexually oriented businesses near protected land uses, the City, through its legislative record, failed to show why the previous distance requirements were not sufficient to address those effects and thus failed to show that the new increased requirements were narrowly tailored to address the problem.

### 5. Legislative Reliance on Other Agencies and Staff

Finally, the City argues that the Court failed to follow the Fifth Circuit's holding in *Lakeland Lounge,* that, in order to demonstrate content-neutral intent, the City may show that City Council members relied upon others to review studies of negative secondary effects. As discussed above, the Court searched the minutes and transcripts of all the City Council meetings, as well as all other evidence in the legislative record, and has failed to find evidence that *anyone* involved in the legislative process actually considered evidence from Houston's prior legislative records, or actual studies from other cities (as opposed to brief summaries of other cities' ordinances), in the process of formulating the Ordinance's new distance requirements. *See* Sum. Jmt. Opinion, at 803 n. 102.

The City cites portions of the record that it claims provide evidence that the City Attorney's Office, the Vice Division, and the Planning Department guided City Council members in their enactment of the new distance requirements. *See* Motion for Reconsideration, at 9 (citing Exhibits 2C, 3D, and 36 to City's Motion for Summary Judgment [Doc. # 120] ). The Court does not doubt that City Council members received guidance on many subjects from these sources. However, the City still has not cited, nor has this Court found, any evidence that the City Attorney's Office, the Vice Division, the Planning Department, or the City Council or its staff considered studies, testimony, or evidence that negative secondary effects exist between 750 and 1,500 feet away from adult businesses or that the original distance requirements are otherwise not large enough to address the businesses' impact on nearby protected land uses.

The City also cites portions of the record that it claims provide evidence that City Council members themselves considered summarized reports of studies of secondary effects. *See* Motion for Reconsideration, at 9–10 (citing Exhibit 1 to City's Motion for Summary Judgment [Doc. # 120]; Exhibit 2C, at 21; Exhibit 35, at 5). The Court has reviewed these portions and finds no evi-

dence from them that Council members reviewed such reports and has found no evidence on which Council members *could have* relied to justify increased distance requirements on the basis of alleviating identified negative secondary effects.

Thus, the Court concludes that there is no reason to alter its original finding that the increased distance requirements in Ordinance 97–75 are content-based, and that the City has failed to justify these amendments under the strict scrutiny test. The Court reaffirms its conclusion that the 1,500 foot distance requirements are unconstitutional.

### B. *Public Parks*

#### 1. Content–Neutrality of Protected Use Status

■ The Dee & Dee Plaintiffs request that the Court reconsider its holding that the City's addition of public parks to the list of protected land uses was a content-neutral amendment to its sexually oriented business ordinance. *See* Dee & Dee Plaintiffs' Corrected Motion for Reconsideration [Doc. # 376], at 11–14. Plaintiffs argue that the legislative record does not contain any actual evidence of negative secondary effects which this amendment could have been enacted to eliminate.

The Court specifically addressed this argument in its Summary Judgment Opinion. There it explained that:

> [The] legislative evidence in support of adding public parks to the list of protected land uses [is] exceedingly slim, but it is sufficiently specific to render this amendment to the Ordinance content-neutral.... [S]ince negative secondary effects of some sort have been generally shown over the years to exist in areas immediately surrounding sexually oriented businesses ... this new testimony and discussion regarding public parks is sufficient—although only marginally—to justify the City's addition of this category of protected land uses to the Ordinance's locational restrictions.... [A] City Council member could have reasonably relied upon the combination of previously adduced evidence and the Committee's new discussion of the is-

sue to conclude that the City had the same interest in protecting public parks that it had in protecting schools, churches, daycare centers, and residential areas.... Thus, the Committee specifically considered why the previous list of protected land uses was not sufficient to alleviate problems the Ordinance was intended to address.

Sum. Jmt. Opinion, at 814–15 & n. 124.

Plaintiffs have failed to persuade the Court that this reasoning was in error. The Supreme Court held in *City of Renton* that evidence that is "reasonably believed to be relevant to the problem that the City addresses," 475 U.S. at 51–52, 106 S.Ct. 925, will be adequate to support a new restriction on adult businesses. The Houston City Council's conclusion that the use of parks by children and families is comparable to use by churches, schools, and daycare centers, which typically contain playgrounds and are sites for activities for children, is a reasonable conclusion drawn from the Ordinance's current and historical legislative records. Therefore, the Court rejects the Plaintiffs' challenge to reconsider its conclusion that the City's addition of public parks to its list of protected land uses is content-neutral.

## 2. Alternative Avenues of Communication

In its Summary Judgment Opinion, the Court concluded, not only that the City's addition of public parks to the list of protected land uses is content-neutral and narrowly tailored to serve substantial governmental interests, but also that the Court also reached the conclusion that Plaintiffs had not raised any material issue of genuine fact with respect to whether the addition of public parks to the list would reduce the number of available sites for adult businesses so much as to be unconstitutional. The Court reached its conclusion that, even with this new restriction, there would still be a sufficient number of alternative sites for adult businesses based

on an estimate from the City's Planning Department that adding parks to the list would eliminate only 1,000 out of roughly 19,000 potential sites for sexually oriented businesses. *See* Sum. Jmt. Opinion, at 814–15 (citing Transcript of October 23, 1996, Committee Meeting, Exhibit 12D to City's Motion for Summary Judgment [Doc. # 120], at 15).

The Dee & Dee Plaintiffs argue that it was improper for the Court to rely on evidence from the legislative record to make this type of determination because the Court only accepted the exhibits making up the legislative record for the limited purpose of showing what evidence City Council members considered in passing Ordinance 97–75. The Court agreed that this evidence would mostly constitute inadmissible hearsay if offered to prove the truth of the matters asserted therein. *See* Sum. Jmt. Opinion, at 786–87.

■ On reconsideration, the Court concludes that the Dee & Dee Plaintiffs are correct that the Court should not have relied on this evidence for proof regarding the ultimate factual issue of whether the addition of public parks leaves a sufficient number of sites for sexually oriented businesses. The Court finds that there is a genuine question of material fact on the number and adequacy of sites available under this amendment and holds that Plaintiffs should have the opportunity to rebut or impeach the City's proffered evidence before the Court uses it for this purpose.

The Court therefore grants the Dee & Dee Plaintiffs' Motion for Reconsideration on the issue of whether the addition of public parks to the Ordinance's list of protected land uses will allow a sufficient number of alternative sites for affected businesses to relocate.[34] The Court's order granting the City summary judgment on this issue is withdrawn, and the issue will be addressed in due course as necessary.[35]

---

34. The Dee & Dee Plaintiffs claim that the Court cited documents in the legislative record for the truth of the matter asserted not only with respect to public parks and alternative sites but also "at several points in the opinion." Dee & Dee Plaintiffs' Corrected Motion for Reconsideration [Doc.

# 376], at 7. However, Plaintiffs do not specify where else in the Opinion they believe the Court made this error. Therefore, in all other respects, this argument is rejected.

35. Plaintiffs have not submitted their own summary judgment evidence to show that the Ordi-

## C. *Multifamily Dwellings*

### 1. Content–Neutrality of Revised Formula

The FTU Plaintiffs contend that, for the same reasons that the Court decided that the Ordinance's new distance requirements are invalid content-based restrictions, the Court should conclude that the Ordinance's new formula for calculating residential areas, which gives greater weight to multifamily dwellings, is also an invalid amendment. *See* FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 12–15. Specifically, these Plaintiffs argue that the Ordinance's legislative history contains no evidence that the Ordinance's previous method of determining whether an area is 75% residential was inadequate to address any negative secondary effects caused by adult businesses.

The Court has found that, as with the City's addition of public parks to the list of protected land uses, City Council members enacted the new multifamily formula based on sparse but adequate evidence. The Court held that this enactment was content-neutral because Committee discussions demonstrated that Council members considered, on the merits, City officials' concerns about the previous formula's inadequacy and lack of logic with respect to residential areas with multifamily dwellings. *See* Sum. Jmt. Opinion, at 815–816. An examination of those discussions reveals that the new multifamily dwelling formula was designed, not to be a substantial expansion of the previous Ordinance's restrictions, but instead to be a mere clarification of the previous method of determining whether an area is residential.

For instance, at one Committee meeting, Council members were informed that, by treating each multifamily dwelling as one tract—the same as a single family dwelling—in the calculation of whether an area is at least 75% residential, the previous version of the Ordinance actually gave less weight per acre to multifamily dwellings than to single family dwellings. Joseph Chow, from the City Planning Department, explained to the Committee that the standard single family lot in the City is one-eighth of an acre. *See* Transcript for November 20, 1996, Committee Meeting, Exhibit 15C to City's Motion for Summary Judgment [Doc. # 120], at 32–33. Therefore, according to this testimony, by requiring that multifamily dwellings be counted to comprise eight residential tracts per acre, rather than a single tract regardless of its size, the new formula, rather than significantly expanding the impact of residential areas on permissible locations for adult businesses, simply treats multifamily and single family dwellings more equally than before. *See id.* at 33 (Co–Chair Boney stated that counting eight tracts per acre is "counting apartments as they would correlate most naturally to a single-family home ... in terms of area").

Although Plaintiffs contend that some of them will be affected by the new multifamily dwelling formula, it does not appear that this amendment will have the same far-reaching effect that the new 1,500 foot distance requirements would have had on the adult business industry as a whole. In fact, the parties' recent submissions establish that it is not clear exactly how the new formula will affect adult businesses located near multifamily dwellings. This uncertainty supports the Court's conclusion that the City Council enacted this amendment for the purpose of closing a perceived loophole in the prior version of the Ordinance, rather than for the purpose of adopting an intentionally more stringent restriction in order to force as many adult businesses to close or relocate as possible. The Court again concludes that the multifamily provision of the Ordinance was based on reasonable inferences from evidence before the Sexually Oriented Business Committee that a correction was necessary to conform the Ordinance to the realities of what constitutes a primarily residential area in the City of Houston.

The Court therefore reaffirms its holding that the new multifamily dwelling formula is not a content-based amendment to the Ordi-

nance's addition of public parks to the list of protected land uses will not provide a sufficient number of alternative sites for adult businesses. The Court nevertheless reverses its grant of sum-

mary judgment for the City on this issue because Plaintiffs have not yet had the opportunity to conduct discovery on the issue of alternative sites. *See* instructions to parties *infra* at 46.

nance. This amendment is therefore valid so long as its implementation is shown, under the relevant constitutional standards, to allow a sufficient number of alternative sites on which affected adult businesses may operate.[36]

## 2. Alternative Avenues of Communication

■■■ Although the Court held in its Summary Judgment Opinion that the Ordinance's new formula for multifamily dwellings is content-neutral and is sufficiently tailored to serve substantial governmental interests, the Court was unable to rule on the constitutionality of the new formula because there was no evidence in the record from which the Court could determine whether the formula satisfied the final element of the First Amendment intermediate scrutiny test. Specifically, the record contained no evidence regarding whether implementation of the formula, isolated from the invalidated increased distance requirements, would allow sufficient alternative avenues of communication for affected adult businesses. *See* Sum. Jmt. Opinion, at 816–17.

The Court directed the parties to submit legal memoranda and affidavits describing what impact the new formula would have on adult businesses in Houston. The Court specifically directed the parties to indicate "what factual evidence currently exists regarding the potential impact of this provision and, if this evidence is now lacking, what measures would need to be taken to produce such evidence." *Id.* at 113. The purpose of this request was so that the Court could ascertain whether the issue of alternative sites with respect to the new multifamily dwelling formula could be determined promptly through the summary judgment process, without the need for further discovery. After examining the parties' submissions in response to the Court's request, the Court has concluded that material factual uncertainties preclude resolution of this issue through summary judgment at this time.

According to the City, as many as 41 adult businesses may have been denied licenses under Ordinance 97–75 based at least in part on the new multifamily dwelling formula.[37] The Court recognizes that there are various reasons why this number may not be accurate.[38] The Court also recognizes that this

**36.** In the alternative, the FTU Plaintiffs request that the Court declare the new multifamily dwelling formula invalid at least with respect to preexisting lawful businesses. For the reasons described *infra* in Section III.D.1., the Court rejects Plaintiffs' argument that the City cannot validly change the rules for adult businesses that previously established themselves in locations that conformed to the previous version of the Ordinance.

**37.** Originally, the City responded to the Court's request by indicating that only *three* businesses were denied licenses under Ordinance 97–75 "solely" on the basis of the multifamily dwelling formula. *See* City's Memorandum of Law in Support of Alternative Avenues of Communication Regarding Multi–Family Dwelling Formula [Doc. # 354], at 2, and attached Affidavit of Robert F. Foulis, ¶ 5. However, in response to objections submitted by various Plaintiffs, the Court directed the City to report to the Court "the identities of the Plaintiffs whose applications were denied, *in whole or in part*, as a result of the multifamily dwelling provision." Order [Doc. # 372] (emphasis added). The Court noted in another Order that the number of businesses denied licenses "solely" on the basis of the multifamily dwelling formula was not a useful figure because those businesses whose licenses had been denied based on *both* the multifamily dwelling formula *and* one of the increased distance

requirements might now be materially affected by the multifamily dwelling formula in light of the Court's invalidation of the Ordinance's increased distance requirements. *See* Order [Doc. # 362], at 2 n. 1.

In response to the Court's Second Order on this issue [Doc. # 372], the City submitted a letter, dated March 30, 1998, which lists 37 Plaintiffs that were denied licenses under Ordinance 97–75 based at least in part on their proximity to residential areas and for whom the residential density calculation included application of the new multifamily dwelling formula. In response to letters submitted by the Chil Soung and N.W. Enterprises Plaintiffs noting errors on this list, the City later added four additional Plaintiffs, bringing the total number to 41. *See* Letter from the City to the Court, dated April 9, 1998.

**38.** Most importantly, as the City admits, it is not clear from the evidence of record whether these businesses were denied licenses *because of* the multifamily dwelling formula or whether, instead, they are included on the list simply because the multifamily dwelling formula was used in calculating whether they violated the new residential proximity restriction. In other words, it is not clear whether these businesses, which were apparently licensed under the previous version of the Ordinance, became nonconforming

number was derived from an analysis of those businesses that were deemed nonconforming under the 1,500 foot residential distance requirement rather than the previous 1,000 foot requirement, even though the Court invalidated the 1,500 foot requirement as unconstitutional.[39] At a minimum, the City's data on the impact of the multifamily formula is uncertain. However, if the City's own figure is nevertheless accepted, the Court finds that the formula's potential effect on 41 adult businesses out of 114 adult businesses operating in Houston[40] is substantial enough to indicate a need for further, more definitive factual development on the issue of how many sites actually would be available if the new multifamily dwelling formula were to be enforced.[41]

The actual number of Plaintiffs affected by the formula remains a material factual question also because it is impossible to determine from the current record how many sexually oriented businesses would be affected if the multifamily dwelling formula were applied using the 1,000 foot residential distance requirement, rather than the 1,500 foot requirement. As the Dee & Dee Plaintiffs point out, some businesses may be affected by the formula under the 1,000 foot requirement, even if they were not affected by the formula under the 1,500 foot requirement, because a calculation based on a 1,500 foot radius might include enough non-residential tracts (outside of the 1,000 foot radius) to

dilute the effect of residential tracts (including multifamily dwellings) located within the 1,000 foot radius. See Dee & Dee Plaintiffs' Memorandum of Law Regarding the Impact of the Multi–Family Dwelling Formula and Incorporated Motion for Partial Summary Judgment [Doc. # 377], at 3.

More importantly, however, the relevant constitutional inquiry is not how many Plaintiffs would be affected by the new multifamily dwelling formula but is instead how many alternative sites would be available for those Plaintiffs that would be forced to relocate. The number of alternative sites that might be available under the new formula as applied either to the 1,000 foot radius or to 1,500 foot radius remains an entirely unresolved issue on this record.

The City has submitted evidence purporting to establish that, even under the full locational restrictions of Ordinance 97–75, including the invalidated distance requirements, there are at least 183 sites legally available in the City to which affected businesses could relocate. See Affidavit of Vice Officer Steve Andrews, Attachment to City's Reply to FTU Plaintiffs' Response to Summary Judgment on Location Issue [Doc. # 244].[42] However, prior to the Court's Summary Judgment ruling, Plaintiffs raised numerous not insubstantial objections to the City's methodology for calculating this figure and urged the Court to allow them opportu-

---

because of the addition of the multifamily dwelling formula, the extension of the residential distance requirement from 1,000 feet to 1,500 feet, or a combination of both.

**39.** Plaintiffs have raised vociferous objections to the fact that the City submitted information regarding application of the multifamily dwelling formula using the invalidated 1,500 foot distance requirement, rather than the 1,000 foot requirement contained in the previous version of the Ordinance. In its Orders of March 13, 1998 [Doc. # 362], and March 17, 1998 [Doc. # 372], the Court specifically directed the City to provide information with respect to the 1,500 foot distance requirement because that information was the only data readily available, and the City stated that comparable information using the 1,000 foot distance requirement will take at least several months to compile.

**40.** According to Vice Officer Robert F. Foulis, the Vice Division received and investigated appli-

cations from 114 adult businesses under Ordinance 97–75. See Affidavit of Robert F. Foulis, Attachment to City's Memorandum of Law in Support of Alternative Avenues of Communication Regarding Multi–Family Dwelling Formula [Doc. # 354], ¶ 4.

**41.** The City claims that only a "negligible" number of Plaintiffs were affected by the formula. The Court disagrees. Forty-one potentially affected businesses out of 114 adult businesses that sought licenses under Ordinance 97–75 is not a "negligible" number.

**42.** This estimate takes into account the spacing requirement of § 28–125(b)(2) of Ordinance 97–75, which the Court noted in its Summary Judgment Opinion would have to be considered in connection with any meaningful analysis of what alternative sites would be available. See Sum. Jmt. Opinion, at 813 n. 121.

nity for discovery so that they could challenge the City's proffer. Given the widely disparate estimates of the number of alternative sites that the City itself specified to the City Council (7,597) and to this Court (183), even before taking into account the Plaintiffs' potential factual challenges to these figures, the Court concludes there remains a material question of fact as to these matters. In order to rule on the constitutionality of the multifamily dwelling formula, it is therefore necessary for the Court first to receive evidence regarding the number of sites that would be available if this formula were implemented.[43]

For these reasons, the Court concludes that there remain genuine questions of material fact regarding how many adult businesses would be affected by the multifamily dwelling formula when implemented in conjunction with the 1,000 foot residential distance requirement and whether there would be a sufficient number of alternate sites available for these affected businesses. All parties' requests for summary judgment on the validity of the multifamily dwelling formula are therefore denied at this time.[44]

The parties are directed to submit a joint proposal (no more than five pages in length) on or before June 22, 1998, for a discovery schedule and trial procedures on the issue of alternative sites under the Ordinance's amendments regarding multifamily dwellings and public parks. The parties should follow (where applicable) the format for a Joint

Discovery/Case Management Plan used in this district pursuant to Fed.R.Civ.P. 16 and 26(f). In this submission, the parties also shall state whether they seek to litigate this issue prior to completion of their appeals on the other locational issues.

### D. Plaintiffs' Global Challenges to Locational Restrictions

Even though Plaintiffs were primarily successful in their challenge to the Ordinance's new locational restrictions on adult businesses, a number of Plaintiffs continue to press arguments in their Motions for Reconsideration attacking the validity of these restrictions in general. Since not all of the new locational restrictions have been invalidated, the Court will address these issues. The Court rejects the City's argument that Plaintiffs lack standing to assert these arguments.

#### 1. "Shell Game" Argument

■ First, the FTU Plaintiffs urge the Court to rule on their "shell game" argument, which they claim that the Court did not address in its Summary Judgment Opinion. In this argument, the FTU Plaintiffs claim that the City has engaged in a long-term strategy of continually changing the rules with which adult businesses must comply in order to operate in Houston. Plaintiffs contend that the last time the City changed the rules governing where many adult businesses could be located, in 1986, most adult businesses in the City either had

---

43. In support of its argument that there would be a sufficient number of sites available under the 1,000 foot residential distance requirement using the new multifamily dwelling formula, the City notes that in *4330 Richmond Ave., et al. v. City of Houston*, No. 91–0665 (S.D.Tex. July 11, 1997), Judge Rainey found there were sufficient sites based on the 1,000 foot requirement of the prior ordinance. *See* City's Memorandum of Law in Support of Alternative Avenues of Communication Regarding Multi–Family Dwelling Formula [Doc. # 354], at 4. However, as the City itself admits, this finding is inapplicable to the issue presented here, since there was no multifamily dwelling formula in the prior ordinance. *See id.*, at 4 n. 2.

44. The Dee & Dee Plaintiffs have recently moved for summary judgment invalidating the multi-family dwelling formula on the ground that the City's responses to the Court on this issue did not

satisfy its burden of production with respect to the alternative avenues prong of the constitutional analysis. *See* Plaintiffs' Memorandum of Law Regarding the Impact of the Multi–Family Dwelling Formula and Incorporated Motion for Partial Summary Judgment [Doc. # 377], at 2, 7. *See also* Dee & Dee Plaintiffs' Objection to N.W. Enterprises, Inc., Memorandum of Law Regarding Multi–Family Dwelling Formula [Doc. # 378] (contending that City should not be given additional time to satisfy its burden of production and that Plaintiffs are entitled to summary judgment immediately on this issue). The Court rejects the Dee & Dee Plaintiffs' argument here and **OVERRULES** their objection to the N.W. Enterprises Plaintiffs' memorandum. This issue is clearly a factual one, and the City has apparently not responded with specifically relevant information because it will take some time to make the appropriate calculations.

to close or change locations. Plaintiffs contend that now that the businesses have settled into a new set of rules and found new locations, and many new businesses have opened in reliance on the set of rules the City adopted, the City should not be allowed to change the rules *again* —and apply them retroactively—forcing the businesses that relied on the previous rules in selecting their current locations to move or close. Plaintiffs argue that no reasonable businessperson would continue to operate an adult business in Houston, knowing that the City could continually change the rules and force the owners to lose their substantial investments. Plaintiffs argue that if the City is permitted to engage in such a strategy, owners of adult businesses would be denied a reasonable opportunity to conduct their businesses and thus would effectively be denied the opportunity to engage in protected speech.

The Court spoke to this issue when it stated that the City "has the prerogative of experimenting with different possible solutions to municipal problems even when dealing with First Amendment interests." Sum. Jmt. Opinion, at 811 (citing *City of Renton*, 475 U.S. at 52, 106 S.Ct. 925). By this ruling, the Court rejected Plaintiffs' argument that the Ordinance's new locational restrictions are invalid merely by virtue of the fact that the City altered the rules upon which adult businesses had relied. As described in the Summary Judgment Opinion, the City may change the restrictions as long as, each time it does so, it satisfies the requisite constitutional test.[45] Plaintiffs have cited no authority for the proposition that enacting a significant change of rules for adult businesses, even for a second time, in and of itself violates the First Amendment. The Court therefore rejects Plaintiffs' "shell game" argument.

## 2. Equal Protection

■ The FTU Plaintiffs also urge the Court to address their argument that the Ordinance's locational restrictions violate, not only the First Amendment, but also the Equal Protection Clause because virtually no other businesses in Houston are subjected to the type of locational restrictions contained in Ordinance 97–75. However, Plaintiffs have not provided the Court with any legal authority in support of their contention that the City's alleged differential treatment of them, compared to other types of businesses, violates the Equal Protection Clause.

The Court is not persuaded that Plaintiffs have a claim under the Equal Protection Clause. In sum, Plaintiffs are incorrect in their assertion that the Equal Protection Clause requires that they be treated "no differently (or at least no worse) than other similarly situated businesses." FTU Plaintiffs' Reply in Support of their Motion for Reconsideration [Doc. # 429], at 15. Because adult businesses are not a protected class, they are not entitled to any heightened equal protection scrutiny. Thus, the City need only prove, under the rational basis test, that it has some minimal justification for treating adult businesses differently from other businesses. Plaintiffs have a heavy burden to prove that the City's treatment of them is invalid under the very low threshold of the rational basis test. *See* Sum.Jmt. Opinion, at 773–74 (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 441– 42, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Village of Belle Terre v. Boraas*, 416 U.S. 1, 7–8, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *SDJ*, 837 F.2d at 1273). Plaintiffs have not persuaded the Court that they have any chance of succeeding on the merits of this test as a matter of law, as to any particular locational restriction or as to the Ordinance as a whole. Plaintiffs, moreover, have not cited any cases involving local regulation of sexually oriented businesses in which an equal protection argument was successful.

---

**45.** The Court explained that its

conclusion that the City has failed to show that the Ordinance's new distance requirements were enacted in a content-neutral manner is not a *per se* ruling that the City cannot revise its previously enacted distance requirements. The City could have validly increased the dis-

tances if it had first, in some way, tied these increases to evidence in the legislative record demonstrating that, or at least supported them with some rationale as to why, the earlier distance requirements did not adequately address the negative secondary effects previously found to exist.
Sum.Jmt. Opinion, at 813.

For these reasons, the Court rejects Plaintiffs' equal protection argument. The Court also denies Plaintiffs' repeated requests to obtain discovery on this issue. Such discovery is not relevant and is not likely to lead to discovery of admissible evidence under Fed. R.Civ.P. 26(b)(1).

### 3. "Spot Zoning"

In their Motion for Reconsideration [Doc. # 388], the Chil Soung Plaintiffs argue once again that Ordinance 97–75 is unconstitutional because it regulates land use even though Houston does not have a comprehensive zoning plan. It is not clear which aspects of the Ordinance the Chil Soung Plaintiffs specifically continue to challenge with this argument, given that the Court already ruled substantially in favor of the Plaintiffs on the locational restrictions, by striking down the Ordinance's new 1,500 foot distance requirements.

To the extent that the Chil Soung Plaintiffs attempt to press their challenge of "spot zoning" against the locational restrictions on which the Court has not ruled, i.e. the addition of public parks to the list of protected land uses and the new multifamily formula for calculating whether an area is residential,[46] the Court rejects this challenge. As cited in the Summary Judgment Opinion, the Texas Supreme Court specifically held in *City of Brookside Village v. Comeau*, 633 S.W.2d 790, 793 (Tex.1982), that cities can regulate land use under their general police powers without adopting comprehensive zoning plans. *See* Sum. Jmt. Opinion, at 798 n. 92. Moreover, in the Summary Judgment Opinion, the Court also undertook an extensive analysis of the question of whether the locational restrictions in Ordinance 97–75 constitute "zoning" and concluded that they do not. *See id.* at 62–70. In *SDJ*, the Fifth Circuit upheld a prior version of Ordinance 97–75 notwithstanding the fact that it regulated locations of sexually oriented businesses in Houston even though the City did not have a comprehensive zoning plan. The Chil Soung Plaintiffs have failed to cite any new authority which could persuade the Court to reconsider the applicability of any of these prior holdings. The Chil Soung Plaintiffs' Motion for Reconsideration is therefore **DENIED**.

### 4. Protected Use Status for Schools, Churches, and Daycare Centers

In their Motion for Reconsideration, the Dee & Dee Plaintiffs challenge the Ordinance's designation of schools, churches, and daycare centers as protected land uses.[47] They argue that, even though the designation of these types of property as protected land uses was upheld by the courts in *SDJ* and *4330 Richmond*, they can nevertheless raise this issue anew because some of the Dee & Dee Plaintiffs were not parties to the previous litigation (and thus are not barred by claim preclusion) and because they raise arguments that were not made in the earlier cases (and thus are not barred by issue preclusion).

Specifically, the Dee & Dee Plaintiffs argue that: (1) the designation of churches as a type of protected land use violates the Establishment Clause; (2) the protected use designation of schools, churches, and daycare centers is not actually supported in the legislative record by evidence of "dehumanizing effects" caused by sexually oriented businesses; and (3) even if the designation is so supported, "dehumanizing effects" are primary, not secondary, effects of sexually oriented businesses and therefore cannot serve as a valid basis for regulation.

The Court notes, first, that, to the extent that these arguments were raised in the earlier summary judgment briefing and ad-

---

**46.** To the extent that Plaintiffs challenge locational restrictions contained in earlier versions of the Ordinance, that challenge is not properly before this Court. The present case involves only challenges to Ordinance 97–75.

**47.** The FTU Plaintiffs also challenge the designation of these protected land uses, but their challenge appears to address the validity of these designations only to the extent that "after-arriving" protected land uses could establish themselves near adult businesses and thereby disqualify preexisting adult businesses from their current locations. *See* FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 23–25; FTU Plaintiffs' Reply in Support of their Motion for Reconsideration [Doc. # 429], at 16–20. The Court addresses the FTU Plaintiffs' argument regarding "after-arriving" protected land uses *infra* in Section III.E.

dressed in the Court's Summary Judgment Opinion, the Court did not reject these arguments on the basis of claim or issue preclusion. The Court also does not hold now that any Plaintiffs who were not parties to previous litigation are barred from raising arguments on the basis of claim preclusion or are barred from raising previously unadjudicated issues on the basis of issue preclusion.

■■■ Instead, the Court rejects Plaintiffs' arguments regarding protected land uses on the merits. Although the Dee & Dee Plaintiffs raise some interesting arguments that the Ordinance's designation of churches as a protected land use violates the Establishment Clause, *see* Dee & Dee Plaintiffs' Corrected Motion for Reconsideration [Doc. # 376], at 16–18, these arguments are foreclosed by the Supreme Court's decision in *City of Renton,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29, which upheld a local ordinance that established minimum distance between sexually oriented businesses and churches.[48]

■■■ In addition, the Court relies on *SDJ* for the conclusion that the City of Houston had adequate justification to designate schools, churches, and daycare centers as protected land uses. In *SDJ,* the Fifth Circuit affirmed the district court's conclusion that the City had adduced an adequate record of negative secondary effects to justify an earlier version of the Ordinance that included minimum distance requirements between sexually oriented businesses and these protected land uses. Thus, Plaintiffs are not barred by claim or issue preclusion from raising issues addressed by *SDJ* but rather are foreclosed by the holding in *SDJ,* which the Court considers to be binding legal precedent on the merits of Plaintiffs' arguments.

### E. *New Issue Regarding "Grandfathering"*

Pursuant to § 28–125(c) of the Code of Ordinances, as it existed prior to and after the enactment of Ordinance 97–75, adult businesses in Houston are subject to locational restrictions based on the existence of protected land uses only at the time an adult business files an "original" application for a sexually oriented business license. Thus, under this provision, if a protected land use moves to a location nearby a licensed adult business, that adult business achieves what is known as "grandfathered" status with respect to that specific protected land use, and the proximity of that protected land use cannot prevent the adult business from obtaining a renewal license, so long as its application is timely filed.[49]

According to the FTU Plaintiffs, the City has begun treating *all* applications for licenses under Ordinance 97–75 as "original" applications, simply on the basis of the fact that the City enacted a new Ordinance, even for adult businesses that were in business in their current locations prior to the passage of Ordinance 97–75. *See* FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 16–22. Plaintiffs argue that, for preexisting businesses that were already licensed at the time of passage of Ordinance 97–75, these license applications should be treated as renewal applications, not original applications, so that preexisting adult businesses may retain their grandfathered status with respect to protected land uses that located themselves nearby after the adult businesses obtained their original licenses.

---

48. Despite Plaintiffs' contentions that more recent Establishment Clause cases have implicitly overturned this aspect of *City of Renton,* the Court will not diverge from the Supreme Court's acceptance in *City of Renton* of the designation of churches as protected land uses in a sexually oriented business land use ordinance. Under *Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997), a lower court should not conclude that a legal precedent has been overturned by implication but instead "should follow the case which directly controls" until and unless that precedent is expressly overturned. *See* Sum.Jmt. Opinion, at 780.

49. Section 28–125(c) provides as follows:

> Property uses and distances for original applications shall be determined as of the time that the application is filed. If a renewal application is timely filed as provided in section 28–124 of this Code, the property uses and measurements for the renewal application shall be determined as of the time that the original application for the enterprise was filed. If not timely filed, renewal applications shall be subject to the same fees and shall be treated in the same manner in all respects as original applications.

### 1. Plaintiffs' Standing to Raise this Challenge

In its Response, the City does not offer any substantive justification for its decision to label as "original" applications what are in reality renewal applications for businesses that have been licensed under previous versions of the Ordinance and have been in operation in their existing locations, sometimes for many years. The City merely argues that Plaintiffs do not currently have standing to raise this challenge because this issue is not ripe. *See* City's Response to FTU Plaintiffs' Motion for Reconsideration [Doc. # 413], at 2–4. In support of this argument, the City posits a strained thesis: since the City intends to appeal the Court's invalidation of the Ordinance's new 1,500 foot requirements, any Plaintiffs who would be affected by these requirements only have a hypothetical possibility that they will be able to stay in their current locations anyway.

The Court rejects the City's argument that its intention to appeal this Court's rulings deprives Plaintiffs of standing to challenge this action. From this Court's perspective, based on its own rulings, Plaintiffs cannot be forced to move from their current locations simply on the basis of the invalidated distance requirements. The mere fact that this Court's rulings are subject to appellate review does not render the possibility that Plaintiffs might stay in their current locations merely a hypothetical possibility.[50]

In addition, various Plaintiff businesses have submitted evidence to show that the City has already denied their permit applications under Ordinance 97–75 in part due to after-arriving protected land uses. *See* FTU Plaintiffs' Reply in Support of their Motion for Reconsideration [Doc. # 429], at 2. Thus, they have shown the necessary individualized and personal stake in the outcome of this issue to achieve standing.[51]

Moreover, although the City has agreed not to enforce the Ordinance's *new* locational requirements pending appeal of this case, *see* City's Response [Doc. # 413], at 4, that assurance does not address Plaintiffs' concern that the City will ignore their grandfathered status with respect to the locational requirements in the Code of Ordinances in effect prior to enactment of Ordinance 97–75. In other words, Plaintiffs fear that, even if the 1,500 foot distance requirements between adult businesses and protected land uses ·is not enforced, the City may nevertheless allow after-arriving protected land uses that located themselves within 750 feet of preexisting businesses to disqualify those businesses from obtaining licenses.

### 2. Analysis on the Merits

After the passage of Ordinance 97–75, all adult businesses were required to apply for new licenses because § 8(a) of the Ordinance renders previous licenses void.[52] It appears that the City has interpreted this fact to mean that applications for new licenses under Ordinance 97–75 may be treated as "original" applications because they are the businesses' first licenses applications under the new Ordinance.

However, nothing in § 8(a), nor any other provision of Ordinance 97–75, indicates that licenses obtained under the Ordinance by preexisting businesses shall be deemed to be "original" licenses—for the purposes of § 28–125(c)—rather than "renewal" licenses. On the contrary, another sentence in § 8(a) of the Ordinance indicates that the voiding of

---

50. Some of Plaintiffs' arguments may well be rendered moot if this Court's invalidation of the Ordinance's increased distance requirements is reversed, but from the standpoint of this Court, this issue has been resolved in Plaintiffs' favor. Moreover, although this Court's rulings are subject to appeal, it is the duty of this Court to resolve the justiciable issues presented to it at this time as fully as possible, so that the parties will not have to pursue unnecessary multiple appeals.

51. The City also argues that the issue is not ripe because the Court has not yet ruled on the constitutional validity of the new multifamily dwelling formula. *See* City's Response to FTU Plaintiffs' Motion for Reconsideration [Doc. # 413], at 1–4. However, the City's treatment of their license applications as "original" applications does not appear relevant to the issue of the new multifamily dwelling formula.

52. Section 8(a) simply provides that "[a]ll permits issued under Article III of Chapter 28 of the Code of Ordinances prior to the date of passage and approval of this Ordinance shall become void on the effective date."

licenses obtained under previous versions of the Ordinance was intended merely to ensure that adult businesses would comply with the *new* restrictions contained in Ordinance 97–75; nothing suggests that the voiding of any existing businesses' licenses was intended to impose retroactively other changes to § 28–125(c) restricting the previous legislative scheme in the absence of the new provision in Ordinance 97–75. In particular, the third sentence of § 8(a) of the Ordinance states that:

> The purpose of this section is to provide for the orderly implementation of *this Ordinance* insofar as the amendments to Article III of Chapter 28 of the Code of Ordinances adopted in Section 3 of this Ordinance institute *new* requirements for enterprises permitted prior to the date of passage and approval of such amendments.

Ordinance 97–75, § 8(a) (emphasis added). Thus, the Court agrees with Plaintiffs that the City has no basis for designating all license applications under Ordinance 97–75, submitted by preexisting, previously licensed, adult businesses, as "original" applications, rather than "renewal" applications for the purpose of § 28–125(c) in the absence of implementation of the new locational requirements of Ordinance 97–75.

Because the City's elimination of grandfathered status for existing businesses is not authorized by the Ordinance, City Council members could not have had any "intent" regarding this action. Thus, the Court cannot apply the *City of Renton* legislative content-neutrality analysis to this action by the City. Instead, the Court enjoins this action by the City on the simple ground that it is not provided for by the Ordinance. The City cannot administratively expand the reach of the Ordinance's locational restrictions beyond their own terms.

Furthermore, the City's unilateral decision to take this action is not only unsupported by the language of the Ordinance, but is also unsupported by the legislative record. The City has not cited, and this Court has not found, any discussion in the legislative record for Ordinance 97–75 by City Council members indicating an intent to eliminate the grandfathered status provided by § 28–125(c) for adult businesses with respect to the locational restrictions contained in the previous versions of the Ordinance, or evidence demonstrating a need to treat all license applications from preexisting businesses as "original" applications under Ordinance 97–75.[53]

For these reasons, the Court holds that the City may not at this time reject a timely filed application for an adult business license under Ordinance 97–75 on the sole ground that the applicant is located within 750 feet of a school, church, or daycare center that arrived after the establishment of the adult business at that location.[54] Because the

**53.** The City Council's Sexually Oriented Business Committee engaged in extensive discussion regarding whether to provide grandfathered status for existing adult businesses that do not conform to the new Ordinance or whether instead to provide amortization. The Committee chose amortization. *See* Transcript for November 20, 1996, Committee Meeting, Exhibit 15C to City's Motion for Summary Judgment [Doc. # 120], at 42–48, 64–67. However, the City has not cited, nor has the Court found, any portion of the legislative record indicating—in the absence of implementation of the new locational restrictions in the 1997 amendments—that the Committee considered eliminating the grandfathered status provided by § 28–125(c) as to adult businesses that were in compliance with the earlier version of the Ordinance at the time they first opened, but as to which after-arriving protected land uses later moved within 750 feet.

**54.** If the Court ultimately upholds the addition of public parks to the list of protected land uses,

then the City could reject a license application submitted by an adult business that is located within 750 feet of a public park that arrived after the establishment of the adult business. Likewise, if the Court ultimately upholds the new multifamily dwelling formula, then the City could reject a license application submitted by an adult business that is located in an area that is 75% residential, as measured by a 1,000 foot radius and using the new multifamily dwelling formula, even if one or more multifamily dwellings moved within 1,000 feet of the adult business after the adult business was first established. This is because these restrictions are clearly included in the 1997 amendments to the Ordinance, and the City may enact retroactive locational restrictions on adult businesses so long as those new restrictions satisfy the requisite First Amendment test. *See supra* Section III.D.1. In contrast, as described in the text, the elimination of grandfathered status with respect to the pre–1997 Ordinance's locational restrictions is not included in Ordinance 97–75.

Court has reached this conclusion, it need not address several of Plaintiffs' related alternative arguments.[55]

### F. Maintenance of Status Quo Pending Licensing Application Process and Administrative and Judicial Review of License Denials

■ The FTU Plaintiffs argue that the Ordinance's license requirement for adult businesses is invalid because, as applied in the current procedural posture of this case, it fails to guarantee a stay of enforcement during the licensing application process and during administrative or judicial review of a license denial. *See* FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 49–54. The Court rejects this argument.

Under *TK's Video v. Denton County, Texas*, 24 F.3d 705, 708 (5th Cir.1994), before enforcing a licensing requirement against adult businesses that were already in existence at the time the licensing requirement went into effect, a municipality must, under the terms of the licensing ordinance, maintain the *status quo* by refraining from enforcing the licensing requirement during the administrative review period and during a "brief period" of time in which those businesses can obtain judicial review of any license denials. *See TK's Video*, 24 F.3d at 709. The City argues that this stay-of-enforcement requirement is satisfied by § 8(a) of the Ordinance, which provided an initial 180–day delay after the Ordinance's passage

during which the Ordinance's new locational provisions would not be enforced and thus allowed Plaintiff businesses, and all preexisting adult businesses, the opportunity to pursue administrative and judicial review of their license denials and of the Ordinance itself.

Plaintiffs argue that the initial 180–day delay does not satisfy the *TK's Video* stay-of-enforcement requirement because of the current procedural posture of this case. Specifically, Plaintiffs contend that, since the Court invalidated the Ordinance's new locational restrictions in part, that portion of the Ordinance was unconstitutional—and thus effectively did not legally exist—at the time the Ordinance was enacted and during the entire initial 180–day period delay of enforcement for the locational restrictions. According to Plaintiffs, if the Ordinance's locational restrictions are ultimately upheld in part and struck down in part, then the locational restrictions in the Ordinance that are ultimately ruled to be valid will not legally come into existence until the completion of this lawsuit. At that point, Plaintiffs contend, they would be entitled to a stay of enforcement for a brief period during which they may seek administrative and judicial review of any license denials under the terms of the Ordinance that are ultimately upheld. Because the Ordinance itself does not provide for such a stay, Plaintiffs argue that the Ordinance is constitutionally invalid under the holding of *TK's Video*.[56]

---

55. In their Motion, Plaintiffs argue that disqualifying adult businesses from locations near after-arriving protected land uses would be constitutionally invalid under the First Amendment, as well as the Establishment and Equal Protection Clauses. *See* FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 23–25. However, Plaintiffs concede that the Court need not address these arguments if it grants their request for an order prohibiting the City from eliminating grandfathered status for adult businesses with respect to after-arriving protected land uses.

56. Plaintiffs contend that the Ordinance does provide the required stay for applicants whose licenses have been suspended or revoked but that it does not provide a stay for original license applicants. *See* FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 50. (In support of this contention, Plaintiffs cite the Ordinance at § 28–257, the section which relates to individual entertainer and manager permits. It appears,

however, that they intended to refer to the Ordinance at § 28–135(c), the section which applies to enterprise permits.) Plaintiffs claim that the Ordinance's stay provision is therefore insufficient because the City has been treating *all* applications for licenses under Ordinance 97–75 as "original" license applications, even for sexually oriented businesses that were in operation before Ordinance 97–75 was enacted. In light of the Court's ruling in the previous section that the City may not treat license applications from preexisting businesses as "original" applications, it is possible that § 28–135(c) provides the stay to which Plaintiffs insist that they are entitled. Arguably, the language of § 28–135(c) supports the conclusion that preexisting businesses whose license applications under Ordinance 97–75 have been denied are in a position comparable to licensed businesses whose permits have been suspended or revoked and which thus are entitled to the stay provided by this section. The final sentence of this section states that:

The Court rejects Plaintiffs' contentions and holds that the initial 180–day delay provided by the Ordinance satisfies the *TK's Video* limited stay-of-enforcement requirement. In *TK's Video*, the Fifth Circuit found that a thirty-day period was a sufficient amount of time for unsuccessful license applicants to pursue judicial remedies. Nothing in *TK's Video* supports Plaintiffs' novel argument that the City was required to build into its Ordinance additional periods of delay contingent on various possible judicial rulings regarding the Ordinance's validity.[57]

Thus, the 180–day period provided by § 8(a) is sufficient for constitutional purposes.[58]

## IV. *AMORTIZATION*

### A. *Equal Protection Argument*

In their Motion for Reconsideration, the FTU Plaintiffs request that the Court reconsider its ruling that Plaintiffs do not have standing to argue that the Ordinance does not provide affected businesses with an adequate amount of time for amortization. *See* Sum. Jmt. Opinion, at 823. These Plaintiffs argue that 180 days, the amount of time

provided by § 8 of the Ordinance, violates the Equal Protection Clause because virtually no other type of business in Houston that is subject to a similar type of land use restriction has such a short period of time in which to recoup its investment and conform to the restriction. *See* FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 8–11.

As described in the Summary Judgment Opinion, it is not even clear, under *SDJ*, that the City must provide amortization at all to businesses affected by a regulation such as Ordinance 97–75 because such a regulation does not constitute a taking. *See* Sum.Jmt. Opinion, at 817–18 (citing *SDJ*, 837 F.2d at 1278).

In any event, in its Summary Judgment Opinion, the Court stated that Plaintiffs do not have standing to raise this challenge because all businesses that will be affected by the upheld provisions of Ordinance 97–75 already had a *de facto* amortization period of more than a year due to the City's agreement not to enforce the Ordinance pending the Court's rulings on the parties' summary judgment motions. *See* Sum.Jmt. Opinion, at 823.[59] Although Plaintiffs concede that they

---

This subsection shall apply only to a decision sustaining the suspension or revocation of a permit for an existing enterprise, and shall not apply to a decision sustaining the denial of an *initial* application for a *proposed* enterprise. § 28–135(c) (emphasis added). Since denial of a renewal application from a preexisting business for a license under Ordinance 97–75 cannot be considered to be an "initial" application for a "proposed" enterprise, the language could be said to imply that a denial of a renewal application would instead be considered in the only other available category, a "suspension or revocation of a permit for an existing enterprise." Thus, it is possible, under this interpretation, that the stay provision of § 28–135(c) applies to preexisting enterprises that have been denied licenses under Ordinance 97–75. However, no party has asserted this interpretation and it is somewhat strained. The Court therefore addresses Plaintiffs' argument on the merits above in the text.

**57.** Plaintiffs also argue that the initial 180–day delay cannot count toward the stay period required by *TK's Video* because the City must have known that implementation of the Ordinance would be delayed due to lengthy constitutional challenges in court. In other words, Plaintiffs appear to contend that, because the City should have known that, due to litigation delays, no

legally binding license denial would occur until well beyond the initial 180–day period, the City should have understood that, as a practical matter, adult businesses would not have the required period of time after those denials in which to raise challenges to those denials on individual grounds in state court, as opposed to the broader types of constitutional grounds raised in this lawsuit. However, it is this Court's understanding that many, if not all, Plaintiff businesses have already pursued state court appeals of their license denials under Ordinance 97–75. Although those appeals may now be stayed pending the outcome of this federal lawsuit, all that is required by *TK's Video* is that the businesses have the opportunity, before a license requirement is enforced, to *initiate* lawsuits challenging license denials. The City was not required to include a stay of enforcement until the completion of the judicial review process.

**58.** *See infra* in Section VIII.A.2. for a discussion of the Court's revision of its ruling regarding the stay-of-enforcement requirement for entertainers and managers who are denied individual permits.

**59.** Plaintiffs are incorrect in their contention that the Court's ruling that they lack standing to raise this challenge to the Ordinance's amortization

have in fact had this year for amortization, they claim that one year is still too short a period and that no other types of businesses that have been subjected to new regulations in Houston have had to make do with just one year for amortization. They also claim that the City's agreement not to enforce the Ordinance pending the Court's rulings does not render moot their facial challenge to the adequacy of the amortization provided by the Ordinance.

The Court reaffirms its prior holding that the delay in enforcement of any locational provisions has deprived Plaintiffs of standing to raise this challenge. Because no Plaintiff businesses were held to the Ordinance's 180–day amortization period, any argument regarding the adequacy of such a period is merely academic. Moreover, the period during which a stay has been in effect, while this case has been in litigation before this Court, should clearly count toward the time the businesses have for *de facto* amortization.[60] The purpose of an amortization period is to allow affected businesses a period of time following new regulation during which they can earn revenue toward reimbursing owners for their investments. There is no need to wait until all legal issues are resolved to begin the clock for amortization purposes. As soon as the City passed its new Ordinance, all owners of adult businesses in the City were on notice that the City intended to change the regulations applicable to their businesses. Since Plaintiffs elected to institute legal challenges to the Ordinance, they

have received even more time to recoup their investment.

Two of the FTU Plaintiffs appear to claim that they will not receive sufficient time for amortization because imminent implementation of the new multifamily dwelling formula will soon force them to close or relocate. However, the Court remains unpersuaded that this issue is ripe or that these Plaintiffs have standing to challenge the adequacy of the Ordinance's amortization provisions, since the Court has not yet ruled on the validity of the multifamily dwelling formula and the City has indicated that it will continue the enforcement standstill until all the locational issues are resolved.

Even if Plaintiffs are correct that the issue is ripe and they have standing to challenge the Ordinance's amortization provisions under the Equal Protection Clause, the Court rejects this challenge. As discussed *supra* in Section III.D.2, given their heavy burden under the rational basis test, Plaintiffs have not persuaded the Court that they have any chance of succeeding on the merits of their Equal Protection challenge.[61]

## B. *Requests for Clarification*

The N.W. Enterprises Plaintiffs request clarification on several issues addressed by the Court in its Summary Judgment Opinion regarding the amortization provisions of the Ordinance. *See* N.W. Enterprises Plaintiffs' Motion for Reconsideration [Doc. # 343], at 10.

---

provision was based simply on an uncertainty as to whether any Plaintiffs would still be affected by the Ordinance's locational restrictions after the Court's partial invalidation of those restrictions. Instead, the Court held that Plaintiffs lacked standing because the litigation delay had effectively extended their amortization period beyond that provided by the Ordinance. *See* Sum. Jmt. Opinion, at 823.

60. As a practical matter, an appeal in this case is inevitable. If enforcement of the Ordinance's locational restrictions are stayed during the appeal, neither the parties nor this Court have any idea how much time Plaintiffs may actually have for a *de facto* amortization period.

61. In their original summary judgment briefing, the FTU Plaintiffs requested discovery on the

issue of what other types of businesses are subject to land regulation by the City so that Plaintiffs could compare their treatment with that of these other types of businesses. The Court indicated that Plaintiffs could have obtained such information through channels other than discovery. *See* Sum.Jmt. Opinion, at 822–23. In their Motion for Reconsideration, the FTU Plaintiffs once again seek discovery on this issue, contending that such information is far more readily available to the City than to Plaintiffs. Again, the Court denies Plaintiffs' discovery request on this issue, since Plaintiffs have not persuaded the Court that their challenge to the Ordinance's amortization provision has any legal viability or that the information is unavailable to Plaintiffs from other sources.

First, the N.W. Enterprises Plaintiffs ask whether the Court considers all amortization decisions moot except as to businesses located within 750 feet of a park, disqualified under the new multifamily dwelling formula, or non-protected businesses not covered by the First Amendment.[62] The City has not responded to this issue, and the Court declines to characterize conclusively the interim legal effect of its rulings on the amortization decisions. Although many of the amortization decisions may currently have no legal effect,[63] to the extent amortization is necessary under the Ordinance or the Constitution and Plaintiffs have participated in amortization hearings, the Court can conceive of no reason that the decisions from the amortization hearings would not be binding on Plaintiffs, should the Court's rulings be reversed by an appellate court.

Second, the N.W. Enterprises Plaintiffs ask whether the Court intends to allow discovery and development of expert witness testimony and trial on the adequacy and constitutionality of the amortization provisions as applied. The answer is no. As explained in the Summary Judgment Opinion, all of Plaintiffs' challenges to the Ordinance's amortization provisions fail as a matter of law because the Fifth Circuit held in *SDJ* that Houston's regulation of sexually oriented businesses cannot constitute a taking. *See* Sum.Jmt. Opinion, at 817–18 (citing *SDJ*, 837 F.2d at 1278). The Court nevertheless analyzed Plaintiffs' more detailed arguments with respect to amortization simply because the district courts in *SDJ* and *4330 Richmond* had done so and so that rulings will already have been made in this case in the event that the Fifth Circuit reconsiders its apparent decision in *SDJ* that no amortization provisions are even necessary in the City's sexually oriented business ordinance. *See* Sum.Jmt. Opinion, at 817–18.[64]

Third, the N.W. Enterprises Plaintiffs ask whether the Court intends to abstain from a case-by-case determination of the constitutionality of the amortization provisions as applied. For the reasons described in the preceding paragraph, the answer is yes.

Finally, the N.W. Enterprises Plaintiffs ask what timetable will apply for appeal of the administrative amortization decisions following the Court's Summary Judgment Opinion. Neither Plaintiffs nor the City has provided the Court with any guidance or suggestions as to the answer to this question. The issue is inadequately framed to permit an informed decision. The parties are expected to confer and try to reach some agreement on the matter.

## V. *NOTICE PROVISION*

In their Motion for Reconsideration, the Dee & Dee Plaintiffs request that the Court reconsider its conclusion that the City acted in a content-neutral manner when it enacted a provision in the Ordinance, § 28–123(f), requiring owners of sexually oriented businesses to give notice to the community when

---

**62.** The Court notes that, despite its distinction between adult businesses that are protected by the First Amendment and those that are not, *see* Sum.Jmt. Opinion, at 780–82, the City has stated that it does not intend to draw this distinction in its enforcement of the Ordinance's locational restrictions. *See* City's Response to N.W. Enterprises Plaintiffs' Motion for Reconsideration [Doc. # 402], at 3. Thus, for purposes of this case, there is no reason to group businesses not covered by the First Amendment in the same category as the Ordinance's new provisions regarding public parks and multifamily dwellings. Also, as the City notes in its Response, the N.W. Enterprises Plaintiffs' argument that a modeling studio Plaintiff should be covered by the First Amendment, *see* N.W. Enterprises Plaintiffs' Motion for Reconsideration [Doc. # 343], at 9, is moot, since the City, for all practical purposes, is treating this Plaintiff as if it were covered by the First Amendment.

**63.** Because the City is enjoined from enforcing the 1,500 foot distance requirements between sexually oriented businesses and protected land uses and between sexually oriented businesses and residential areas, the amortization decisions that were made for the businesses that would have been forced to close or move due solely to these invalid provisions currently have no legal effect.

**64.** Furthermore, to the extent that Plaintiffs are attempting to challenge the City's hearing officer's fact-based rulings on Plaintiffs' individual amortization claims, the Court deems these issues to be non-constitutional. Accordingly, they must be addressed in the administrative and state court appeals process set forth in the Ordinance and the Texas Government Code, not in this federal lawsuit.

such a business is about to open. *See* Sum. Jmt. Opinion, at 823–24; Dee & Dee Plaintiffs' Corrected Motion for Reconsideration [Doc. # 376], at 18–19. Plaintiffs argue that the legislative record does not contain any evidence supporting the City's argument that this provision furthers a substantial governmental interest. Instead, Plaintiffs contend that the record demonstrates that the City Council enacted this provision simply in order to create one more obstacle that could limit the opening of sexually oriented businesses in the City. The Court rejects Plaintiffs' argument and reaffirms its previous ruling upholding the Ordinance's notice provision. In its Summary Judgment Opinion, the Court relied on *TK's Video,* 24 F.3d at 710, in which the Fifth Circuit upheld a similar notice provision. As the Court noted before, the Fifth Circuit in *TK's Video* squarely held that such notice requirements are not "disguised censorship. Rather, they are typical of notices routinely required in zoning regulations." *Id.*[65] The requirement of such notices is not content-based.

## VI. *STRUCTURAL VISIBILITY, AND LIGHTING REQUIREMENTS*

### A. *Adequacy of City's Justification*

In the Summary Judgment Opinion, the Court rejected Plaintiffs' facial challenges to the Ordinance's new structural, visibility, and lighting requirements. *See* Sum.Jmt. Opinion, Section V.E. In their Motion for Reconsideration, the Dee & Dee Plaintiffs have raised a creative new argument as to why the City Council could not have reasonably believed that these requirements would prevent the crime of public lewdness. *See* Dee & Dee Plaintiffs' Corrected Motion for Reconsideration [Doc. # 376], at 21–22. These Plaintiffs argue that these requirements will instead actually contribute to the prevalence of this crime. According to Plaintiffs, the crime of public lewdness, defined under Texas Penal Code § 21.07, cannot occur in a non-public place unless an actor is reckless

about whether some person will observe her or his conduct who will be offended by such conduct. Therefore, Plaintiffs contend, the provisions of the Ordinance that enhance visibility inside sexually oriented businesses actually *create* the crime of public lewdness by making it more likely that actors engaging in lewd acts will be observed by others.

The Court rejects this argument. First, the legislative record establishes that public lewdness was not the only crime with which the City Council was concerned when it enacted the interior structural, visibility, and lighting requirements; it was also concerned about prostitution and the use or sale of narcotics. *See* Transcript of August 29, 1996, Committee Meeting, Exhibit 8E to City's Motion for Summary Judgment [Doc. # 120], at 94–95. Second, even if Plaintiffs' interpretation of the criminal statute is correct, Plaintiffs do not explain why the interior of sexually oriented businesses should qualify as non-public places. Furthermore, the City's substantial governmental interest in preventing the commission of lewd acts at sexually oriented businesses is not contingent on the issue of whether those acts, if not observed by others, would violate a specific state criminal statute. Finally, as the Court explained previously, Plaintiffs have offered no legal authority challenging the City's right to deny patrons of adult businesses any expectation of privacy while on the premises of those businesses. *See* Sum.Jmt. Opinion, at 828.

For these reasons, the Court reaffirms its rejection of Plaintiffs' facial challenges to the Ordinance's new structural, visibility, and lighting requirements.

### B. *Deadline for Compliance*

In their Motion for Reconsideration, the N.W. Enterprises Plaintiffs requested a stay of the City's enforcement of the Ordinance's structural provisions pending Plaintiffs' appeal of this issue, or, in the alternative, a

---

65. In addition, the Court notes that, according to the Legislative Report for Ordinance 97–75, City Council members received letters requesting that the public be notified when a sexually oriented business applies for an application. *See* Exhibit 36 to City's Motion for Summary Judgment [Doc.

# 120], at 11–12 ("Suggestions ranged from 90 day notices by property signs to postcards being mailed to all residents in the area. Notification by newspaper, certified mail, and public hearings were also brought forth.").

briefer stay that would allow them time to comply with these provisions. *See* N.W. Enterprises Plaintiffs' Motion for Reconsideration [Doc. # 343], at 1–2, 4–6. This issue is now moot, since the Court ruled in the March 2, 1998, conference that the arcade and mini-theatre Plaintiffs would have 120 days to complete necessary renovations, with one 30–day extension if needed.

## C. *VIP Rooms*

### 1. Procedural Background

In the prior summary judgment briefing, one of the FTU Plaintiffs, Ice Embassy, raised an "as applied" challenge to two provisions of the Ordinance, §§ 28–136(b) and 28–258(c), that prohibit entertainment from being provided in enclosed areas of sexually oriented businesses. Specifically, Ice Embassy argued that these provisions could not constitutionally apply to a large "VIP room" within an adult cabaret that is separated by a transparent door from the main area of the cabaret but that conforms with the Ordinance's other structural, visibility, lighting, supervision, and police access requirements.

In the Summary Judgment Opinion, the Court upheld the *facial* validity of §§ 28–136(b) and 28–258(c) as content-neutral means of preventing negative secondary effects, such as criminal public lewdness violations, from occurring within sexually oriented businesses. *See* Sum. Jmt. Opinion, at 824–27. In support of this conclusion, the Court noted that the legislative record "is replete with testimony and discussion of criminal offenses, such as public lewdness, that occur most frequently when physical obstructions and low levels of lighting exist within these businesses." *Id.* at 826 (citations omitted). However, the Court specifically stated that "this ruling does not purport to address the 'as applied' challenge Ice Embassy has raised to §§ 28–136(b) and 28–258(c) with respect to large VIP rooms." *Id.* at 827.

Over the City's objection, the Court allowed Ice Embassy to amend its Complaint to raise this "as applied" challenge. *See* Sum. Jmt. Opinion, at 825–26. The Court also instructed the City that, if it intended to interpret §§ 28–136(b) and 28–258(c) as applying to the type of large VIP room that Ice Embassy described, then it would have to respond to Ice Embassy's Motion for Partial Summary Judgment [Doc. # 258] on this issue. The Court reserved ruling on this issue in its Summary Judgment Opinion because it had not been fully briefed but noted its concern that the legislative record did not appear to contain any evidence that would justify the application of the prohibition against adult entertainment in enclosed areas to large VIP rooms. *See* Sum. Jmt. Opinion, at 827 n. 145.

The City has now responded to Ice Embassy's Motion, see City's Response in Opposition to FTU Plaintiff Ice Embassy, Inc.'s Motion for Partial Summary Judgment Regarding VIP Room [Doc. # 355], and Ice Embassy has submitted a Reply to the City's Response [Doc. # 385]. In its Response, the City indicates that it intends for §§ 28–136(b) and 28–258(c) to apply to large VIP rooms, as well as smaller enclosed areas. The City argues that the legislative record contains sufficient evidence to show that the City Council enacted these provisions in order to combat negative secondary effects created by adult entertainment in enclosed areas, *including* large VIP rooms, and that therefore these provisions are content-neutral, even as applied to these large rooms, and should be upheld under First Amendment intermediate scrutiny.[66]

### 2. Analysis

■ After reviewing the parties' legal memoranda and exhibits on this issue, and particularly the portions of the legislative record on which the City relies, the Court concludes that the legislative record does not

---

**66.** The City continues to argue that Ice Embassy does not have standing to raise this challenge, since Ice Embassy has not yet built its proposed VIP room. However, Ice Embassy has invested the funds to design and obtain architectural drawings for the proposed addition and renovation to its facility. The City has provided no authority to challenge the Court's decision that Ice Embassy is entitled to a ruling on the constitutionality of these provisions as applied to its proposed VIP room before it invests as much as $400,000 to build the room. *See* Sum. Jmt. Opinion, at 826 n. 143.

contain evidence to support the City's contention that §§ 28–136(b) and 28–258(c) were enacted in order to combat negative secondary effects in large VIP rooms that conform with all the Ordinance's other structural, visibility, lighting, supervision, and police access requirements. Therefore, as applied to a room such as the one described by Ice Embassy, these provisions are content-based and thus subject to First Amendment strict scrutiny. Under this standard, the Court concludes that application of these provisions to such a room would be an unconstitutional restriction on speech and therefore cannot be enforced.[67]

Ice Embassy's proposed VIP room will be more than 4,000 square feet large, will hold more than 200 people, and will be separated from the main part of the business by a completely transparent heavy glass door with no locking mechanism. *See* Declaration of Robert Furey ("Furey Declaration") [Doc. # 260], ¶ 10.

The evidence of negative secondary effects contained in the legislative record that supports the facial validity of §§ 28–136(b) and 28–258(c) does not relate to the type of large VIP room that Ice Embassy describes in its Supplemental Complaint [Doc. # 256], Motion for Partial Summary Judgment [Docs. # 258 and 259], and the accompanying declaration [Doc. # 260]. In enacting these requirements, City Council members were concerned about the prevalence of lewd or other criminal acts within sexually oriented businesses in dark or small enclosed areas that managers and police officers cannot see from a distance. Although Council members and police officers who spoke to the Sexually Oriented Business Committee mentioned that large VIP rooms *exist* in some adult cabarets, there was no evidence presented that, or discussion as to how, a prohibition against providing adult entertainment in enclosed areas—the prohibition eventually enacted in §§ 28–136(b) and 28–258(c)—would curtail negative secondary effects in large VIP rooms that provide clear lines of sight for managers throughout the rooms and conform with other structural, visibility, lighting, supervision, and police access requirements.[68]

The City appears to admit that the only reason why Ice Embassy's proposed VIP room would violate §§ 28–136(b) and 28–258(c) is that Ice Embassy intends to put a door at the entrance of the room.[69] Ice

---

67. In the alternative, even if the Court should analyze these provisions as content-neutral, it would nevertheless strike down their application to the large type of room described in this section because such an application would not be sufficiently narrowly tailored.

68. In making this finding, the Court has carefully reviewed portions of the legislative record relating to VIP rooms, including the exhibits that the City cites in support of its arguments. specifically Exhibit 36 to the City's Motion for Summary Judgment [Doc. # 120], at 5–6; Exhibit 8D, at 6; Exhibit 8E, at 85–121; Exhibit 9D, at 54–55; and Exhibit 40. The following testimony illustrates the type of evidence upon which the City relies. During one Sexually Oriented Business Committee meeting, a police officer testified as follows:

The visibility aspect, obviously, it's dark inside. A lot of times, employees, dancers, they employ methods of disguising their actions by using furniture and built-in sort of places in the clubs themselves that lend themselves to be more out of sight than others. Obviously, it goes back to the dark aspect. It's very hard to see if you're any length away from another table.
Transcript of August 29, 1996, Committee Meeting, Exhibit 8E to City's Motion for Summary Judgment [Doc. # 120], at 85–86. This testimony obviously relates to the issues of visibility,

clear lines of sight, and lighting, not to whether an adult cabaret has a door at the entrance to a 4,000 square foot VIP room. In that same meeting, another officer explained that:

[O]nce [the dancers] feel comfortable with you, they'll ask you to move to a different part of the club, a secluded area or even they'll ask you to give them some money to tip the managers or the floor person so that they will look the other way while they perform a table dance.
As far as prostitution is some of these places, we've conducted many investigations and in one particular club we had a black light run up right into the VIP room. The black light shows semen residue all over their couches. Used condoms were discovered on the floor.
*Id.* at 88. Again, nothing in this testimony conveys how the presence or absence of a door separating a large VIP room from the main area of a club would affect whether criminal activity takes place within the room. Instead, the issue raised by this testimony is clearly whether these rooms, like the main areas of the businesses, have adequate lighting, visibility, supervision, and police access.

69. In its Response to Ice Embassy's Motion for Partial Summary Judgment, the City states that:
Section 28–136(b) *simply does not prohibit* the existence of VIP rooms in an enterprise, but

Embassy has stated that it wants to have a door separating its VIP room from the main area of its business in order to prevent noise from the main area from intruding on the VIP room. Ice Embassy represents in its Supplemental Complaint and in its Motion for Partial Summary Judgment that it intends for its VIP room to comply with the other Ordinance provisions, including the police access requirement of § 28–136(c).[70] See Supplemental Complaint of Plaintiff Ice Embassy [Doc. # 256], at 8. See also Furey Declaration, ¶ 8 (describing how the business will provide free, anonymous membership cards for undercover police officers).

The City's specific concern about such a door is that it believes it would be more difficult for police officers to enter a VIP room that has a door at its entrance than an identical VIP room that does not have such a door. The City does not explain, however, how the absence of a door would make Ice Embassy, or other similarly situated adult businesses, less likely to comply with the police access requirement.[71] More significantly, however, the legislative record contains no indication that City Council members considered evidence regarding, or even discussed the possibility that, prohibiting an adult business from placing a door at the entrance of a VIP room that holds 200 people would help reduce any criminal activity that may occur within that room.

The City's justification and evidence simply do not apply to large VIP rooms that conform with the Ordinance's other structural, visibility, lighting, supervision, and police access requirements. Although there was passing reference during Committee discussions to the possibility of prohibiting VIP rooms entirely,[72] no such prohibition was enacted. Council members never discussed the possibility of allowing the VIP rooms to remain, but without doors at their entrances. Therefore, as noted above, there is no evidence in the legislative record explaining how the mere absence of a door at the entrance to a 4,000 square foot room, which holds more than 200 people, is appropriately lit, and is fully visible to management, would further the City's interest in reducing criminal activi-

rather only the provision of entertainment in a separate area to which access is "blocked or obscured by any door, curtain or other barrier." Thus, regardless of the size of the VIP room, the prohibition is of the door or other barrier, and the absence of a door does not prohibit the enterprise from having such a VIP room as claimed by plaintiffs. City's Response Regarding VIP Room [Doc. # 355], at 2 (emphasis in original).

70. This provision states that:

It shall be the duty of any owner, operator or manager of an enterprise to allow immediate access by any police officer, city fire department official or health officer to any portion of the premises of the enterprise upon request for purpose of inspection of such premises for compliance with this article, or any other applicable law.

§ 28–136(c).

71. The City appears to be concerned that a door at the entrance to a VIP room would prevent police officers from entering the room and immediately seeing whether any offenses are occurring. See City's Response Regarding VIP Room [Doc. # 355], at 6 (citing Transcript of August 19, 1996, Committee Meeting, Exhibit 7G to City's Motion for Summary Judgment [Doc. # 120], at 14243 (police officer explained to Committee that "what we're looking for is the ability for an undercover officer to walk in and look around to see if this club is engaging in illegal activity in a very short period of time")). However, the City has not detailed why the mere presence or absence of a door at the entrance to a large VIP room would affect whether police officers could instantly see activities within the room once they stepped inside the room. In the specific case at issue here, Ice Embassy's proposed VIP room would not only have a door with transparent glass and no locking mechanism, but also have a vestibule and what appears to be a narrow hallway at its entrance; thus, a police officer could not see inside the room until first passing through the vestibule and hallway anyway. See Exhibits A and B to Furey Declaration [Doc. # 260] (copies of floor plans for Ice Embassy's proposed VIP room). Finally, there is no evidence in the record of any warning signal to indicate the approach of police officers, or of the City's concern about such mechanisms at the Ice Embassy's proposed VIP room. Thus, it is entirely unclear why it would make any difference whether or not there is a door at the end of this hallway and vestibule.

72. See, e.g., Transcript of August 29, 1996, Committee Meeting, Exhibit 8E to City's Motion for Summary Judgment [Doc. # 120], at 94 (Co–Chair Boney asks whether "the elimination of these secluded areas, VIP rooms, would that substantially eliminate some of this overt criminal behavior?" Police officer replies, "[e]xactly.").

ty inside sexually oriented businesses.[73] The evidence in the record establishes that the City's prohibition against doors or other barriers blocking entrances to enclosed areas was enacted in order to prevent criminal activity from occurring in small enclosed areas not visible to managers or police officers, such as rooms in adult bookstores and arcades.[74]

The Court therefore holds that §§ 28–136(b) and 28–258(c) of Ordinance 97–75 may

not be applied to the VIP room described by Ice Embassy in its Supplemental Complaint, a large separate room within an adult business, where the room is in compliance with the other structural, visibility, lighting, supervision, and police access requirements of the Ordinance.[75] Because Plaintiffs have prevailed on this issue under a First Amendment analysis, the Court need not address Plaintiffs' alternative challenge to §§ 28–136(b) and 28–258(c) under the Equal Protection Clause.[76]

73. Another possible justification for the application of §§ 28–136(b) and 28–258(c) to large VIP rooms is the City's concern about the cost of criminal investigations within these rooms. The Sexually Oriented Business Committee heard testimony that adult cabarets usually charge a high fee for access to their VIP rooms which has hampered the ability of the City police force to conduct undercover operations, since the City often cannot afford to pay these fees. *See* Legislative Report for Ordinance 97–75, Exhibit 36 to City's Motion for Summary Judgment [Doc. # 120], at 6. However, the City Council did not act on this concern by prohibiting entrance fees for VIP rooms. Moreover, this concern is vitiated by Ice Embassy's representation in its Supplemental Complaint and Motion for Partial Summary Judgment, that it will provide free anonymous passes to the police department so that police officers can perform undercover investigations. *See* Supplemental Complaint of Plaintiff Ice Embassy [Doc. # 256], at 8. In any event, even if undercover police officers have to pay a fee to enter a separate area of an adult cabaret, the City has provided no reason as to why the presence or absence of a door, particularly *one* made of transparent glass, at the entrance to a large, appropriately lit area visible to management, would have any effect on the ability of police officers to enter and conduct investigations.

74. *See, e.g.*, Transcript of August 29, 1996, Committee Meeting, Exhibit 8E to City's Motion for Summary Judgment [Doc. # 120], at 101–04 (police officers explain to City Council Committee that anonymous sex occurs behind closed doors in small four-foot-by-four-foot or six-foot-by-six-foot rooms in adult bookstores); Transcript of September 16, 1996, Committee Meeting, Exhibit 9D to City's Motion for Summary Judgment, at 54 (after describing enforcement problems inside sexually oriented businesses, Captain Chandler tells Committee "[w]e would ask there be no doors on the booths inside of adult arcades").

75. The Court emphasizes that its holding on this issue is an "as applied" ruling. Because the only VIP room that has been described to the Court and that the Court has been asked to rule on is the room specifically described by Ice Embassy, the Court limits its holding to the scenario de-

scribed in Ice Embassy's amended complaint. In this scenario, a 4,000 square foot room is separated from the rest of the business only by a completely transparent glass door without any locking mechanism, and the interior of the room complies with the Ordinance's other structural, visibility, lighting, supervision, and police access requirements. The Court assumes from Ice Embassy's complaint that there is no "secret" warning system by which management can surreptitiously alert personnel in the VIP room of the approach of a police officer, thereby destroying the officer's ability to inspect inconspicuously the premises and to do so without management's artificial interruption of activities that were taking place immediately prior to the officer's arrival at the VIP room.

> The City urges the Court to reject Ice Embassy's "as applied" challenge because the City fears that an invalidation of §§ 28–136(b) and 28–258(c) with respect only to large VIP rooms such as the one described by Ice Embassy would create too much uncertainty regarding the circumstances under which the City could enforce these provisions. Although the Court recognizes that there may be, in another case, some circumstances in which it might be difficult to determine whether this Court's "as applied" invalidation of these provisions would prohibit their enforcement, that analysis would be fact-intensive and is not before the Court at this time. For the purposes of this ruling, it is sufficient for the Court to note that there is a clear distinction between large separate VIP rooms, which comply with all other structural, visibility, lighting, supervision, and police access requirements, and smaller enclosed areas, about which the City Council Committee heard evidence that prohibiting doors and non-transparent barriers would reduce criminal activity.

76. However, as noted *supra* in Section III.D.2, sexually oriented businesses are not entitled to heightened protection under the Equal Protection Clause and thus any restrictions on them are subject to only the lowest form of equal protection scrutiny, the rational basis test. Plaintiffs have not cited any authority to support their request that the Court invalidate these provisions as applied to Ice Embassy's proposed VIP room under the Equal Protection Clause. Instead,

## VII. SIGNAGE

### A. First Amendment and Texas Constitution Challenge

In the Summary Judgment Opinion, the Court rejected Plaintiffs' challenge brought under the First Amendment and Texas Constitution to the Ordinance's restrictions on sexually oriented businesses exterior signage. *See* Sum. Jmt. Opinion, Section V.F. Although the Court noted concern about the severity of these restrictions, the Court held that it was nevertheless bound under the authority of *SDJ* to uphold these restrictions. *See* Sum. Jmt. Opinion, at 832–33. Encouraged by this concern, the Dee & Dee Plaintiffs have requested that this Court reconsider its reliance on *SDJ* in upholding the Ordinance's signage restrictions under the First Amendment. *See* Dee & Dee Plaintiffs' Corrected Motion for Reconsideration [Doc. # 376], at 19–20. However, for the reasons described in the Summary Judgment Opinion, the Court declines this request. If the Court of Appeals chooses to reconsider its conclusions based on more recent Supreme Court First Amendment cases from other contexts, it may do so. Until and unless such reconsideration occurs, this Court must abide by the holding of *SDJ*.[77]

In connection with their arguments regarding signage, the Dee & Dee Plaintiffs also reassert their argument that the Supreme Court altered the narrow tailoring prong of the First Amendment test in *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). They argue that therefore the Fifth Circuit's conclusion in *SDJ* regarding the Ordinance's signage provisions is no longer valid because *SDJ* predated the *Ward* Court's revision of the narrow tailoring requirement. In the Summary Judgment Opinion, however, the Court specifically rejected the argument that *Ward* altered the test applied by the Fifth Circuit in *SDJ*. *See* Sum. Jmt. Opinion, at 775 n. 44. Plaintiffs do not cite any new authority or raise any new argument to challenge the Court's conclusion on this issue. Thus, the Dee & Dee Plaintiffs' signage arguments are rejected.

### B. Texas Statutory Challenge

#### 1. Procedural Background

In the Summary Judgment Opinion, the Court held that the Ordinance's expanded regulation of sexually oriented business signage, contained in § 28–130(g), does not violate the First Amendment or the Texas Constitution. *See* Sum. Jmt. Opinion, Section V.F. The FTU Plaintiffs argued that, even if this provision is constitutionally valid, the City may not enforce it without first complying with a state statute, TEX.LOC. GOV'T CODE § 216.001 *et seq.* (" § 216"), which provides for procedural protection and compensation for individuals or entities affected by municipal signage regulation. Concluding that Plaintiffs' argument regarding § 216 appeared on the surface to have substance but had not been fully briefed by the parties, the Court provided the parties further opportunity to develop their positions and the facts on this issue. *See* Sum. Jmt. Opinion, Section V.F.4.[78]

Thereafter, the FTU and A.H.D. Plaintiffs amended their complaints to add express

---

they cite only *Minneapolis Star and Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), which was not an Equal Protection case but was instead a First Amendment case. *See* Brief in Support of FTU Plaintiff Ice Embassy, Inc.'s Motion/Cross–Motion for Partial Summary Judgment [Doc. # 259], at 14.

77. Plaintiffs incorrectly assert that the Court found Plaintiffs' attacks on the signage requirements justified in light of *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), and *City of Ladue v. Gilleo*, 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994). In fact, in its Summary Judgment Opinion, the Court specifically distinguished these cases. *See* Sum. Jmt. Opinion, at 833.

78. The Court declined to address Plaintiffs' constitutional argument that the expanded signage regulation constituted an unlawful taking without compensation since it appeared that this issue could be obviated by resolution of Plaintiffs' state statutory argument. *See* Sum. Jmt. Opinion, at 835. Thus, the City is incorrect in its assertion that the Court ruled on Plaintiffs' takings argument with respect to the Ordinance's expanded signage regulation. *See* City's Motion for Summary Judgment on Ordinance 97–75, Article III, Section 28–130(g) [Doc. # 397], at 5. The Court's discussion of takings law in the Summary Judgment Opinion, at 817–18, relates solely to the Plaintiffs' argument that, if the Ordinance prevented them from continuing to provide adult entertainment at their current locations, that change would constitute a taking.

causes of action under § 216. *See* FTU Plaintiffs' Second Amended Complaint [Doc. # 350], at 75–76 [79]; A.H.D. Plaintiffs' Second Amended Complaint [Doc. # 358], at 28–31. The City now has moved for summary judgment on this issue, arguing that § 216 does not apply to the regulation contained in § 28–130(g) of the Ordinance. *See* City's Motion for Summary Judgment on Ordinance 97–75, Article III, Section 28–130(g) [Doc. # 397] and City's Supplement to Docket No. 397 [Doc. # 430]. The FTU Plaintiffs have filed a Response and Cross–Motion on this issue. *See* FTU Plaintiffs' Response in Opposition to the City of Houston's Motion for Summary Judgment on Ordinance 97–75, Article III, Section 28–130(g), and the FTU Plaintiffs' Cross–Motion for Summary Judgment [Doc. # 435]. In addition, several of the FTU and A.H.D. Plaintiffs have, in accordance with this Court's instructions, filed declarations indicating the costs they have incurred in purchasing their existing signage and the costs they anticipate incurring if they must remove or alter that signage. *See* Declaration of Men's Club of Houston President David Fairchild [Doc. # 384]; Affidavit of A.H.D. Plaintiff Ali M. Davari [Doc. # 411]; Declarations of Colorado Manager Robert G. Furey [Docs. # 373 and 437].[80]

### 2. Analysis

 In its new summary judgment motion, the City contends that it does not need to comply with the provisions of § 216 [81] because that chapter only pertains to signs that must be "relocated, reconstructed, or removed." § 216.001 *et seq.* The City argues in a strained turn of phrase that § 28–130(g) will merely require "alteration" or "conver[sion]" of Plaintiffs' signs. *See* City's Motion for Summary Judgment on Section 28–130(g) [Doc. # 397], at 2, 4.

 The City has failed to persuade the Court that there is any meaning in the distinction it attempts to draw. In support of its argument, the City asserts that Plaintiffs could comply with § 28–130(g) by simply changing the lettering on their existing signs so that the signs do not display the names of or otherwise identify Plaintiffs' businesses. *See* City's Motion for Summary Judgment on Section 28–130(g) [Doc. # 397], at 4. Even if this assertion is correct, the City does not explain why such a change would not constitute "reconstruction" of the nonconforming signs and thus be encompassed within the scope of § 216. More importantly, however, the City's witness on this issue, Ollie Schiller from the City's Sign Administration Division, concedes that such a change would be a "reconstruction." In her supporting affidavit, she avers that:

Based upon my experience and expertise in administering the sign code, with re-

---

**79.** Since that time, the FTU Plaintiffs have attempted to file a Third Amended Complaint [Doc. # 434], which the City opposes. The Court addresses the FTU Plaintiffs' Motion for Leave to file this third complaint *infra* in Section X.

**80.** The City argues that the Colorado Club does not have standing to raise an argument under § 28–130(g) because it is not located in a multi-unit center, as defined by § 28–130(g). *See* City's Motion for Summary Judgment on Ordinance 97–75, Article III, Section 28–130(g) [Doc. # 397], at 6–8. Based on an inspection conducted by Officer Robert Foulis, see Affidavit of Robert Foulis, Attachment to City's Motion, the City asserts that the other businesses located in the Colorado Plaza do not have entranceways directly onto public property, a public way, or a common area, and that therefore the Colorado Club is subject to the Ordinance's signage restrictions regardless of the validity of the City's attempt to implement § 28–130(g) without complying with

§ 216 of the Texas Local Government Code. In response, the FTU Plaintiffs argue that the Colorado Club is indeed located in a multi-unit center because the other businesses have the required entranceways on a side of the complex that Officer Foulis failed to inspect. *See* FTU Plaintiffs' Response and Cross–Motion for Summary Judgment [Doc. # 435], at 20–21. This Court need not and will not decide this fact question. Regardless of whether the Colorado Club has standing, there is still a justiciable controversy with respect to the applicability of § 216 because there are other Plaintiffs who also raise this statutory claim and for whom the City does not argue that § 28–130(g) does not apply.

**81.** As described in the Summary Judgment Opinion, various provisions of § 216 require a municipality that extends or strengthens its signage regulations to designate a sign control board that must compile a list of non-conforming signs and to provide compensation for owners of non-con-

spect to sign modifications and changing of the letters, symbols or other advertising matter on sign cabinets, it is my opinion that changing the message referring to the Colorado on the subject signs would not require the removal of the sign structure or *substantial reconstruction* of the sign and structure. Rather, this could be accomplished by replacement of the individual channel letters, Colorado, to any other name.

Affidavit of Ollie Schiller, Attachment to City's Motion for Summary Judgment on Section 28–130(g) [Doc. # 397], at 2 (emphasis added).[82] Although Schiller attempts to downplay the extent of the reconstruction that might be necessary, this statement clearly concedes that at least *some* reconstruction will be necessary in order for Plaintiffs' signage to be in compliance with the Ordinance.[83] The Court takes judicial notice of the fact that restructuring signage, like just about anything in this world, will have *some* cost. The City has not cited, and the Court has not found, any provision of § 216 of the Tex. Loc. Gov't Code that indicates that the statutory chapter only applies when the cost involved in complying with new signage regulations is above some minimum threshold.

It is clear from the parties' filings on this issue that there are material factual questions as to how much reconstruction will actually be necessary and thus what those

costs will be. For instance, Plaintiffs deny that they could retain their signs and be in compliance with § 28–130(g) of the Ordinance merely by changing the lettering on those signs. Instead, they argue that, for a number of the signs at issue, the current lettering is integral to the sign structures and could not simply be removed and replaced with other lettering. *See* FTU Plaintiffs' Response and Cross–Motion for Summary Judgment [Doc. # 435], at 4–6.

The Court does not need to resolve the factual disputes regarding the extent of reconstruction, or even removal, of Plaintiffs' signs that will be necessary for Plaintiffs to comply with § 28–130(g) of the Ordinance and thus how much it will cost Plaintiffs to comply with this provision. That is precisely the purpose of § 216 of the Texas Local Government Code—to establish a procedure by which this type of factual dispute may be resolved, as well as to create a mechanism for a municipality to provide compensation for any necessary reconstruction or removal of signs due to municipal regulation. *See* § 216.007 ("[t]he board shall determine the compensable costs according to standards applicable in a proceeding under Chapter 21, Property Code").[84] Thus, the Court will leave the resolution of these factual disputes to the board that the City must designate in accordance with § 216.004 and to the state district courts pursuant to § 216.014, if any appeals are necessary.[85]

---

forming signs. *See* Sum. Jmt. Opinion, at 835–36.

**82.** The FTU Plaintiffs have filed Objections [Docs. # 438 and 461] to Schiller's affidavits on the grounds that they contain impermissible legal opinions, ambiguous testimony, unsubstantiated expert opinions, and hearsay. The Court **OVERRULES** these objections for the same reasons it overruled similar objections raised in the FTU Plaintiffs' prior briefing. *See* Sum. Jmt. Opinion, at 830–31 n. 152. In any event, as described below in the accompanying text, Schiller's testimony supports Plaintiffs' argument that § 28–130(g) will require reconstruction of their signs and also demonstrates that the parties have factual disagreements that will need to be resolved by the City-designated sign board.

In a similar vein, the City has filed Objections to the declarations of Plaintiffs' witnesses Raschid Chawdhary and David A. Furlow [Doc. # 468] regarding the signage issue. The Court did not rely on these declarations because they are not relevant to the legal issues properly presented

here. The City's Objections [Doc. # 468] are **OVERRULED** as moot.

**83.** In her more recent affidavit, Schiller again acknowledges that some reconstruction will be necessary through her averment that § 28–130(g) will not impose on the FTU Plaintiffs "the necessity of *completely* removing and replacing the signage." Affidavit of Ollie Schiller, Attachment to City's Response in Opposition to FTU Plaintiffs' Cross Motion for Summary Judgment [Doc. # 456] (emphasis added).

**84.** Section 216.007 also provides that "[t]he compensable costs for a sign that is required to be reconstructed include expenses of labor and materials and any loss in the value of the sign due to the reconstruction in excess of 15 percent of that value."

**85.** The parties also appear to disagree about which of Plaintiffs' signs are affected by § 28–130(g). Although Plaintiffs believe that they will have to remove practically all signs located on the exteriors of their businesses, including signs

For the reasons just described, the Court holds that the City may not enforce § 28–130(g) without first complying with § 216 of the Texas Local Government Code.

### 3. A.H.D. Plaintiff's Motion to Join

■ On April 16, 1998, the A.H.D. Plaintiffs filed a Motion to Join the FTU Plaintiffs' Response and Cross–Motion for Summary Judgment regarding signage [Doc. # 445]. Assuming this motion to be unopposed, the Court granted the Motion on April 17, 1998. *See* Order [Doc. # 447]. The City has now filed a Response [Doc. # 458] to this Motion, in which it states that it opposes allowing the A.H.D. Plaintiffs to join the FTU Plaintiffs' Response and Cross–Motion [Doc. # 435] because that Response and Cross–Motion was accompanied by evidence pertinent to the signage of the FTU Plaintiffs, not the A.H.D. Plaintiffs. The City notes that it has previously objected to the A.H.D. Plaintiffs' purportedly untimely attempt to submit its own evidence regarding signage.

The Court rejects the City's opposition to the A.H.D. Plaintiffs' Motion to Join [Doc. # 445] and reaffirms its Order of April 17, 1998 [Doc. # 447]. The Court's ruling in favor of Plaintiffs on the signage issue is primarily a legal conclusion, not a factual finding based on the FTU Plaintiffs' evidence. The A.H.D. Plaintiffs' evidence to which the City objects only provided additional support for the Court's conclusion that at least *some* costs will be involved for Plaintiffs located in multi-unit centers, that are not already in compliance with the signage provisions, to comply with § 28–130(g).[86]

Thus, the Court's conclusion that, before enforcing the Ordinance's new signage provision, the City must follow the procedures set forth in § 216 of the Texas Local Government Code applies to all Plaintiffs who will be affected by the new signage provision, not just the Plaintiffs who have submitted evidence regarding the costs involved in complying with the provision.

As neither party has raised any genuine issue of material fact regarding the general applicability of § 28–130(g), the Court **GRANTS** the FTU Plaintiffs' Cross–Motion for Summary Judgment on § 28–130(g) [Doc. # 435] and **DENIES** the City's Motion for Summary Judgment on § 28–130(g) [Doc. # 397].

## VIII. ENTERTAINER AND MANAGER PERMIT REQUIREMENT

In the Summary Judgment Opinion, the Court generally upheld the Ordinance's new requirement that entertainers and managers working in sexually oriented businesses must obtain individual permits. However, the Court restricted what types of personal information the City could collect from permit applicants and declared all information collected to be confidential and not subject to disclosure under the Texas Public Information Act. In addition, the Court struck down a requirement that entertainers must wear identification cards while working. Since the time the Summary Judgment Opinion was issued, a number of issues have arisen with respect to the permit requirement. These issues, along with the parties' motions for reconsideration of various issues relating to the permit requirement, are discussed below.

### A. Date on Which Enforcement May Begin

#### 1. Permit Requirement in General

Due to Plaintiffs' concern that all entertainers and managers who are currently working at adult businesses and want to

---

related to valet parking, hours of operation, and even security systems, the City's arguments regarding which signs might need to be altered appear only to relate to Plaintiffs' large signs which display the names of or otherwise identify Plaintiffs' businesses. Resolution of these disputes regarding the applicability of the Ordinance's regulations may also be resolved by the designated sign board and state courts.

**86.** The Court therefore also overrules the City's Objections to Plaintiffs' Evidence [Doc. # 457] on the signage issue. In these objections, the City finds fault with virtually every paragraph of the affidavits submitted in support of the FTU Plaintiffs' Response and Cross–Motion for Summary Judgment regarding signage. It is not necessary for the Court to provide a detailed legal analysis of the admissibility of every paragraph of these affidavits because they are simply not dispositive of the Court's ruling.

apply for permits under the Ordinance would not be able to complete the application process by the previously agreed upon deadline of April 6, 1998, the Court entered an order on April 7, 1998, extending the date on which the City could begin enforcing the permit requirement for entertainers and managers to June 5, 1998. *See* Order [Doc. # 432].[87] On April 24, 1998, the City filed a Motion to Dissolve this Order [Doc. # 451], in which it requested that the Court allow it to begin enforcing the permit requirement immediately. The FTU and A.H.D. Plaintiffs filed responses opposing this Motion [Docs. # 459 and 460].

The City's Motion is denied. In light of the fact that the extended date already has passed and the permit requirement has gone into effect, the issue is moot.[88]

### 2. Individuals Who Have Already Been Working at Adult Businesses

■■■ In the Summary Judgment Opinion, the Court ruled that:

> any manager or entertainer who is working at a protected enterprise immediately before the individual permit requirement goes into effect must be allowed to continue working, whether or not a temporary permit is obtained, pending the processing of her or his permit application and pending any appeal of a permit denial.

87. Under the terms of this Order, entertainers and managers must have filed their permit applications by May 22, 1998, in order to continue working pending processing of their applications.

88. Pursuant to § 28–254 of the Ordinance, individuals may apply for permits between the hours of 8:00 a.m. and 12:00 p.m. on Mondays, Wednesdays, and Fridays. Nothing in the Ordinance states that these hours were to change after the permit requirement went into effect. According to this provision, individuals who want to obtain original or renewal permits can submit applications at these times. Of course, any individuals who apply for permits after June 5, 1998, will not be able to work until they have received their permits. This is because, prior to the date enforcement began, the City provided a mechanism, as required by the Court's Summary Judgment Opinion, for individuals who were already working at adult businesses on February 18, 1998, to continue working pending the processing of their applications.

Sum. Jmt. Opinion, at 858–59. The Court based this decision on *TK's Video*, 24 F.3d at 708–09, in which the Fifth Circuit held that a municipality must maintain the *status quo* for licensees that were in business prior to the enactment of a new licensing regulation. *See* Sum. Jmt. Opinion, at 846.

However, upon further consideration of the *TK's Video* opinion, the Court concludes that the *status quo* need not be maintained throughout the *entire* appeal of a permit denial. Instead, *TK's Video* merely requires that the *status quo* be maintained "during the licensing process" and for a "brief period" in which unsuccessful applicants may "access the courts." *TK's Video*, 24 F.3d at 708–09. Thus, the Court's previous order is withdrawn to the extent that it requires an unsuccessful permit applicant who filed an application by the deadline, and who was already working at an adult business when the permit requirement went into effect, to be allowed to continue working until the entire judicial appeal of the applicant's permit denial is complete. Instead, the City may begin enforcing the permit requirement against such an individual thirty days[89] after the individual's application is rejected, unless the individual receives a state court injunction enjoining the City's enforcement of the permit requirement pending judicial review.[90]

89. The Court incorporates the thirty day period provided by § 28–257 of the Ordinance for a permit holder to seek an injunction or obtain judicial review of a permit revocation decision. This length of time was deemed constitutionally sufficient in *TK's Video*, 24 F.3d at 709.

90. Pursuant to the Court's Order of April 7, 1998 [Doc. # 432], the application deadline for individuals to receive this *status quo* protection was May 22, 1998. *See supra* note 87. In addition, at the conference held on February 20, 1998, the Court declared that, for purposes of determining which individuals were entitled to this *status quo* protection, the date the permit requirement was upheld, February 18, 1998, would be considered the date the permit requirement went into effect. Thus, all entertainers and managers who were working at adult businesses in Houston on or immediately before February 18, 1998, and who applied for permits by May 22, 1998, cannot be prohibited from continuing to work at adult businesses, even if their applications were denied, until thirty days after their applications are rejected.

**B. Collection of Personal Information**

**1. Phone Numbers and Home Addresses**

In the Summary Judgment Opinion, the Court enjoined the City from requiring entertainers and managers to disclose their phone numbers and home addresses on their permit applications. *See* Sum. Jmt. Opinion, at 840–41, 859. In its Motion for Reconsideration, the City requests that the Court reconsider this injunction. *See* City's Motion for Reconsideration [Doc. # 364], at 14–17.

█ The City's request is based on logistical difficulties it encountered in attempting to communicate with applicants about the results of their permit applications. It appears, however, that these logistical difficulties resulted at least in part from a misinterpretation of the Court's injunction. The Court clarified the injunction at the conference held on April 7, 1998. As explained orally at that conference, the Court ruled that the City could not *require* permit applicants to disclose their phone numbers and home addresses. The Court did not, however, prohibit the City from inviting each applicant to disclose her or his phone number (or numbers) and home addresses, *if* the applicant chose to do so. Also, by prohibiting the compelled disclosure of home, but not other, addresses, the Court expected that the City would request that each applicant provide some address for mailing purposes; the City was simply prohibited from requiring the address to be a "home" address.

Thus, the Court declines the City's request to reconsider the injunction against compelled collection of applicants' phone numbers and home addresses. Under the injunction, the City may still obtain other addresses by which it can communicate with permit applicants. Moreover, there is no evidence that the City's lack of applicants' phone numbers and home addresses has impeded its ability to conduct criminal history checks on applicants.

In the alternative, the City argues that the injunction against compelled disclosure of phone numbers and home addresses is not necessary because the Court declared the application information to be confidential and not subject to public disclosure. *See* Sum. Jmt. Opinion, Section V.G.4. The Court declines to reconsider this injunction, primarily because the City has not shown any real justification for needing this information and because the City is permitted to request the information so long as it is listed as "optional" on the application. The injunction is also well supported by the Court's concern about the chilling effect that such disclosure requirements could have on entertainers and managers, even with a court order prohibiting the release of the information to the public.

**2. Criminal History**

**a. Propriety of Court's Injunction**

The City also requests that the Court reconsider its injunction prohibiting the City from requiring applicants to disclose convictions or jail time spent for those convictions prior to five years before they file their applications or convictions for crimes other than those enumerated in the Ordinance. *See* Sum. Jmt. Opinion, at 841, 859; City's Motion for Reconsideration [Doc. # 364], at 17. The City argues that this injunction is unnecessary because this information was not required by the Ordinance itself but was instead merely included on the City's original application form that has now been modified in compliance with this injunction.

The Court rejects the City's request to modify this injunction. As the City concedes, the City's application form previously requested criminal record information beyond that authorized by the Ordinance. The fact that the City complied with the injunction is not a basis for eliminating that injunction. To do so might allow the City to infer that it may now resume requesting overbroad information.[91]

The Court merely held that the City's application of the permit requirement was not narrowly tailored with respect to criminal histories, so that the City in practice was requesting information

---

91. However, to allay the City's concern that the Court found the Ordinance itself unconstitutional in this regard, the Court points out that its Summary Judgment Opinion does not state that the Ordinance actually required this information.

## b. Constitutionality of Criminal Background Checks

The FTU and Dee & Dee Plaintiffs urge the Court to reconsider its decision to uphold the Ordinance's requirement that entertainers and managers must undergo criminal background checks in order to obtain permits under the Ordinance. *See* Sum. Jmt. Opinion, at 847; FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 36–41; Dee & Dee Plaintiffs' Corrected Motion for Reconsideration [Doc. # 376], at 25. Plaintiffs strenuously argue that the First Amendment prohibits the use of prior criminal offenses to justify future restraints on speech.[92] In support of this challenge, Plaintiffs argue once again that the Fifth Circuit's decision to uphold a similar requirement in *TK's Video*, 24 F.3d at 709, simply contradicts the holdings of other cases, including prior United States Supreme Court opinions.

As stated in its previous Summary Judgment Opinion, the Court is bound by recent Fifth Circuit authority that is directly on point to the issue presented here. If the Fifth Circuit's conclusion was in error, then it is the role of the Fifth Circuit to reconsider that conclusion, not the role of this Court. The Court therefore reaffirms its earlier ruling that the Ordinance's requirement that entertainers and managers obtain individual permits for which they must undergo criminal background checks is constitutionally valid.[93]

## 3. Other Information

The A.H.D. Plaintiffs appear to contend that, even after the Court issued its Summary Judgment Opinion and orally clarified at a conference held on April 7, 1998, what information could be required on the entertainer and manager permit application forms,[94] the City continues to demand that applicants disclose overbroad "unauthorized personal information." *See* A.H.D. Plaintiffs' Response to the City of Houston's Motion to Dissolve Emergency Order Extending the Entertainer/Manager Licensing Deadline

---

beyond that authorized by the City Council's enactment. *See* Sum. Jmt. Opinion, at 840–41.

**92.** The FTU Plaintiffs claim that their challenge to the Ordinance's requirement that entertainers or managers be denied permits on the basis of prior speech-related violations was not addressed by the City in its Motion for Summary Judgment and that therefore this cause of action was not properly presented to the Court at the time it issued its Summary Judgment Opinion. *See* FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 26–35. Plaintiffs argue that, because this issue was not properly presented or fully briefed, it was inappropriate for the Court to grant summary judgment for the City on this cause of action. The Court disagrees. In its Motion for Summary Judgment, the City asserted that the Ordinance's new permit requirement for entertainers and managers is constitutionally valid. *See* City's Motion for Summary Judgment [Doc. # 120], at 41. One of the express purposes of this permit requirement is to prevent individuals who have been convicted of certain offenses from working as entertainers and managers in sexually oriented businesses. *See* Preamble to Ordinance 97–75, at 4 ("Whereas, the City Council finds that persons who are employed in sexually oriented business [sic] should be subject to verification that they have not been convicted of certain crimes . . ."). Thus, the City's contention that this requirement is valid necessarily encompassed Plaintiffs' objection to the criminal background check requirement. As explained in the Summary Judgment Opinion, at 785, "[t]he

Court rejects Plaintiffs' attempts to characterize numerous detailed arguments, many of which have been addressed by the parties' briefing and by the Court in this Opinion, as discrete causes of action." This issue was not only raised by the City's summary judgment motion, but the Court also addressed it on the merits. *See* Sum. Jmt. Opinion, at 847. Thus, the Court did not merely rule in favor of the City on this point on the ground that Plaintiffs did not adequately brief the issue.

**93.** In the Summary Judgment Opinion, the Court noted concern that no Plaintiffs had shown that they have the requisite standing to challenge the criminal background check requirement. *See* Sum. Jmt. Opinion, at 847–48 n. 196 (citing *FW/PBS*, 493 U.S. 215, 234, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)). The FTU Plaintiffs have now pointed out that several of the FTU Plaintiffs who are entertainers have demonstrated standing by submitting declarations that, within the past five years, they have been convicted of public lewdness while performing in adult businesses. *See* FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 37 (citing Declarations of Donna Soto [Doc. # 38], ¶ 4; Leah Marie Wilson [Doc. # 49], ¶¶ 18–23; and Charisma Berry [Doc. # 50], ¶¶ 18–24). The Court agrees that these Plaintiffs have adequately demonstrated their standing to raise this challenge and the concern expressed in the Summary Judgment Opinion regarding standing has now been addressed.

**94.** *See supra* Section VIII.B.1.

[Doc. # 460], at 2 (addressed *supra* in Section VIII.A.1). However, Plaintiffs do not specify what other information they continue to object to the City requiring on the permit application forms; nor have they formally requested relief on this issue. The Court therefore will not address this contention.

### C. *Confidentiality of Application Information*

The City states that it does not oppose the Court's declaration that permit application information remain confidential. *See* Sum. Jmt. Opinion, Section V.G.4. However, it requests that the Court reconsider its injunction against public disclosure of this information as redundant in light of the Court's ruling that the information is confidential. *See* City's Motion for Reconsideration [Doc. # 364], at 18. The Court entered this injunction simply to make clear in the decretal section of the Summary Judgment Opinion what this confidentiality ruling means and to ease enforcement of this ruling upon future challenges or requests for information. The City has not cited any authority for the proposition that such an injunction is not an appropriate remedy. Accordingly, the Court denies the City's request for reconsideration of this injunction.

### D. *Permit Revocation Provisions*

█ In their Motion for Reconsideration, the FTU Plaintiffs argue that the Ordinance's permit revocation provisions should be declared void due to a lack of adequate procedural safeguards and should be declared void to the extent that they allow permits to be revoked based on mere arrests, rather than convictions.[95] Plaintiffs also con-

95. The City denies that the Ordinance allows revocations on this basis. *See* City's Response to FTU Plaintiffs' Motion for Reconsideration [Doc. # 413], at 8–9.

96. At least with respect to procedural safeguards, Plaintiffs are mistaken. The City specifically argued in its original summary judgment motion that the safeguards for permit revocations are adequate. *See* City's Motion for Summary Judgment [Doc. # 120], at 41 n. 16.

97. The FTU Plaintiffs also claim that the Ordinance's revocation provisions are facially unconstitutional because they do not allow for a stay of

tend that, as a procedural matter, it was improper for the Court to grant summary judgment for the City on these issues because the City did not identify these issues in its Motion for Summary Judgment. *See* FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 26–35.[96]

Contrary to Plaintiffs' contention, however, the Court's Summary Judgment Opinion did not address the Ordinance's provisions regarding revocation of entertainer and manager permits. This issue could not have been properly addressed because no party has even claimed that this issue is ripe for adjudication. No entertainers or managers have yet presented the Court with any evidence that the City has tried to *revoke* their permits. In light of the Supreme Court's strict holding regarding standing in *FW/PBS* for individuals who attempt to challenge criminal record criteria in adult entertainment permit requirements, *see* 493 U.S. at 234, 110 S.Ct. 596; Sum. Jmt. Opinion, at 847–48 n. 196, the Court cannot and does not reach these issues at this time with respect to permit revocations. *Cf. Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (court cannot consider merits of an issue until standing is shown).[97]

### E. *"As Applied" Challenges*

### 1. Videotaping of Application Process

█ In their earlier briefing, Plaintiffs objected to the City's practice of videotaping individuals applying for entertainer and manager permits but did not specifically seek relief on this issue. In its prior Summary Judgment Opinion, the Court noted concern

revocation pending full judicial review of the administrative revocation decision but instead only allow for a 30–day stay under § 28–257. *See* FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 44–45. Although Plaintiffs concede that this 30–day provision meets the constitutional requirements articulated by the Fifth Circuit in *TK's Video,* Plaintiffs nevertheless seek a ruling from the Court on this issue so that they may urge the Fifth Circuit to reconsider this holding. While the Court, at first blush, sees no constitutional deficiency in the amount of time provided for a stay under § 28–257, it cannot rule on the question since no Plaintiff yet has standing to challenge this provision.

about the possible chilling impact of the videotaping but did not expressly order the City to cease the videotaping. *See* Sum Jmt. Opinion, at 848 ("The Ordinance itself does not authorize the Houston Police Department to make these videotapes, and nothing in the legislative record for the Ordinance suggests a justification for such action. The Court therefore seriously questions the City's decision to make these videotapes.").

Plaintiffs now request the Court to enter a formal order requiring the City to stop videotaping permit applicants and to destroy all such videotapes made to date.[98] The parties have submitted supplemental briefing on this issue. *See* FTU Plaintiffs Supplemental Brief on Videotaping [Doc. # 446]; City of Houston's Brief in Opposition to FTU Plaintiffs' Assertions of Unconstitutionality of Videotaping [Doc. # 453].

After considering the parties' arguments and affidavits on this issue,[99] the Court concludes that the City's videotaping practice is not unconstitutional under the circumstances presented. Because of the currently highly contentious climate surrounding this litigation, the Court concludes that the City's videotaping of the permit application process is a permissible, content-neutral exercise of administrative prerogative.

Plaintiffs argue that the City's practice of videotaping permit applicants is unconstitutional because of the chilling effect it may have on many individuals. In support of this claim, Plaintiffs have called the Court's attention to several affidavits submitted by entertainers in support of Plaintiffs' earlier requests for temporary restraining orders.[100] The City argues that these individuals do not have standing to raise this complaint because they all obtained permits and thus were not chilled by the videotaping. The Court concludes that Plaintiffs have standing to argue this issue.[101] In cases involving restraints on speech, the law allows individuals to raise constitutional challenges on behalf of others with whom they have some pertinent relationship and who, as a practical matter, would not be likely to raise the challenge themselves. As the Court explained in its Summary Judgment Opinion,

"[A]n exception from traditional rules of standing to raise constitutional issues has reflected the Court's judgment that the very existence of some statutes may cause persons not before the Court to refrain from engaging in constitutionally protected speech or expression. The exception is justified by the overriding importance of maintaining a free and open market for the interchange of ideas."

Sum. Jmt. Opinion, at 788 (quoting *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 60, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)).[102]

The City argues that it is videotaping the permit application process with a surveillance camera in order to protect itself and its employees from charges of abuse or harassment by permit applicants. In support of this argument, the City has submitted two

---

98. The FTU Plaintiffs' have amended their Complaint to include an express cause of action challenging the videotaping. *See* FTU Plaintiffs' Corrected Motion for Leave to File Third Amended Complaint [Doc. # 443], at 12, and ruling *infra* in Section X.

99. In addition, at the conference held on April 7, 1998, the Court received oral testimony from Captain Roy B. Chandler regarding the mechanics of the City's videotaping of the permit application process and, in the presence of counsel after the conference, viewed a portion of one original recent videotape. The City is directed to submit under seal a copy of the video tape viewed by the Court and counsel so that the record on this issue will be complete.

100. *See* Declarations of Ann Marie Hasselbach [Doc. # 33], ¶ 10; Andrea Allbright Marco [Doc. # 35], ¶ 12; Kimberly Ann Dushman [Doc. # 40],

¶ 9; Heather Weldin [Doc. # 42], ¶ 7; and Naomi L. Parrish [Doc. # 44], ¶ 9.

101. Although Plaintiffs have not submitted affidavits from individuals who have actually been chilled by the videotaping, they argue that this is because such individuals do not want to make their identities as erotic entertainers known by becoming involved in litigation, even if they have the opportunity to submit affidavits anonymously or under seal.

102. The Court also noted that "opponents who challenge an ordinance on the basis of the first amendment are 'entitled to rely on the impact of the ordinance on the expressive activities of others as well as their own.' " Sum. Jmt Opinion, at 788 (quoting *SDJ*, 636 F.Supp. at 1365 n. 2; *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981)).

affidavits in which police officers attest to their fears of unfounded accusations. One officer avers that: "I feel that the permitting process needs to be videotaped to protect me against unfounded allegations and to document the verbal abuse directed at the officers and the outright rudeness of some applicants." Affidavit of Stefanie G. Leonard, Exhibit B to City's Brief in Opposition to FTU Plaintiffs' Assertions of Unconstitutionality of Videotaping [Doc. # 453], ¶ 3. The other states that:

> In order to protect the officers who are required to interface with the applicants against unfounded allegations and to document the verbal abuse directed at my officers and the outright rudeness of some applicants, I have permitted the officers to videotape the permitting process to protect their integrity and the integrity of the permitting process.

Affidavit of Roy B. Chandler, Exhibit C to City's Brief, ¶ 4.[103]

The City claims that its officers' fears of unfounded accusations is very real in light of Plaintiffs' contentions that city officials "threaten and bully the applicants," see A.H.D.'s Motion to Compel [Doc. # 412], at 4, and that conditions at the permitting area are "very scary," see Declaration of Robert G. Furey [Doc. # 419]. Moreover, the City contends that, because video surveillance cameras are common in our society today, Plaintiffs' claim that the videotaping of appli-

cants would have any real chilling effect on potential applicants is disingenuous. The City requests that the Court take judicial notice of the pervasiveness of video surveillance cameras in such places as banks, convenience stores, and government offices.

In response to a request by the Court, the City has also submitted evidence regarding other City permit processes that are recorded on videotape.[104] This evidence indicates that video cameras are used in the City office where individuals apply for building permits, in the Municipal Courts Building where individuals post bonds, at the airport, and at the Houston Police Department building where individuals apply for city permits for burglar alarms and auto dealer licenses. See Exhibits E–H to City's Brief in Opposition to FTU Plaintiffs' Assertions of Unconstitutionality of Videotaping [Doc. # 453]. The City's evidence shows, however, that, in none of these other examples, does the City directly aim video cameras on individuals applying for permits to engage in a controversial form of expression of a sensitive nature, nor does the City make a video recording of every individual who performs a specific activity. In these examples, the video cameras are set up to monitor activities within their buildings in general, and it would not be possible to ascertain from the resulting videotapes alone what purpose an individual had for being in the building.[105]

103. For some reason which the Court is at a loss to understand, Plaintiffs—or at least their counsel—appear to believe that the City's defense of its videotaping of the permit application process is that the City wants to protect itself from allegations of "sexual harassment." Plaintiffs argue that such a defense is not viable because women apply for other types of municipal permits, in addition to adult entertainment permits, and because the City could use female police officers to process permit applications. These arguments are entirely irrelevant to the issue presented here. As far as this Court is aware, no applicants have brought forth any allegations of sexual harassment. See also Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (holding that sexual harassment is not limited to men harassing women).

104. The Court did not invite this comparison in order to evaluate Plaintiffs' Equal Protection Clause arguments against the videotaping. As

discussed supra in Section III.D.2, the Court is not persuaded that Plaintiffs can succeed on this constitutional basis in any of their attacks on the Ordinance. Instead, the Court requested that the City submit evidence regarding other city permit processes that are videotaped in order to evaluate the City's defense that video surveillance is common in this type of situation and that therefore the City's decision to videotape applicants is not content-based.

105. The evidence regarding video surveillance of the City office that administers building permits indicates that video cameras are located in the stairwells of the building and in the building permit office itself but that only "some of the permit desks are covered" by the video cameras. Affidavit of Don Thompson, Exhibit E to City's Brief in Opposition to FTU Plaintiffs' Assertions of Unconstitutionality of Videotaping ("City's Videotaping Brief") [Doc. # 453] (emphasis added). The video camera at the Municipal Courts Building is located at the entrance of the build-

In contrast, the video camera at the sexually oriented business permit office is situated in plain view in a corner of a large room where individuals apply for entertainer and manager permits and is directed specifically at the desks at which individuals complete the application forms with City officials. The camera films the applicants from the front while they approach the desks from the waiting area approximately twenty to thirty feet away and then films the applicants' backs at about a ten to fifteen foot distance while they complete the paperwork with City officials. The videotape also shows the waiting area in the background. The camera does not record the actual information individuals submit on their permit applications or the faces of the applicants while they are meeting with the City officials.

Plaintiffs argue that a number of potential applicants will be deterred from applying for permits, and thus from engaging in protected activity, for fear of having these videotapes in the hands of government officials. In support of their challenge to the entire permit requirement, Plaintiffs argue that many entertainers and managers would not want to have personal information about themselves in City records which identify them as working in sexually oriented businesses. Although the Court has concluded, under the authority of *TK's Video*, that the permit requirement is valid in general, the Court nevertheless has recognized the serious nature of Plaintiffs' concerns regarding their privacy and has therefore declared permit application information to be confidential and not subject to disclosure under the Texas Public Information Act. *See* Sum. Jmt. Opinion, Section V.G.4. The Court also enjoined the City from requiring applicants to submit more information than is expressly required by the Ordinance and is needed by the City in order to conduct the criminal background checks. *See id.* Section V.G.3.[106]

After consideration of Plaintiff's arguments against the videotaping and the City's justifications for it, as well as the method of recording, the Court upholds the City's practice of videotaping permit applicants. The Court has reached this decision in part because § 28–254(a)(4) of the Ordinance validly requires entertainers and managers to submit photographs of themselves. In this circumstance, videotapes of the application process, taken from at least a ten foot distance, are no more revealing than the applicants' photographs. In fact, the City's videotapes contain less information than the entertainers and managers' application files, all of which include applicants' close-up photographs. Moreover, the City's stated interest in videotaping the application process so as to protect itself and its employees from possible allegations of abuse or harassment is substantial enough, under the requirements of *TK's Video*, 24 F.3d at 709–10, to outweigh Plaintiffs' concerns that individuals who may want to engage in protected First Amendment activity will be chilled by this practice. While videotaping is not the only way the City can defend itself against unfounded charges of abuse, it is an inexpensive method of ensuring an accurate and unbiased record

---

ing and thus does not record the purpose for which individuals enter the building. *See* Affidavit of A.O. Hernandez, Exhibit F to City's Videotaping Brief. Likewise, according to the City's evidence, although there are video monitors at the airport, these monitors are located "in various areas" of the facility and therefore do not single out individuals engaging in any one specific activity. Affidavit of Jerry Crenshaw, Exhibit G to City's Brief. Moreover, according to this affidavit, not all of the video monitors at the airport are even equipped for video *recording*, as opposed to mere monitoring. Finally, the City's evidence establishes that the video cameras at the Houston Police Department building are located at the entrance to the building and therefore do not record the purpose for which individuals enter the building. *See* Affidavit of D.L. Smith, Exhibit H to City's Brief. Although this affidavit indicates that there are at least two types of licenses which individuals can obtain at the Police Department building, there are clearly many other purposes for which people enter this building.

**106.** In support of this holding, the Court cited the Fifth Circuit's statement in *TK's Video* that:

"Compelled content-neutral disclosure of owner and employee information can chill protected expression ... [w]e insist that countervailing state interests must further a substantial government interest. This protective skirt requires a 'relevant correlation' or 'substantial relation' between the information required and the government interest."

Sum. Jmt. Opinion, at 840 (quoting *TK's Video*, 24 F.3d at 709–10).

of the application process and may allow the City to avoid unfounded accusations waged against its officers.

Thus, the Court holds, under the facts presented here, that the City's videotaping of the permit application process is not an unconstitutional imposition on Plaintiffs' right to engage in expressive activity.

The Court expresses, however, the following caveat. Because videotaping is relatively intrusive and it is possible that it may have some incidental chilling effect on expressive activity,[107] the Court can conceive of no reason why the tapes should not be erased or destroyed after two years, which would be the statute of limitations for an applicant to bring a § 1983 or tort claim alleging abuse by an officer during the application process. *See Burns v. Harris County Bail Bond Board,* 139 F.3d 513, 518 (5th Cir.1998). The City's stated interest in having these videotapes would not extend beyond this period of time.

### 2. Permissibility of Bringing Young Children into Application Room

In their earlier briefing, the FTU Plaintiffs complained that an applicant for an entertainer permit was not permitted to bring her young child with her into the room in the permit application room. In its Summary Judgment Opinion, the Court noted this concern but stated that it was not persuaded that this issue rose to the magnitude of a constitutional violation. *See* Sum. Jmt. Opinion, at 848. The FTU Plaintiffs now seek an express determination regarding the constitutionality of this practice. *See* FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 47–48. However, the City indicates that, since hearing of Plaintiffs' complaints, it has altered its policy and is now allowing permit applicants to bring children with them into the application room. *See* City's Response to FTU Plaintiffs' Motion for Reconsideration [Doc. # 413], at 10. The FTU Plaintiffs' request for an injunction on this issue is therefore moot, and the Court declines to reach the issue on the merits.

### F. *Conspicuous Display Requirement*

■ In its Summary Judgment Opinion, the Court held that, as applied to entertainers, the Ordinance's requirement that individuals working in adult businesses must conspicuously wear identification cards while performing is an impermissible content-based restriction on speech. *See* Sum. Jmt. Opinion, Section V.G.7. The Court did not address the validity of the conspicuous display requirement as applied to managers because it did not appear that Plaintiffs had addressed this point in their summary judgment briefing. *See* Sum. Jmt. Opinion, at 850.[108]

---

**107.** The City asserts that Plaintiffs' claim that "individuals who regularly expose themselves in a state of nudity or near-nudity to total strangers on a daily basis" would be chilled by the City's videotaping of the permit office is frivolous. City's Brief in Opposition to FTU Plaintiffs' Assertions of Unconstitutionality of Videotaping [Doc. # 453], at 8. As noted in its Summary Judgment Opinion, the Court believes that this argument belittles the genuine concern of entertainers, who have not sacrificed their First Amendment rights merely because they have chosen to appear undressed anonymously in public. *See* Sum. Jmt. Opinion, at 842–43. According to Plaintiffs, many of the individuals currently working in sexually oriented businesses intend to pursue other careers at a later time in their lives and worry about City officials having such revealing documentation of their involvement in this business, which could, in unforeseen ways, come back to haunt them later in their careers. Although the City asserts that it has taken measures to keep these videotapes confidential along with the rest of the permit application informa-

tion, Plaintiffs contend that they have no guarantee that the videotapes could not, at some point, fall into the wrong hands and be used to cause them embarrassment or harm. Moreover, Plaintiffs have raised a serious argument that entertainers and managers may have genuine concern about *government* officials obtaining more information about them than is authorized by legislative mandate. In *TK's Video,* the Fifth Circuit acknowledged the possible chilling effect that can result from the government's collection of personal information about individuals engaging in protected activity and therefore required that the government have a solid justification for its collection of all personal information regarding these individuals. *See* 24 F.3d at 709–10; Sum. Jmt. Opinion, at 842–43.

**108.** Plaintiffs claim that they did argue this point in their summary judgment briefing. On reexamination of the FTU Plaintiffs' summary judgment response, the Court agrees that there was passing mention of the fact that Plaintiffs were challenging the conspicuous display requirement

In their reconsideration motions, the City requests that the Court reconsider its holding invalidating the requirement as applied to entertainers, and the FTU Plaintiffs request that the Court reach this issue, and invalidate the requirement, with respect to managers. *See* City's Motion for Reconsideration [Doc. # 364], at 19–20; FTU Plaintiffs' Motion for Reconsideration [Doc. # 381], at 42–43. After further consideration of the legislative record and the parties' arguments, the Court withdraws its previous ruling invalidating the conspicuous display requirement with respect to entertainers and now holds that the requirement is constitutional as applied both to entertainers and to managers.

In its request for reconsideration on this issue, the City cites evidence from the legislative record that it claims supports the content-neutrality of the conspicuous display requirement. *See* City's Motion for Summary Judgment [Doc. # 120], Exhibit 7G, at 17–18; Exhibit 9D, at 29–30; Exhibit 36, at 12, 15–16.[109] After further examination of this evidence and other portions of the legislative record,[110] the Court now concludes that City Council members did not act with content-based intent when they decided to require individuals working in adult businesses to wear identification cards while working. Instead, the Council adopted this requirement with the content-neutral purpose of ensuring

that in fact all entertainers and managers working in adult businesses are properly licensed and that the licensure of all employees can be easily ascertained without interruption of the entertainment by and business of Plaintiffs.

It is clear from the Committee's discussions and testimony of police officials that an important goal of the new Ordinance was to allow police officers to enforce the law in adult businesses from a distance, without having to get themselves involved in illegal activity.[111] By requiring that individuals who must have licenses to work in adult businesses conspicuously display their licenses while working, the City sought to allow officers to enforce the licensing requirement upon entering a business and looking around at the entertainers and managers working there.[112] With the conspicuous display requirement in force, police officers would be able to ascertain whether individuals are properly licensed without provoking direct immediate confrontations with them.[113]

In making this ruling, the Court specifically relies on indications in the record that the City has taken measures to make the conspicuous display requirement narrowly tailored. The identification cards that entertainers and managers are required to wear do not contain the licensee's real name or other identifying information that could in-

---

with respect to both entertainers and managers. However, Plaintiffs' substantive arguments were limited to the chilling impact the requirement would have on entertainers. *See* FTU Plaintiffs' Response to City's Motion for Summary Judgment [Doc. # 170], at 68–75.

**109.** The City also argues that the Court previously erred in stating that it is not clear whether the conspicuous display requirement was challenged before the Fifth Circuit in *TK's Video. See* Sum. Jmt. Opinion, at 848–49. In support of this argument, the City notes that the district court specifically upheld the conspicuous display requirement. *See TK's Video, Inc. v. Denton County, Tex.,* 830 F.Supp. 335, 344 (E.D.Tex.1993), *aff'd in part,* 24 F.3d 705. This citation does not, however, contradict this Court's statement that the *Fifth Circuit* did not address this issue. In fact, the Court has recently reviewed the briefs submitted to the Fifth Circuit in *TK's Video* and has ascertained that this issue was not even raised in the appeal.

**110.** *See, e.g.,* Minutes for August 8, 1996, Committee Meeting, Exhibit 6D to City's Motion [Doc. # 120], at 10; Exhibit 7G, at 33, 43, 134–35, 143; Exhibit 8E, at 97–99.

**111.** *See* Transcript of August 19, 1996, Committee Meeting, Exhibit 7G to City's Motion for Summary Judgment [Doc. # 120], at 143 (Captain Chandler explains that "what we're looking for is the ability for an undercover officer to walk in and look around to see if this club is engaging in illegal activity in a very short period of time").

**112.** *See id.* at 43 (identification cards should be "readable in the environment").

**113.** *See id.* at 33 (Harris County Assistant District Attorney explains that conspicuous display requirement "does away with the ... problem [of] the unknown dancer, when the officer doesn't want to make the arrest at the time they observe the incident"), 134–35 (officers often want to come back and make arrests at a later time).

crease the licensee's risk of being subject to harassment or other dangers, such as stalking. Instead, each card contains only the licensee's picture, a stage name, and an identification number.[114] This information is sufficient to allow police officers to ascertain without intrusion whether all entertainers and managers working in adult businesses are licensed but is not so broad as to create any real danger for the licensees.[115]

Thus, the Court concludes that the conspicuous display requirement is a permissible content-neutral regulation that is narrowly tailored to serve the City's substantial interest in ensuring that only licensed entertainers and managers work in adult businesses. The Court holds that the requirement is constitutionally valid as applied to both entertainers and managers.[116]

**114.** *See* Exhibit 3 to City's Motion for Reconsideration [Doc. # 364]; Transcript of September 16, 1996, Committee Meeting, Exhibit 9D to City's Motion for Summary Judgment, at 29–30 (Captain Chandler explains that "to protect the dancers, they would have to wear on them ... a license that does not have their name on it. It has some kind of number and a picture. That allows a citizen who is offended to complain on them by number and stage name, but it protects them from stalkers").

**115.** In its original invalidation of the conspicuous display requirement, the Court noted that the requirement would constitute some intrusion on the entertainers' engagement in expressive activity. The Court now concludes that the intrusion, if any, is not substantial enough to override the City's power to implement a content-neutral regulation that will assist its officers in performing their law enforcement duties.

In addition, the Court notes that the conspicuous display requirement intrudes even less on managers' speech than on entertainers' speech because managers are not subject to as severe a threat of harassment from patrons as are entertainers, who put themselves on display before patrons in a state of undress.

**116.** The entertainers may decide where and how to display the identification cards, which may be on an arm or ankle, as suggested by the City's counsel at a pretrial conference.

**117.** To the extent that these Plaintiffs request that the Court "reconsider" its holding with respect to these definitions, Plaintiffs' request is not correctly stated. The Summary Judgment Opinion did not purport to clarify these definitions, as this issue was not even presented to the Court prior to that time.

## IX. CLASSIFICATION OF ADULT MOVIE THEATRES SEATING LESS THAN 100 PATRONS

In their Motions for Reconsideration, the N.W. Enterprises and Elgin Investment Company Plaintiffs request that the Court resolve a potential ambiguity in the Ordinance's definitions of adult movie theatres and adult mini-theatres. *See* N.W. Plaintiffs' Motion for Reconsideration [Doc. # 343], at 6–8; Elgin Investment Co.'s Motion for Reconsideration [Doc. # 367]. Specifically, these Plaintiffs argue that conventional adult movie theatres that have a seating capacity of fewer than 100 patrons should be considered, under the Ordinance, to be adult movie theatres and not adult mini-theatres.[117] In contrast, the City argues that such theatres are classified under the Ordinance as both adult movie theatres *and* adult mini-theatres.[118]

**118.** Thus, both sides agree that conventional adult movie theatres that have a seating capacity of fewer than 100 patrons should be considered to be adult movie theatres under the Ordinance. Section 28–121 defines an "adult movie theatre" as:

An establishment, containing a room with tiers or rows of seats facing a screen, or projection area, whose primary business is the exhibition to customers of motion pictures which are intended to provide sexual stimulation or sexual gratification to such customers and which are distinguished by or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas.

The City believes that such theatres should be also be classified as adult mini-theatres. Section 28–81 defines an "adult mini-theatre" as follows:

Adult mini-theatre shall mean any premises that is subject to regulation under Chapter 243 of the Local Government Code as amended, to which members of the public or members of any club, group or association are admitted and permitted to use one or more 'mini-theatre devices.'

Section 28–81 defines a "mini-theatre device" as follows:

Mini-theatre device shall mean any coin or slug-operated or electrically or electronically or mechanically controlled machine or device that dispenses or effectuates the dispensing of 'entertainment,' that is intended for the viewing of more than five (5) persons but less than 100 persons in exchange for any payment of any consideration. The term 'mini-theatre device' shall not include any conventional motion picture screen or projection area designed to be viewed in a room containing tiers or rows of seats with a viewer seating capacity of 100 or more persons.

It appears that Plaintiffs are concerned about this potential ambiguity because if any of their businesses · are classified as both adult movie theatres *and* adult mini-theatres, then they will be required to obtain licenses to operate under Article II of the Ordinance (the article that applies to adult arcades and mini-theatres) as well as licenses under Article III (the article that applies to all adult businesses). However, these Plaintiffs do not explain why they oppose obtaining Article II licenses in addition to Article III licenses. They do not specify which, if any, provisions of Article II they find objectionable and why. They also do not explain what else is at stake with respect to this issue, what impact this statutory interpretation will have on them, how this controversy is ripe, and even why this Court has jurisdiction to make this determination.[119]

Thus, the Court concludes that this matter is not ripe for resolution. The controversy simply is not framed specifically enough to permit the Court's intervention. A ruling on this issue must therefore await the City's enforcement of the Article II license requirement against these Plaintiffs and more particularized arguments, most likely in defense to a state court criminal prosecution.[120]

## X. FTU PLAINTIFFS' MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT

On April 13, 1998, the FTU Plaintiffs attempted to file a Third Amended Complaint. *See* FTU Plaintiffs' Corrected Motion for Leave to File Third Amended Complaint [Doc. ¶ 443].[121] This Complaint would add HFR Enterprises, the landlord for Plaintiff Ice Embassy, as a Plaintiff in this case; incorporate Ice Embassy's supplemental complaint regarding its proposed VIP room; add a cause of action regarding the City's elimination of grandfathered status for Plaintiffs with respect to after-arriving protected land uses; and add a cause of action challenging the City's videotaping of entertainers and managers applying for permits. The City has filed an Objection [Doc. # 455] to this Motion, and the FTU Plaintiffs have filed a Reply [Doc. # 462].

Because the FTU Plaintiffs' Third Amended Complaint raises no surprises and will cause no prejudice for the City, the Court grants leave to amend. Pursuant to Fed. R.Civ.P. 15(a), "leave [to amend] shall be freely given when justice so requires." *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct.

Plaintiffs argue that, no matter how many seats a theatre holds, a conventional movie theatre is not a mini-theatre because a conventional movie theatre projector is not a mini-theatre device as specifically defined in § 28–81. Further, Plaintiffs argue that a conventional movie theatre cannot be a mini-theatre because, under the definition of a "mini-theatre," patrons do not "use" a conventional movie theatre projector as they would use an adult mini-theatre device. By this, Plaintiffs mean that, in a conventional movie theatre, patrons do not control the projector as they would in a mini-theatre.
The City argues, however, that under the Ordinance's definitions, a conventional movie theatre projector can also be a mini-theatre device because such a projector, although not coin or slug-operated, is nevertheless an electrically controlled machine. The City also argues that the term "use" in the Ordinance's definition of an "adult mini-theatre" does not require that patrons actually control the machine but also applies to patrons watching a film showed by a projectionist who is an employee of the theatre. Furthermore, the City argues that the disputed theatres are clearly mini-theatres under the Ordinance's definition because the last sentence of the definition of an adult mini-theatre device would be superfluous if *no* conventional motion picture screen or projection area were to be considered a mini-theatre, no matter how many seats it was intended to hold.

**119.** In contrast, Plaintiff Ice Embassy persuaded the Court that a decision is necessary with respect to the Ordinance's application to large VIP rooms because an adverse decision would cause it to abandon its plans to build its proposed VIP room.

**120.** Plaintiffs appear to try to put this issue into the form of a constitutional argument by contending that the legislative record for Ordinance 97–75 does not contain any evidence that conventional adult movie theatres seating less than 100 patrons create the same sorts of negative secondary effects as adult arcades. However, Plaintiffs have failed to raise a constitutional issue because they do not even specify what requirements of Article II they believe should not apply to conventional adult movie theatres that seat fewer than 100 patrons.

**121.** This Motion superseded an earlier Motion for Leave to File Third Amended Complaint [Doc. # 433], which is **DENIED AS MOOT** in light of Plaintiffs' corrected Motion.

227, 9 L.Ed.2d 222 (1962); *Lowrey v. Texas A & M University System*, 117 F.3d 242, 245–46 (5th Cir.1997). In addition, the Court addresses the City's specific objections below.

■ First, the City objects to the addition of HFR Enterprises as a Plaintiff in this case on the ground that this intervention is untimely. The City argues that HFR Enterprises should not be allowed to join the lawsuit now because it has been aware since last year that it had an interest in this litigation but failed to intervene sooner. However, the City does not indicate how it will be prejudiced by the addition of this Plaintiff to the case. The Court therefore will allow HFR Enterprises to join the litigation so long as it agrees to be bound by the Court's prior scheduling orders and rulings. See Sum. Jmt. Opinion, at 769 n. 12 (allowing late intervention by Plaintiff KQ Investments under similar conditions).

Second, the City objects to the FTU Plaintiffs' attempt to amend their Complaint to incorporate the VIP room issue on the ground that this cause of action is already included in Ice Embassy's earlier supplemental complaint and is therefore unnecessary and duplicative. The City does not explain, however, how it would be unfairly prejudiced by this amendment and the Court can conceive of none. This amendment is allowed.

Third, the City objects to the FTU Plaintiffs' attempt to add a claim regarding the City's elimination of grandfathered status for preexisting adult businesses with respect to after-arriving protected land uses on the ground that the FTU Plaintiffs do not have standing to assert this claim. The City contends that this claim is not ripe because the City may still appeal the Court's invalidation of the Ordinance's increased distance requirements and because an appellate reversal would moot Plaintiffs' claim regarding the elimination of a business's grandfathered status. The Court rejected this argument *supra* in Section III.E. and held that these Plaintiffs do have standing to raise issues that were created by the Court's rulings in its Summary Judgment Opinion. In any event, even if the Court is in error about the ripeness of these claims, lack of ripeness does not preclude Plaintiffs from adding them to their Complaint, so that the matters may be raised at a later time if and when they become ripe.

Fourth, the City objects to Plaintiffs' attempt to add a cause of action challenging the City's videotaping of entertainers and managers applying for permits on the ground that Plaintiffs lack standing to raise this issue. For reasons discussed *supra* in Section VIII.E.1, the Court rejects this argument.

Finally, the City argues that the FTU Plaintiffs' Third Amended Complaint is untimely and would result in undue delay to the proceedings. The Court disagrees. This amendment will not cause any delay, since the Court, in this Opinion, has already addressed the issues included in the Complaint. Moreover, the Court concludes that addressing all of Plaintiffs' arguments in the current litigation will reduce delay in the long run and will promote judicial efficiency by obviating the need for separate lawsuits on issues closely related to those already raised here. Therefore, the Court concludes that justice requires that Plaintiffs' Motion for Leave to File a Third Amended Complaint be granted.

## XI. *ATTORNEYS' FEES*

Finally, the N.W. Enterprises Plaintiffs claim that Plaintiffs' partial success in this case entitles them to attorneys' fees, and they request guidance as to how to submit their application for fees. The Court declines to address attorneys' fees issues until the case has been concluded before this Court and judgment has been entered.

## XII. *CONCLUSION*

For the foregoing reasons, it is

**ORDERED** that the Court's Memorandum Opinion and Order ("Summary Judgment Opinion") [Doc. # 331] is **REAFFIRMED** except in the following respects:

1. The Court withdraws its conclusion that the addition of public parks to the Ordinance's list of protected land uses is constitutional. A ruling on the validity of this amendment, contained in § 28–125(b)(1) of the Ordinance, must

await further factual development of the issue regarding the number of permissible sites that would exist for adult businesses if this amendment were implemented.[122]

2. The Court withdraws its ruling that invalidated § 28–256(a) of the Ordinance, the requirement that entertainers in adult establishments must wear identification cards while working. The Court now upholds this requirement for both entertainers and managers.[123]

3. The Court withdraws its ruling that any entertainer or manager who was working in an adult business prior to the time that the individual permit requirement went into effect, who applied for a permit by the application deadline, and whose application was denied, must be allowed to continue working pending the completion of the entire judicial appeal of the applicant's permit denial. The Court now holds instead that such individual must only be allowed to continue working for thirty days following the denial of the permit, unless the individual receives a state court injunction enjoining the City's enforcement of the permit requirement pending judicial review.[124]

It is further

**ORDERED** that a ruling on the validity of the new multifamily dwelling formula, contained in § 28–125(b)(3) of the Ordinance, must await further factual development of the issue regarding the number of permissible sites that would exist for adult businesses if this formula were implemented.[125] The Dee & Dee Plaintiffs' Motion for Partial Summary Judgment regarding the multifamily dwelling formula [Doc. # 377] is therefore **DENIED.** It is further

**ORDERED** that the City cannot constitutionally apply the Ordinance's prohibition against providing adult entertainment in enclosed areas, contained in §§ 28–136(b) and 28–258(c) of the Ordinance, to Plaintiff Ice Embassy's large VIP room.[126] Ice Embassy's Motion for Partial Summary Judgment on this issue [Doc. # 258] is therefore **GRANTED.** It is further

**ORDERED** that the City may not enforce § 28–130(g) of the Ordinance without providing the affected businesses with the procedural protections and compensation required by § 216.001 *et seq.* of the Texas Local Government Code.[127] The City's Motion for Summary Judgment on Ordinance 97–75, Article III, Section 28–130(g) [Doc. # 397] is therefore **DENIED** and the FTU Plaintiffs' Cross–Motion for Summary Judgment on § 28–130(g) [Doc. # 435] is **GRANTED.** It is further

**ORDERED** that the City may not at this time reject a timely filed application for an adult business license under Ordinance 97–75 on the sole ground that the applicant is located within 750 feet of a school, church, or daycare center that arrived after the establishment of the adult business at that location.[128] It is further

**ORDERED** that the parties' Motions for Reconsideration [Docs. # 343, 364, 367, 370, 376, 381, 388] are **GRANTED IN PART** and **DENIED IN PART** in accordance with this Supplemental Memorandum Opinion and Order. It is further

**ORDERED** that the A.H.D. Plaintiffs' Motion to Join the FTU Plaintiffs' Response to Defendant's Memorandum regarding the multifamily dwelling formula [Doc. # 380] is **GRANTED.** It is further

**ORDERED** that the Dee & Dee Plaintiffs' Motion for Leave to File Corrected Motion for Reconsideration [Doc. # 374] is **GRANTED.**[129] The Dee & Dee Plaintiffs' Corrected Motion for Reconsideration [Doc. # 376] su-

---

122. *See* discussion *supra* Section III.B.2.

123. *See* discussion *supra* Section VIII.F.

124. *See* discussion *supra* Section VIII.A.2.

125. *See* discussion *supra* Section III.C.2.

126. *See* discussion *supra* Section VI.C.

127. *See* discussion *supra* Section VII.B.

128. *See* discussion *supra* Section III.E.

129. *See* discussion *supra* note 10.

persedes their earlier Motions [Docs. # 369 and 375]. The earlier Motions [Docs. # 369 and 375] are therefore **DENIED**. It is further

**ORDERED** that the Dee & Dee Plaintiffs' Objection to N.W. Enterprises, Inc., Memorandum of Law Regarding Multi–Family Dwelling Formula [Doc. # 378] is **OVERRULED**.[130] It is further

**ORDERED** that the FTU Plaintiffs' Objections to Summary Judgment Affidavits of Ollie Schiller [Docs. # 438 and 461] are **OVERRULED**.[131] It is further

**ORDERED** that the FTU Plaintiffs' Corrected Motion for Leave to File Third Amended Complaint [Doc. # 443] is **GRANTED**.[132] The FTU Plaintiffs' Motion for Leave to File Third Amended Complaint [Doc. # 433] is **DENIED AS MOOT**. It is further

**ORDERED** that the City's Motion to Dissolve Emergency Order Extending the Entertainer/Manager Licensing Deadline [Doc. # 451] is **DENIED**.[133] It is further

**ORDERED** that the N.W. Enterprises' Plaintiffs Motion to adopt FTU Plaintiffs' briefing on videotaping [Doc. # 454] is **GRANTED**. It is further

**ORDERED** that the City's Objections to Plaintiffs' Evidence on the signage issue [Doc. # 457] are **OVERRULED**.[134] It is further

**ORDERED** that the City's Objections to Declarations of Raschid Chawdhary and Affidavit of David A. Furlow [Doc. # 468] are **OVERRULED**.[135] It is further

**ORDERED** that the City shall submit under seal a copy of the videotape of the permit application process that the Court and counsel viewed after the conference held on April 7, 1998.[136] It is further

**ORDERED** that the parties are directed to submit a joint proposal (no more than five pages in length) on or before June 22, 1998, for a discovery schedule and trial procedures on the issue of alternative sites under the Ordinance's amendments regarding multi-family dwellings and public parks. The parties should follow (where applicable) the format for a Joint Discovery/Case Management Plan used in this district pursuant to Fed. R.Civ.P. 16 and 26(f). In this submission, the parties also shall state whether they seek to litigate this issue prior to completion of their appeals on the other locational issues.[137]

**THIS IS NOT A FINAL JUDGMENT.**

## *AMENDED MEMORANDUM OPINION AND ORDER REGARDING CONSPICUOUS DISPLAY REQUIREMENT*

### I. *INTRODUCTION*

This Opinion addresses the constitutionality of § 28–256(a) of Ordinance 97–75, the provision of Houston's new sexually oriented business ordinance that requires entertainers and managers at these businesses to wear their licenses while working. In its Summary Judgment Opinion, the Court held that this provision was unconstitutional as applied to entertainers and determined that it did not need to address the issue with respect to managers. *See* Amended Memorandum Opinion and Order [Doc. # 472], at 187–91. In its Reconsideration Opinion, the Court reversed itself and held the provision to be constitutional as applied to entertainers and extended this holding to managers as well. *See* Supplemental Memorandum Opinion and Order [Doc. # 474], at 107–10.

Plaintiffs, seeking a ruling that the provision is unconstitutional as applied both to entertainers and to managers, have now submitted extensive briefing on this issue and have requested that the Court reconsider the matter once again. *See* Motion to Amend [Doc. 487]. The City has filed a brief opposing this request. *See* Response [Doc. # 497].

---

130. *See* discussion *supra* note 44.

131. *See* discussion *supra* note 82.

132. *See* discussion *supra* Section X.

133. *See* discussion *supra* Section VIII.A.1.

134. *See* discussion *supra* note 86.

135. *See* discussion *supra* note 82.

136. *See* discussion *supra* note 99.

137. *See* discussion *supra* at 46.

For the reasons described below, the Court reaffirms its decision upholding the "conspicuous display requirement" for entertainers but withdraws its decision upholding the requirement for managers.

## II. *ENTERTAINERS*

In their arguments regarding entertainers, Plaintiffs contend that the conspicuous display requirement must be evaluated under strict First Amendment scrutiny because it mandates speech and alters the expressive conduct of entertainers at sexually oriented businesses. They argue that the requirement fails this test because the City has not shown a compelling interest in it and because it is not the least restrictive means available of achieving the City's purported interest.

In the alternative, Plaintiffs contend that, even if the requirement should be evaluated under the less stringent test of intermediate First Amendment scrutiny, it cannot survive under this test either because the City does not have an important governmental interest in compelling entertainers to wear their licenses. In addition, applying the intermediate scrutiny standard, Plaintiffs claim that the requirement is not narrowly tailored because it restrains substantially more speech than necessary.

Finally, Plaintiffs argue that the conspicuous display requirement violates the Equal Protection Clause because it creates a discriminatory classification which turns upon the exercise of a fundamental constitutional right.

The Court will address each of these arguments in turn.

### A. *Strict First Amendment Scrutiny*

In support of their new argument that the conspicuous display requirement should be evaluated under strict scrutiny on the basis that it mandates speech, Plaintiffs rely primarily on *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). In *Riley*, the Supreme Court, in pertinent part, struck down a state law that required professional fundraisers to make disclosures regarding the percentage of contributions

they retained as consideration for their fundraising activities. The Court held that the statute should be subject to strict First Amendment scrutiny because it impermissibly compelled the fundraisers to engage in speech. Plaintiffs rely on the fact that the Court's opinion in *Riley* contains broad language suggesting that strict scrutiny should apply whenever a regulation mandates speech: "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the act as a content based regulation of speech." *Id.* at 795, 108 S.Ct. 2667.

Plaintiffs argue that the conspicuous display requirement mandates speech in the same way that the invalid fundraising statute in *Riley* mandated speech. In particular, Plaintiffs contend that the conspicuous display requirement compels speech by requiring entertainers to divulge information about themselves to patrons by wearing their licenses while working.

■ The Court is not persuaded by Plaintiffs' reliance on *Riley*. Rather than create a new rule that all instances of mandated speech in any First Amendment context must be evaluated under strict scrutiny, the Supreme Court merely decided that *mandated* speech should be treated the same as *restrictions* on speech. *See id.* at 796–97, 108 S.Ct. 2667 ("There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say."). Nothing in *Riley* indicates that if the mandated speech is not in a context that would otherwise be subjected to strict scrutiny, the mere fact that the challenged regulation mandates speech, rather than restricts it, would require the regulation to be subjected to strict scrutiny.

In *Riley*, the Court applied strict scrutiny because it found that the challenged statute was a content-based restriction on speech. In contrast, this Court has held, and now reaffirms, that the conspicuous display requirement is content-neutral with respect to

entertainers because the legislative record reveals that the City Council relied upon evidence that such a requirement would help combat negative secondary effects associated with sexually oriented businesses. *See* Recon. Opinion, at 908–09. Therefore, the Court rejects the argument that strict scrutiny must be applied to this requirement.

Moreover, *Riley* concerned a type of speech that courts have consistently afforded greater protection than the speech that is at issue in this case. The speech in *Riley,* solicitation of funds for charitable purposes, involved political speech.[1] In contrast, sexually oriented entertainment is protected, at best, only within the "outer perimeters of the First Amendment." *See Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). Although the Supreme Court in *Riley* included broad language regarding the implication of the fact that the fundraising statute mandated speech, the Supreme Court was careful to note that the speech at issue was "fully protected expression." *Riley,* 487 U.S. at 796, 108 S.Ct. 2667. Thus, *Riley* does not require the conspicuous display requirement to be evaluated under a strict scrutiny analysis.

 In any event, the Court also rejects Plaintiffs' analogy to *Riley* because it is not persuaded that the conspicuous display requirement compels any more than a minimal amount of speech. As indicated by the City and relied upon by the Court in its previous ruling, the Ordinance does not require that the licenses that entertainers must wear will contain their real names. Instead, these licenses only contain each license holder's stage name, photograph, and an identification number. *See* Recon. Opinion, at 908–09. The entertainers use their stage names and display their faces (which are depicted on the license photographs) while at work, even without the conspicuous display requirement. In addition, the identification number has no meaning to the public, since the City must keep the license application information completely confidential. *See* Sum. Jmt. Opinion, at 841–43; 858–59. Thus, there is little or no expression compelled by the conspicuous display requirement that entertainers would not reveal without the requirement.

Plaintiffs also assert that the requirement that entertainers wear their licenses alters the entertainers' expressive conduct and therefore must be subjected to strict scrutiny. The Court rejects this argument as well. Even if the requirement imposes an incidental burden on the entertainers' expressive conduct, it is not subject to strict scrutiny unless it is content-based, an argument that the Court has rejected. *See Barnes,* 501 U.S. at 567–68, 111 S.Ct. 2456 (a content-neutral statute that "furthers substantial governmental interests" may be valid under less demanding scrutiny "despite its incidental limitations on some expressive activity"); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46–47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

Plaintiffs creatively argue that, by requiring entertainers to wear licenses, the City is altering the entertainers' expression by:

> Mandat[ing] that dancers send out a subtle psychological message to customers stating that they are a bureaucratically regulated commodity, a concept quite discordant with the image of exoticism, freedom and sexuality which they are trying to convey. A major component of the entertainer's expressive conduct is her physical appearance while she is on stage. The presence of a badge, whether attached to her torso, ankle or wrist, would detract from her performance and mar the physical and, more significantly, the mental impression which the communication attempts to convey.

Plaintiffs' Motion to Amend, at 8. However, Plaintiffs have been able to cite no authority for the argument that a requirement such as a license display requirement alters the expression of topless dancers so as to require the application of strict scrutiny. The Court also notes that this argument is very similar to an argument raised by Plaintiffs that the Court rejected regarding the three foot and

---

1. More exactly, the Court found that the speech involved in *Riley* was commercial speech "intertwined with otherwise fully protected speech," including "advocacy and dissemination of information." *Riley,* 487 U.S. at 796, 798, 108 S.Ct. 2667.

no touch rules. The Court held in its Summary Judgment Opinion that strict scrutiny was not applicable to these provisions. *See* Sum. Jmt. Opinion, at 855–56.

In short, Plaintiffs have failed to persuade the Court that strict scrutiny applies to the evaluation of the constitutionality of the conspicuous display requirement with respect to entertainers. Therefore, the Court need not address Plaintiffs' contention that the City has failed to show a compelling interest in enacting this regulation for entertainers.

### B. *Intermediate First Amendment Scrutiny*

In the alternative, Plaintiffs argue that the conspicuous display requirement is also invalid under intermediate scrutiny. In support of this argument, Plaintiffs largely repeat arguments that the Court has already addressed and rejected.

As discussed in the Reconsideration Opinion, the Court finds that the City has met its burden of showing that it has an important governmental interest in requiring entertainers to wear their licenses. This interest is to allow police officers easier and less intrusive enforcement of the license requirement, a regulation that the Court has found to be valid.

Plaintiffs challenge this decision by citing once again a Tenth Circuit case, *American Constitutional Law Foundation v. Meyer*, 120 F.3d 1092 (10th Cir.1997), *cert. granted*, —— U.S. ——, 118 S.Ct. 1033, 140 L.Ed.2d 100 (1998), an opinion which struck down a requirement that individuals collecting signatures on political petitions wear licenses while collecting their signatures. The *Meyer* court quoted *Riley* for the proposition that "the First Amendment does not permit the state to sacrifice speech for efficiency." *Riley*, 487 U.S. at 795, 108 S.Ct. 2667; *Meyer*, 120· F.3d at 1102. This Court cited the *Meyer* opinion in its Summary Judgment Opinion, at 850 n. 201, but upon further consideration concluded that *Meyer* is not applicable here. Most importantly, *Meyer* involved political speech, and this Court is not persuaded that *Meyer's* reasoning should

apply to the conspicuous display provision of Ordinance 97–75, which requires topless dancers to wear licenses that contain little information.

As for Plaintiffs' argument that the conspicuous display requirement must fail intermediate scrutiny because it is not narrowly tailored, the Court rejects this argument as well. The Court does not find that the requirement restrains substantially more speech than necessary. On the contrary, the Court is persuaded that the City Council reasonably concluded that, by requiring entertainers to display their licenses somewhere on their person while working, the City's police officers would interfere even less with the entertainers' expression than if there were no conspicuous display requirement. With this requirement, the police are able to ascertain from a distance whether an entertainer has a license to work in a sexually oriented business. Without the requirement, the police would have to engage in more intrusive and potentially contentious confrontations with entertainers because they would have to ask the entertainers to retrieve their licenses upon demand, even when such a request would interrupt an entertainer's performance or other activities while working.

Plaintiffs have suggested law enforcement alternatives that they would prefer to the conspicuous display requirement to ensure that entertainers are all properly licensed while at work—indeed, alternatives that the Court finds logical. There is, however, no doctrinal requirement that the City enact the alternative that a Plaintiff or the Court prefers, or even the least restrictive means available to achieve the City's interest. *See* Sum. Jmt. Opinion, at 854–55 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1276 (5th Cir.1988)). Since the Court has found that, for entertainers, the conspicuous display requirement is a content-neutral government regulation designed to address perceived secondary effects caused by adult businesses,[2] the City was required to enact

---

**2.** City Council members were concerned that the

sexually oriented businesses were attracting mi-

regulations that are "narrowly tailored" to address these effects. The method used by the City to address the identified secondary effects must be left to the discretion of the elected City Council members, so long as their chosen method is narrowly tailored. The conspicuous display requirement for entertainers meets this criterion.[3] Despite Plaintiffs' arguments that the requirement intrudes on their artistic freedom, the Court concludes that the intrusion is only an incidental burden on the entertainers' expression, given the leeway the Ordinance includes as to where on an entertainer's person the license may be displayed. *See Barnes,* 501 U.S. at 567–68, 111 S.Ct. 2456.

The Court therefore concludes once again that, with respect to adult entertainers, the conspicuous display requirement is valid under intermediate First Amendment scrutiny.[4]

### C. *Equal Protection*

Finally, Plaintiffs argue that the conspicuous display requirement violates the Equal Protection Clause. In no case to this Court's knowledge has a court struck down any regulations regarding sexually oriented entertainment based on the Equal Protection Clause. Plaintiffs once again rely on *Minneapolis Star & Tribune Company v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). However, this case involved the First Amendment, not the Equal Protection Clause. Furthermore, *Minneapolis Star* concerned First Amendment guarantees with respect to freedom of the press. The Court will abide by its previous holding that the conspicuous display requirement is governed by cases specifically addressing sexually oriented entertainment.

The Court therefore is unpersuaded that Plaintiffs can succeed on their equal protection arguments.

### III. *MANAGERS*

In its Reconsideration Opinion, the Court held that intermediate scrutiny applies to the conspicuous display requirement because the Houston City Council justified the requirement in the legislative record of Ordinance 97–75 with reference to negative secondary effects that the requirement was expected to alleviate. See Recon. Opinion, at 908–09. The Court did not notice at the time, however, that the legislative evidence upon which it relied in upholding this requirement pertained exclusively to entertainers. See Recon. Opinion, at 908–09.[5]

Plaintiffs now have argued—and a further detailed review of the legislative record with this issue specifically in mind convinces the Court—that there is absolutely nothing in the legislative record of Ordinance 97–75 that pertains to secondary effects that would be alleviated by imposing the conspicuous display requirement on managers working in adult businesses. The Court finds that the comments by witnesses and Council members that support the City Council's justification for the conspicuous display requirement, even given a generous interpretation, simply do not address the issue of law enforcement difficulties with identifying managers at adult businesses. No one stated in any City Council meetings or hearings that police officers have had any difficulty identifying managers or perceiving managerial misconduct from a distance. Likewise, the record contains no

nors or people who have been convicted of specified crimes, such as public lewdness or prostitution, to work as entertainers, thereby increasing the likelihood of such activities occurring at these businesses again.

**3.** Again, this Court notes that the City has not required the entertainers to display their real names or addresses, but instead only their stage names, photographs, and identification numbers.

**4.** In their arguments regarding intermediate scrutiny, Plaintiffs rely on cases involving commercial speech, including *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d

532 (1995), and *Edenfield v. Fane,* 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). However, Plaintiffs have failed to persuade the Court that it should apply the test relating to commercial speech, instead of the test articulated in the case law as specifically addressing the context of adult entertainment. *See* Sum. Jmt. Opinion, at 779–80.

**5.** From the parties' initial briefing, the Court did not perceive that Plaintiffs' arguments on this topic were addressed to managers at all. *See* Sum. Jmt. Opinion, at 850. In the Reconsideration Opinion, the Court did not address managers separately from entertainers.

evidence of any concern that police officers should be able to ascertain whether managers are licensed without having to confront them, ask to see their licenses, and thereby interfere with their expressive conduct.[6]

Therefore, with respect to managers, the Court withdraws its prior ruling upholding the conspicuous display requirement. Because the legislative justification for this requirement was only expressed with respect to entertainers, and the record contains no justification for this requirement for managers specifically, the Court must treat the requirement as a content-based regulation that is subject to strict scrutiny. Since the City has not demonstrated that the record contains evidence of any compelling interest in requiring managers to display their licenses while at work, the Court concludes that the requirement for managers is unconstitutional as a violation of the managers' First Amendment rights.

## IV. *CONCLUSION*

For the foregoing reasons, it is

**ORDERED** that Plaintiffs' Motion to Amend [Doc. # 487] is **GRANTED IN PART and DENIED IN PART**. The Court holds that § 28-256(a) of Ordinance 97-75, the conspicuous display requirement, is constitutionally valid with respect to entertainers and invalid with respect to managers.

---

**6.** There is no evidence that managers even directly engage in expressive conduct as entertainers do. This point raises concern for the Court, which has not been addressed by the parties, as to whether managers are entitled to the same First Amendment protection as entertainers since their work does not entail "directly" engaging in the expressive conduct that entitles entertainers to that protection, namely topless dancing. The City does not appear to argue that managers are not entitled to First Amendment protection. Indeed, it appears that all parties *assume* that managers are entitled to such protection.

Without the benefit of argument on this issue, the Court concludes that managers are entitled to First Amendment protection. Because the work of managers furthers the primary purpose of sexually oriented businesses, which is to provide

a forum for expression that is controversial and protected—to a limited extent—under the First Amendment, the Court concludes that managers are protected. This result is in harmony with *TK's Video, Inc. v. Denton County*, 24 F.3d 705, 709-10 (5th Cir.1994), which recognized that licensing of clerks and other employees of adult businesses, who do not themselves engage in sexually oriented performances, must still be evaluated under a First Amendment analysis. *See also TK's Video, Inc. v. Denton County*, 830 F.Supp. 335, 343-44 (E.D.Tex.1993) (invalidating licensing requirement for stockholders, limited partners, equity holders, property owners, and others associated with adult businesses on the ground that such a requirement violated these individuals' First Amendment rights) (this portion of opinion not appealed).